**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

NETWORK-1 TECHNOLOGIES, INC.

                    *Plaintiff*,

vs.

HEWLETT-PACKARD COMPANY AND
HEWLETT PACKARD ENTERPRISE
COMPANY

                    *Defendants*.

CASE NO. 6:13-cv-072-RWS

**JURY TRIAL DEMANDED**

**Network-1 Technologies, Inc.'s**
**motion for new trial on infringement**

**[originally filed under seal]**

## Table of Contents

I.  Introduction. ................................................................................................................ 1

II.  The Court should grant a new trial on infringement because the verdict was
against the great weight of the evidence. ............................................................... 1

    A.  A finding that HP's detection current is not a "low level current" would be
    against the great weight of the evidence. ................................................... 2

        1.  A "low level current" must be sufficient to "begin start up" of an
        access device, not "cause start up." ........................................... 2

        2.  Network-1 presented compelling evidence that HP's detection
        current is sufficient to "begin start up" of an access device. ..................... 4

        3.  HP's counter evidence was irrelevant because it applied a claim
        construction proposal that this Court rejected. ........................... 9

    B.  A finding that no HP accused product used a "main power source" would
    be against the great weight of the evidence. .......................................... 12

        1.  Undisputed evidence demonstrates that two categories of accused
        HP switches use a single power supply that performs both required
        functions of the "main power source." ..................................... 12

        2.  The evidence also demonstrates, overwhelmingly, that the
        remaining HP switches use a single power supply that performs
        both required functions of the "main power source." .............................. 14

III.  The Court should also grant a new trial on infringement because HP elicited
evidence and made arguments based on a rejected claim construction. ........................... 17

IV.  Conclusion. ............................................................................................................ 18

## Table of Authorities

**Cases**

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
   749 F.3d 1349 (Fed. Cir. 2014) ................................................................................ 13

*Chicago Mercantile Exch., Inc. v. Tech. Research Grp., LLC*,
   782 F. Supp. 2d 667 (N.D. Ill. 2011) ......................................................................... 9

*Chimie v. PPG Industries, Inc.*,
   402 F.3d 1371 (Fed. Cir. 2005) ................................................................................ 13

*Cucuras v. Sec'y of Dep't of Health & Human Servs.*,
   993 F.2d 1525 (Fed. Cir. 1993) ................................................................................ 15

*DataTreasury Corp. v. Wells Fargo & Co.*,
   2010 WL 5140732 (E.D. Tex. Sept. 27, 2010) ........................................................... 9

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
   575 F.3d 1312 (Fed. Cir. 2009) ............................................................................ 9, 17

*Guar. Serv. Corp. v. Am. Emp's Ins. Co.*,
   893 F.2d 725 (5th Cir. 1990) ................................................................................... 17

*Hypoxico, Inc. v. Colorado Altitude Training LLC*,
   2012 WL 3705006 (S.D.N.Y. Aug. 28, 2012) ............................................................ 17

*Liquid Dynamics Corp. v. Vaughan Co.*,
   449 F.3d 1209 (Fed. Cir. 2006) .................................................................................. 9

*Medtronic Navigation, Inc. v. Brainlab Medizinische Computersystems GMBH*,
   417 F. Supp. 2d 1188 (D. Colo. 2006) ................................................................. 17, 18

*Shows v. Jamison Bedding, Inc.*,
   671 F.2d 927 (5th Cir. 1982) ................................................................................. 1, 2

*Wavetronix v. EIS Elec. Integrated Sys.*,
   573 F.3d 1343 (Fed. Cir. 2009) .................................................................................. 9

**List of Exhibits**

| | |
|---|---|
| **Ex. 1** | U.S. Patent No. 6,218,930, trial exhibit P1 ('930 patent) |
| **Ex. 2** | HP-Dkt. [1] 74 – 11/6/2017 trial transcript |
| **Ex. 3** | HP-Dkt. 75  – 11/7/2017 am trial transcript |
| **Ex. 4** | HP-Dkt. 76 – 11/7/2017 pm trial transcript |
| ██████ | ████████████████████████████████ |
| **Ex. 6** | HP-Dkt. 79 – 11/9/2017 am trial transcript |
| **Ex. 7** | HP-Dkt. 80 – 11/9/2017 pm trial transcript |
| **Ex. 8** | HP-Dkt. 83 – 11/10/2017 trial transcript |
| **Ex. 9** | HP-Dkt. 84 – 11/13/2017 trial transcript |
| **Ex. 10** | HP-Dkt. 85 – 11/8/2017 am trial transcript [redacted] |
| **Ex. 11** | P122 – IEEE 802.3af PoE Powered Device Controllers Data Sheet |
| **Ex. 12** | P245 – HP Power over Ethernet Planning and Implementation Guide |
| **Ex. 13** | Diagrams from HP's direct examination of Dr. Davis |
| **Ex. 14** | Dkt. [2] 596-5 – Cisco *Markman* order |
| **Ex. 15** | Dkt. 634 – *Markman* hearing transcript |
| **Ex. 16** | Dkt. 693 – *Markman* order |
| **Ex. 17** | Dkt. 817-6 – Cisco *Daubert* order |
| **Ex. 18** | Dkt. 964 – *Daubert* order |
| ██████ | ██████████████████████████████ |
| ██████ | ███████████████████████████████ |
| ██████ | ██████████████████████ |

---

[1] "HP-Dkt." refers to the docket in *Network-1 Technologies, Inc. v. Hewlett-Packard Company and Hewlett Packard Enterprise Company*, severed case 6:13-cv-00072.

[2] "Dkt." refers to the docket in *Network-1 Technologies, Inc. v. Alcatel-Lucent USA Inc., et al.*, consolidated case 6:11-cv-00492.

## I.     Introduction.

At trial, HP asserted two non-infringement theories: (1) HP's detection current is not a "low level current," and (2) HP's switches do not use a "main power source." [3]

For "low level current," Network-1 presented undisputed evidence that HP's detection currents satisfied the Court's actual construction of "low level current."  HP's rebuttal evidence was completely irrelevant: it only showed that HP does not infringe under its own, rejected claim construction proposal for "low level current."  For "main power source," Network-1 presented undisputed evidence that certain categories of HP switches include a "main power source" that satisfies the claim requirements.  HP ignored those switches and focused on other accused switches.  That tactic cannot sustain a verdict of non-infringement.  If only a single accused HP switch infringes, a verdict of non-infringement is against the great weight of the evidence.

Because a finding of non-infringement based on either theory would be against the great weight of the evidence, the Court should grant a new trial on infringement.

In addition, the Court should grant a new trial to remedy HP's improper evidence and arguments based on a rejected claim construction.  This evidence and argument was improper, highly prejudicial, and likely influenced the jury.

## II.    The Court should grant a new trial on infringement because the verdict was against the great weight of the evidence.

A court should grant a new trial when a verdict is "against the great weight of the evidence." *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 931 (5th Cir. 1982).  The Court "need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence." *Id*. at 930.  This standard "is lower than that for a directed verdict or a judgment

---

[3]  Ex. 2 (HP opening) 212:8-9, 214:6-8; Ex. 7 at 12:12-23.  Network-1 presented extensive evidence that HP's accused products satisfied the other claim elements, which HP did not dispute at trial.  Ex. 3 at 109:5-126:22; Ex. 4 at 3:14-80:19.

notwithstanding the verdict," and a verdict can be against the "great weight of the evidence, and thus justify a new trial, even if there is substantial evidence to support it." *Id*.[4]

### A. A finding that HP's detection current is not a "low level current" would be against the great weight of the evidence.

#### 1. A "low level current" must be sufficient to "begin start up" of an access device, not "cause start up."

At the *Markman* hearing, a key dispute was whether a "low level current" must be sufficient to "begin start up" of an access device (as Network-1 argued) or whether it must be sufficient to "cause the access device to start up" (as HP argued). Ex. 16 at 11-12.

A current sufficient to "*begin start up*" of an access device requires a current high enough to begin the process[5] of starting up the access device. This is met if the current begins to start up a component in the device. For example, in the '930 preferred embodiment, the low level current reaches a component of the access device—a "dc-dc switching supply." '930 patent at 3:12-16. That single component "begin[s] to start up but the low level current is unable to sustain the start up." *Id*. at 3:15-16. The low level current does not complete start up of that single component, much less the entire device. Completed start up does not happen unless and until the switch determines—using the "low level current"—that it is safe to send operating power.

By contrast, a current sufficient to "*cause the access device to start up*" could have been interpreted to require a current high enough to cause the access device to actually start up, i.e., to not just begin but complete start up. That theory is fundamentally wrong. As Network-1 pointed

---

[4] In this Motion, internal quotations and citations are omitted and emphasis is added (unless otherwise noted).

[5] The Court ruled that "'start up' is not purely instantaneous but rather must occur over some period of time." Ex. 18 at 7. "'[S]tart up' of a PD (access device) is the process that it goes through as it proceeds from no power, to the point where it becomes fully operational." Ex. 17 at 6, n.3.

out, requiring a "low level current" to actually cause an access device to start up (rather than just begin start up) was "[d]irectly contrary to the whole purpose of the invention, [6] and contrary to the actual preferred embodiment" [7] from which the Court derived the construction.  Ex. 15 at 64:11-24, 73:12-74:2.

As the '930 patent specification explains, only after detecting the appropriate voltage in response to the "low level current" is "the power output to the remote equipment" increased to a level that actually causes start up such that the access device "becomes active."  '930 patent at 3:12-22.  For phone 62 (the access device in Figure 3), "becom[ing] active" would include the lights and display screen turning on, none of which happens when the "low level current" is delivered.  Network-1 explained: "The preferred embodiment didn't say it's sufficient to cause the access device to start up, it says we've got a ... component in that device that begins to start up.  [Defendants] leave out 'begin.'"  Ex. 15 at 64:11-24.  A "low level current" cannot complete start up of that one component, much less the entire access device.

The Court agreed with Network-1 and held that a "low level current" need not "cause start up" but need only "begin start up:"

> start up.  *See D-Link Markman Order* at 8-10; *see also Cisco Markman Order* at 15-16.  The current need not be sufficient to result in a completed start up and thus the prior construction from *D-Link* and *Cisco* must be clarified.  The current must be sufficient to "begin start up" rather than "cause start up," thus eliminating any implication that the current must be sufficient to result in a completed start-up.  *See* '930 Patent at 3:12-17.

---

[6]  The purpose of sending a detection current is to determine whether an access device can accept power sufficient to cause the device to start up before sending that power.  '930 patent at 3:17-22; Ex. 3 at 104:6-20.  Sending a detection current sufficient to cause a device to start up would damage devices not designed to accept remote power.  *Id.*

[7]  Requiring a "low level current" to cause an access device to start up would have excluded the '930 preferred embodiment in which the low level current causes only a single component in the access device to begin to start up and is not sufficient to start up that component, any other component, or the rest of the device.  '930 patent at 2:66-3:16.

Ex. 16 at 11.  Accordingly, the construction requires that a "low level current" be high enough to

begin the start up process of the access device; it does not require that the current be so high as to

cause the access device to actually start up.

> **2.      Network-1 presented compelling evidence that HP's detection current is sufficient to "begin start up" of an access device.**

Applying the Court's construction, the evidence presented at trial demonstrated that HP's

detection current is a "low level current" because it is sufficient to "begin start up" of the access

device. [8]  As explained above, a "low level current" must be sufficient to begin the process of

starting up the access device.  A current is at that level if it reaches a component in the access

device (e.g. the dc-dc switching supply in the preferred embodiment) and that component

consumes power from the current and begins to start up.  '930 patent at 3:14-16 ("the remote

power supply [is] beginning to start up but the low level current is unable to sustain the start

up"); Ex. 7 (Davis cross) 87:6-8 ("if an access device begins to start up, it has a component that's

consuming power"). [9]

Network-1 presented compelling evidence that HP's detection current begins start up of

the access device much in the same way as the "low level current" in the '930 patent preferred

embodiment—it reaches at least one component in the access device that begins to start up.

Using a circuit diagram from a data sheet, Dr. Knox showed that HP's detection current causes

---

[8]  The Court construed "low level current" as "a non-data-signal current that is sufficient to begin start up of the access device but that is not sufficient to sustain the start up."  Ex. 16 at 12.  HP does not dispute that HP's detection current satisfied the other two requirements of the construction—it is "a non-data signal current" (Ex. 4 (Knox direct) 55:23-56:15 ("definitely a non-data signal current"), and "not sufficient to sustain the start up" of an access device (Ex. 6 (Tremblay direct) 44:15-23 ("can never … sustain that start up").

[9]  To be a "low level current" it is not necessary for a current to begin to start up the same component that began to start up in the preferred embodiment.  Ex. 17 at 5-6 (granting *Daubert* because expert improperly "limits the meaning of 'start up' to the preferred embodiment where the DC-DC switching power supply internal to the access device" begins to start up) ▌ ███████████████████████████████████████████████  Rather, the "low level current" may begin to start up any component in the access device.

not just one but multiple components in an access device to consume power and begin to start up,

including center tap transformers , bridge diodes , capacitors , and integrated

circuits: .



Ex. 11.  Dr. Knox testified that HP's detection current causes these components "to consume

power … they begin to start up … there are active components in there that are impacted by the

low level current … the device has begun to start up."  Ex. 4 at 62:1-23.  He further testified that

these components "are actually used when the access device is actually running, actually

operating" to "separate the data" and allow the device to transmit and receive data (i.e., to

operate as an access device).  *Id.* at 60:13-62:23.

HP's witnesses reinforced Dr. Knox's testimony.  They confirmed that HP's detection

current causes these components to consume power [10] and "work during the detection phase:"

> 20   Q.         (By Ms. Doan) Can you tell us whether the <u>components</u>
> 21   that <u>Mr. Dovel covered on P122-1</u> during operational
> 22   circuitry, do they or do they not work during detection
> 23   circuitry – during the detection phase?
> 24   A.     Yes, ma'am.  <u>Several of those do work during the</u>
> 25   <u>detection phase</u>.

---

[10]  HP's expert confirmed that "each of these components we've got highlighted in
yellow here will begin to consume power from the detection current."  Ex. 7 (Davis cross) 92:4-
8; Ex. 6 (Tremblay direct) 20:5-7 (HP's detection current is "consuming some current in the
access device").

Ex. 6 (Tremblay redirect) 70:20-71:4.  For a component to "work," it must first begin to start up.  Accordingly, the only way these components could "work during the detection phase" is if they first began to start up.  And because the only power available to these components "during the detection phase" is from HP's detection current (*see* Ex. 10 (Wright via deposition) 89:5-10), HP's detection current must necessarily be sufficient to begin to start up these components.

For example, the capacitor  is an essential component in the access device for "noise filtering."  Ex. 4 (Knox direct) 61:5-7; *id.* (Knox cross) 151:14-25.  For the capacitor to begin to start up, and then operate, it needs power to charge.  It is undisputed that HP's detection current provides sufficient power to charge and start up the capacitor.  Mr. Dwelley admitted "[t]he detection current must charge that capacitor before detection can proceed."  Ex. 6 at 130:25-132:7; Ex. 10 (Knox redirect) 46:23-47:11 ("we have capacitors that charged up" from HP's detection current).  Accordingly, it is undisputed that HP's detection current is sufficient to start up a component the access device—in this example, the capacitor.

Consistent with this undisputed evidence, HP's witnesses also admitted that a current of "a hundred microamps would be sufficient to begin start up" of an access device, and that HP's detection current is higher than that level—the "current levels are between 165 and 275 microamps."  Ex. 7 (Davis cross) 82:16-20, 83:12-18; Ex. 6 (Dwelley direct) 112:23-113:12.  These admissions, in themselves, prove that HP's detection current satisfies the Court's construction.

Faced with Network-1's undisputed evidence, HP attempted to sidestep the issue by asserting that these components that begin to start up are not "part of the access device":

```
13  Q.  And [Dr. Knox] showed it going through a number of components in
14  the access device, right?
15  A.  Now that's in the interface, yes.
16  Q.  These are part of the access device, right?
```

17  A.   <u>That's part of the interface on the access device</u>.
18  Q.   But <u>part of the access device</u>?
19  A.   <u>No, sir</u>.

12  Q.   And at a minimum you would agree that this chip and
13  these center tap transformers are essential components during
14  the operation of the access device, true?
15  A.   <u>That does not make them part of the access device which</u>
16  <u>they are not</u>.

Ex. 7 (Davis cross) 87:13-19, 89:12-16.  These assertions are contrary to the undisputed evidence

applying the Court's construction of "access device."

The Court defined "access device" as "a device that can receive and transmit data over a

network." Ex. 16 at 25.  Therefore, the essential components of an access device (i.e., those that

make it an access device) are (1) components used to receive and transmit data over a network,

and (2) components that provide the power needed to receive or transmit data (such as the dc-dc

switching supply [11] in the preferred embodiment).  Take away either category and there is no

"device that can receive and transmit data over a network."  An access device may have

additional components that are optional and not essential (such as lights or display screens).  But

those are not the components that make a device an "access device."  The components that make

a device an "access device" are those that allow the device to "receive and transmit data over a

network."  To be a "low level current," HP's detection current must begin to start up one of those

components.  And that is what the undisputed evidence showed.

The components that Network-1 identified as beginning to start up as a result of HP's

detection current are essential to the devices' core functions of receiving and transmitting data.

It is undisputed that the center tap transformers are essential components in the access device

that receive and transmit data. Ex. 4 (Knox direct) 60:21-24 ("center tap transformers … are

---

[11] In the '930 preferred embodiment, this dc-dc switching supply, used to provide
operating power, is the component that begins to start up as a result of the "low level current."
'930 patent at 2:66-3:16.

used to separate the data"); *id.* at 81:9-82:2 ("The center tap transformers, you need transformers even if you're just going to send and receive data"); Ex. 10 (Knox redirect) 45:13-24 ("these transformers … that's where the data … comes over").  It is also undisputed that the diode bridge, capacitor, and PoE chip are critical to providing operating power when receiving and transmitting data—if these components were removed, "the whole thing would just stop operating."  *Id.* at 45:6-12; Ex. 4 (Knox Direct), 60:25-61:4, 61:8-14; Ex. 8 (Knox rebuttal) 150:22-151:6 ("any one of those, if you remove it from the circuit, you don't have a working phone more.  It's dead.").

Nor are these components physically separate from the other components of the access device, as HP suggested.  As demonstrated in a diagram of an access device (used by HP's expert at trial and shown to the right), the components that Network-1 identified are located in the heart of the access device, on the same circuit board as other operating components.  The PoE chip is highlighted in purple (Ex. 7 (Davis direct) 22:2-8), and the center tap transformer (labeled with the transformer symbol ▦) is highlighted in orange. [12]  Ex. 13.



Access Device

Finally, HP's own witnesses confirmed that the components that Network-1 identified are "operational circuitry" "used during the operation of the access device" and are "an important part of the operation of this access device."  Ex. 7 (Davis cross) 87:20-89:11. [13]

---

[12] The transformer ▦ "at the top" of P122 (Ex. 11 at 1; Ex. 4 (Knox direct) 60:18-24) corresponds to the transformer ▦ in the center of the access device in HP's diagram.

[13] Ex. 7 (Davis cross) 88:17-89:11 ("components that the detection current went through that were used during the operation of the access device when it was fully operational … includes the center tap transformers ... diode…capacitor … PoE chip"), *id.* at 87:20-23 ("an important part of the operation of this access device is that this transformer here, the center tap

Accordingly, undisputed evidence established that HP's detection current was sufficient to begin start up of essential components in the access device.  HP's response that those components are "not part of the access device" is false and should be given no weight.

### 3.      HP's counter evidence was irrelevant because it applied a claim construction proposal that this Court rejected.

A non-infringement verdict must be based on comparing the properly construed claims to the accused device.  *Wavetronix v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed. Cir. 2009) ("Infringement analysis [requires] compar[ing] the accused device to the claims as construed.").  "Once a district court has construed the relevant claim terms … then that legal determination governs for the purposes of trial.  No party may contradict the court's construction to a jury." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009). Evidence and argument showing that an accused product does not meet the requirements of a claim construction that was not adopted but in fact rejected by the Court is completely irrelevant. *Liquid Dynamics Corp. v. Vaughan Co*., 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) ("expert opinion evidence [is] irrelevant" where it is "based on an impermissible claim construction"); *DataTreasury Corp. v. Wells Fargo & Co.*, 2010 WL 5140732, at *6 (E.D. Tex. Sept. 27, 2010) (expert opinions were "outside of the Court's claim construction and thus as a matter of law cannot support the jury's finding"); *Chicago Mercantile Exch., Inc. v. Tech. Research Grp., LLC*, 782 F. Supp. 2d 667, 673 (N.D. Ill. 2011) ("evidence based upon a mistaken construction of a patent is irrelevant").

---

transformer"); Ex. 6 (Tremblay cross) 63:18-64:25 (HP's "detection current is going … through various components … of that access device" which are "used when it's fully operational … [T]he center tap itself [is] used when it's fully operational … [It is part] of the operational circuitry"), *id*. at 66:3-67:13 (when an HP phone is operating, a current will "go through the center tap transformers… though the diodes… charge the capacitor…" and "go through the – this integrated circuit … The center tap transformers are used during full operation … The diodes are used during full operation" the "capacitor [is used during full operation]").

Under the Court's actual construction of "low level current," HP's detection current must be "sufficient to begin start up of the access device."  The Court rejected HP's proposal that the "low level current" has to be at a higher level—high enough to cause an access device to actually start up.  A "low level current ... need not be sufficient to result in a completed start up."  Ex. 16 at 11.  Accordingly, to counter Network-1's infringement evidence, HP would have had to present evidence that HP's detection current does not reach any component in the access device and cause that component to begin start up.  By contrast, it would be irrelevant for HP to elicit testimony that HP's detection current is not sufficient to cause the device to actually operate—for example, to cause the external indicator lights and display screen on a phone to turn on, or the phone be operational and ready to make calls.  That would only be relevant to showing non-infringement if the Court had adopted HP's rejected claim construction proposal.  But that irrelevant testimony is exactly what HP elicited.

HP and its witnesses asserted their conclusion—that HP's detection current does not "begin start up" of an access device.  But that conclusion was arrived at by applying HP's rejected construction.  HP's witnesses confirmed that when they attempted to determine whether HP's detection current was a "low level current" what they were looking for was actually something else—they were looking to see whether the detection current was sufficient to actually start up the access device and cause it to become operational:

- "'begin start up'… refer[s] to the point when <u>the device gets operational power</u> and <u>begins to do its operational functions</u>" (Ex. 6 (Tremblay cross) 57:3-9);

- "we know that it's <u>not beginning to start up</u> the access device" because "<u>the phone is not on</u>.  …. There's <u>no display</u>.  <u>Can't make a phone call</u> with it.  It's … <u>nonoperational</u>" (Ex. 6 (Tremblay direct) 23:24-25:7);

- "the way this low level current is going to work" is that "it's <u>going to start up the access device</u>" (Ex. 7 (Davis direct) 18:3-13 ("it <u>starts up</u>, but then it's not sufficient

to sustain").

What is worse, HP's witnesses further required that, to "begin start up," the ancillary circuitry in the access device visible to a user also needed to actually turn on and start operating—i.e., "lights turning on… red light is turned on."  Ex. 6 (Tremblay direct) 24:9-25, 26:25-27:13.

The vast bulk of HP's evidence applied the rejected construction.  HP's witnesses required a "low level current" to be high enough to "start up," "turn on," and "begin to operate" an access device.  Ex. 7 (Davis cross) 82:2-83:4 ("the access device has not started up because it doesn't have 30 volts"), *id*. (Davis direct) 37:7-39:20 ("we don't turn on the access device until we've got at least 30 volts … the access device has got [to] receive 30 volts and whatever current is associated with it in order to turn on and begin to operate"); Ex. 6 (Tremblay direct) 26:3-12 ("we don't allow that start up and turn-on to the operational circuitry until its gets just above around 38 volts"), *id*. at 25:20-23 ("although there's current being sent, the phone is not usable"), *id*. at 19:4-17 (based on HP's detection current, [the phone] is not functioning.  You can't make phone call with it").

At trial, HP demonstrated that the components of a phone visible to a user (e.g. the indicator light and display screen) do not turn on and the phone does not actually operate when a 10 volt detection current is delivered—the access device is "not functioning.  You can't make a phone call with it."  Ex.6 (Tremblay direct) 17:22-19:17.  Based on this demonstration, HP argued that its 10 volt detection current is not a "low level current" because 30 volts is required "to turn on and begin to operate" an access device.  Ex. 7 (Davis direct) 39:7-41:13.  But HP's demonstration only confirmed that HP's 10 volt detection current does not cause start up—i.e., it does not allow you to "make a phone call" and is not "sufficient to result in a completed start

up." Ex. 16 at 11. [14]  HP's demonstration did not show that HP's detection current is not

sufficient to begin the start up process by beginning to start up an essential component of the

access device. [15]

A non-infringement verdict must be based on comparing the properly construed claims to

the accused device.  The undisputed evidence applying the Court's actual construction

demonstrated that HP's detection current is a "low level current."  HP's rebuttal evidence applied

a construction rejected by the Court.  That evidence is irrelevant.  Accordingly, a verdict of non-

infringement based on "low level current" is against the great weight of the evidence.

**B.      A finding that no HP accused product used a "main power source" would be
against the great weight of the evidence.**

**1.      Undisputed evidence demonstrates that two categories of accused HP
switches use a single power supply that performs both required
functions of the "main power source."**

The '930 claim language includes two requirements for a "main power source"

(1) "supply power to the data node," i.e., the switching functionality, and (2) "delivering a low

level current from said main power source to the access device."  '930 patent at 4:56-62. [16]  If

---

[14] Delivering a detection current at a level sufficient to operate an access device such that
one could "make a phone call with it" would damage devices that are not designed to accept
remote power.  Ex. 6 (Tremblay direct) 17:22-19:17, 22:7-23.  The purpose of the '930 patent is
to avoid delivering power at such a level until the system first determines, using the "low level
current," that the access device can accept such remote power.  *See* Ex. 14 at 1 ("damage can
occur when power is delivered to an access device that is not designed to accept it").

[15] When HP's detection current was delivered to the phone in HP's trial demonstration,
that phone looked exactly like phone 62 of Figure 3 of the '930 patent when the low level current
of the preferred embodiment is delivered to phone 62.  In the preferred embodiment, the low
level current is not sufficient to turn on the power supply inside the phone ('930 patent at 2:66-
3:17) and, as a result, no current even reaches any lights or screen of phone 62.  There would be
nothing to observe—no lights would go on, no screen would flicker.  To the eye, both the phone
in Figure 3 and the phone in HP's demonstration would be "doing absolutely nothing"—"[i]t's
not functioning."  Ex. 6 (Tremblay direct) 19:4-17.

[16] The construction of "main power source" also requires that the source be a "DC power
source."  Ex. 16 at 25.  It is undisputed that the HP's power supplies are DC power sources.  Ex.
3 at 121:8-19 ▓▓▓▓▓▓▓▓▓▓▓

<u>any</u> accused HP switch includes a "main power source" that satisfies these requirements, then a

finding that HP does not infringe this element would be against the great weight of the evidence.

This is because if even a single accused HP switch infringed, a non-infringement finding is

improper. *Chimie v. PPG Industries, Inc.*, 402 F.3d 1371, 1382 (Fed. Cir. 2005) (remanding

summary judgment of non-infringement—although two products did not infringe, there was a

genuine issue of fact that a third infringed); *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d

1349, 1367 (Fed. Cir. 2014) ("there is no 'rare infringement' exception to liability… even one

instance of infringement is adequate to support a judgment of infringement").  Accordingly, if

the evidence proved that certain HP switches had a "main power source" but others did not, then

a verdict of non-infringement was against the great weight of the evidence.  Damages could be

reduced to account for the amount of infringement, but a verdict of no infringement would be

improper. *Braintree*, 749 F.3d at 1367 ("The law responds to rare infringement not by

eliminating liability, but by providing for a correspondingly low award of damages.").

At trial, there was undisputed evidence demonstrating that two types of HP accused

switches have a single power source that provides power for both the switch itself and for the

detection current, and therefore satisfies the "main power source" limitation.

<u>Modular switches</u>:  HP witnesses testified that, "[f]or this particular power supply" used

in HP's accused "modular switches," the power used by the switch and for detection both come

from a DC output of a "single power supply":

> 22         Would you agree that <u>all the power</u> that's consumed
> 23  inside that switch, whether it's <u>for the switch fabric, for</u>
> 24  <u>detection</u>, whatever, <u>comes through that DC output</u> on the
> 25  other <u>end of that single power supply</u>?
>  1  A.   <u>Yes, sir</u>.

Ex. 6 (Tremblay cross) 50:22-51:1, 47:6-17, 48:20-49:10 ("all of the power" comes from "that

output, that DC power"), 49:16-22, 51:2-8 ("Q.  Why didn't you tell the jury that in your direct

examination?  A.  We did not talk about this particular power supply in the direct examination."),
45:14-22.

_Switches with redundant power supplies_:  HP's witnesses testified for switches with a
primary power supply and redundant power supply, both the primary and redundant supplies
each individually performs the two "main power source" functions:  each provides 12 volts for
the switch and 54 volts for the detection current: ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████  154:15-156:10; Ex. 6 (Tremblay cross) 51:9-52:3 ("Even though we have two power
supplies, this is not a situation where the left one does 54 volts for Power over Ethernet and  the
right one does the switch fabric."). [17]

Because undisputed evidence demonstrates that certain accused HP switches use a power
supply that meets the claim requirements of a "main power source," a finding of non-
infringement based on this limitation is against the great weight of the evidence.

> **2.      The evidence also demonstrates, overwhelmingly, that the remaining
> HP switches use a single power supply that performs both required
> functions of the "main power source."**

The remainder of HP's switches use power structures that fall into two categories:
"structure A, structure B." [18] Ex. 7 (Davis cross) 107:6-13.  For power structure A, HP's expert
confirmed that "a <u>single</u> internal power supply … provides two isolated voltages," one for the

---

[17] The 12 volts provides power to the switch and the 54 volts provides power for the
detection current. Ex. 10 (Tremblay via deposition) 77:2-17 ("[T]he 12-volt is used for the
majority of the switching side … The 54 volts will be used for PoE-related circuity, such as
applying current and voltage in the detection process."); Ex. 3 at 121:8-19, 124:7-17; Ex. 4 at
170:11-13, 171:3-5.

[18] Power structure A consists of a power supply that has a single AC input and two
isolated DC outputs, one for the switch fabric and one for the PoE functions, including the
detection current. Ex. 7 at 114:12-16; ████████. Power structure B consists of a power
supply that has a single AC input and a single DC output that provides power for both the PoE
circuity (including the detection current) and, after being converted downstream, the switch. Ex.
7 at 107:14-108:10.

switch and one for the detection current.  *Id.* at 115:10-22. [19]  For power structure B, HP's expert

also confirmed that "one power supply" provides two voltages, one for the switch and one for the

detection current:

> 7        Question:  Do you agree, sir, that in this power
> 8     structure B, there is one power supply which provides two
> 9     isolated voltages?
> 10        Answer:  Yes.
> 11        Is that truthful testimony?
> 12  A.  Yes.

Ex. 7 (Davis cross) at 110:7-12. [20]

In addition to these clear admissions, Network-1 presented compelling evidence that

these switches use a "main power source," and HP responded with evidence that should be given

little, if any, weight.  Network-1 presented HP's pre-litigation documents stating that HP's

switches use a "single internal power supply" that provides power for the switch ("voltage[] for

the switch") and the for the detection current ("voltage[] for … PoE functionality"):

> The following examples only show the EPS connections, however, remember
> these switches use a single internal power supply which provides two isolated
> output voltages for switch and PoE functionality. One supply voltage provides
> power for the switch functionality while the isolated voltage provides power
> for the PoE functionality. If either voltage fails, the entire power supply shuts

Ex. 12 at 79, 83-84, 88, 98, 165.  In response, HP presented conflicting testimony that this

reference to a "single" supply referred to two power supplies.  *See* Ex. 7 (Davis cross) 115:7-

116:2.  "[O]ral testimony in conflict with contemporaneous documentary evidence deserves little

weight."  *Cucuras v. Sec'y of Dep't of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir.

1993).  Moreover, if HP's "single internal power supply" were actually two power supplies, HP

would certainly have at least one document supporting that fact.  ███████████████████

---

[19]  HP's expert confirmed that a "single power supply can produce multiple isolated DC
outputs."  Ex. 7 (Davis cross) 117:4-16 ("That was … my power supply configuration A.")
[20]  HP's expert referenced a third category, power structure C, but "didn't actually identify
any HP switches that have … power structure C."  Ex. 7 (Davis cross) 125:3-8.

█████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████ █████████████████████████

████████████████████████ As a result, a finding of non-infringement based on the

"main power source" element is against the great weight of the evidence.

### III. The Court should also grant a new trial on infringement because HP elicited evidence and made arguments based on a rejected claim construction.

"Once a district court has construed the relevant claim terms … [n]o party may contradict

the court's construction to a jury." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321

(Fed. Cir. 2009).  If a party presents evidence based on an alternative construction, the verdict

should be put aside, especially when the Court specifically rejected that alternative construction.

*See Medtronic Navigation, Inc. v. Brainlab Medizinische Computersystems GMBH*, 417 F. Supp.

2d 1188, 1201 (D. Colo. 2006) (setting aside a verdict because it "resulted from [party's]

deliberate distortion of the court's claim construction rulings") *aff'd.*, 222 F. App'x 952 (Fed.

Cir. 2007) (non-precedential); *Hypoxico, Inc. v. Colorado Altitude Training LLC*, 2012 WL

3705006, at *4 (S.D.N.Y. Aug. 28, 2012) (granting JMOL and reversing a verdict of

infringement because the "attorney in summation did not essentially base his argument on … the

court's construction, but presented to the jury the argument which he had proposed to the court,

and which the court had rejected").  Improper arguments "become the basis for granting a new

trial when the trial judge, with the benefit of his or her first hand knowledge of the entire

proceedings, believes that the remarks infected the deliberations and conclusions of the jury."

*Guar. Serv. Corp. v. Am. Emp's Ins. Co.*, 893 F.2d 725, 729 (5th Cir. 1990).

The Court rejected "cause the access to start up" and included "begin start up" in in its

construction of "low level current" specifically to "eliminat[e] any implication" that a "low level

17

current" must actually start up an access device, i.e., to specifically preclude the very theory that HP presented at trial.  Ex. 16 at 11; *see* Section II(A)(1).  HP ignored the Court's ruling and elicited extensive testimony (recited above) applying the rejected construction.  Moreover, HP presented a physical demonstration showing that its detection current does not satisfy the rejected construction because it does not cause the access device to start up.  We know that the jury paid particular attention to, and was influenced by, this demonstration because the jury asked a specific follow-up question regarding this demonstration.  Ex. 6 at 85:18-86:18.

In addition, HP argued in its closing that its detection current is not a "low level current" because it does not satisfy the rejected construction—i.e., because it does not cause a phone to start up.  Ex. 9 at 115:15-19 ("The phone can't start until power gets to the operational circuity … The phone can't start until you have more than 30 volts."); *id*. at 115:24-25 ("at 10 volts forever, it's never going to start up").  "At trial [HP']s counsel ignored the [construction] … made by this court and misdirected the jury …. [HP's] disagreement with the court's claim construction does not give counsel license to mislead the jury by their presentation of evidence and argument."  *Medtronic*, 417 F. Supp. 2d at 1201; *Hypoxico*, WL 3705006, at *12 ("where a party repeatedly ignores the court's claim construction … the jury's verdict may be properly overturned").

The Court should grant a new trial because HP presented evidence and made arguments based on a claim construction of "low level current" that was expressly rejected by the Court.

**IV.    Conclusion.**

The Court should grant a new trial on infringement.

18

Date: February 2, 2018                                      Respectfully submitted,

                                                            By: /s/ *Sean A. Luner*
                                                                 Sean A. Luner
                                                                 CA State Bar No. 165443
                                                                 Gregory S. Dovel
                                                                 CA State Bar No. 135387
                                                                 Christin Cho
                                                                 CA State Bar No. 238173
                                                                 Jonas Jacobson
                                                                 CA State Bar No. 269912
                                                                 DOVEL & LUNER, LLP
                                                                 201 Santa Monica Blvd., Suite 600
                                                                 Santa Monica, CA 90401
                                                                 Telephone:  310-656-7066
                                                                 Email:  sean@dovel.com
                                                                 Email:  greg@dovel.com
                                                                 Email:  christin@dovel.com
                                                                 Email:  jonas@dovel.com

                                                                 T. John Ward, Jr.
                                                                 State Bar No. 00794818
                                                                 Claire Henry
                                                                 State Bar No. 24053063
                                                                 Andrea Fair
                                                                 State Bar No. 24078488
                                                                 WARD, SMITH & HILL, PLLC
                                                                 1127 Judson Road, Suite 220
                                                                 Longview, Texas 75601
                                                                 Telephone: (903) 757-6400
                                                                 Facsimile: (903) 757-2323
                                                                 Email: jw@wsfirm.com
                                                                 Email: claire@wsfirm.com
                                                                 Email: andrea@wsfirm.com

                                                            ATTORNEYS FOR PLAINTIFF,
                                                            NETWORK-1 TECHNOLOGIES, INC.


### Certificate of Service

I certify that this document is being served on counsel of record by email on the filing date listed above.

*/s/ Sean A. Luner*
Sean A. Luner

## **Certificate of Authorization to Seal**

I certify that the protective order governing this cause authorizes this document to be filed under seal.

*/s/ Sean A. Luner*
Sean A. Luner