**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

NETWORK-1 TECHNOLOGIES, INC.

          *Plaintiff*,

vs.

HEWLETT-PACKARD COMPANY AND
HEWLETT PACKARD ENTERPRISE
COMPANY

          *Defendants*.

CASE NO. 6:13-cv-072-RWS

**JURY TRIAL DEMANDED**

**Network-1 Technologies, Inc.'s**
**renewed motion for judgment as a matter of law and**
**motion for new trial on validity**

**[originally filed under seal]**

# Table of Contents

I.      Introduction.................................................................................................................. 1

II.     The Court should rule that HP failed to prove the asserted claims of the '930
        patent were obvious and should enter judgment of validity as a matter of law................. 3

        A.      HP failed to prove that the Fisher system is prior art and, as a result, HP
                was estopped from asserting the remaining obviousness combination. ................ 3

                1.      The Fisher system is not prior art because HP failed to meet its
                        burden of showing that the Fisher system was in "public use." ................ 4

                2.      HP failed to corroborate Dr. Fisher's testimony that the system was
                        used and that it had the key functionality he described. ............................ 7

                3.      HP is estopped from asserting the combination that remains once
                        the Fisher system is disqualified for not being prior art. .......................... 10

        B.      The Court should conclude that the claims were not obvious because HP's
                obviousness combination is missing three key claim elements. .......................... 11

                1.      HP's asserted obviousness combination is missing the important
                        "low level current" element. .................................................................. 12

                2.      HP failed to present evidence that its obviousness combination
                        taught the important "secondary power source" element. ........................ 16

                3.      HP failed to present evidence that its asserted obviousness
                        combination included a "main power source." ......................................... 19

        C.      The Court should conclude that the claims were not obvious because HP
                failed to provide sufficient motivation for the combination. ............................... 21

        D.      The Court should conclude that the claims were not obvious based on
                unusually strong objective evidence. .............................................................. 25

        E.      The Court should conclude that the asserted claims were not obvious. ............... 27

III.    The Court should also conditionally grant a new trial on validity.................................... 28

        A.      The Court should grant a new trial because the jury's verdict of
                obviousness is against the great weight of the evidence...................................... 28

        B.      A new trial should also be granted because Fisher's highly prejudicial
                testimony should have been excluded.............................................................. 29

        C.      A new trial should also be granted because HP made improper arguments
                in its closing that infected the jury's findings. ................................................. 30

                1.      HP improperly asserted in closing that Cummings disclosed "a low
                        level current."....................................................................................... 30

                2.      HP improperly asserted in closing that Mr. Godici believed that the
                        '930 patent was invalid based on extensive prior art and evidence. ......... 32

IV.    Conclusion. ................................................................................................................... 34

## Table of Authorities

**Cases**

*Alaniz v. Zamora-Quezada,*
  591 F.3d 761 (5th Cir. 2009) .................................................................... 34

*Allied Colloids, Inc. v. American Cyanamid Co.,*
  64 F.3d 1570 (Fed. Cir. 1995) .................................................................... 8

*Amgen Inc. v. F. Hoffman-La Roche Ltd,*
  580 F.3d 1340 (Fed. Cir. 2009) ................................................................ 25

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,*
  776 F.2d 281 (Fed. Cir. 1985) ............................................................ 29, 30

*ATD Corp. v. Lydall, Inc.,*
  159 F.3d 534 (Fed. Cir. 1998) .................................................................. 26

*August Tech. Corp. v. Camtek, Ltd.,*
  655 F.3d 1278 (Fed. Cir. 2011) ................................................................ 13

*Baby Buddies, Inc. v. Toys R Us, Inc.,*
  611 F.3d 1308 (11th Cir. 2010) .................................................................. 7

*Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.,*
  752 F.3d 967 (Fed. Cir. 2014) .................................................................. 23

*Carson v. Polley,*
  689 F.2d 562 (5th Cir. 1982) .................................................................... 33

*CFMT, Inc. v. Yieldup Int'l Corp.,*
  349 F.3d 1333 (Fed. Cir. 2003) ................................................................ 13

*Chemcast Corp. v. Arco Indus. Corp.,*
  913 F.2d 923 (Fed. Cir. 1990) .................................................................. 11

*Clock Spring, L.P. v. Wrapmaster, Inc.,*
  560 F.3d 1317 (Fed. Cir. 2009) .................................................................. 5

*Delano Farms Co. v. California Table Grape Comm'n,*
  778 F.3d 1243 (Fed. Cir. 2015) .................................................................. 4

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,*
  851 F.2d 1387 (Fed. Cir. 1988) ................................................................ 30

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,*
  567 F.3d 1314 (Fed. Cir. 2009) ................................................................ 26

*Dey, L.P. v. Sunovion Pharm., Inc.,*
  715 F.3d 1351 (Fed. Cir. 2013) .............................................................. 5, 6

*Edwards v. Sears, Roebuck & Co.,*
  512 F.2d 276 (5th Cir. 1975) .................................................................... 34

*Finnigan Corp. v. Int'l Trade Comm'n,*
  180 F.3d 1354 (Fed. Cir. 1999) ....................................................... 8, 11, 33

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  582 F.3d 1288 (Fed. Cir. 2009) ....................................................... 1, 19, 20, 31

*Guar. Serv. Corp. v. Am. Emp's Ins. Co.*,
  893 F.2d 725 (5th Cir. 1990) ........................................................................ 34

*Harrington Mfg. Co., Inc. v. Powell Mfg. Co.*,
  815 F.2d 1478 (Fed. Cir. 1986) ...................................................................... 5

*Honeywell Int'l, Inc. v. U.S.*,
  609 F.3d 1292 (Fed. Cir. 2010) .................................................................... 13

*In re Chapman*,
  595 F.3d 1330 (Fed. Cir. 2010) .................................................................... 25

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*,
  676 F.3d 1063 (Fed. Cir. 2012) .................................................................... 29

*In re Ethicon, Inc.*,
  844 F.3d 1344 (Fed. Cir. 2017) .................................................................... 27

*In re Fine*,
  837 F.2d 1071 (Fed. Cir. 1988) .................................................................... 25

*In re Magnum Oil Tools Int'l, Ltd.*,
  829 F.3d 1364 (Fed. Cir. 2016) .................................................................... 25

*Innogenetics, N.V. v. Abbott Labs.*,
  512 F.3d 1363 (Fed. Cir. 2008) .................................................................... 24

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
  751 F.3d 1327 (Fed. Cir. 2014) .................................................................... 23

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
  424 F.3d 1374 (Fed. Cir. 2005) .................................................................. 5, 8

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
  688 F.3d 1342 (Fed. Cir. 2012) .................................................................... 28

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*,
  381 F.3d 1142 (Fed. Cir. 2004) .............................................................. 19, 20

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
  579 F.3d 1363 (Fed. Cir. 2009) ...................................................................... 9

*McGinley v. Franklin Sports, Inc.*,
  262 F.3d 1339 (Fed. Cir. 2001) .............................................................. 25, 28

*Newell Companies, Inc. v. Kenney Mfg. Co.*,
  864 F.2d 757 (Fed. Cir. 1988) ................................................................ 28, 31

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
  520 F.3d 1358 (Fed. Cir. 2008) .................................................................... 30

*PAR Pharm., Inc. v. TWi Pharm., Inc.*,
  773 F.3d 1186 (Fed. Cir. 2014) .................................................................... 12

*Power Mosfet Techs., LLC v. Siemens AG*,
    378 F.3d 1396 (Fed. Cir. 2004) ............................................................. 15, 18

*Realtime Data, LLC v. Actian Corp.*,
    No. 6:15-cv-463-RWS-JDL (E.D. Tex. Apr. 3, 2017) ........................... 16

*Richardson-Vicks Inc. v. Upjohn Co.*,
    122 F.3d 1476 (Fed. Cir. 1997) ............................................................. 1, 30

*Rosco, Inc. v. Mirror Lite Co.*,
    120 F. App'x 832 (Fed. Cir. 2005) .......................................................... 11

*Shows v. Jamison Bedding, Inc.*,
    671 F.2d 927 (5th Cir. 1982) .................................................................. 32

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
    137 S. Ct. 1002 (2017) ............................................................................. 7

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001) .............................................................. 20

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) .............................................................. 33

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
    617 F.3d 1296 (Fed. Cir. 2010) .............................................................. 28

*Vizio, Inc. v. ITC*,
    605 F.3d 1330 (Fed. Cir. 2010) .............................................................. 13

*Winner Int'l Royalty Corp. v. Wang*,
    202 F.3d 1340 (Fed. Cir. 2000) .............................................................. 25

*WMS Gaming Inc. v. International Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999) .............................................................. 28

*Woodland Trust v. Flowertree Nursery, Inc.*,
    148 F.3d 1368 (Fed. Cir. 1998) ............................................................... 5

**Statutes**

17 U.S.C. § 408 ................................................................................................ 6

17 U.S.C. § 410 ................................................................................................ 6

35 U.S.C. § 102 ................................................................................................ 4

35 U.S.C. § 112 ................................................................................................ 9

35 U.S.C. § 315 .............................................................................................. 10

**Rules**

37 C.F.R. § 202 ................................................................................................ 7

Fed. R. Civ. P. 50 ....................................................................................... 3, 32

**Table of Exhibits**

| Ex. 1 | U.S. Patent No. 6,218,930, trial exhibit P1 ('930 patent) |
|---|---|
| **Ex. 2** | HP-Dkt. [1] 74 – 11/6/2017 trial transcript |
| **Ex. 3** | HP-Dkt. 75 – 11/7/2017 am trial transcript |
| **Ex. 4** | HP-Dkt. 76 – 11/7/2017 pm trial transcript |
| **Ex. 5** | HP-Dkt. 80 – 11/9/2017 trial transcript |
| **Ex. 6** | HP-Dkt. 82 – 11/10/2017 am trial transcript |
| **Ex. 7** | HP-Dkt. 83 – 11/10/2017 pm trial transcript |
| **Ex. 8** | HP-Dkt. 84 – 11/13/2017 trial transcript |
| **Ex. 9** | HP-Dkt. 85 – 11/8/2017 trial transcript [redacted] |
| **Ex. 10** | DX89 – Fisher photographs |
| **Ex. 11** | DX119 – U.S. Patent 5,345,592 (Woodmas) |
| **Ex. 12** | DX123 – WO 98/54843 (Fisher international) |
| **Ex. 13** | DX138 – U.S. Patent 6,496,105 (Fisher '105) |
| **Ex. 14** | DX139 – U.S. Patent 6,710,704 (Fisher '704) |
| **Ex. 15** | DX144 – U.S. Patent 5,991,885 (Chang) |
| **Ex. 16** | DX157 – U.S. Patent 5,994,998 (Fisher '998) |
| **Ex. 17** | DX500 – Fisher system photographs |
| **Ex. 18** | Dkt. [2] 693 – Claim construction report and recommendation |
| **Ex. 19** | Dkt. 811-2 – Invalidity contentions |
| **Ex. 20** | Dkt. 811-5 – Petition for IPR |
| **Ex. 21** | Dkt. 811-9 – IPR Final Written Decision |
| **Ex. 22** | Dkt. 832 – "Driving points" order |
| **Ex. 23** | Dkt. 860 – Claim construction order |
| **Ex. 24** | Dkt. 921 – Order overruling objections to "driving points" order |
| **Ex. 25** | Dkt. 1047-1 – Final election of prior art |
| **Ex. 26** | Dkt. 1050 – Order denying motion to strike litigation settlement agreements |
| **Ex. 27** | Dkt. 1064 – Order denying *Daubert* re: "secondary power source" |
| **Ex. 28** | Dkt. 1068 – Order granting MSJ re: estoppel |
| **Ex. 29** | Neikirk amended invalidity report |

---

[1] "HP-Dkt." refers to the docket in *Network-1 Technologies, Inc. v. Hewlett-Packard Company and Hewlett Packard Enterprise Company*, severed case 6:13-cv-00072.

[2] "Dkt." refers to the docket in *Network-1 Technologies, Inc. v. Alcatel-Lucent USA Inc., et al.*, consolidated case 6:11-cv-00492.

| Ex. 30 | ████████████████████ |
|--------|----------------------|
| Ex. 31 | Copyright Office Circular 40A |
| Ex. 32 | Email from HP's counsel – 11/5/2017 |

## I.      Introduction.

Network-1 moves the Court for an order concluding as a matter of law that the asserted claims were not obvious, renews its motion for judgment as a matter of law of validity, and moves for an order conditionally granting new trial on validity.

HP's invalidity case was limited to a single theory of obviousness.  Obviousness remains a question of law for the Court to decide.  That question should be decided in Network-1's favor.

"It is black letter law that the ultimate question of obviousness is a question of law." *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997).  The Court must "accept the factual findings, presumed from a favorable jury verdict, which are supported under the substantial evidence/reasonable juror standard," but the Court remains "the ultimate decision maker on the question of obviousness." *Id.*  "Where, as here, the jury made no explicit factual findings regarding obviousness, [the Court] must determine whether the implicit findings necessary to support the verdict are supported by substantial evidence." *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1294 (Fed. Cir. 2009).

For five reasons, the Court should conclude that the claims of the '930 patent were not obvious and enter a judgment of validity as a matter of law.

(1) HP's obviousness combination was estopped.  HP brought an *inter partes* review that resulted in all claims of the '930 patent being confirmed as valid.  HP was therefore estopped from asserting any ground for invalidity it raised or reasonably could have raised in that IPR, including obviousness based on a combination of Fisher, Woodmas, and Chang patents. Following the IPR, HP was unable to find any new prior art patents or publications that could not have been included in its IPR petition.  So HP took the prior art it already had—the Fisher, Woodmas, and Chang patents—and added the "Fisher system" (because a "system" cannot be presented in an IPR and is generally not subject to estoppel).  But for a "system" to be prior art, it

must have been publicly sold or used.  The "Fisher system" was not.  It was never sold or commercialized, and never used in public.  Its only use was by Dr. Fisher in his internal testing—i.e., in private, not in public.  Accordingly, the only prior art in HP's asserted combination was the Fisher, Woodmas, and Chang patents, which HP is estopped from asserting.

(2) <u>HP's obviousness combination was uncorroborated</u>.  HP's reliance on the Fisher system fails for a second, independent reason:  HP never corroborated Dr. Fisher's testimony that the system was in use—even *privately*—or that it actually included the claimed functionality.

(3) <u>HP's obviousness combination is missing key elements</u>.  HP's asserted combination also fails because it is missing three important elements.  First, as HP's expert Dr. Neikirk admitted, there is no "low level current" in the asserted prior art.  Ex. 7 at 54:7-13 ("I cannot conclude that [the patent] is obvious … because of that one missing element [a low level current].").  Second, there is no "secondary power source."  In fact, Dr. Neikirk did not even attempt to show that this element—and its construed requirements—was present in the asserted prior art.  And third, HP presented no evidence of a "main power source" that performs the two required functions: (1) supplying power to the data node and (2) delivering a low level current from the main power source to the access device.

(4) <u>HP failed to show a reason to combine</u>.  HP asserted that two of its references would be combined because the resulting system would be "simpler."  There was no further explanation.  Under controlling law, this conclusory assertion was legally insufficient to meet HP's burden of proving a reason to combine the asserted references.  Moreover, HP cannot meet its burden because the Chang patent expressly teaches away from the '930 invention.

(5) <u>The objective evidence precludes a conclusion of obviousness</u>.  Objective evidence of validity must always be considered and can be decisive.  Each of HP's major competitors licensed the '930 patent, collectively paying over $100 million.  This was powerful, unrebutted

objective evidence of non-obviousness, and it overrides HP's failed combination of references.

For the same reasons a validity judgment should be entered, the verdict was against the great weight of the evidence and the Court should conditionally grant a new trial.  Fed. R. Civ. P. 50(c)(1).  Moreover, a new trial is also warranted because HP made highly improper arguments.

During its closing, HP purported to relay to the jury the contents of a private, pre-trial conversation between HP's counsel and HP's expert, Nicholas Godici.  According to HP, Mr. Godici—a former commissioner for patents—told HP's counsel that "he could not believe how much prior art and how much evidence this case had with respect to this patent being invalid," and that he had "never seen this much prior art in any case before."  Ex. 8 at 123:14-18, 132:23-133:1.  That conversation never happened and those words were never spoken by Mr. Godici—certainly not at trial.  Indeed, Mr. Godici was not designated as an invalidity expert and did not provide any testimony about the validity of the '930 patent, much less say that he had never before seen so much invalidating prior art for a patent that had withstood two reexaminations and three IPRs.  Moreover, HP went on in its closing to assert a brand new theory—never before disclosed and not presented at trial—that the Cummings patent discloses the "low level current" that was missing from HP's asserted combination of references.  *Id.* at 131:20-132:1.  HP's improper arguments were made knowingly and deliberately, they were false, and they were highly prejudicial.  They independently warrant a new trial.

## II.    The Court should rule that HP failed to prove the asserted claims of the '930 patent were obvious and should enter judgment of validity as a matter of law.

### A.    HP failed to prove that the Fisher system is prior art and, as a result, HP was estopped from asserting the remaining obviousness combination.

At trial, HP asserted obviousness based on the combination of "the Fisher patents, the Fisher system, Woodmas, and Chang."  Ex. 8 (jury instructions) 63:15-17.  The combination thus included: (1) a collection of patents issued to Fisher, Woodmas, and Chang, and (2) "the Fisher

system."  The Fisher system is not prior art.  It is undisputed that the system was never sold,

publicly used, or otherwise made available to the public.  Moreover, HP failed to provide any

corroboration—not a single document, and no system or component demonstration—for Dr.

Fisher's testimony about the core functionality that the system was alleged to include.  Without

the Fisher system, what is left is the collection of patents—a collection that HP was estopped

from asserting.  Accordingly, the obviousness combination fails as a matter of law and cannot

support the verdict of invalidity.

   **1.  The Fisher system is not prior art because HP failed to meet its burden of showing that the Fisher system was in "public use."**

   HP did not contend the Fisher system was ever sold.  HP instead contended that the

Fisher system was prior art because it had been "in public use" by Dr. Fisher.  *See* Ex. 7 (Neikirk

direct) 22:7-9, 182:5-16. [3]  Thus, for the system to be prior art, HP had to prove it was "in public

use prior to the critical date."  *Delano Farms Co. v. California Table Grape Comm'n*, 778 F.3d

1243, 1250 (Fed. Cir. 2015); 35 U.S.C. § 102(a) & (b).

   To prove public use, HP had to provide clear and convincing evidence that use of the

Fisher system was "accessible to the public."  *Woodland Trust v. Flowertree Nursery, Inc.*,

148 F.3d 1368, 1370 (Fed. Cir. 1998) (applying § 102(a)); *Dey, L.P. v. Sunovion Pharm., Inc.*,

715 F.3d 1351, 1354-55 (Fed. Cir. 2013) ("public use" under § 102(b) is use that "(1) was

accessible to the public; or (2) was commercially exploited."). [4]

   For a system to be "accessible to the public," members of the public must be allowed to

---

[3]  Ex. 32 ("For the Fisher system, it is prior art under 35 USC § 102(a) & § 102(b)."). Section 102 refers to the pre-AIA version of 35 U.S.C. § 102 which applies because the '930 patent application was filed before March 16, 2013.

[4] There was no contention or evidence at trial that the Fisher system was "commercially exploited."  Dr. Fisher did not contend that his system was ever sold, advertised, or commercialized in any way.  Thus, only the "accessible to the public" prong of this test applies.

see it in use.  For example, public use occurs when executives from other companies are invited to view a public demonstration of all patent-practicing features of the system, *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009), or when the system is demonstrated for a journalist to gain favorable press, *Harrington Mfg. Co., Inc. v. Powell Mfg. Co.*, 815 F.2d 1478, 1481 (Fed. Cir. 1986).  In contrast, a company's internal testing of a system "is insufficient to create a public use."  *Invitrogen Corp. v. Biocrest Mfg.*, *L.P.*, 424 F.3d 1374, 1383 (Fed. Cir. 2005).  Indeed, that is the very point of such testing—to test the technology inside the walls of the company offices and outside the view of competitors and the public.

HP did not have and did not present any evidence at trial that the Fisher system or its use was ever "accessible to the public."  Instead, HP presented testimony from Dr. Fisher that his own use of the system was internal, not public.

Dr. Fisher testified that he developed his system while working and doing research for 3Com (a company HP bought), Ex. 6 at 123:14-24, 137:8-25, and that he tested the system inside the 3Com offices, *id*. at 131:16-19 ("to test it, we would, you know, plug that in, stick this into the front of the hub, and then take the 10BaseT wiring that was in the building and plug it in").  Dr. Fisher did not testify that he had ever shown his system to anyone outside of 3Com, such as to other companies, journalists, or the IEEE task force.  *Id.* at 138:1-8.  Dr. Fisher's testimony about his own internal testing is the <u>only</u> evidence that HP—through its invalidity expert—cited to support the contention that there was public use of the Fisher system.  Ex. 7 at 22:7-14 ("Dr. Fisher told us this morning that they built a system, they plugged it into the network at their offices and used it.").  As a matter of law, this internal testing was not a public use.  *Invitrogen*, 424 F.3d at 1383 ("that Invitrogen secretly used the cells internally to develop future products that were never sold, without more, is insufficient to create a public use bar to patentability").  At most, Dr. Fisher's testimony established that the system was tested by him at the 3Com offices.

That would be a private use, not a public use.

No other witness—lay or expert—provided any testimony that would even suggest, much less establish by clear and convincing evidence, that any use of the Fisher system "occurred in public," or that the public had "access to and knowledge" of its use.  *See Dey, L.P. v. Sunovion Pharm., Inc.*, 715 F.3d 1351, 1355 (Fed. Cir. 2013).

When confronted with this problem pre-verdict, HP asserted that one of the components of the Fisher system, an access point circuit board, bears the mark "Copyright 1996."  This mark, according to HP, "indicat[ed] that the copyright office had reviewed it and that it was available," and therefore in "public use." Ex. 7 at 182:11-16.  That is wrong on multiple levels.

*First*, marking a component with a copyright notice does not create an inference that the component was ever shown to, or registered with, the Copyright Office.  "Registration with the Copyright Office is permissive; it is not required before adding the symbol on a work that qualifies for copyright protection."  *Baby Buddies, Inc. v. Toys R Us, Inc.*, 611 F.3d 1308, 1321 n.20 (11th Cir. 2010); 17 U.S.C. § 408(a) ("Registration Permissive…[T]he owner of copyright … may obtain registration of the copyright claim…[R]egistration is not a condition of copyright protection.").  Moreover, registering an item with the Copyright Office creates a public record of the registration, including an application for registration and a certificate of registration.  17 U.S.C. § 408, § 410(a).  HP introduced no evidence of registration; and that absence of proof is itself strong evidence that no registration took place.

*Second*, had the circuit board component been registered, the board itself would not have been sent to the Copyright Office. [5]  Moreover, registering the copyright to the circuit board

---

[5] The Copyright Office does not ask for deposits of three-dimensional useful articles (such as a circuit board), much less an entire system that uses that useful article.  37 C.F.R. § 202.19 ("The following categories of material are exempt from the deposit requirements … (6)

would not be evidence that the entire Fisher system (i.e., all the other components) had also been sent to the Copyright Office and then fired up and used by the Copyright Office employees.

*Third*, had the circuit board component been sent to the Copyright Office, there is no evidence that the administrative employees at the Copyright Office—having no required technical background—went out and purchased or otherwise acquired the other components necessary for the Fisher system to function, connected them all together (without any instructions) to recreate Dr. Fisher's system, and then used the system.

HP failed to present any evidence that there was any public use of the Fisher system because there is no such evidence.  The system was never publicly used and, therefore, as a matter of law, is not prior art.  *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1383 (Fed. Cir. 2005); *Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1574 (Fed. Cir. 1995).

### 2.  HP failed to corroborate Dr. Fisher's testimony that the system was used and that it had the key functionality he described.

To rely on a system as prior art, HP must present evidence "corroborative of [Dr. Fisher's] *use of the claimed invention*."  *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1369 (Fed. Cir. 1999) (emphasis in original).  Dr. Fisher testified that he used a "Fisher system" that would "detect whether or not [an access device] was an Ethernet or a PoE" in 3Com's offices prior to the critical date.  Ex. 6 at 135:24-136:14.  Therefore, HP was required to present evidence that this "Fisher system" (1) actually was used prior to the critical date and (2) included

---

… any useful article.").  Instead, what is required is "identifying material" (e.g., a drawing or photograph of the board layout).  *See* 37 C.F.R. § 202.20 (xi)(A)(1); 37 C.F.R. § 202.2; Ex. 31. A drawing or photograph is all that is needed because only the visual layout of the board, that exists independently of its function, is copyrightable.  *See Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1008 (2017).  A drawing or photograph of a circuit board cannot be a public use of a system because it cannot be "used" (e.g., a drawing of a circuit board cannot detect a Power-over-Ethernet access device).

the functionality upon which HP relied in its obviousness case. *Finnigan*, 180 F.3d at 1367 ("a witness's uncorroborated testimony is equally suspect as clear and convincing evidence if he testifies concerning the use of the invention in public before invention by the patentee (§ 102(a)), [or] use of the invention in public one year before the patentee filed his patent (§ 102(b))"); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1375 n.4 (Fed. Cir. 2009).

The supposed use of the Fisher system in 3Com's offices was testified to by Dr. Fisher, but was never corroborated by any other witness or exhibit.  There was also no corroboration of Dr. Fisher's testimony that the "Fisher system" actually included the functionality he said it had (much less that this functionality was ever publicly used).

Dr. Fisher testified that his system would supply power to an "access point" by using an "authentication server" and "hub" that performed a "staged powering up" with a "current limit," and an "authentication process" that would "keep the power limited" during authentication, and then increase power. [6]  HP provided <u>no</u> corroboration for Dr. Fisher's testimony that his system could perform these functions, much less that such a system was ever in public use—not a single document, not a single word of testimony from a colleague of Dr. Fisher's, not a single second of demonstrating how the collection of components that supposedly formed part of the Fisher system did what Dr. Fisher said they did.

Instead, HP displayed on counsel's table the access point and related components that Dr. Fisher brought to his deposition.  Ex. 17; Ex. 6 (Fisher) 128:24-131:19 ("Those are the access

---

[6] Ex. 6 at 132:2-24 (describing the "staged powering up," "current limit," "authentication process," and ability to "increase the power limit."); *id*. at 132:25-133:12 (they would "keep the power limited during the initial association and authentication"); *id.* at 140:9-19; *id.* at 141:6-13 (describing authentication); *id.* at 141:21-142:13; *id*. at 131:16-19 (one part would be stuck into "the hub"); *id*. 140:9-19 (testifying about the operation of the switch in the Fisher system); *id.* at 140:20-26 (the data would be sent back to the "security server" in the "detection system that [Dr. Fisher] invented").

point motherboard, the access point, and the access point mounting bracket").  Missing from this collection: the authentication server and the hub/switch that supposedly performed the staged power up, detection, and authentication functions about which Dr. Fisher testified.  The few dormant components produced by Dr. Fisher did not corroborate the functionality of any system, much less the functions to which he testified.

What is worse, the access point components that Dr. Fisher brought to his deposition and that HP displayed at trial did not even relate to the system that supposedly had the staged power up, detection, and authentication functions.  Those functions were supposedly present in the *second* generation of Dr. Fisher's system, whereas the components presented were from the *first* generation of the system, which Dr. Fisher admitted did <u>not</u> include those functions.  Ex. 6 at 131:6-15, 135:24-136:14 ("this was a prototype that existed prior to us building it into the hub…there's pieces that I don't have here, which was the second generation of this stuff, that would detect whether or not it was an Ethernet or a PoE…I don't have that with me").

Indeed, not only did HP fail to present evidence corroborating its claim that the Fisher system was in public use and included an authentication method akin to the '930 patent's "low level current" detection, HP actually introduced evidence to the contrary—in the form of the Fisher patents.  Fisher and 3Com had every incentive to disclose all important elements of their system in their patent applications, both to allow for the broadest patent protection, and because it was required at the time by the "best mode" requirement. [7]  Therefore, if the staged power up, detection, and authentication functions to which Dr. Fisher testified were actually in the system he had developed, it is highly likely that those functions would have been mentioned in the

_____

[7] 35 U.S.C. § 112 (pre-AIA) ("The specification … shall set forth the best mode contemplated by the inventor of carrying out his invention"); *Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 930 (Fed. Cir. 1990) (patent is invalid "where the inventor has failed to disclose the only mode he ever contemplated of carrying out his invention").

Fisher patents.  But none of Fisher's patents says anything about those functions.  Ex. 6 (Fisher) 136:20-137:7; Ex. 12; Ex. 13; Ex. 14; Ex. 16.

Accordingly, because HP failed to introduce evidence corroborating any use of the Fisher system or its key functionality, it cannot server as an invalidating prior art reference.  *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1369-70 (Fed. Cir. 1999) ("This testimony is…not corroborative of Jefferts' use of the claimed invention.…[W]hat we are left with is Jefferts' testimony concerning his alleged public use," which is "insufficient as a matter of law to establish invalidity of the patent."); *Rosco, Inc. v. Mirror Lite Co.*, 120 F. App'x 832, 837 (Fed. Cir. 2005) ("None of the evidence relied upon by the trial court provided sufficient corroboration that Exhibit 110 has [the claimed limitation] … [T]here was no basis for a finding of invalidity in the absence of such proof.").

### 3.       HP is estopped from asserting the combination that remains once the Fisher system is disqualified for not being prior art.

Once the Fisher system is removed from HP's asserted combination because it is not prior art, HP's remaining combination consists of the Fisher patents, Woodmas, and Chang.  HP is estopped from asserting that combination.

If an *inter partes* review is instituted and the petitioner loses in a Final Written Decision, the petitioner "may not assert . . . in a civil action … that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that *inter partes* review."  35 U.S.C. § 315 (e)(2).  HP filed an IPR petition that resulted in a Final Written Decision that all claims of the '930 patent are valid.  Ex. 20; Ex. 21.  HP was aware of the Fisher patents, Woodmas, and Chang before filing its IPR, because HP disclosed each reference in its invalidity contentions. Ex. 19 at 3, 5, 6, 11, 13, 14.  Therefore, as the Court held in its summary judgment order on estoppel, HP reasonably could have raised the combination during the *inter partes* review:

> HP disclosed each reference in its invalidity contentions on December 19, 2012
> (Docket No. 811-2)—almost eight months before HP filed its IPR on August 6,
> 2013 (Docket No. 811-5).  Accordingly, … HP reasonably could have raised each
> invalidity ground before the PTAB.

Ex. 28 at 5.  HP was thus estopped from relying on a combination of these patents.  *Id.* at 2.

Accordingly, HP's invalidity case fails as a matter of law.

### B.    The Court should conclude that the claims were not obvious because HP's obviousness combination is missing three key claim elements.

HP's obviousness case was premised on its assertion that all claim elements were

disclosed in its prior art combination.  Ex. 7 (Neikirk direct) 18:17-21 ("When combined all of

the pieces are there."); *id.* at 36:6-11 ("After you've combined everything together, all the pieces

are there"); Ex. 8 at 126:21-24 ("when [the references are] all put together, it … presents every

single thing that's disclosed in the '930 patent").

To meet its burden, HP had to present substantial evidence that all claim elements were in

fact disclosed.  *See PAR Pharm., Inc. v. TWi Pharm., Inc.,* 773 F.3d 1186, 1194 (Fed. Cir. 2014)

("We first must determine whether TWi carried its burden to prove that all claimed limitations

are disclosed in the prior art.").  When "none of the prior art references…alone or in

combination, discloses" an element of the asserted claims, the accused infringer has "failed to

sustain their burden of proving that the asserted claims are invalid."  *Vizio, Inc. v. ITC*, 605 F.3d

1330, 1342-43 (Fed. Cir. 2010); *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1342 (Fed.

Cir. 2003) ("no obviousness" where "no combination of the prior art, even if supported by a

motivation to combine, would disclose all the limitations of the claims.").

Accordingly, under controlling law, an invalidity verdict based on an asserted

combination of prior art must be reversed when an important element of the challenged claim is

missing from the combination.  *August Tech. Corp. v. Camtek, Ltd*., 655 F.3d 1278, 1290 (Fed.

Cir. 2011) ("as a matter of law [an asserted combination] would not render the asserted claims

obvious" when the combination "does not disclose the claimed strobing and therefore does not supply the missing element for purposes of the obviousness analysis."); *Honeywell Int'l, Inc. v. U.S.*, 609 F.3d 1292, 1300-01 (Fed. Cir. 2010) ("Given the failure to prove that the cited references disclose element (a)(3), the government has failed to carry its burden of proving [obviousness] by clear and convincing evidence").

HP failed to introduce sufficient evidence that its references disclosed three important elements: a "low level current," "secondary power source," and "main power source."

### 1. HP's asserted obviousness combination is missing the important "low level current" element.

#### a. Chang does not disclose a "low level current."

HP's invalidity expert, Dr. Neikirk, analyzed Chang and "concluded that … Chang … did not disclose a low level current." Ex. 7 at 40:11-16.  Network-1's expert, Dr. Knox, agreed.  Ex. 3 at 107:9-108:25.  Thus the undisputed evidence demonstrated that Chang did not teach a low level current.

#### b. The Fisher system and patents do not disclose a "low level current."

Dr. Neikirk analyzed the Fisher system and patents, spoke with Dr. Fisher, and then concluded the Fisher system and patents do not disclose a "low level current." Ex. 7 at 15:6-14, 15:20-21, 38:25-39:13.  Dr. Knox reached the same conclusion.  *Id*. at 129:17-21.  It is therefore undisputed that the Fisher system and patents do not disclose a "low level current."

In its closing, however, HP asserted that Dr. Fisher's testimony about the "stage[d] power-up[]" "detection authentication" that was purportedly part of his system (but not in any of his patents) demonstrated a "low current."  Ex. 8 at 131:5-17.  That theory fails for three reasons.

*First*, as explained above, Dr. Fisher's purported system was not in public use and, therefore, does not qualify as prior art.

*Second*, as explained above, Dr. Fisher's testimony about his purported staged power up, detection, and authentication system lacks any corroboration and, therefore, under controlling law cannot be used to support a verdict of obviousness.

*Third*, as shown above, both parties' experts analyzed the Fisher system and patents, compared it to the Court's construction of "low level current," and concluded that the Fisher system and patents did not meet that construction.  Dr. Fisher did not provide any contrary testimony.  Nor could he: he was not designated as an expert and he never purported to have studied the Court's construction or to have applied the construction to his own system or patents.

### c.      Woodmas does not disclose a "low level current."

The Court construed "low level current" as "a non-data-signal current that is sufficient to begin start up of the access device but that is not sufficient to sustain the start up."  Ex. 18 at 12. Both parties' experts agreed that Woodmas does <u>not</u> disclose a current that meets that definition. Ex. 7 (Neikirk cross) 45:14-46:3 ("Woodmas is not disclosing that low level current as required by the Court."); *id.* (Knox rebuttal) at 130:20-22 ("The low level current is not taught by Woodmas."); *id.* at 130:23-131:22.

Moreover, the jury could not reasonably conclude that the Woodmas current is "sufficient to begin start up of the access device" because it is undisputed that the Woodmas current never even *reaches* an access device, much less begins to start up such a device.  Ex. 7 (Neikirk cross) 48:1-49:16 ("[W]e were viewing [camera] 18 as being the remote device …. [T]here's no current that reaches any of the items in box 16 [of] Figure 1 … Current does not reach this camera"); Ex. 11 at 2:50-52, Fig 1.

Indeed, Dr. Neikirk admitted, "I could not find that [low level current] element in the art I used," and "I have one missing element and, hence, I cannot conclude that [the '930 patent] is obvious in my analysis because of that one missing element."  Ex. 7 at 50:8-22, 54:7-13.  HP's

counsel also admitted that Woodmas "[d]oesn't necessarily meet Judge Schroeder's [low level current] claim construction."  Ex. 8 at 129:4-5.  "Using his [Dr. Neikirk's] analysis and the way he's applying it [i.e., when he applies the Court's construction], <u>these patents are valid</u>, yes, they are."  *Id*. at 123:10-12.

Accordingly, based on the trial record, a "comparison of the properly construed claim to the prior art," *Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1406 (Fed. Cir. 2004), can only lead to one conclusion: the important "low level current" limitation is missing from the asserted combination and the '930 claims are therefore not obvious as a matter of law.

### d.      HP's "Dr. Knox's construction" argument fails.

HP argued that the "low level current" limitation is nonetheless found in Woodmas using what HP calls "Dr. Knox's construction."  Here is HP in its closing:

> [H]e had to say, look, I don't know the element would be met.  And if it's not met, yes, it'd be valid.  But that's using Judge Schroeder's claim construction, not Dr. Knox's. Using Dr. Knox's, the patent is definitely invalid."

Ex. 8 at 123:4-8.  The "he" in that argument is HP's expert Dr. Neikirk.  HP was expressly admitting that, according to its own expert, when "using Judge Schroeder's claim construction" the patent would "be valid."  *Id.*  But HP is also claiming that, using "Dr. Knox's construction," the patent is "definitely invalid."  *Id.*  This argument fails for three reasons.

<u>*First*</u>, the only construction of "low level current" that matters is "Judge Schroeder's claim construction."  HP's admission that the patent is valid under this construction is fatal to its invalidity case and precludes a conclusion of obviousness.

<u>*Second*</u>, if a defendant presents an invalidity analysis that purports to apply plaintiff's infringement theory, the theory must be one that "applied the Court's claim constructions." *Realtime Data, LLC v. Actian Corp*., No. 6:15-cv-463-RWS-JDL, Dkt. 491 at 4-7 (E.D. Tex. Apr. 3, 2017) (an "invalidity expert [can] apply a patentee's infringement theories in his or her

analysis, provided that these theories rely on the court's claim construction."). Conversely, a defendant cannot base invalidity on a construction that is materially different from the Court's construction—for example, if it removes a key requirement of the Court's construction.

The theory that HP adopted for its invalidity analysis replaced the Court's definition of "low level current" with a current "sufficient to go through the detection circuitry of a PD." Ex. 8 at 117:1-12, 129:2-6. This erroneous construction removed two key requirements of the Court's constriction—"non-data signal current" and "current that is sufficient to begin start up."

| Court's construction | Erroneous construction [8] |
|---|---|
| "a non-data signal current that is sufficient to begin start up of the access device but that is not sufficient to sustain the start up" | current sufficient to go through the detection circuitry of the access device |

As a result, and as HP's own counsel and expert admitted, this construction is "completely different" from the Court's construction. Ex. 8 at 117:1-12 ("Judge Schroeder's claim construction" is "completely different" from "Dr. Knox's [purported construction]" that HP applied to Woodmas); ███████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Moreover, were it not for this error (i.e., if the omitted requirements from the Court's construction were applied) then it is undisputed that Woodmas does not disclose a "low level current" and that the patent is valid. As HP's counsel told the jury in closing argument: "[U]sing

---

[8] Ex. 8 (HP closing) 117:1-16 (the "application of low level current" used in Dr. Neikirk's invalidity analysis is "sufficient to go through the detection circuitry of a PD."); *id.* at 129:2-7. As Dr. Neikirk phrased it in his expert report, the erroneous construction is a current where "the current is merely used in a detection process, subsequent to which the access device may actually start up." Ex. 29 at ¶227; *id.* at 104-06; *id.* at ¶402; ███████████████████████████ ███████████████

Judge Schroeder's claim construction," even HP's validity expert "had to say, look, I don't know the element would be met.  And if it's not met, yes, it'd be valid."  Ex. 8 at 123:4-7.

Accordingly, HP's theory did not "compar[e]…the properly construed claim to the prior art," *Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1406 (Fed. Cir. 2004), and, therefore, cannot establish that Woodmas taught a low level current.

    *Third*, it was Dr. Neikirk, not Dr. Knox, who came up with this erroneous construction. Dr. Knox testified that it is <u>not</u> enough to show that current flows through the detection circuitry in an access device for that current to be a "low level current" because such a theory would ignore the "sufficient to begin the start up" requirement of the Court's construction.  Ex. 9 at 68:20-69:6.  Dr. Knox further explained that the "sufficient to begin the start up" requirement is met when "components actually respond[]" to the current flowing through the detection circuitry, *id.*, by "consuming power" and "operating."  Ex. 4 at 62:1-23.  ██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████  ██████████████████████████

████████████████████████████████████████

████████████████████

    Because HP failed to provide evidence that the prior art taught a critical requirement, "low level current," HP's obviousness case fails as a matter of law, and the Court should conclude that the asserted claims were not proven obvious.

> **2.**    **HP failed to present evidence that its obviousness combination taught the important "secondary power source" element.**

To present substantial evidence, an expert must "explain in detail how [the] claim

element is disclosed in the prior art reference."  *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381

F.3d 1142, 1152 (Fed. Cir. 2004) (internal quotations omitted).  For construed terms, the expert

must explain how the Court's construction is taught by the prior art.  *Fresenius USA, Inc. v.*

*Baxter Intern.*, *Inc.*, 582 F.3d 1288, 1300 (Fed. Cir. 2009) ("the district court correctly granted

JMOL" when defendant's expert failed to explain how the prior art taught the "stepper motor

structure" required by the court's construction).  This explanatory expert testimony is required

"even when the reference has been submitted into evidence before the jury."  *Koito*, 381 F.3d at

1152; *Fresenius*, 582 F.3d at 1300 (holding that a defendant's "evidentiary burden of proof

cannot be carried" by merely submitting a technical manual to the jury).  This is because it is a

defendant's burden "to clearly disclose, discuss, and identify for the jury the supporting evidence

upon which it [is] relying to prove that the claim limitation was present in the prior art."  *Id.*

When the patent and prior art are technically complex, such testimony is essential.  *Koito*, 381

F.3d at 1152 n.4. (holding that, while an "'easily understandable'" patent may not require

detailed explanation, a "technical patent document" does).

HP failed to submit <u>any</u> testimony explaining how a "secondary power source" is found

in the prior art.  The only mention of this core claim term by HP's invalidity expert, Dr. Neikirk,

was in his preliminary statement identifying the "key pieces" that the claim requires: "There's a

main power source.  Secondary power source.  Low level current.  Sensing.  And controlling."

Ex. 7 at 19:10-15.  That is it.  He did not explain how a "secondary power source" is found in

any asserted reference.  And he did not mention the Court's construction at all (much less

explain how it was taught by the prior art). [9]  This complete absence of testimony from Dr.

---

[9] Dr. Neikirk did not even make a conclusory assertion that a "secondary power source"
was found in an asserted reference.  And such an assertion would have been inadequate.
"General and conclusory testimony…does not suffice as substantial evidence of invalidity."

Neikirk stands in stark contrast to the corresponding infringement testimony by Network-1's

expert, Dr. Knox, who testified for over twenty pages explaining how the Court's construction of

"a secondary power source" was met by HP's accused products.  *See* Ex. 4 at 24-48.  Because

"the evidentiary burden of proof cannot be carried without clearly identifying the corresponding

structure in the prior art," *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1300 (Fed.

Cir. 2009), HP's evidence failed as a matter of law.

Moreover, a "secondary power source" is not a simple claim term that requires no

explanation; it is technically complex.  It was the most extensively disputed and construed term.

It was construed and clarified (Ex. 18 at 9-10; Ex. 22), the subject of a *Daubert* motion (Ex. 27),

and addressed by five rounds of briefing and five orders. [10]  The resulting construction of

"secondary power source" was:

> a source of power connected to provide power between the data node and the
> access device using the data signaling pair; the driving points of the secondary
> power source must be physically separate from the driving points of the main
> power source (a driving point is a point of a power source from which a particular
> power level can be provided for driving a load).

Ex. 22 at 8.  Without explanatory expert testimony, the jury could not identify any "driving

point" in the prior art or determine if the "driving points of the secondary power source" were

"physically separate from the driving points of the main power source."  Because HP provided

no such evidence, HP failed to meet its burden on obviousness and judgment of nonobvious must

be granted as a matter of law.  *See Fresenius*, 582 F.3d at 1300 ("Because Fresenius failed to

present any evidence that the required stepper motor structure existed in the prior art, the district

court correctly granted JMOL."); *Koito,* 381 F.3d at 1145 ("we hold that Koito did not present

---

*Koito*, 381 F.3d at 1152; *Telemac Cellular Corp. v. Topp Telecom, Inc*., 247 F.3d 1316, 1329
(Fed. Cir. 2001) ("Broad conclusory statements offered by Telemac's experts are not evidence
and are not sufficient to establish a genuine issue of material fact.").
   [10] Ex. 18; Ex. 23; Ex. 22; Ex. 24; Ex. 27.

substantial evidence…to support the jury's finding of … obviousness.").

> **3.      HP failed to present evidence that its asserted obviousness combination included a "main power source."**

The claim language sets forth two requirements of a "main power source": (A) "a main power source connected to supply power to the data node," and (B) "delivering a low level current from said main power source to the access device."  '930 patent, claim 6 at 4:55-56, 4:60-61.  Accordingly, if a system does not have a power source that meets <u>both</u> requirements, then that system does not have a "main power source" as required by the claims.  HP's counsel and expert repeatedly confirmed this two-fold requirement of a "main power source":

> 12   So there's one power source has to connect to
> 13   supply power to the data node, and it also has to deliver the
> 14   low level current.  That's what the patent requires.

Ex. 2 (HP opening) 214:6-16; Ex. 8 (HP closing) 117:22-119:1; Ex. 5 (Davis direct) 12:12-23; *id.* at 59:22-60:6.

HP never identified a power source in its asserted obviousness combination that meets both claim requirements: (A) supplying power to the data node and (B) delivering a low level current from that power source to the access device.  Instead, the asserted combination has two <u>separate</u> power sources—one power source (from Fisher) that (A) supplies power to the data node but does not deliver a low level current to the access device, and a separate power source (from Woodmas) that (B) delivers a low level current to the access device but does not supply power to the data node.

*Power source from Fisher*:   HP's invalidity expert, Dr. Neikirk, identified a "DC power supply" "in the hub" of Fisher as the "main power source" of the asserted combination.  Ex. 7 at 23:18-21 (Fisher "certainly requires a DC power supply.  There's no other way to get a hub to work.  So there's also a main power source in the hub or switch that this access point would have

to be connected to.").  Dr. Neikirk testified that this power source in Fisher supplies power to the data node.  *Id*. at 26:25-27:5 ("[Y]ou could use the hub's power supply [in Fisher] to basically power everything. … So we have a…main power source.").  But Dr. Neikirk never contended, or even suggested, that a low level current is delivered from this power source in the Fisher hub to the access device (the Fisher wireless access point). [11]  Indeed, he admitted that he could not find a low level current in the Fisher system.  *Id.* at 39:11-13.  For delivery of a low level current, Dr. Neikirk looked to a separate power source from Woodmas.

*Power source from Woodmas*:  Dr. Neikirk's asserted combination included a separate, second power source—the "power delivery unit" from Woodmas.  Ex. 7 at 35:19-20 ("So we'll take the power delivery unit [from Woodmas] and put it in the hub.").  Dr. Neikirk asserted that this second power source delivers a low level current to the access device.  *See id*. at 48:25-49:1 ("the power delivery unit is supplying the low power signal"); *id*. at 47:5-6 ("Woodmas specifically says it applies low power, yes, from the power delivery unit").  But Dr. Neikirk never contended, or suggested, that this second power source from Woodmas (i.e., the "power delivery unit") also supplies power to the data node.  Instead, his entire discussion of the "power delivery unit" concerns the purported path for sending a detection current to the power reception unit and sending operating power to the access device, i.e., a camera in Woodmas, not power to any data node (e.g., a switch or hub).  *Id*. at 31:2-33:25.

Dr. Neikirk never asserted (much less provided substantial evidence of how or why) the two power sources in Woodmas and Fisher could be modified to create a single power source that performed as claimed by the '930 patent.  Instead, he merely gave conclusory testimony that

---

[11]  Dr. Neikirk asserted that the Fisher power supply "powers everything," including "the access device."  Ex. 7 at 25:21-27:1.  But he did not identify this as power that delivered a low level current and in fact admitted that he could not find a low level current in Fisher.

you could "take the [Woodmas] power delivery unit and put it in the [Fisher] hub," Ex. 7 at

35:19-20, which results in two separate power supplies performing the two required functions.

Accordingly, HP's asserted obviousness combination does not include a "main power

source" that satisfies the claim requirements.  In the words of HP's own counsel, the asserted

combination would not practice the claims of the '930 patent because it "do[es]n't have one

power source that does A and B, powers the data node and delivers detection current. …

[Instead,] [t]here are two power supplies."  Ex. 8 at 117:22-119:1.  Because HP provided no

evidence of this fundamental requirement of the asserted claims, the jury's invalidity verdict

must be overturned and judgment of validity granted as a matter of law.

### C.     The Court should conclude that the claims were not obvious because HP failed to provide sufficient motivation for the combination.

"A party seeking to invalidate a patent on obviousness grounds must demonstrate by

clear and convincing evidence that a skilled artisan would have been motivated to combine the

teachings of the prior art references to achieve the claimed invention, and that the skilled artisan

would have had a reasonable expectation of success in doing so."  *InTouch Techs., Inc. v. VGO*

*Commc'ns, Inc.*, 751 F.3d 1327, 1347-49 (Fed. Cir. 2014) (internal quotations omitted); *Bristol-*

*Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 973 (Fed. Cir. 2014) (same);

*Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373-74 (Fed. Cir. 2008) ("some kind of

motivation must be shown from some source, so that the jury can understand why a person of

ordinary skill would have thought of either combining two or more references or modifying one

to achieve the patented method.") (internal quotations omitted).

At trial, HP's obviousness combination first modified Fisher by adding the hub from

Chang and then modified the Fisher-Chang combination by inserting the power delivery unit and

power reception unit from Woodmas. Ex. 7 (Neikirk direct) 34:2-36:5.  This combination fails

because HP failed to provide clear and convincing evidence of a reason why one of ordinary skill in the art would have made the first part of the combination: adding the hub from Chang to Fisher.

The only reason that Dr. Neikirk gave for using the hub from Chang was "one of ordinary skill trying to simplify that system…from Fisher…would look to Chang…[because] Chang puts everything in a hub.  So it's now simpler and more combined."  Ex. 7 at 34:20-35:6.  But Dr. Neikirk provided no reasoning or rational underpinning to support this conclusion.  The Fisher patents already had a hub that included everything within it.  Ex. 16 at 4:52-53 ("the power and data coupler 110 is included in a network card in the hub 240").  Dr. Neikirk failed to explain why or how using the Chang hub with Fisher would be any different than using the Fisher hub with Fisher, much less how doing so would "simplify" anything.  Because Dr. Neikirk's testimony on the reason to combine Fisher and Chang consisted of mere conclusory statements unsupported by "articulated reasoning with some rational underpinning," HP failed to satisfy its burden.  *InTouch*, 751 F.3d at 1351; *In re Magnum Oil Tools Int'l, Ltd*., 829 F.3d 1364, 1380 (Fed. Cir. 2016). [12]

HP failed to show a legally sufficient motivation to combine for an additional reason—the Chang reference expressly taught away from creating the invention.  As a matter of law, if a reference in a proposed combination expressly taught away from the claimed invention, then the asserted combination cannot render the claimed invention obvious.  This is because it cannot be obvious to combine a reference to create the invention when that reference expressly says not to do so.  "[R]eferences that teach away cannot serve to create a prima facie case of obviousness."

---

[12] HP also failed to present any evidence that a skilled artisan "would have perceived a reasonable expectation of success in making" the combination of Woodmas with Fisher and Chang.  *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1362 (Fed. Cir. 2009).  Dr. Neikirk did not set forth even a conclusory assertion on this issue.

*McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001); *In re Chapman*, 595

F.3d 1330, 1337 (Fed. Cir. 2010) ("A finding that a reference teaches away can preclude a

finding that the reference renders a claim obvious."); *In re Fine*, 837 F.2d 1071, 1074 (Fed. Cir.

1988) ("error to find obviousness where references diverge from and teach away from the

invention at hand") (internal quotations omitted); *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d

1340, 1349-50 (Fed. Cir. 2000) ("if Johnson did in fact teach away from Moore, then that finding

alone can defeat Wang's obviousness claim."); *DePuy Spine, Inc. v. Medtronic Sofamor Danek,

Inc.*, 567 F.3d 1314, 1327-28 (Fed. Cir. 2009) (holding that because one reference in the asserted

combination taught away, that combination was not obvious).

At trial, there was undisputed evidence demonstrating that Chang—a reference in HP's

proposed obviousness combination—expressly taught away from the '930 claims.  A reference

teaches away "when a person of ordinary skill, upon reading the reference, would be discouraged

from following the path set out in the reference, or would be led in a direction divergent from the

path that was taken by the applicant."  *Depuy Spine*, 567 F.3d at 1327 (internal quotation marks

omitted); *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998) (reversing a judgment of

invalidity in part because references "cautioned against compressing the layers in a multilayer

insulator").  The '930 claims require delivering both the detection current and operating power

over the data signaling pair.  In relevant part, the '930 claims require:

- a "data signaling pair…arranged to transmit data";
- "delivering a low level current…over said data signaling pair"; and
- delivering operating power over that same "data signaling pair": "supply power…via
  said data signaling pair"

Ex. 1 at claim 6.  At trial, Dr. Knox explained these claim requirements.  Ex. 3 at 107:20-108:10;

Ex. 4 at 124:12:17; *id*. at 125:4-24.

Chang's express teachings discourage a person of ordinary skill from taking this path and

lead in a direction divergent from that path.  Chang teaches that the detection signal and

operating power should *not* be sent over the data signaling pairs and instead should each be sent

over separate wires.  Ex. 15 at 10:3-7; Ex. 3 (Knox direct) 106:7-25.  Moreover, Chang

affirmatively cautions against putting detection signals on the data signaling pair to avoid

interfering with the data signals: "In order to perform detection that is continuous and does not

interfere the with the normal transmit and receive, the device presence detector 414 [that

performs detection] does not connect to the signal lines [the data signaling pair]."  Ex. 15 at

10:3-7.  Chang expressly discourages using the data signaling pairs to deliver detection signals

(on the "data signal lines") as used in the '930 claims, stating that if "detection circuitry is also

coupled directly to the data signal line," this "may lead to interference or even corruption on the

communication link when running the detection procedure."  *Id*. at 2:49-55.  By teaching that the

data signal pairs should not be used to deliver detection signals and power, Chang teaches a path

that diverges from the requirements of the '930 claims—that a detection current and operating

power be delivered on the data signaling pair.  Ex. 3 (Knox direct) at 107:20-22 (the '930 patent

did not "follow this –this method of using detection and power on spare wires").

　　　At trial, HP did not rebut this compelling evidence and testimony of "clear

discouragement."  *In re Ethicon, Inc.*, 844 F.3d 1344, 1351 (Fed. Cir. 2017).  Rather, HP's

invalidity expert confirmed these teachings from Chang: "Chang actually used what are called

spare pairs to do its presence detection and powering."  Ex. 7 at 35:8-10; *see* Ex. 29 at ¶195

("Chang specifically teaches using a pair of wires different from those used for Ethernet data

transmission to perform remote detection and powering.") (citing Ex. 15 at 10:3-7).

　　　Because undisputed evidence demonstrates that Chang expressly taught away from the

asserted claims, and because "references that teach away cannot serve to create a prima facie

case of obviousness," HP failed to show a reason to combine, as a matter of law.  *McGinley v.*

*Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2000).

> **D.    The Court should conclude that the claims were not obvious based on unusually strong objective evidence.**

"[C]onsideration of the objective evidence presented by the patentee," "i.e., secondary considerations"—including "licenses showing industry respect"—"is a necessary part of the obviousness determination." *WMS Gaming Inc. v. International Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999).  "To be clear, a district court must *always* consider any objective evidence of nonobviousness presented in a case." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010) (emphasis in original).

When objective evidence of non-obviousness is undisputed, the Court must consider it despite a general jury verdict of obviousness. *See Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 767 (Fed. Cir. 1988) (holding that, for JMOL, "undisputed facts" may be taken as true); *see Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1356-57 (Fed. Cir. 2012) (only "factual disputes" are presumed resolved in favor of the verdict).

In reaching an ultimate legal conclusion on obviousness, the weight to be given an objective indicator of non-obviousness is a question of law.  *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1083 (Fed. Cir. 2012) (holding, as a matter of law, that "the most relevant objective considerations, when considered as part of the totality of the evidence, support a nonobviousness finding.").  Such evidence can be "entitled to such weight that it may be decisive" on the question of obviousness. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985).

Network-1 submitted undisputed evidence that, of the ten largest players in the marketplace who account for 95% of worldwide sales, all of them (except HP) have licensed the '930 patent, and did so for substantial sums of money far exceeding any costs of litigation,

collectively well over $100 million.  Ex. 7 (Mills direct) 122:6-20; *id.* (Knox rebuttal) 131:23-

133:6. [13]  Accordingly, Network-1 presented compelling objective evidence that the industry

viewed the '930 patent as valuable and valid.  Moreover, this evidence was unrebutted.  HP did

not cross-examine Network-1's expert or elicit any rebuttal testimony from its own expert on the

issue.

      Appropriately weighing such objective evidence requires considering "[t]he rationale for

giving weight to secondary considerations," i.e., "that they provide objective evidence of how

the patented device is viewed in the marketplace, by those directly interested in the

product."  *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir.

1988).  That is, the greatest weight should be given to objective evidence that demonstrates that

competitors in the marketplace (objective sources) viewed the patent favorably (i.e., as a

valuable and non-obvious invention).  And the strongest possible objective evidence would

consist of every major market participant agreeing to pay royalties that substantially exceeded

any potential litigation costs.

      That is precisely the circumstance here.  An entire industry of sophisticated technology

companies—resistant to paying licensing fees for invalid patents and experienced in challenging

patents—does not pay more than $100 million to license an obvious invention.  This objective

evidence is thus "the most pertinent, probative, and revealing evidence available to the decision

maker in reaching a conclusion on the obviousness/nonobviousness issue."  *Ashland Oil, Inc. v.

Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985).  It is "the most probative

and cogent evidence of nonobviousness in the record."  *Ortho-McNeil Pharm., Inc. v. Mylan*

---

[13] *See* Ex. 26 at 8-9, 11 (order rejecting HP argument that Network-1 licenses entered
only "to avoid further litigation" and instead finding agreements "probative of the economic
value of the patented technology in the marketplace").

*Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008). Given the unusually powerful licensing evidence in this case, the Court should conclude that this objective factor is "decisive" and leads to an ultimate conclusion of nonobviousness. *Ashland Oil*, 776 F.2d at 306 (Fed. Cir. 1985).

### E. The Court should conclude that the asserted claims were not obvious.

Obviousness is ultimately a question of law for the Court. *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997). To answer this question, the Court accepts the jury's implied factual findings that are supported by substantial evidence. *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1294 (Fed. Cir. 2009). But if HP failed to provide legally sufficient evidence for facts essential to its obviousness theory, this is fatal. *See id.* at 1299 (affirming JMOL because "[defendant] failed to prove that [an important claim limitation] was present in the prior art"). The Court must also consider all "probative admissions" obtained from HP's expert and all "undisputed facts" proven by Network-1. *See Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 767 (Fed. Cir. 1988). The Court should conclude that the asserted claims of the '930 patent were not obvious.

HP failed to provide sufficient evidence that the Fisher system was prior art. This eliminates an essential component of HP's obviousness combination. Moreover, the rest of the references consists of patents that HP was estopped from asserting.

In addition, HP failed to provide sufficient evidence that HP's asserted prior art combination disclosed important elements of the claims: "a low level current," "secondary power source," and "main power source." The absence of any one of these elements compels the conclusion that the claims were not obvious as a matter of law.

In addition, HP provided insufficient evidence that one of ordinary skill would be motivated to combine HP's asserted references to create the claimed invention. Moreover, because one of the references in HP's combination (Chang) expressly taught not to perform an

important part of the claimed invention, one of ordinary skill would not have been motivated to make the asserted combination.

Finally, undisputed evidence established a powerful objective indicator of non-obviousness: effectively the entire industry (minus HP) licensed the '930 patent for over $100 million.

Each of these reasons independently compels the conclusion that the asserted claims were not obvious.  The Court should rule that the claims of the '930 patent were not obvious and enter judgment as a matter of law that HP failed to prove the '930 patent invalid.

### III.    The Court should also conditionally grant a new trial on validity.

In addition to ruling as a matter of law that the claims were not obvious and granting JMOL on the issue of invalidity, the Court should also conditionally grant a new trial on validity. Fed. R. Civ. P. 50 ("If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial").

#### A.    The Court should grant a new trial because the jury's verdict of obviousness is against the great weight of the evidence.

A court should grant a new trial when the jury's verdict is "against the great weight of the evidence." *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 931 (5th Cir. 1982).  In deciding to grant a new trial, the Court "need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence." *Id*. at 930.  "This standard, of course, is lower than that for a directed verdict or a judgment notwithstanding the verdict," and a verdict can be against the "great weight of the evidence, and thus justify a new trial, even if there is substantial evidence to support it." *Id*. (internal quotations omitted).

Here, the jury's verdict of obviousness is against the great weight of the evidence.  As shown above, the jury's verdict is: (1) against the weight of the evidence that the Fisher system

was not prior art; (2) against the weight of the evidence that the prior art is missing a "low level

current"; (3) against the weight of the evidence that a "secondary power source" was not shown

in the asserted combination; (4) against the weight of the evidence that a "main power source"

was not shown in the asserted combination; (5) against the weight of the evidence that there was

no motivation to combine HP's references to create the invention and that one of the references

actually taught away from the claims; and (6) against the weight of a powerful objective

indicator of non-obviousness.  This requires a new trial on validity.

> **B.     A new trial should also be granted because Fisher's highly prejudicial testimony should have been excluded.**

A new trial is also required because Mr. Fisher's testimony should not have been

admitted.  A court should "grant a new trial when the jury has inadvertently considered

inadmissible evidence, and the evidence was prejudicial to the losing party." *Carson v. Polley*,

689 F.2d 562, 570 (5th Cir. 1982).  Uncorroborated testimony from an alleged prior art inventor,

used to try to invalidate the patent, is inadmissible.  *Texas Digital Sys., Inc. v. Telegenix, Inc*.,

308 F.3d 1193, 1217 (Fed. Cir. 2002) (affirming decision to exclude the uncorroborated

testimony of an alleged prior inventor when there was no corroboration of public use).  This is

because, with no corroboration, the testimony is not credible and therefore has no probative

value; and this zero probative value is substantially outweighed by the risk of unfair prejudice

(e.g., the danger that the jury will wrongly credit the testimony).  *Finnigan Corp. v. Int'l. Trade

Comm'n*., 180 F.3d 1354, 1368 (Fed. Cir. 1999) (holding that uncorroborated testimony is "open

to grave suspicion") (internal quotes omitted); *Texas Digital*, 308 F.3d at 1217.

At trial, Dr. Fisher's testimony was admitted over Network-1's objection.  Ex. 6 at 8:2-

14.  This was prejudicial because it was powerful to the jury (presented by a charismatic,

seemingly disinterested witness who purported to describe his system in detail) and made the

difference between winning and losing (it purported to solve a fatal problem in HP's invalidity case—the missing "low level current"). Ex. 8 at 131:5-18.  Moreover, HP heavily emphasized Mr. Fisher's testimony—mentioning "Fisher" 248 times before the jury.  Because the jury "considered [this] inadmissible evidence, and the evidence was prejudicial to [Network-1]," a new trial should be granted on validity.  *Carson*, 689 F.2d at 570.

### C.    A new trial should also be granted because HP made improper arguments in its closing that infected the jury's findings.

The Court should grant a new trial on validity for the additional reason that HP made improper remarks in its closing that prejudiced Network-1 and infected the jury's findings. "[I]mproper remarks become the basis for granting a new trial when the trial judge, with the benefit of his or her first hand knowledge of the entire proceedings, believes that the remarks infected the deliberations and conclusions of the jury." *Guar. Serv. Corp. v. Am. Emp's Ins. Co.*, 893 F.2d 725, 729 (5th Cir. 1990).  "It is a particularly indefensible tactic to use closing arguments to bring before the jury damaging facts not in evidence and never established." *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 778 (5th Cir. 2009) (internal quotes omitted).  "Where placing material facts not in evidence before the jury in final argument substantially prejudices a party, reversal is required." *Edwards v. Sears, Roebuck & Co*., 512 F.2d 276, 284 (5th Cir. 1975).

During closing argument, HP's counsel made two material statements regarding the validity of the '930 patent that had no support in evidence.  Because (as demonstrated above) the jury could not have properly found the '930 claims invalid based on the actual evidence that HP presented at trial, it is highly likely that HP's improper statements infected the jury's findings. Accordingly, a new trial on validity should be granted.

### 1.    HP improperly asserted in closing that Cummings disclosed "a low level current."

HP's expert relied exclusively on Woodmas for the "low level current" element.  Ex. 7 at

39:11-13; *id.* at 40:11-13.  And on cross-examination, HP's expert admitted that "Woodmas is

not disclosing that low level current as required by the Court."  *Id*. at 45:14-46:3.  Faced with

this admission, HP came up with a new invalidity theory in closing:  that a different reference,

Cummings, disclosed the "low level current" limitation:

> Page 131
> 16      So there's so much evidence of this low current
> 17  going to detection circuitry.  Who else do we have?  We've
> 18  got –
> 19      I'm sorry, Larry.
> 20      With respect to the Cummings patent – and you'll
> 21  have the Cummings patent before you.  It's DX146.  This is
> 22  another patent that's claiming to have PoE detection as well.
> 23  It's from April 1995, way before the – the '930 patent.
> 24  It's detecting – it's detecting the connection of such
> 25  equipment low current power is provided to each of the
> Page 132
> 1  current loops.  You'll have this.  It's DX146.

Ex. 8 at 131:16-132:1.

This assertion was highly improper.  HP did not disclose Cummings in its Invalidity

Contentions or in its Final Election of Prior Art and therefore was barred from asserting

invalidity based on Cummings.  Ex. 19; Ex. 25.  And HP did not present any evidence that

Cummings satisfied the Court's definition of "low level current."  Cummings was not even

mentioned by HP's invalidity expert at trial. [14]

Moreover, this assertion likely infected the jury's invalidity verdict.

*First*, Cummings contains the phrase "low current power," which sounds similar to "low

level current," even though there is no evidence that the Cummings current would meet the

---

[14]  The only mention of Cummings at trial was by HP's non-infringement expert, in
asserting that the "low level current" detection method of the '930 patent was a minor
improvement over other detection methods in the prior art.  Ex. 5 at 16:8-17:14 (compared to
Cummings and other background art, the '930 patent contributed a "different way of performing
the detection step" using a "low level current.")

Court's definition of "low level current."  HP knew that the jury would likely be confused by the similarity between these words, and emphasized that similarity in its remarks in closing.

_Second_, HP's improper assertion that Cummings taught a "low level current" could not be adequately rebutted by Network-1 (and was therefore likely to be believed by the jury) because Network-1 did not have any warning that it should elicit testimony on Cummings (because HP had never before disclosed this theory).

_Third_, HP's improper assertion would seem crucial to the jury because it purported to solve a fatal problem with HP's invalidity case—HP's own expert admitted that Woodmas did not disclose a "low level current."  Indeed, this is how HP introduced its Cummings argument in closing. Ex. 8 at 129:16-18 ("Woodmas doesn't disclose [a low level current] … [W]e definitely think that it does, but what else was out there?").

HP's argument was not marginally improper.  It violated rules and orders forbidding sandbagging.  It was highly misleading, with no foundation in truth.  And it was an unrebuttable assertion on a crucial issue.  Because HP asserted in closing "damaging facts not in evidence and never established…without any proper basis whatever," that were "grossly improper" and "clearly prejudicial," a new trial should be granted.  _Edwards_, 512 F.2d at 284-85.

**2.    HP improperly asserted in closing that Mr. Godici believed that the '930 patent was invalid based on extensive prior art and evidence.**

During his testimony, Mr. Godici, who HP called to "discuss Patent Office procedures" (Ex. 2 (_voir dire_) 22:7-23:14; _id._ (HP opening) at 49:20-23), was careful not to offer any opinions regarding the validity of the '930 patent.  His expert report did not include any opinions on whether any reference was prior art or disclosed any aspect of the claims, and Mr. Godici did not present any such opinions at trial.

In its closing argument, however, HP asserted that Mr. Godici had said (in a conversation

that took place before trial) that he had never before seen so much prior art and evidence

showing that a patent was invalid:

> Page 123
> 14        Look at all the prior art.  You know when Nick
> 15   Godici, when we were talking about coming and him
> 16   testifying, he could not believe how much prior art and how
> 17   much evidence this case had with respect to this patent being
> 18   invalid…
> …
> Page 132
> 25   Godici says: I've never seen this much prior art in any case
> Page 133
> 1     before.

Ex. 8 at 123:14-18, 132:25-133:1.

There is no evidence in the record to support these assertions.  Mr. Godici did not testify

that he had "never seen this much prior art," that he "could not believe how much prior art"

existed, or about "how much evidence this case had with respect to this patent being invalid."

These fabricated assertions were "grossly improper and clearly prejudicial."  *Edwards*, 512 F.2d

at 284-85.

Moreover, these improper assertions likely infected the jury deliberations and validity

conclusion.  Backed by Mr. Godici's distinguished Patent Office credentials as "the former

chairman of the United States Patent and Trademark Office" (Ex. 2 (*voir dire*) 49:20-23), they

likely had a significant impact on the jury.  Indeed, that is the very reason HP presented that

argument: HP knew it would be persuasive to the jury that the former chairman of the Patent

Office had never before seen so much prior art and evidence of invalidity.  Because HP asserted

damaging, made-up evidence on invalidity during its closing argument, a new trial is required.

*Edwards*, 512 F.2d at 285 (reversal is required when a defendant injects damaging, made-up

testimony "into jury argument without any proper basis").

## IV.    Conclusion.

The Court should rule that HP failed to prove that the claims of the '930 patent were

obvious and should grant the motion for judgment of validity as a matter of law on all grounds.

The Court should also conditionally grant the motion for new trial on validity on all grounds.


Date: February 2, 2018                     Respectfully submitted,

By:  /s/ *Sean A. Luner*
Sean A. Luner
CA State Bar No. 165443
Gregory S. Dovel
CA State Bar No. 135387
Christin Cho
CA State Bar No. 238173
Jonas Jacobson
CA State Bar No. 269912
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone:  310-656-7066
Email:  sean@dovel.com
Email:  greg@dovel.com
Email:  christin@dovel.com
Email:  jonas@dovel.com


T. John Ward, Jr.
State Bar No. 00794818
Claire Henry
State Bar No. 24053063
Andrea Fair
State Bar No. 24078488
WARD, SMITH & HILL, PLLC
1127 Judson Road, Suite 220
Longview, Texas 75601
Telephone: (903) 757-6400
Facsimile: (903) 757-2323
Email: jw@wsfirm.com
Email: claire@wsfirm.com
Email: andrea@wsfirm.com

ATTORNEYS FOR PLAINTIFF,
NETWORK-1 TECHNOLOGIES, INC.

## Certificate of Service

I certify that this document is being served on counsel of record by email on the filing date listed above.

/s/ *Sean A. Luner*
Sean A. Luner

## Certificate of Authorization to Seal

I certify that the protective order governing this cause authorizes this document to be filed under seal.

/s/ *Sean A. Luner*
Sean A. Luner