# EXHIBIT 4

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
 2                             TYLER DIVISION

 3
      NETWORK-1 TECHNOLOGIES, INC.  )
 4                                            DOCKET NO. 6:13cv72
          -vs-                     )
 5                                            Tyler, Texas
                                   )  1:57 p.m. - 5:24 p.m.
 6    HEWLETT-PACKARD COMPANY, ET AL    November 9, 2017

 7
                         TRANSCRIPT OF JURY TRIAL
 8                          AFTERNOON SESSION
              BEFORE THE HONORABLE ROBERT W. SCHROEDER III
 9                    UNITED STATES DISTRICT JUDGE

10
                          A P P E A R A N C E S
11

12    FOR THE PLAINTIFF:

13    MR. GREGORY DOVEL
      MS. CHRISTIN CHO
14    MR. JONAS JACOBSON
      DOVEL & LUNER
15    201 Santa Monica Blvd., Ste. 600
      Santa Monica, CA 90401
16

17    MR. T. JOHN WARD JR.
      WARD, SMITH & HILL, PLLC
18    1507 Bill Owens Parkway
      Longview, TX 75604
19

20

21
      COURT REPORTER:            MS. JUDY WERLINGER CSR, CRR
22                               DEPUTY OFFICIAL COURT REPORTER
                                 P.O Box 75
23                               Marlin, TX 76661

24    Proceedings taken by Machine Stenotype; transcript was
      produced by a Computer.
25
```

```
 1   FOR THE DEFENDANTS:

 2
     MS. JENNIFER DOAN
 3   MR. JOSH R. THANE
     HALTOM & DOAN
 4   6500 Summerhill Road, Ste. 100
     Texarkana, TX 75503
 5

 6   MR. DAVID H. DOLKAS
     MS. JODI BENASSI
 7   MCDERMOTT WILL & EMERY LLP
     275 Middlefield Road, Ste. 100
 8   Menlo Park, CA 94025

 9
     MS. NATALIE A. BENNETT
10   MCDERMOTT WILL & EMERY LLP
     500 North Capitol Street, NW
11   Washington, DC 20001

12
     MR. HERSH H. MEHTA
13   MCDERMOTT WILL & EMERY LLP
     444 West Lake St.
14   Chicago, IL 60606-0029

15
     MR. MARK E. FERGUSON
16   MR. MARK S. OUWELEEN
     MS. FAYE E. PAUL
17   BARTLIT BECK HERMAN
        PALENCHAR & SCOTT LLP
18   54 W. Hubbard St., Ste. 300
     Chicago, IL 60654
19

20

21

22

23

24

25
```

1              First, in your view, did the '930 patent inventors

2    invent Ethernet networking?

3    A.    No, they did not.

4    Q.    When was Ethernet networking first brought to the

5    marketplace?

6    A.    It was brought to the marketplace in the late 1970s, and

7    it became an IEEE standard in the early 1980s.

8    Q.    Now, did the '930 inventors, Mr. Katzenberg and

9    Mr. Deptula, invent Power over Ethernet?

10   A.    No, sir, they did not.

11   Q.    When did Power over Ethernet come into being?

12   A.    Really I think it -- it came into its own with the

13   patents that were issued to Mr. Fisher and his team, and that

14   was in the late '90s.

15   Q.    That's David Fisher you're talking about?

16   A.    Yes.

17   Q.    The 3Com engineer?

18   A.    Yes, sir.

19   Q.    Now, some of us probably remember 3Com's product from

20   when 3Com was making and selling products in its own name.

21           Do you know what's happened to 3Com by then?

22   A.    Hewlett-Packard purchased them in 2010.

23           MR. FERGUSON:   Now, let's put the next slide up,

24   please.   It's Slide 7 -- 4.7.

25   Q.    (By Mr. Ferguson) Is this a copy of the patent you're

1    talking -- or one of the patents you're talking about?

2    A.    Yes, sir.   This is one of the Fisher patents.

3    Q.    Did Mr. Fisher's patents actually teach explicitly the

4    idea of sending power and data over the same lines?

5    A.    Yes, sir, it did.

6              MR. FERGUSON:   Let's move to the next page, please.

7    Q.    (By Mr. Ferguson) What are we looking at here?

8    A.    What we've got displayed here is a figure, Figure 2, out

9    of the patent and text from the patent that --

10   Q.    Excuse me.   If I could interrupt you, Dr. Davis.

11             MR. FERGUSON:   Your Honor, could Dr. Davis come and

12   indicate on the big screen?   I think it might be easier to

13   explain.

14             THE COURT:   You may.

15   Q.    (By Mr. Ferguson) And, Dr. Davis, if you don't mind

16   stopping and picking up a microphone.

17   A.    Is this part of the test?

18             You want to ask the question again?

19   Q.    Could you just walk us through --

20             THE COURT:   Mr. Ferguson, do you have your mic on?

21             MR. FERGUSON:   I was hoping to do it from here, and

22   then I realized I probably couldn't.

23   Q.    (By Mr. Ferguson) Dr. Davis, if you could, then, just

24   using that diagram, could you walk us through how the Fisher

25   patent discloses the idea of Power over Ethernet?

1    A.    Yes, I can.   As I said a second ago, we have Figure 2

2    and wording addressing Figure 2 that comes out of Column 3 of

3    the patent.

4                What we see over here is a data hub and then power

5    coming from, as was called this morning, a wall wart; and

6    both of those come into this power and data coupler.

7                They are merged, and they go out on a single table

8    identified here as network cable 160.

9                And they come over to this wireless access point

10   that's depicted as being mounted up in the ceiling.

11               And the text specifically addresses the question,

12   it says:   The network cable 160 includes one or more wires

13   for transmitting the combined power and data signal 107.

14               So Fisher's patent specifically taught combining

15   power and data onto the same wire.

16   Q.    Okay.   Thank you.   You can have your seat again.

17   A.    (Complies.)

18               MR. FERGUSON:   Your Honor, I think that Dr. Davis

19   and I might better hold on to these because we have some more

20   things to do away from the podium.

21               THE COURT:   That's fine.

22   Q.    (By Mr. Ferguson) Do you know, Dr. Davis, who owns the

23   Fisher patents now?

24   A.    Yes.   They are owned by Hewlett-Packard.

25   Q.    Okay.   So now let's talk specifically about detection.

1    We've heard that the Merlot inventor didn't invent Ethernet,

2    didn't invent Power over Ethernet.

3              Did the '930 patent inventor invent the idea of

4    doing detection of remote equipment over Ethernet lines?

5    A.    No, they did not.

6    Q.    Is there something you're aware of, some prior work that

7    you're aware of that touched on that?

8    A.    Yes, sir.  I showed on the next slide a patent issued to

9    Cummings.

10   Q.    Can you tell us what we're looking at here and explain

11   what you mean by that?

12   A.    Yes, sir.  The left side is the front page --

13   Q.    And by the way, for the record, this is DX146.

14   A.    Yes, sir.

15             The front page is shown on the left, and on the

16   right, some things have been blown up, the inventor's name,

17   Mr. Cummings.  The patent was actually issued in April of

18   1995.

19             And then out of the abstract, they describe what it

20   is this patent does.  And in the three highlighted sections,

21   we see that they are wanting to do detection of the

22   disconnection of equipment from the network.

23             And then the second highlighted section, the way

24   they're going to do that is with a low level -- a low current

25   power signal that's provided to something they call a current

1    loop.

2              And then they -- down at the bottom, it says:  This

3    invention is particularly adapted to be used with an existing

4    10BaseT communication link.  10BaseT is slang for an Ethernet

5    network.

6    Q.    You say it's engineer slang for it?

7    A.    Yes, sir.

8    Q.    Okay.  Now, in light of all that background, all this

9    other prior art we've been talking about, what is it, in your

10   view, that the '930 patent did contribute to the state of the

11   art with their '930 patent invention?

12   A.    It's my opinion that the '930 patent contributed a very

13   narrowly defined different way of performing the detection

14   step.

15   Q.    And what is that in particular?

16             THE WITNESS:  Can we go to the next slide?

17   A.    This is my effort to try and depict what they do.

18   Remember we've got this idea of a low level current being

19   used in the patent, and the Court's construction for that is

20   shown on the right.

21             Everybody can probably repeat this with me by now,

22   but it's:  A non-data-signal current that is sufficient to

23   begin start up of the access device but that is not

24   sufficient to sustain the start up.

25             So what I have on the left is showing a low level

```
1    Q.    Do you see that this transistor over here -- it's an
2    active component, right?
3    A.    It has the potential to be in detection.  I'm not sure.
4    Q.    You see the DET pin up here?
5    A.    I do.
6    Q.    And the DET pin shows the detection current going into
7    one side of this transistor, right?
8    A.    Yes.
9    Q.    Now, you told us something about the background of the
10   technology and various items and -- and you talked about the
11   Fisher patent, right?
12   A.    I did.
13   Q.    And in your report -- in your report you mentioned --
14   from Page 43 to 44 you say:  I discussed with Mr. Fisher the
15   work that led to the 3Com Power over Ethernet patents on
16   September 19th, 2016.  During the call, Mr. Fisher explained
17   and so on.  Is that correct?
18   A.    What you have up here, yes.
19   Q.    And then you went on in the following pages of your
20   report to summarize the call.
21         For example, in Paragraph 100 from Page 46, you
22   began:
23         During my conversation with Mr. Fisher, Mr. Fisher
24   also discussed -- and you say Mr. Fisher stated -- Mr. Fisher
25   stated, Mr. Fisher stated.  During my conversation with Mr.
```

1    A.   No, sir.

2    Q.   Well, let's do this:  Let me show you another document.

3    This is something written by Dean Neikirk, the gentleman you

4    never talked to, never met.  And you'll see here it starts

5    out:  During my conversation with Mr. Fisher, Mr. Fisher also

6    discussed.  Mr. Fisher stated and so.  Do you see that?

7    A.   I do.

8    Q.   Now, let's do this, let's take your Paragraph 100 and

9    lay it over top of Mr. Neikirk's Paragraph 71.  Do you see

10   that they're identical?

11   A.   Yes, they look that way.

12   Q.   The truth is that you copied over 25 pages of your

13   report from Mr. Neikirk, right?

14   A.   No, sir.

15   Q.   Well, you would agree here these are so identical,

16   somebody copied somebody, right?

17   A.   I -- I don't know.  What I did was I took notes of --

18   the HP lawyers were -- were on the phone call with me and Mr.

19   Fisher.  I took notes.  I said this is what I heard, and this

20   is how I want my paragraph to -- to read, and -- and this is

21   what they sent me back as a draft that I read and said, yes,

22   this captures what he said.

23   Q.   So it was actually written by HP's lawyers; is that

24   right?

25   A.   The -- I gave them an outline of this is what I want to

1    say, and I'm not sure if -- if they typed it or a -- a clerk

2    typed it.  They sent it back to me as a draft, I reviewed it,

3    sent it forward and said this is what I want to say.

4    Q.   All right.  Let's take a look.  When did this happen in

5    relationship to finalizing your report?

6    A.   I'm sorry?

7    Q.   When did all that happen in relationship to when you

8    actually finalized and signed your report?

9    A.   The report was submitted the end of November of last

10   year.

11   Q.   And when was it that you drafted this and with the help

12   of the HP attorneys?

13   A.   Sometime after the conversation in September.

14   Q.   Now let's look at a couple of other examples.  Here's

15   Page 15 from Mr. Neikirk's report, Page 23 from yours.

16            Virtually identical, right?

17   A.   It's hard to say.

18   Q.   Let's take a look at Page 19 from Mr. Neikirk, Page 27

19   from your report.  Word-for-word identical, right?

20   A.   I can't say that.  It's all mashed together.

21   Q.   Well, take a look at the top, the top paragraph.  Those

22   words -- those -- the top paragraph is word-for-word

23   identical, right?

24   A.   The first couple of lines appear to be, yes.

25   Q.   Here's a paragraph -- or Page 33 from Mr. Neikirk's

```
1    report, Page 45 from your report.  Appear to be either
2    identical or very close, right, just looking at them?
3    A.    Yes.
4    Q.    Page 35 from Mr. Neikirk's report, Page 47 from yours.
5    Word-for-word identical, right?
6    A.    I'm not sure.
7    Q.    Well, you both include the same figure, right?  Right?
8    A.    Yeah, we both have the same figure.
9    Q.    Now, sir, for all these words to match up like this
10   you've got to agree that this wasn't a coincidence, it was --
11   somebody was copying somebody, right?
12   A.    Copying may be a -- a strong term.  Certainly there --
13   there's lots of information that was already out there and --
14   and written up, especially on some of the prior art stuff.
15   Q.    There's a lot of stuff that's out there that's written
16   up, but how you chose to write up your conversation with Mr.
17   Fisher turned out to be identical to what Mr. Neikirk had
18   written on his, right?
19   A.    I -- I don't remember.  It looked close.
20   Q.    Now, Mr. Neikirk finished his report, signed it,
21   submitted on October 14th, right?
22   A.    That appears to be true.
23   Q.    You submitted your report November 30th, 2016, right?
24   A.    Yes.
25   Q.    Six weeks later?
```

```
 1                        CERTIFICATION

 2

 3              I HEREBY CERTIFY that the foregoing is a true

 4   and correct transcript from the stenographic notes of the

 5   proceedings in the above-entitled matter to the best of our

 6   abilities.

 7

 8

 9   /s/ Shea Sloan
     SHEA SLOAN, CSR                        November 9, 2017
10   Official Court Reporter
     State of Texas No.:  3081
11   Expiration Date:  12/31/18

12

13

14   /s/ Judith Werlinger
     JUDITH WERLINGER, CSR
15   Deputy Official Court Reporter
     State of Texas No.:  731
16   Expiration Date  12/31/18

17

18

19

20

21

22

23

24

25
```