# EXHIBIT 5

```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE EASTERN DISTRICT OF TEXAS
 2                               TYLER DIVISION

 3

    NETWORK-1 TECHNOLOGIES, INC.  )
 4                                         DOCKET NO. 6:13cv72
        -vs-                      )
 5                                         Tyler, Texas
                                 )  8:17 a.m.
 6  HEWLETT-PACKARD COMPANY, ET AL   November 10, 2017

 7

                          TRANSCRIPT OF JURY TRIAL
 8                            MORNING SESSION
                BEFORE THE HONORABLE ROBERT W. SCHROEDER III
 9                   UNITED STATES DISTRICT JUDGE

10

                          A P P E A R A N C E S
11

12  FOR THE PLAINTIFF:

13  MR. GREGORY DOVEL
    MS. CHRISTIN CHO
14  MR. JONAS JACOBSON
    DOVEL & LUNER
15  201 Santa Monica Blvd., Ste. 600
    Santa Monica, CA 90401
16

17  MR. T. JOHN WARD JR.
    WARD, SMITH & HILL, PLLC
18  1507 Bill Owens Parkway
    Longview, TX 75604
19

20

21
    COURT REPORTER:          MS. JUDY WERLINGER CSR, CRR
22                           DEPUTY OFFICIAL COURT REPORTER
                             P.O Box 75
23                           Marlin, TX 76661

24  Proceedings taken by Machine Stenotype; transcript was
    produced by a Computer.
25
```

```
 1   FOR THE DEFENDANTS:

 2
     MS. JENNIFER DOAN
 3   MR. JOSH R. THANE
     HALTOM & DOAN
 4   6500 Summerhill Road, Ste. 100
     Texarkana, TX 75503
 5

 6   MR. DAVID H. DOLKAS
     MS. JODI BENASSI
 7   MCDERMOTT WILL & EMERY LLP
     275 Middlefield Road, Ste. 100
 8   Menlo Park, CA 94025

 9
     MS. NATALIE A. BENNETT
10   MCDERMOTT WILL & EMERY LLP
     500 North Capitol Street, NW
11   Washington, DC 20001

12
     MR. HERSH H. MEHTA
13   MCDERMOTT WILL & EMERY LLP
     444 West Lake St.
14   Chicago, IL 60606-0029

15
     MR. MARK E. FERGUSON
16   MR. MARK S. OUWELEEN
     MS. FAYE E. PAUL
17   BARTLIT BECK HERMAN
        PALENCHAR & SCOTT LLP
18   54 W. Hubbard St., Ste. 300
     Chicago, IL 60654
19

20

21

22

23

24

25
```

1    patent, yes, they could apply for re-examination.

2    Q.    And, indeed, in the '401 reexamination, Network-1 did

3    apply for additional claims, didn't they?

4    A.    They did submit new additional claims, yes.

5    Q.    So let's talk about when the re-examination is

6    instituted or granted.  What has to happen first?

7    A.    Well, the Patent Office has to decide whether or not the

8    evidence that's submitted to the Patent Office in the request

9    for re-examination, this new evidence that I talked about,

10   whether that establishes what's called a substantial new

11   question of patentability.

12            In other words, is the information that the

13   requester puts forward to base the re-examination on, does it

14   raise the question of patentability of the claims?

15   Q.    Okay.  And, indeed, was there a substantial new question

16   of patentability to be determined?

17   A.    Yes.  The Patent Office decided that there was a

18   substantial new question of patentability in the -- in the

19   request for the first re-examination, so they started the

20   process of re-examination.

21   Q.    And in the first re-examination, were all of the claims

22   of the '930 patent rejected?

23   A.    Initially, yes.  The first office action by the PTO,

24   they rejected the claims, yes.

25   Q.    And after all the claims of the '930 patent were

1   Q.   Yeah.  I'm focusing on the '401 right now --

2   A.   Right.

3   Q.   -- with respect to that case.

4   A.   Right.

5   Q.   Okay.  Do you recall whether any of the pleadings in

6   that case were filed with -- in this particular case were

7   filed in the '401 re-exam?

8   A.   I don't believe so, no.

9   Q.   And after there was a private meeting, with respect to

10  Dr. Knox and Corey Horowitz and the lawyers, what happened to

11  the claims?

12  A.   The -- the next action was by the Patent Office, and

13  they confirmed the patentability of those claims.

14  Q.   Okay.  But, again, the patentability was confirmed

15  without hearing from David Fisher, the Fisher system, the

16  witnesses in this case, and all the documents in this case.

17  A.   Correct.  The Patent Office didn't have all of the

18  information that the jury has now in this case.

19  Q.   All right.  Now, there was another re-examination,

20  right?

21  A.   The second -- yeah, the second re-examination.

22  Q.   And is that the '444 re-examination?

23  A.   Yes.

24  Q.   Tell us about that.

25  A.   Well, it was a second request or second challenge, and

```
 1    it was a request to re-examine the case -- or the '930 a
 2    second time.  My recollection, it was filed by Sony
 3    Corporation.
 4    Q.    So it was filed by Sony.  So Sony actually thought they
 5    ought to at least be able to speak or submit whatever they
 6    wanted to to the Patent Office?
 7    A.    Correct.  They get to submit one time.  They get to
 8    submit the request for re-examination with what they consider
 9    to be new information that would establish a substantial new
10    question of patentability.
11    Q.    And was there, indeed, found again the second time, a
12    substantial new question of patentability?
13    A.    Yes.  The Patent Office found that there was, based on
14    the information that Sony sent in.
15    Q.    And what does that mean, a substantial new question of
16    patentability?
17    A.    Well, it just means that in view of the information that
18    was submitted in that request from Sony, it raised questions
19    with respect to the patentability of the claims in the '930
20    to the high enough extent that the Patent Office figured it
21    was worth taking a second examination --
22    Q.    Okay.
23    A.    -- a re-examination.
24    Q.    And so they granted a second re-examination, and, again,
25    did the Patent Office hear from David Fisher or the Fisher
```

1   system?

2   A.   No.   That wasn't part of what the Patent Office

3   considered.

4   Q.   Did they hear from the various witnesses in this

5   particular case with respect to David Tremblay or Brian

6   Dowling or David Dwelley or the TI witnesses and Microsemi

7   witnesses?   Did they hear from any of those witnesses?

8   A.   No.   No.   They were -- the PTO did not hear from them,

9   no.

10  Q.   What happened to the claims in the '444 re-exam?

11  A.   Well, again, similarly they were -- they were initially

12  rejected by the Patent Office.

13  Q.   All claims that were submitted for re-examination were

14  initially rejected?

15  A.   That's my recollection, yes.

16  Q.   And then what happened?

17  A.   And then there was another interview similar to the

18  first re-examination where essentially the same folks that

19  were -- that came in for the interview in the first

20  re-examination came in and talked to the Patent Office again.

21  Q.   So the Patent Office found a substantial new question

22  about the patentability, like I'm wondering if this is right;

23  is that fair?

24  A.   Correct.

25  Q.   And then they rejected all the claims.

1    A.    Correct.

2    Q.    And then Corey Horowitz and his team came and visited

3    with the Patent Office in private?

4    A.    Again, just like they did in the first one, yes.

5    Q.    Is that proceeding recorded so that we can review it and

6    see what they said to the Patent Office?

7    A.    It's not recorded verbatim, but there is a summary that

8    the patent examiner will -- will write up and put into the

9    file, a short summary, but it's clearly not everything

10   that -- it's not recorded in the sense of a transcript or a

11   tape or anything like that.

12   Q.    Who was with Mr. Horowitz in this second visit to the

13   Patent Office?  Was his legal team there as well?

14   A.    Yes.  That's my recollection, yes.

15   Q.    And that included again Mr. Dovel's partner, Sean Luner?

16   A.    That's my recollection, yes.

17   Q.    And, again, did Mr. Knox -- Dr. Knox --

18            MS. DOAN:  I'm sorry, Dr. Knox.

19   Q.    (By Ms. Doan) -- travel to Washington, D.C. to speak to

20   the Patent Office?

21   A.    I believe he did, yes.

22   Q.    Did the Patent Office get to hear in the '444

23   re-examination about the prior art combination that this jury

24   is going to hear about?

25   A.    No.  The -- the request for re-examination that came in

1    that outlined the combination didn't include the combination

2    that I understand will be brought forward to the jury in this

3    case.

4    Q.   And that's the Fisher, Chang, and Woodmas combination?

5    A.   Correct.

6    Q.   Did they get to hear from any of the HP witnesses about

7    how HP's product worked?

8    A.   No, they didn't hear from HP.

9    Q.   Did they get to hear about anybody from the IEEE?

10   A.   No.

11   Q.   Did they hear about any -- did they hear about anything

12   else that -- the documents that we have in this particular

13   case, with respect to the expert reports in this case, were

14   they before the re-examination board?

15   A.   To the best of my recollection, I don't believe the

16   expert reports in this particular case were.  There were some

17   documents that were submit -- there were -- there was a long

18   list of documents in the second -- in the second

19   re-examination --

20   Q.   There were --

21   A.   -- that were submitted.

22   Q.   There were some.

23   A.   Yes.

24   Q.   And there -- in fact, our invalidity contentions were

25   brought before the Patent Office, right?

1  Q.   And to be fully candid, the Patent Office has seen the
2  Fisher patent by itself, right?
3  A.   Yes.   That's what I was alluding to, yes.   It was -- it
4  was cited in -- in -- in the file, yes, amongst many other
5  patents.
6  Q.   And the Patent Office has seen the Chang reference by
7  itself, fair?
8  A.   Correct.
9  Q.   And it's seen the Woodmas reference by itself, correct?
10 A.   Yes.
11 Q.   But each of them are missing certain elements that, in
12 combination, have never been before the Patent Office.
13 A.   Exactly.   The -- the explanation of combining and how
14 those patents might be combined to invalidate the patent,
15 that explanation was never before the Patent Office.
16 Q.   And then Judge Fogel goes on to say:   And of course,
17 there's a possibility that mistakes were made or important
18 information was overlooked.
19      Do you see that?
20 A.   Yes.
21 Q.   And I know you used to be the former commissioner of
22 patents.   Mistakes can happen anywhere, fair?
23 A.   We're all human, and mistakes can be made.   And, you
24 know, one of the -- one of the things that could occur is
25 that they didn't have -- when the Patent Office made the

1  A.    I'd like to explain what an IDS is.

2  Q.    Yeah, sure.

3  A.    An IDS is an information disclosure statement, and that

4  would have been sent in or this one was sent in by the patent

5  owner during the reexamination process.   It's different than

6  the request for reexamination.   The request for reexamination

7  only lists three or four or five patents and describes in

8  detail the case to be made why the claims would -- would not

9  be patentable.

10        After that, an IDS is filed or could be filed and

11  it is -- an IDS is literally just a list of patent numbers,

12  and the three patents that you just mentioned were submitted

13  in that type of an IDS filing.

14  Q.    And I've put that on the board now.   That's D97, Page

15  860.   Is this what you're referring to?

16  A.    Yeah.   That's the listing.   I mean, it's literally a

17  list of patent numbers.   Yes.   These no -- there's no

18  explanation.   There's no discussion of those documents.

19  Q.    And it mentions Chang, Woodmas and Fisher, right?

20  A.    Correct.

21  Q.    Now, did you see whether there was actually any

22  discussion in the reexams of Chang, Woodmas, and Fisher, that

23  is, discussion by the patent owner?

24  A.    In -- in any other -- either of the reexaminations?

25  Q.    Right.

1    2003, went on to be responsible for 3Com -- excuse me --

2    Texas Instruments' RF and wireless.  The world's first single

3    chip, 802.11 chip, for mobile phones was ours, and we went to

4    number one market share in Wi-Fi in cell phones.

5            And what you now -- you know, when you use your

6    cell phone and you're using the Wi-Fi, that's a lot of stuff

7    that we pioneered in that time frame.

8            After that, 3Com -- excuse me -- TI got out of the

9    wireless business, and I went off in 2008 to start my own

10   company again called R2 Semiconductor where we went off and

11   developed some very high-performance technology for power

12   management, and I am presently doing power management and

13   President and CEO of R2.

14           QUESTION:  In general, what were your roles and

15   responsibilities while you were employed at 3Com?

16           ANSWER:  I was responsible for developing the

17   wireless networking technology.  I managed an engineering

18   group, and I was the guy that worried about the system

19   problems, you know, was kind of the key architect on a lot of

20   things and managed the engineers' day-to-day activity.

21           QUESTION:  Did you ever do any research or

22   development in the Power over Ethernet field?

23           ANSWER:  Yeah, we did.  I -- myself and Larry were

24   kind of the key inventors of it.

25           QUESTION:  And who is Larry?

1          ANSWER:   Excuse me?

2          QUESTION:   Who is Larry?

3          ANSWER:   Larry Burns was co-inventor, and his name

4     is on the patent.

5          QUESTION:   How did the idea come about to do the

6     research on Power over Ethernet?

7          ANSWER:   We were -- as we were developing the

8     wireless data network, one of the marketing requirements and

9     the feedback we got from the IT managers, information

10    technology managers, the guys that took care of the Ethernet

11    and the data networking corporations, is they really did not

12    want the access point sitting on a desktop.  They wanted it

13    someplace remote, someplace that people couldn't pick it up

14    and take it.

15         Data networking was all very new at the time, and

16    one of the common problems people had was people were

17    unplugging things.  You know, they would see something new

18    and go:  Hey, what's that, you know, and they unplug it, and

19    the network goes down.

20         So one of the key requirements for rolling out the

21    technology was making it remote that the average person

22    couldn't gain access to.

23         So about that time, people were mounting

24    projectors.  Instead of having a, you know, projector on your

25    desk, they were starting to mount them on the ceiling.  And I

1    was sitting there one day going, well, we could put that up

2    there.

3           And that came -- then I realized quickly that if we

4    hung the access point from the ceiling, we would solve the

5    remote problem, that people couldn't touch it easily, and we

6    had better coverage.  You could get better coverage

7    wirelessly, cover more area more thoroughly.

8           The problem then was how do you get DC power to it?

9    Nobody wanted to call the electrician to run an AC outlet up

10   there for 110.  You know, in a building like we're in today

11   and most commercial buildings, you'd have to get a

12   licensed -- and certainly in San Francisco, it would have to

13   be unionized, a union electrician, and they'd have to run

14   metal conduit, and they'd have to run wires.

15          And the building code for all of that drove the

16   expense up, and we realized that the better way to do it was

17   to run the power over the data line and remotely power it.

18          And as we started thinking about that, it also gave

19   rise to addressing solutions -- addressing another key

20   care-about, which was security.

21          In the early days of data networking, when

22   everybody had a desktop computer and it was just then moving

23   to portable computers, the IT managers never worried so much

24   about security of the network, because if you got through the

25   front door, you were either an employee or you were allowed

1    to be there, and nobody carried a desktop computer with them,

2    you know.

3                So up until that time frame, IT managers didn't

4    really worry about network security.  They figured, if you

5    were there and you had access to the building, you could --

6    you were allowed to be there, and you could stick an Ethernet

7    cable in, and you were supposed to be there, right?

8                But they released all of a sudden, with the advent

9    of the notebook computers or portable computers, as we called

10   them then, that somebody could walk in and plug into the

11   network.

12               So in that time frame, 1993, '94, '95, with the

13   advent of portable computing, IT managers were just then

14   starting to think about securing the premise, and they

15   realized they had a really big hole coming up that anyone

16   could walk in with a wireless access point, plug it in, walk

17   out of the building, and then sit in the parking lot, and

18   access the network.

19               So in that time frame, the key care-abouts of make

20   it hard for the average person to get to, so they don't

21   unplug it and do something, make it secure and make it that

22   we can manage security.

23               All of those things kind of conspired and came

24   together to -- and the Power over Ethernet was a great way to

25   solve it.  We didn't have to call an election.  We could

 1    remotely power it.  We could authenticate and identify what
 2    it was.  We could shut it down.  There was all sorts of
 3    remote management, remote manageability once we had the
 4    solution in place.
 5                So those -- I'm sorry -- long answer to a short
 6    question, but those were the motivations at the time.
 7                QUESTION:  During your research in the Power over
 8    Ethernet field, was one of your concerns whether or not the
 9    device -- the access device that was plugged into the
10    Ethernet cable, was actually capable of using Power over
11    Ethernet?
12                ANSWER:  It was kind of the opposite of that.  We
13    wanted to make sure that we weren't blowing up a regular
14    Ethernet adapter card.
15                So we didn't care -- we weren't so much concerned
16    with was it PoE; we were more concerned with was it not PoE.
17                You know, because at the time, and still is today
18    the case, in order to impedance match the Category 5 wiring
19    or the Ethernet wiring in the building, they hang a 75-ohm
20    resistor on each end.
21                And if all you did was had that resistor out there,
22    which was on your Ethernet card, and you plug the cable into
23    a Power over Ethernet for a 24-volt supply, so much current
24    would go down, you would blow up the Ethernet card.
25                So we were more concerned about detecting that it

1    wasn't an Ethernet card; and if there was an Ethernet card

2    that got plugged in by mistake, you shut down right away.

3          And then if you got beyond that state, then you

4    were authenticating for security, and was this a network

5    device allowed to attach to the network, and could you

6    control it to keep -- could you turn it off at night?  Could

7    you manage every node and keep track of who was out there?

8          So once -- you know, once you authenticate and you

9    know that the access point is allowed to be there hooked up

10   with Power over Ethernet, well, you want to make sure that

11   all the wireless network, all the wireless cards that come in

12   similarly are allowed on the network.

13         And those were the kinds of concerns that we cared

14   about.

15         QUESTION:  Have you ever had applied for and

16   received any patents?

17         ANSWER:  Yes.

18         QUESTION:  You have in front of you what's been

19   marked as Exhibit 1, which is three pictures.

20         ANSWER:  Yeah.

21         QUESTION:  Do you recognize what's shown in

22   Exhibit 1?

23         ANSWER:  I do.

24         QUESTION:  Are you familiar with the devices that

25   are portrayed in these three photographs?

1              ANSWER:  Very familiar with them.

2              QUESTION:  And how are you familiar with these

3    devices?

4              ANSWER:  Those are the access point motherboard,

5    the access point, and the access point mounting bracket that

6    I designed in '94 through '94 time frame.

7              QUESTION:  Did you take these photographs?

8              ANSWER:  I did.

9              QUESTION:  Do the photographs fairly and accurately

10   represent the devices as they existed in 1996?

11             ANSWER:  These are pictures of devices that were

12   second-generation devices that were built and assembled in

13   '96.  And you can see the -- the stenciling on this 3Com

14   board that says:  All right reserves (sic), Copyright 1996.

15             QUESTION:  Were the devices that are in the three

16   pictures of Exhibit 1 all in existence in 1996?

17             ANSWER:  Yeah, uh-huh, they were.  And I still have

18   them in my backpack.

19             QUESTION:  Mr. Fisher, you have in front of you

20   what's been marked as Exhibit 1, which is three pictures.  Is

21   there any way that you can tell from these pictures when this

22   access device was built?

23             ANSWER:  Well, this would have been assembled

24   sometime in 1996 because of the date on the silk screen, on

25   the motherboard.

1          QUESTION:   I believe you mentioned earlier today

2     that you have these devices with you?

3          ANSWER:   I do.

4          QUESTION:   Could you access those?

5          ANSWER:   Yeah.   Yes.

6          This was a first-generation of the -- sorry.   This

7     is the first generation of a prototype where you stick this

8     into the front of the hub, and then the Ethernet cable went

9     in here to remotely power it.

10          So this is the mounting bracket that we mentioned

11    before, and I was really proud of this because I had two

12    little clips, and you just stick it up to the T-bar and go

13    click, like that, and that's the one picture you see.

14          And then this is the access point.   And the cover

15    on the back, which may not be here, snapped on like that, and

16    there was a nice, pretty plastic thing over it.

17          And this was the antenna.   I think he indicated

18    2.4 gigahertz.   So this thing would sit on top, attach to the

19    T-bar, and this thing attached to it, and then you had your

20    coverage.

21          These are the boards that are inside of this.   We

22    can take that out, if you'd like.   The radio portion of it

23    was in the bottom, and that's just the radio, of which I've

24    got a card here somewhere.

25          And this is the access point that actually had the

1    Power over Ethernet electronics.  And these are just the

2    PCMCIA cards that would -- you know, you would put in your

3    computer and talk on the other side.

4              And -- and that was other stuff.  So, yeah, I've

5    got all that kind of stuff around here.

6              QUESTION:  So the system that you've just shown us,

7    is it okay if I call this the Fisher system?

8              ANSWER:  Sure.  You can call it the Fisher system.

9    It was the -- it was the first Power over Ethernet.  And I

10   was thinking, if I were really bold, I would get out the

11   charger and the Ethernet and fire it up, which we probably

12   could do.

13             You know, this was the -- just a regular wall wart

14   that -- in this prototype -- it was in the days -- this was a

15   prototype that existed prior to us building it into the hub.

16             So in order to test it, we would, you know, plug

17   that in, stick this into the front of the hub, and then take

18   the 10BaseT wiring that was in the building and plug it in

19   here, so...

20             QUESTION:  And did you actually implement powering

21   an access device using Power over Ethernet technology in

22   1996?

23             ANSWER:  Well, we probably had it working in '95.

24   This was second generation that was done in '96.  But, yeah,

25   we probably had done it in 1995.  But, yeah, this was -- this

1    was it.

2              QUESTION:   Did the Fisher system do any type of

3    staged powering up?

4              ANSWER:   Yeah.   We powered up -- the first thing we

5    did was set a current limit to make certain we weren't --

6    nobody inadvertently attached a regular Ethernet device so we

7    didn't blow it up.

8              Regular Ethernet devices have 75-ohm resistors.

9    Actually, they're in parallel, so you could have much lower

10   resistance.   But if you just hooked up a very stiff power

11   supply to a regular Ethernet port, you're likely to blow it

12   up, and, in fact, I did once.

13             So we set a current limit that you would check

14   quickly to see if -- as long as you didn't exceed current

15   limit and were able to maintain a voltage, it didn't shut

16   down the power supply.

17             And then you would go on to an authentication

18   process by which you would decide whether that thing was

19   allowed on the network -- or whether the access point was

20   allowed on the network or not.

21             And then from there, lots of things can happen.

22   You can increase the power limit.   You can decrease it.

23   There was all sorts of possibilities that we had conceived

24   of, depending on what the eventual limit would be.

25             QUESTION:   Was the power that was used during the

1    detection and authentication that you've just described

2    sufficient to power the entire access device?

3              ANSWER:   No.   No.   We tried to keep it very -- and,

4    remember, the entire access device -- you know, we -- nothing

5    existed.   This was the very first Power over Ethernet thing,

6    and it consumed -- when you turned the radios on, it consumed

7    a lot more power than during the initial process.

8              But we did no -- we knew that people would

9    eventually put all sorts of things on the network.   We just

10   didn't know what.   So we were certain in our case to keep the

11   power limited during the initial association and

12   authentication and then crank up the power.

13             QUESTION:   In the late 1996 time frame, was it

14   routine for systems engineers to implement a staged

15   power-up-type system?

16             ANSWER:   I would say yeah.   Yes.   I would say yes.

17   It was pretty routine.

18             QUESTION:   I'm going to hand you what is being

19   marked as Exhibit 5, which is U.S. Patent No. 5,994,998

20   titled, Power Transfer Apparatus for Concurrently

21   Transmitting Data and Power Over Data Wires, with the named

22   inventors as being David Fisher and Lawrence Burns and

23   Stephen Muther.

24             Do you recognize this document?

25             ANSWER:   Yeah.   It's a patent.

1          QUESTION:   Is the invention that is captured in the

2   '998 patent, is that a result of the development of the

3   Fisher system that we discussed earlier today?

4          ANSWER:   Yes, it is.

5          QUESTION:   Do the '998 patent and the Fisher system

6   disclose a system for providing current and network data

7   traffic over the same Ethernet line to a remote device?

8          ANSWER:   It does.

9          QUESTION:   And do the '998 patent and the Fisher

10  system disclose providing Power over Ethernet to a remote

11  access device?

12         ANSWER:   It does.

13         QUESTION:   Can you please explain to the jury how

14  the '998 patent and the Fisher system disclosed providing

15  Power over Ethernet to a remote device?

16         ANSWER:   Well, I haven't read this thing in

17  20 years, but the -- the notion of -- like in the first page,

18  there is a power and data coupler, which was ostensibly this

19  guy, which, you know, 110 was -- this was power and data

20  coupler, and here is the external power source, which is 150

21  in the patent, and this little cable, 120, on that picture,

22  that's 120 right here.

23         That's -- I'm sorry.   This is 120 right here.   The

24  data signal is 104.   And so this is the cable data signal 104

25  that goes off to the communication network, which, in this

case, would be the form of a Ethernet hub or router.  So this is 104.

If I had a data -- if I had a Ethernet cable with me, which, strangely, I do -- so this is a Cat 5 Ethernet cable.  So this would be 107.  And if we took this apart, you know, this would be 107, which got plugged right in here, like that.  And the other end of 107 would go into this, which is the wireless access point.

And the power and data decoupler is this little gizmo right here.  And out -- you know, that would be 170, is this guy right here.  So the power signal 105 is buried inside the trace, and that goes into the voltage regulator gizmo.

And the network device 100 is this guy right here that says parallel tasking, the 3Com Ethernet, and then, of courts, the microcontroller that ran all the protocol stacks. So this is all kind of -- everything else here is sort of 100 on that.

And the way it basically worked was this guy injected the power, and here is where it comes in across the Cat 5, and we strip the power off here and send the data over here to the Ethernet chip.

And, yeah, that's all pretty much in that.

QUESTION:  Was the Fisher system capable of determining whether or not an access point was able to accept

1          QUESTION:   Do you have any recollection of

2   presenting the authentication system that you had developed

3   at 3Com to the IEEE task force?

4          ANSWER:   I don't -- I can't answer that.   I don't

5   recall.

6          QUESTION:   Do you recall if anybody else at 3Com

7   presented that authentication system to the IEEE task force?

8          ANSWER:   I have no knowledge.

9          QUESTION:   Are there any documents that you

10  retained yourself relating to this authentication system?

11         ANSWER:   No.   No.   I didn't retain any of that

12  documentation.

13         QUESTION:   Was this authentication system concealed

14  from the public?

15         ANSWER:   I can't answer that.

16         QUESTION:   When you say you can't answer that --

17         ANSWER:   I don't know.   I don't know.

18         QUESTION:   And did you have any conversations with

19  experts in this litigation?

20         ANSWER:   Well, you mean -- I have to be careful.

21  Over the last 20 years, I've probably been -- I've been

22  involved in a number of litigations on Power over Ethernet.

23  I don't quite know what you mean by "this litigation."

24         QUESTION:   I mean this case concerning the '930

25  patent.

1    here --

2                ANSWER:  Uh-huh.

3                QUESTION:  -- these are all taken at the same time;

4    is that correct?

5                ANSWER:  Yeah.  Yeah.

6                QUESTION:  And that was maybe a few months ago; is

7    that correct?

8                ANSWER:  Sometime in the last year.

9                QUESTION:  Okay.  Under your system, during

10   authentication, the access device would start up and operate

11   and send the data back and forth to the switch; is that

12   correct?

13               ANSWER:  The -- in operation, when the device was

14   plugged in, you know, the first thing it had to do was to

15   make sure it wasn't an Ethernet thing.  Otherwise, the power

16   supply on the host end would shut down.

17               Then, inevitably, we would exchange data packets

18   for authentication, and information passed back and forth at

19   a high level.

20               QUESTION:  Okay.  So in the detection system that

21   you invented, the first thing that would happen is that some

22   power would be sent to the access point, the access point

23   would start up, operate, and send some data back to the

24   security server; is that correct?

25               ANSWER:  That's correct, uh-huh.

1          COURT SECURITY OFFICER:  All rise.

2              (Lunch recess.)

3

4                        CERTIFICATION

5

6              I HEREBY CERTIFY that the foregoing is a true

7    and correct transcript from the stenographic notes of the

8    proceedings in the above-entitled matter to the best of our

9    abilities.

10

11

12   /s/ Shea Sloan                 November 10, 2017
     SHEA SLOAN, CSR
13   Official Court Reporter
     State of Texas No.:  3081
14   Expiration Date:  12/31/18

15

16
     /s/ Judith Werlinger
17   JUDITH WERLINGER, CSR
     Deputy Official Court Reporter
18   State of Texas No.:  731
     Expiration Date  12/31/18
19

20

21

22

23

24

25