# EXHIBIT 6

```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
 2                            TYLER DIVISION

 3
       NETWORK-1 TECHNOLOGIES, INC.   )
 4                                            DOCKET NO. 6:13cv72
           -vs-                       )
 5                                            Tyler, Texas
                                      )  12:59 p.m.
 6     HEWLETT-PACKARD COMPANY, ET AL    November 10, 2017

 7
                        TRANSCRIPT OF JURY TRIAL
 8                         AFTERNOON SESSION
              BEFORE THE HONORABLE ROBERT W. SCHROEDER III
 9                   UNITED STATES DISTRICT JUDGE

10
                         A P P E A R A N C E S
11

12     FOR THE PLAINTIFF:

13     MR. GREGORY DOVEL
       MS. CHRISTIN CHO
14     MR. JONAS JACOBSON
       DOVEL & LUNER
15     201 Santa Monica Blvd., Ste. 600
       Santa Monica, CA 90401
16

17     MR. T. JOHN WARD JR.
       WARD, SMITH & HILL, PLLC
18     1507 Bill Owens Parkway
       Longview, TX 75604
19

20

21
       COURT REPORTER:          MS. JUDY WERLINGER CSR, CRR
22                              DEPUTY OFFICIAL COURT REPORTER
                                P.O Box 75
23                              Marlin, TX 76661

24     Proceedings taken by Machine Stenotype; transcript was
       produced by a Computer.
25
```

```
 1   FOR THE DEFENDANTS:

 2
     MS. JENNIFER DOAN
 3   MR. JOSH R. THANE
     HALTOM & DOAN
 4   6500 Summerhill Road, Ste. 100
     Texarkana, TX 75503
 5

 6   MR. DAVID H. DOLKAS
     MS. JODI BENASSI
 7   MCDERMOTT WILL & EMERY LLP
     275 Middlefield Road, Ste. 100
 8   Menlo Park, CA 94025

 9
     MS. NATALIE A. BENNETT
10   MCDERMOTT WILL & EMERY LLP
     500 North Capitol Street, NW
11   Washington, DC 20001

12
     MR. HERSH H. MEHTA
13   MCDERMOTT WILL & EMERY LLP
     444 West Lake St.
14   Chicago, IL 60606-0029

15
     MR. MARK E. FERGUSON
16   MR. MARK S. OUWELEEN
     MS. FAYE E. PAUL
17   BARTLIT BECK HERMAN
        PALENCHAR & SCOTT LLP
18   54 W. Hubbard St., Ste. 300
     Chicago, IL 60654
19

20

21

22

23

24

25
```

1    A.    It -- it has to be obvious to one of ordinary skill.

2    And, again, in this case it's someone with a bachelor's

3    degree in electrical engineering or an equivalent field.

4    Q.    Okay.  And you look at it not today but back at the time

5    period of the claimed invention?

6    A.    Yes.  I look at it through the eyes of that person at

7    the time of the invention.

8    Q.    And your standard is by clear and convincing evidence?

9    A.    Yes, it is.

10   Q.    Did you find it by clear and convincing evidence?

11   A.    Yes, I did.

12   Q.    Now let's look at this.  What have we learned in this

13   case so far about detection methods being well-known in the

14   late 1990s?  Who have you heard that from in this case?

15   A.    I believe Mr. Horowitz testified to that, but we've seen

16   plenty evidence of that.

17   Q.    Okay.  Did you also see documents that reflected that in

18   writings from Mr. Horowitz?

19   A.    Yes, I did.

20   Q.    And we also saw Dr. Fisher just testify at the very end

21   of the video about things were well known?

22   A.    Yes.

23   Q.    Detection methods?

24   A.    Yes, we did hear that from him this morning.

25   Q.    Now let's look at the -- the prior art.  And I want to

1    report.  I don't want this time taxed against me.

2              THE COURT:  I understand.  So you just need to be

3    careful about how you phrase your questions.

4              MS. DOAN:  I will.  No problem.

5              MR. DOVEL:  Thank you, Your Honor.

6              (Bench conference concluded.)

7    Q.   (By Ms. Doan) Mr. -- Dr. Neikirk, was Mr. Fisher's

8    system, was it in public use?

9    A.   Yes, I believe it was.

10   Q.   And has it been corroborated here that it was in public

11   use?

12   A.   Yes.  Dr. Fisher told us this morning that they built a

13   system, they plugged it into the network at their offices and

14   used it.

15   Q.   But other than that, do -- do we also have additional

16   evidence of corroboration on the system itself?

17   A.   Yes, there is.  If you look at the printed circuit

18   board -- I think Dr. Fisher also mentioned this this

19   morning -- you can look at that board and there's a marking

20   on it that says Copyright 1996.

21             MS. DOAN:  Your Honor, we'd like to publish the

22   Fisher -- one of the switchboards to the jury.

23             THE COURT:  Any objection to that?

24             MR. DOVEL:  No objection, Your Honor.

25             THE COURT:  Very well.

1    Q.    (By Ms. Doan)  And what does the Fisher system teach us?

2    A.    If we look at the Fisher system -- and I think, yes,

3    here we can go back to the system.

4    Q.    Sure.

5    A.    In the lower right-hand corner it is an access point, a

6    Wi-Fi hotspot or Wi-Fi access point.  That is a device

7    that -- that exchanges -- sends and receives data over

8    Ethernet cable.  That is an access point.

9           You can see what I labeled 3, that's the

10   Ethernet connector.  And as we saw Dr. Fisher showing

11   this morning with the cable, that is a data signaling

12   pair that connects this to the rest of the network.

13   Q.    And what else does it teach us?

14   A.    If you look at and listen to what -- he described how it

15   operates when it's plugged into the network.  He mentioned

16   that it's connected to a hub or a switch, which is basically

17   what we've been seeing for the last week.

18          That device certainly requires a DC power supply.

19   There's no other way to get a hub to work.  So there's also a

20   main power source in the hub or switch that this access point

21   would have to be connected to.

22   Q.    All right.  So the Fisher system, when you go back to

23   your pieces and you compare them to the actual Fisher system

24   to the claims in the -- in the '930 patent, which of these

25   elements does it teach us?

1  A.    So, again, we're -- we're looking for these key pieces.

2  And we have data node which was one, and we have main power

3  source -- I don't know whether -- we have access device --

4  I'm sorry -- two, and we have data signaling pair, and we

5  have a main power source, four.

6  Q.    All right.   And did you also look at the Fisher patents?

7  A.    Yes, I did.

8  Q.    All right.   So look at the -- the tag line at the

9  beginning says Fisher '998.   Did you look at just the '998 or

10  did you look at all the Fisher patents?

11  A.    No, I looked at both U.S. patents and the PCT.

12  Q.    All right.   So there's a Fisher '998 and the '704 and

13  the European patent.

14  A.    Yes, that's correct.

15  Q.    And what does the Fisher -- what do the Fisher patents

16  teach us?

17  A.    So if we looked at the Fisher patent -- and I think

18  let's go to Figure 2, I think it is, is a good one to look

19  at -- well, actually --

20  Q.    Let's look at the abstract first if you don't mind.

21  A.    We can look at the title and the abstract.   The title

22  tells us it's specifically about supplying electrical current

23  powering a wireless access point and doing that concurrently

24  with network data across a transmission line.   The

25  transmission line is that cable that connects the boxes

1    together.

2    Q.    All right.   And we're on -- we're at DX157.   Tell us

3    what the abstract teaches us as well.   And the abstract's on

4    the first page of the patent, right?

5    A.    Yes, it is.

6    Q.    Okay.   And there's also Figure 1 below -- below the

7    abstract?

8    A.    Yeah.   That's -- it's not labeled Figure 1.   On the next

9    page it'll be Figure 1.

10   Q.    Okay.   And then tell me what the -- tell me what the

11   abstract teaches us.

12   A.    Well, we just talked about the fact that it's

13   specifically about powering a wireless access point using

14   power and data over a transmission line.

15   Q.    All right.   Now let's go to the Figure 2, please.   Tell

16   us what this Figure 2 is teaching us.

17   A.    So this is Figure 2 from -- from the Fisher patents and

18   what we see, this is -- corresponds pretty much to what he

19   showed us this morning.

20          There is -- on the left it's labeled power adapter.

21   He called that a wall wart.   That is connected using a power

22   cable, he had that out, and it's connected to a power data

23   coupler.   That was one of those other boxes he held up.

24          There's also a hub.   That's the -- or that's

25   the data node, and that hub is connected also to the

1  power data coupler.  Only data flows in that wire.  So,

2  I think I've got that colored green.

3         And then the combination is going to connect over a

4  network cable out to the wireless access point, that Wi-Fi

5  node.  And when in use, it supplies both power and data via

6  this network cable.

7  Q.   And the -- the hub there on 240 that looks like -- kind

8  of like a radiator, that is -- and I know this is from 1997,

9  but that would be equivalent to the -- the hub or switch or

10  data node that we've had on the tables all week long?

11  A.   Yes.  It would be fairly -- it's basically the -- the

12  Ethernet functionality is the same, yes.

13  Q.   That's what a -- that's what a hub is?

14  A.   That's what a hub is.

15  Q.   Okay.  And so what -- what pieces does it teach us from

16  the Fisher patents?

17  A.   So if we look at this upper right-hand corner, we have

18  an access device that was the wireless access point.  We have

19  data signaling pair.  We have the -- the network -- or the

20  data node.

21         Now, it is important to notice that Fisher itself,

22  even though in this picture it shows a separate power supply

23  that provides power to the access device, Fisher actually

24  calls out that you can put all this in one box; and that in

25  that box you could use the hub's power supply to basically

```
 1    power everything.
 2              So, although he didn't draw that picture, he did
 3    call that out in -- in the text.
 4              So we have a data node, access device, data
 5    signaling pair, and main power source.
 6    Q.    And so -- and then this little teal line, that goes from
 7    the powering and data coupler, you've got 3 on it, that goes
 8    up to, like, the wireless access device in the ceiling?
 9    A.    Yes.
10    Q.    What type of -- of information or power is in that?  Is
11    that the combined data and power?
12    A.    Yes, that's the combined data and power.
13    Q.    Okay.  Just like we've been talking about all week from
14    the switch to the phone?
15    A.    Yes, that's correct.
16    Q.    All right.  So I'll go back to Claim 6.  And what --
17    what elements are taught by the Fisher -- all three Fisher
18    patents teach the same four elements as well?
19    A.    Yes.  The -- the data node, access device, data
20    signaling pair, and main power source appear in the Fisher
21    patents.
22    Q.    All right.  Now, my assistant tells me I'm short on
23    time, so let's go to the Chang patents.
24    A.    Okay.  The Chang patent -- and if we just look at the
25    title, the Chang patent is specifically about detecting the
```

1   presence of a -- a remote device and providing power to that.

2   Q.   Okay.  And we're talking about DX124, the European Chang

3   patent as well as DX144, the U.S. Chang patent?

4   A.   Yes, we are.

5   Q.   All right.  And so what else does the Chang patent teach

6   us in the field of the invention?

7   A.   So it specifically talks about using network hubs and

8   network interface adapters.  The network hub will be the data

9   node and the network interface adapter is the access -- is

10  the access device.

11  Q.   And what else?

12  A.   It talks about how it detects the presence of one of

13  those devices.  It's coupled through the pairs, the wire that

14  connects them.  And it talks about providing the electrical

15  power from the hub to that remote adapter, to the access

16  device using the network's wiring.

17  Q.   Now, let's go to Figure 2 of the U.S. Chang patent?

18  A.   Yes.

19  Q.   Tell us what this teaches us, please, sir.

20  A.   So this shows the details of how the system works or

21  part of the details.  It has a network hub again which is

22  a -- a data node.  It has a -- a presence detector which

23  we'll look at how that works in just a second, and when

24  that -- when you plug in a access device that's capable of

25  receiving power, the presence detector will note that and

1   then data and power will both flow to and from -- or data

2   will flow both ways, power will flow to the access device.

3   Q.   Let me -- let me stop you right there.  See the long

4   blue box you have there where it's got network hub, is that

5   like one of the backs of the switches we've been looking at

6   all week long?

7   A.   Yes.

8   Q.   And these little small boxes, square boxes, they're like

9   the little ports on the outside of the -- the switches?

10  A.   Yes.  Or -- or it could be even the bigger box, and this

11  is internal and you have those things labeled 204.  They're

12  the same.

13  Q.   Okay.

14  A.   Same thing.

15  Q.   And you've got something blinking here on 206.  What is

16  that?

17  A.   So 206 is the detected device.  It is a -- let's see.

18  It is a network -- it is an access device.  It sends and

19  receives data over the network.

20  Q.   Okay.  And what else does it teach us?

21  A.   It also teaches us that if you have a device that's not

22  capable of accepting power -- so if you look at the two

23  things on the lower right-hand corner that are labeled

24  computer, those are devices that Chang specifically points

25  out are not capable of receiving power, and Chang's system

1    would actually select them not to apply power, so it not only

2    detects whether a device is capable of accepting power, it

3    also detects when it's not and it makes a decision on

4    supplying power based on that.

5    Q.   And that's like the example we saw this week where the

6    switch was attached to a laptop computer which doesn't

7    receive power and then the phone which does receive power and

8    data?

9    A.   Yes, that's correct.

10   Q.   Okay.  And what else does it teach us?  So which pieces

11   are met by -- by the Chang patent?

12   A.   So we have using the same labeling system the net -- the

13   network device, the access device, the data signaling pair.

14   So that's one, two and three.  And there's a main power

15   supply, Chang discusses that.  And that's four.

16   Q.   Okay.  Now, let's look -- let's look and compare it back

17   to Claim 6 which -- which the pieces and elements that have

18   been met with respect to Claim 6.

19   A.   So we have data node, access device, data signaling

20   power, main power source.

21   Q.   And?

22   A.   In addition to that, we had a sensing and a controlling

23   element.

24   Q.   Okay.  And the controlling element?

25   A.   So that -- that's the whether power is applied or not.

1    That's controlling.

2    Q.   All right.   Now let's look at Woodmas, please.   This is

3    the Woodmas '592 patent.

4    A.   Yes, it is.

5    Q.   Let's -- what is -- and it's DX -- I'm sorry -- DX119.

6    Tell us what Woodmas teaches us.

7    A.   Woodmas is about a system that has to send and -- and

8    receive information, data, back and forth between a control

9    station -- and in this example a camera -- and it wants to

10   use only a single set of wires.

11            So it's the wires are 30, which it identifies can

12   be a two-wire pair or a coaxial cable.   They're just

13   different kinds of wires.

14            So it also talks about how it starts the presence

15   detection by applying a low-power output to the cable.   That

16   is received over there on the right at the power reception

17   unit.

18            There's a voltage controlled oscillator inside that

19   that responds to the applied power, which is about 15

20   milliamps, if I recall what the patent suggests.

21            It sends back a signal, and then the power delivery

22   unit senses that signal; and in response to it, if it's

23   present, it applies full operating power.

24            It does that via a control element via a field

25   of trans -- transistor, FET.

1    Q.    All right.   So, stop here because it looks like this is

2    a camera and a headset and a microphone.   How is that

3    equivalent to the IP that we saw earlier with respect to

4    transmitting data and power?

5    A.    So the access device has to do just that.   It has to

6    transmit -- it has to transmit and receive information, data.

7    It also has to be powered, and that's -- the camera requires

8    power.   The power reception unit helps negotiate whether it

9    receives power, and it transmits -- the data transmits back

10   and forth.

11   Q.    And applying Judge Schroeder's claim construction,

12   Woodmas, that's in this case, Woodmas clearly connotes a low

13   level current?

14   A.    So this --

15            MR. DOVEL:   Your Honor, that's leading.

16            MS. DOAN:   I'm sorry.

17            THE COURT:   Sustained.

18   Q.    (By Ms. Doan) Applying your -- Judge Schroeder's claim

19   construction from this case, does it apply -- does it show

20   what type of detection or current is being used, and if so,

21   what?

22   A.    So applying the Court's construction it's clearly

23   teaching us a great deal about low level currents because

24   they have to be something that's sufficient to begin start up

25   but not sustain, which there is clearly a low -- a limited

```
 1    power applied that causes the voltage-controlled oscillator

 2    to operate and only in response to that will it send full

 3    power.

 4               Now, to be careful, it -- that has to be sent over

 5    a data signaling pair, which has to connect an access device

 6    to the network device.  And -- and in Woodmas those aren't

 7    present.

 8               So I'm going to go ahead and label it, but I want

 9    to point out that it's not -- standing on its own, it doesn't

10    meet the Court's construction for low level current standing

11    of its own.

12    Q.    And so what do you have to do to meet the Court's

13    construction with respect to Woodmas?

14    A.    So that's where the combination of the pieces of art

15    comes into play because we have to look at not only whether

16    all of those pieces are present, but do they relate to one

17    another in the same way the patent does.

18    Q.    Okay.

19               MS. DOAN:  Let's go to 34, please, Josh.

20    Q.    (By Ms. Doan) First of all, all three combined teach all

21    of the elements; is that correct?

22    A.    Yes.  And I'll go ahead and check off low level current,

23    again, pointing out that we'll see that it's truly the low

24    level current as construed by the Court when we look at the

25    combination.
```

1          MS. DOAN:  Go to 35, please.  Yes.

2     Q.   (By Ms. Doan) Tell us about this combination.  Is this

3     what you're combining, all three of them together?

4     A.   So I'm combining the Fisher system, the three Fisher

5     patents, the Chang patents and Woodmas.  And to do this let

6     me start with the Fisher system.

7               It was a foundational Power over Ethernet system,

8     and one of the things the Fisher system taught was a kind of

9     presence detection.

10               Dr. Fisher talked about the encryption.  And so

11     let's use that as the access device.  So I put it up there.

12               That encryption system, he also talked about you

13     had to have a network security system to monitor it.

14     That's -- that is fairly high level, requires another

15     computer.

16               So one of ordinary skill in the art would -- would

17     be motivated to look for a simpler thing that doesn't require

18     another computer connected to that.  Something that would do

19     it all with the hub.

20     Q.   And -- and, Dr. Fisher, you're -- sorry -- Dr. Neikirk,

21     you're talking now about the Fisher system, images DX089 and

22     the Fisher '704 patent, DX138 and the Fisher patent '157; is

23     that right?

24     A.   Yes, I am.

25     Q.   Okay.

1    A.    So in -- what one of ordinary skill trying to simplify

2    that system that -- from Fisher --

3    Q.    And what would you combine next?

4    A.    -- would look to Chang.  Chang puts everything in --

5    puts everything in a hub.  So it's now simpler and more

6    combined.  So we'll put that there.

7    Q.    Okay.  And what's next?

8    A.    And so there's still an issue, though, because Chang

9    actually used what are called spare pairs to do its presence

10    detection and powering.  And he also points out there's

11    situations where you only have three pairs of wires, two of

12    them are always used for the Ethernet traffic.  So you only

13    have one pair left.  That actually isn't enough to implement

14    what Chang taught.

15          So, again, one of ordinary skill seeing that

16    problem is going to go look for something that can do it all

17    over one pair which is Woodmas.  Woodmas teaches doing

18    everything over that pair of wires, 30.

19          So we'll take the power delivery unit and put it in

20    the hub.  We'll take the power reception unit and put it out

21    in the wireless access point.  And now we've accomplished

22    everything we wanted to do.

23          We're doing power over data signaling pair.  The

24    data signaling pair is present because the signal is -- sent

25    back from the power reception unit is, in fact, information.

1   It's data.   It provides power on that same power -- pair of

2   wires.

3              All of the elements -- all of the pieces are

4   present and their interrelationships between the various

5   pieces are all present.

6   Q.   All right.   And so let's look at it in comparison to

7   Claim 6.   Are all the elements now made in Claim 6,

8   especially with Woodmas after you've combined everything

9   together?

10  A.   After you've combined everything together, all the

11  pieces are there, and all the interrelationships are there.

12  Q.   And let me ask you this:   I know we just saw a bunch of

13  things move around the screen.   Is this the proper analysis

14  for one of ordinary skill in the art for looking at obvious

15  combinations with respect to an invalidity analysis?

16  A.   Yes, it is.   It's not just a random collection of pieces

17  of art where you cherry pick.   You have to have -- there has

18  to be some reason why that person of ordinary skill would --

19  would put it together this way, and I've just explained why

20  you'd do that.

21  Q.   Now, I know that Dr. Knox, when he did his analysis, he

22  went through Claim 6, and then he just put up these and said

23  these other claims were met too.   Have you actually done the

24  analysis with respect to each, Claims 13, 14, 17, and 22 that

25  have the same pieces as Claim 6?

```
 1    Yes.
 2    Q.    (By Ms. Doan) So with respect to wrapping up with
 3    respect to the prior art that you've analyzed in this case,
 4    what is your opinion after combining and analyzing each of
 5    the pieces and the elements in each of the claims of the '930
 6    compared to what was known in the art at the time?
 7    A.    So it is my opinion that the patent claims are obvious
 8    in light of the prior art.   There's motivation to combine the
 9    prior art in the way that -- that yields the claims of the
10    patent.   That, yes, it is obvious.
11    Q.    And what is the red bar down here at the bottom?
12    A.    That's just trying to indicate.   We see that there's --
13    there's several patents there that all relate generally to
14    remote -- to sensing of devices.   And so in that time frame
15    it's clear that the presence detection was something that was
16    generally known.
17    Q.    Okay.   Thank you, sir.
18              MS. DOAN:   Pass the witness.
19              THE COURT:   Cross?
20              MR. DOVEL:   Yes, thank you, Your Honor.
21                        CROSS-EXAMINATION
22    BY MR. DOVEL:
23    Q.    Good afternoon, Dr. Neikirk.
24    A.    Good afternoon.
25    Q.    I just want to talk to you first about one of your
```

1    the various elements of the claim.

2    Q.   Sir, in your opinion, does Woodmas disclose or teach a

3    low level current using the Court's definition of low level

4    current applied correctly as you understand it?

5    A.   Applying the Court's constructions as -- as Dr. -- Dr.

6    Davis -- excuse me.  It's late on Friday -- as the Plaintiff

7    has, then yes, it is present.

8    Q.   And do you agree that Dr. Knox has properly applied the

9    Court's constructions?

10   A.   I actually, respectfully, disagree with Dr. Knox's

11   application of the Court's construction so --

12   Q.   Let's go back to my question then.

13           In your opinion, does Woodmas disclose or teach a

14   low level current using the Court's definition of low level

15   current applied correctly?

16   A.   Applied as -- as the Plaintiff has applied it, it is

17   present.

18   Q.   No, sir.  As you think it should be applied.

19   A.   Okay.  So you want to take it out of the context of the

20   infringement analysis and ask me about my view of what it

21   means to start up or not sustain start up, then yes, I'd

22   agree.  I don't think it's present.

23   Q.   In other words, when you're doing an invalidity analysis

24   in this case, you've got to apply the Court's claim

25   constructions, correct?

1    A.    In the context of the combination that we talked about,

2    the Fisher system, the Fisher patents, Chang and Woodmas,

3    absolutely.

4    Q.    And is there any doubt in your mind that with respect

5    to -- is there any doubt in your mind that with respect to

6    the Court's claim construction of low level current and the

7    combination we put before this jury, that the combination

8    does indeed show a low level current?

9    A.    No.   There's absolutely no doubt in my mind whatsoever.

10   Q.    And Mr. Dovel was telling you that, well, if you apply

11   it differently.  What they're trying to do, would you agree,

12   is that they want one construction for infringement but for

13   you to look totally differently for invalidity; is that

14   right?

15   A.    That certainly is how it appears to me.

16   Q.    And isn't it the law that an infringement analysis

17   should be the same thing for an invalidity analysis?

18   Goose/gander rule.  We're familiar with that.

19   A.    I'm not familiar with that phrase, but that's what I've

20   been told before.  You have to do it the same way for both.

21   You can't get it one way and not get it the other.

22   Q.    So if Dr. Knox is going to take the position, in sending

23   any current at all as a low level current, then he's got to

24   live and die with that on the invalidity analysis, right?

25   A.    If that's what Dr. Knox said.  I mean, whatever he says

1  for infringement, you have to do the same thing for the

2  validity analysis.

3  Q.    Right.   And so in your expert report, the part that

4  Dr. -- that Mr. Dovel did not show the jury, you do actually

5  say that Woodmas shows low level current as the interpreted

6  by Dr. Knox?

7  A.    I -- I believe that that's either a direct quote or very

8  close to the exact words I used, yes.

9  Q.    I'm seeing here the paragraph --

10              MS. DOAN:   And can you blow that up, please, Josh?

11  Q.    (By Ms. Doan) -- that Mr. Dovel did not show.

12              Well, you're honest that you disagree with

13  Network-1's application of the Defendants' construction of

14  low level current, but note that under such an erroneous

15  application, Chang, in view of Woodmas, does disclose a low

16  level current.

17              In particular, as discussed above, Woodmas is --

18  15mA current participates in a detection routine, subsequent

19  to which a connected access device may actually start up.

20  Woodmas explains that its 15mA current is applied, quote,

21  when power delivery unit 34 is initially energized, closed

22  quote.

23              And after supplying this 15mA current, Woodmas,

24  quote, asks whether the power status signal is present as

25  detected, closed quote, and provides the power signal status

1    to microcontroller 54, if detected.

2          Do you see that?

3    A.    I do.

4    Q.    That's exactly what you told the jury, is it not?

5    A.    Yes, it is.

6    Q.    By delivering this 15mA current before full operating

7    power is supplied and looking for a return voltage

8    representative of the full low level current, both the

9    presence and functionality of power delivery unit 76 are

10   checked before full power is imposed on cable 30.

11         Do you see that?

12   A.    I do.   That's --

13   Q.    And that would be applying Judge Schroeder's claim

14   construction of beginning to start up the access device but

15   insufficient to sustain start up, as Dr. Knox is applying it,

16   right?

17   A.    Yes, that's correct.

18   Q.    Using his analysis and the way he's applying it, these

19   patents are invalid?

20   A.    Yes, they are.

21              MS. DOAN:  Nothing further.

22              THE COURT:  Recross?

23              MR. DOVEL:  Pass the witness, Your Honor.

24              THE COURT:  All right.

25              MR. DOVEL:  Nothing further.

```
 1    last comment he made about promissory estoppel, we are

 2    requesting that there be a damages question for HP's breach

 3    of contract counterclaim.

 4              THE COURT:  Well, let me suggest, to the extent the

 5    verdict form is -- that's previously been submitted --

 6    different from what you all want now, I'm going to ask you to

 7    resubmit it.

 8              MS. BENNETT:  Absolutely.  That's fine.

 9              THE COURT:  Let's do that by noon tomorrow.

10              MS. BENNETT:  Will do.

11              THE COURT:  Okay.  What else?  Anything else?

12              All right.  Hope you get some rest this weekend.

13              MR. JACOBSON:  Your Honor, I apologize.  The

14    Plaintiff has some motions judgments as a matter of law.

15              THE COURT:  Okay.

16              MR. FERGUSON:  Sounds like you're eager to hear

17    them.

18              MR. JACOBSON:  Now that it's clear I'm the one

19    holding us here, I'll be as concise as possible.

20              THE COURT:  Everyone knows.

21              MR. JACOBSON:  I want to address a few issues

22    briefly, and then one -- I want to address one issue in some

23    more detail.

24              First, we move for a judgment as a matter of law

25    that the Fisher system is not proper prior art under
```

1    Section 101, and there's two bases for this.

2              One, there's no evidence of public use from which a

3    reasonable jury could find that element.  The only evidence

4    that was even asserted was that the system was used in the

5    3Com offices.  That can't possibly be public use because the

6    public can't even just walk into the 3Com offices and see

7    it's being used.

8              Second, Your Honor, the Federal Circuit requires

9    corroboration when an inventor testifies that he invented

10   something.  There was zero corroboration of the

11   authentication element of the Fisher system, which was

12   asserted to cover -- to satisfy the detection elements of the

13   '930 patent.

14             Second, Your Honor, the Fisher, Woodmas, and Chang

15   combination is estopped under IPR estoppel, Section 315.  It

16   was raised or reasonably could have been raised by HP in the

17   IPR.

18             What HP did in adding the Fisher system as a

19   redundant, additional piece into that combination, cannot

20   defeat IPR estoppel.  That would swallow the estoppel rule.

21             There's another basis, that HP's entire validity

22   case should be rejected as a matter of law.  Their own expert

23   admitted that applying the Court's claim construction

24   correctly, there is -- that the combination doesn't render

25   the patent obvious.

1           Given that admission, there's not sufficient

2    evidence for which any reasonable jury could conclude that

3    the patent is obvious.

4           Now, let me address the issue I wanted to address

5    in some more detail, Your Honor.  We're moving for judgment

6    as a matter of law on HP's promissory estoppel claim.  Their

7    promissory estoppel claim is related to the RAND obligation.

8           They claim that Merlot made a promise to offer

9    reasonable and nondiscriminatory rates; that HP relied on

10   that promise; and that it was injured by its reliance.

11          This theory fails for two independent reasons as a

12   matter of law, Your Honor.  I have a couple of slides on this

13   one, which I'll put up.

14          The parties have been addressing the contract

15   claims under New York law, Your Honor.  I'm not aware of any

16   other potential choice-of-law state where the law would

17   differ.

18          (Discussion off the record.)

19          MR. JACOBSON:  I've been informed this is withdrawn

20   Your Honor, so the good news is I'm done.

21          THE COURT:  Well, that one will be easy,

22   Mr. Jacobson.

23          MR. FERGUSON:  That's one less slide we have to

24   see.

25          MR. JACOBSON:  Those are all the issues I wanted to

1    Dr. Neikirk's testimony, and what they learned about the

2    Patent Office from Mr. Godici.

3             MR. JACOBSON:  Your Honor, I should make one thing

4    clear about the Fisher system, for the record.

5             Mr. Fisher testified about two different systems.

6    He testified about a system he built and he actually had some

7    physical pieces of.  And for that system, there's absolutely

8    no contention that it even did detection.  That system was

9    offered to purportedly satisfy other elements of the claim.

10   So that's what he had the physical pieces of.

11            Now, in his deposition, he testified about another

12   system he says he built, a system that could do

13   authentication.  And that system is what was offered as

14   evidence of invalidity of the detection elements of the '930

15   patent.

16            And for the authentication system, there's no

17   corroboration whatsoever.  The physical pieces he had he

18   admits don't do authentication.  He's got no documents that

19   demonstrate that authentication system existed, and no

20   evidence whatsoever of public use for that authentication

21   system.

22            THE COURT:  Thank you, Mr. Jacobson.

23            Mr. Jacobson, I'm going to deny your motions for

24   the same reasons I've denied Ms. Bennett's motions.  I think

25   there's a legally sufficient evidentiary basis on all of

1      these issues for a jury to find in the Defendants' favor.

2                So your motions will be denied.

3                MR. JACOBSON:  Understood, Your Honor.

4                THE COURT:  All right.  Very well.

5                What else?

6                Mr. Thane?  Exhibits.

7                MR. THANE:  Yes, Your Honor.

8                With respect to exhibits, there were a number of

9      exhibits that were shown today.  It would probably be best if

10     we could meet and make sure that we agree on which ones are

11     going to come into evidence and make sure there's not any

12     objections.

13               Would you prefer that we do that now?

14               THE COURT:  I think that makes sense.

15               Mr. Jacobson, is that okay with you?

16               MR. JACOBSON:  That's amenable to me, Your Honor.

17               We do have a few from yesterday that we have met

18     and conferred on, and I'll go ahead and read those in.

19               THE COURT:  That's fine.

20               MR. JACOBSON:  All right.  Plaintiff moves into

21     evidence DX5, DX74, DX75, DX78, DX79, P252, and P253.

22               THE COURT:  All right.  And those are without

23     objection?

24               MR. THANE:  Without objection, Your Honor.

25               THE COURT:  All right.  Very well.

1                COURT SECURITY OFFICER:  All rise.

2                   (Court recessed.)

3

4                        CERTIFICATION

5

6                I HEREBY CERTIFY that the foregoing is a true

7    and correct transcript from the stenographic notes of the

8    proceedings in the above-entitled matter to the best of our

9    abilities.

10

11

12   /s/ Shea Sloan                     November 10, 2017
     SHEA SLOAN, CSR
13   Official Court Reporter
     State of Texas No.:  3081
14   Expiration Date:  12/31/18

15

16
     /s/ Judith Werlinger
17   JUDITH WERLINGER, CSR
     Deputy Official Court Reporter
18   State of Texas No.:  731
     Expiration Date  12/31/18
19

20

21

22

23

24

25