**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| NETWORK-1 TECHNOLOGIES, INC.<br><br>*Plaintiff*,<br><br>vs.<br><br>HEWLETT-PACKARD COMPANY AND HEWLETT PACKARD ENTERPRISE COMPANY<br><br>*Defendants*. | CASE NO. 6:13-cv-072-RWS<br><br>**JURY TRIAL DEMANDED** |

**Network-1 Technologies, Inc.'s reply in support of
motion for new trial on infringement**

**[originally filed under seal]**

**Table of Contents**

I. "delivering … from said main power source" ................................................................. 1

II. "low level current" .......................................................................................................... 4

III. "main power source" ...................................................................................................... 7

# Table of Authorities

**Cases**

*Budde v. Harley-Davidson, Inc.*,
 250 F.3d 1369 (Fed. Cir. 2001) ................................................................................................ 1

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
 474 F.3d 1323 (Fed. Cir. 2007) ................................................................................................ 3

*Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*,
 2017 WL 4020589 (E.D. Tex. Sept. 12, 2017) ......................................................................... 7

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
 778 F.3d 1365 (Fed. Cir. 2015) ............................................................................................ 2, 6

*z4 Techs., Inc. v. Microsoft Corp.*,
 507 F.3d 1340 (Fed. Cir. 2007) ................................................................................................ 5

**List of Exhibits**

| **Ex. 22** | HP-Dkt. 76 [1] – 11/7/2017 pm trial transcript |
|---|---|
| ▮ | ▮ |
| **Ex. 24** | HP-Dkt. 79 – 11/9/2017 am trial transcript |
| **Ex. 25** | HP-Dkt. 80 – 11/9/2017 pm trial transcript |
| **Ex. 26** | HP-Dkt. 83 – 11/10/2017 trial transcript |
| **Ex. 27** | HP-Dkt. 85 – 11/8/2017 am trial transcript |
| **Ex. 28** | Dkt. [2] 693 – *Markman* order |
| **Ex. 29** | *Markman* order – *Network-1 v. D-Link* (6:05-cv-00291-LED) |
| ▮ | ▮ |

---

[1] "HP-Dkt." refers to the docket in *Network-1 Technologies, Inc. v. Hewlett-Packard Company and Hewlett Packard Enterprise Company*, severed case 6:13-cv-00072.

[2] "Dkt." refers to the docket in *Network-1 Technologies, Inc. v. Alcatel-Lucent USA, Inc., et al.*, consolidated case 6:11-cv-00492.

I.    **"delivering … from said main power source"**

HP asserts that, in its switches, a downstream PoE chip limits the current delivered from an upstream power source, [3] which means the current is "created" by the PoE chip and is therefore "from" the PoE chip, not "from" the upstream power source. Opp. 2-4. This non-infringement theory was rejected by the Court in claim construction and by HP's own expert.

During claim construction, HP sought to narrow the ordinary meaning of "from said main power source" to "supplied by a main power source." Ex. 28 (*Markman*) at 16. The Court rejected HP's construction, expressly holding that "Defendants have not demonstrated that the 'source' is necessarily where the current is created." *Id.* at 17. This narrowing limitation rejected by the Court is what HP now asserts as a basis for non-infringement: that a "main power source" must be where the detection current is "created":

> in HP's switches, the 44-57V power supply … (the alleged "main power source") provides power for separate PoE chips that in turn create detection currents. … [T]hus HP's switches never "deliver low level current from said main power source."

Opp. 8. [4]

> If HP's switches provide power from a power supply to separate detection circuitry and the detection circuitry then creates and delivers detection currents, then, as explained above, those detection currents simply are not delivered "from" that power supply.

Opp. 7. A non-infringement finding must be based on the claim as "properly construed." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1375 (Fed. Cir. 2001). Applying a rejected

---

[3] The PoE chip limits the current originating from the upstream power supply. Ex. 6 (Dwelley) 111:21-112:22 (the "Linear chip … limits the maximum voltage that can appear during detection" from the upstream power supply); Ex. 27 (Knox) 41:17-43:12 ("circuitry in this PoE chip … limit[s] the amount of current…[t]o a low level").

[4] Emphasis is added and internal quotations are omitted (unless otherwise noted).

construction is not applying the claims as "properly construed."

Moreover, after a jury verdict, it is improper to argue non-infringement based on adding limitations to the plain meaning of a phrase: "it is too late at the JMOL stage to argue for or adopt a new and more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation." *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1373 (Fed. Cir. 2015), *judgment reinstated in relevant part*, 824 F.3d 1344 (Fed. Cir. 2016). This is especially true when a court expressly ruled that a phrase has its "plain meaning" with no additional limitations, as the Court did in this case. Ex. 28 (*Markman*) at 17.

The "plain meaning" of "delivering a low level current from said main power source" does not include the limitation that the "main power source" (or any other specific component) actually perform the "delivering." Rather, it requires that there be "delivering," that what is delivered is a "low level current," and that the delivered "low level current" must be "from said main power source." [5] "Delivering a low level current from said main power source" does not exclude a downstream component from limiting the amount of current, so long as the current is from the upstream power source. It is undisputed that HP's detection current flows from the upstream power source and that if the upstream power source were turned off, there would be no detection current. Opp. 7-8; Ex. 22 (Knox) 50:1-51:19. That HP's detection currents also "come from" and are "coming out of" downstream PoE chips (Opp. 3-4) does not mean that they are not "deliver[ed] … from" the upstream power supply (just as water "coming out of" a kitchen faucet does not mean that the water was not "deliver[ed] … from" an upstream water tank or reservoir).

---

[5] HP's theory requiring the "main power source" to directly do the "delivering" (i.e. be the last component in the delivery process) is analogous to asserting that if water from a water tank (or reservoir) is delivered through a water faucet, that is not "delivering water from the water tank" because the faucet performs the last step in the delivery process.

2

*See* Ex. 27 (Knox) 41:17-43:12. [6]



---

[6] Moreover, "[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007). Precluding downstream circuity from limiting the current "from said main power source" to a low level would improperly exclude the '930 preferred embodiment in Figure 1 in which the downstream detector 22 with resistor 26 does exactly what a PoE chip in HP's products does—limits the current level from the upstream power source 16. '930, Fig. 1; 2:52-65; Ex. 29 (*D-Link Markman*) at 12 ("Switch 28 controls the current through the data signaling pair. When the switch is open, a low level of current flows; when it is closed, resistor 26 is short-circuited and a high level of current flows." (citing '930, 3:16–22)); Ex. 27 (Knox) 43:16-23 ("It's exactly how the preferred embodiment in the patent works. … this resistor 26 is going to restrict the maximum amount of current that can flow through the access device to this low level current.").

Network-1 presented a great weight of evidence that, applying the claim language as construed by the Court (i.e. with its "plain meaning" and without HP's rejected limitation), HP's switches perform the step of "delivering [HP's detection current] from a main power source." [8] Because HP's responsive evidence (Opp. 3-5) is based on a limitation rejected by the Court (and by HP's own expert), it should be given no weight. Accordingly, the verdict was against the great weight of the evidence.

## II. "low level current"

HP does not dispute (or even directly address) the compelling evidence presented in Network-1's motion demonstrating that HP's detection current causes several components in the access device (including capacitors, transistors, bridge diodes, and integrated circuits) to start up and work. Mot. 4-9; Ex. 6 (Tremblay) 70:20-71:4 ("several of those do work during the detection phase"). HP also does not dispute that these components are essential for an access device to perform the definitional functions of an access device—i.e. transmitting and receiving data. Mot. 6-9. Instead, HP expressly or implicitly makes four arguments. Each fails.

HP argument 1: HP asserts that a current with a level greater than HP's detection current is required for any current to be "delivered to the access device itself" or to "operational circuitry" in the access device. Opp. 14-16. For support, HP cites only to general conclusions

---

[8] *See* Ex. 22 (Knox) 50:1-51:19 ("this low level current [is] delivered <u>from the main power source</u> … [the] detection current … comes out of the main power supply … goes up through that internal circuitry inside that integrated circuit … goes out to our data signaling pair"); Ex. 3 (Knox) 126:13-22; Ex. 27 (Knox) 41:17-42:18 (the PoE chip "restricts the current to a low level, but that <u>current comes from that main power supply</u>"); Ex. 24 (Tremblay) 87:18-25 (power for HP's detection current comes "<u>from</u> this isolated 54-volt power supply"); Ex. 25 (Davis) 50:21-25 ("Q. Where does the power come from … A. It comes from … a 50-volt power supply"); Ex. 26 (Knox) 158:9-159:8 ("Q. Is the low level current in HP switches delivered from the main power source to the access device? A. Yes, definitely."); Ex. 25 (Davis) 105:17-20 ("The only <u>component that drives power for the detection current</u> is the <u>output of the</u> 44- to 57-volt <u>power supply itself</u>"); ███████████████████████
████████████████████████████████

4

from its witnesses that when HP's detection current is applied, "nothing is delivered to the access device itself." *Id.* at 14. Such conclusory testimony without underlying factual support is given no weight. *See z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1355 (Fed. Cir. 2007) ("there must be factual support for an expert's conclusory opinion").

HP does not present any evidence (or even attorney argument) that the components affected by HP's detection current (the transformers, capacitor, PoE chip, etc.) do not fall within the Court's definition of "access device," or are not used when the access device is fully operational. Nor does HP address (much less attempt to rebut) the evidence Network-1 identified proving that these components are key operational components of the access device. Mot. 4-8, n. 13. HP's complete lack of specific evidence and argument certainly cannot overcome the great weight of the evidence presented by Network-1, which includes admissions by HP's own witnesses (Dr. Davis and Mr. Tremblay) that these components <u>are</u> "operational circuitry" "used during the operation of the access device," and are "an important part of the operation of this access device." [9]

HP argument 2: HP asserts that beginning to start up "essential components in the access device" does not satisfy the Court's construction of "low level current" because the construction requires a current to begin start up of "the access device" not "<u>essential components in</u> the access device." Opp. 17 (emphasis in original). HP does not present any evidence (or even attorney

---

[9] Ex. 7 (Davis) 87:20-89:11; Ex. 6 (Tremblay) 63:18-64:25; 66:3-67:13. As Network-1 explained (Mot. 7), a component in an access device is part of the "access device itself" if it is essential to operating the "access device" as construed by the Court—"a device that can receive and transmit data over a network." Ex. 28 (*Markman*) at 25. HP did not dispute that, applying the Court's construction of "access device," the operational components of an "access device" include those that receive data from or transmit data to the network cable and those that regulate or provide power for receiving and transmitting data. HP also did not dispute that the components affected by HP's detection current include components that receive data from and transmit data to the network cable (e.g. the transformers), and components that regulate or provide power for receiving and transmitting data (e.g. the capacitor, diodes, and PoE chip). Mot. 4-8.

5

argument) to prove that beginning to start up essential components of the access device is not beginning to start up the "access device."  To the extent that HP is asserting that a "low level current" must begin to start up all components in the access device (rather than just some essential components), this argument fails.  A limitation requiring all components in an access device to begin to start up is not found in the Court's construction, and therefore cannot be the basis of a non-infringement argument post-verdict.  *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1373 (Fed. Cir. 2015).  Moreover, the Court did not include such a limitation because it would have improperly excluded the '930 preferred embodiment upon which the relative term "low level current" construction was derived in which only a single component of the access device begins to start up. [10]  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

     HP argument 3:  HP asserts that "Network-1 interprets the Court's construction" so that it eliminates the concept of "begin start up" and requires only "a component of the access device to consume power."  Opp. 16-17 (*citing* Mot. 4).  That is false.  The actual cited passage from Network-1's brief reads:

> a "low level current" must be <u>sufficient to begin the process of starting up the access device</u>.  A current is at that level if it <u>reaches a component</u> in the access device (e.g. the dc-dc switching supply in the preferred embodiment) and <u>that component</u> consumes power from the current <u>and begins to start up</u>.

---

[10]  In the '930 preferred embodiment, the low level current reaches a component of the access device—a "dc-dc switching supply."  '930, 3:12-16.  That single component "begin[s] to start up but the low level current is unable to sustain the start up."  *Id*. at 3:15-16.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Mot. 4.[12] Network-1 properly requires that a "component in the access device … begins to start up," which is exactly what happens in the '930 preferred embodiment from which the construction was derived.[13]

<u>HP argument 4</u>: HP asserts that the verdict is supported by Mr. Dwelley's assertion that during detection an access device is like "a picture on the wall. … It is looked at." Opp. 15 (quoting HP-Ex. 5 (Dwelley) 115:16-25). Mr. Dwelley's analogy is completely undermined by undisputed testimony from each HP witness, including Mr. Dwelley himself, confirming that "several" access device components "do … work during the detection phase." Ex. 6 (Tremblay) 70:20-71:4; Ex. 6 (Dwelley) 130:25-132:1 ("[t]he detection current must charge that capacitor before detection can proceed"). When one looks at a picture on the wall, components in the picture do not "work"—e.g., the canvas does not charge up and the paint does not return a corresponding current. Mr. Dwelley's analogy does not overcome the great weight of Network-1's evidence ignored by HP.

## III. "main power source"

HP does not dispute that if only a single accused HP switch infringes, a verdict of non-infringement is against the great weight of the evidence. Network-1 identified two categories of HP switches that HP's own witnesses unambiguously admitted use a single power source that performs the two required functions of the "main power source": modular switches and switches

---

[12] Quoting '930, 3:14-16 ("the remote power supply [is] beginning to start up but the low level current is unable to sustain the start up"); Ex. 7 (Davis) 87:6-8 ("if an access device begins to start up, it has a component that's consuming power").

[13] HP asserts that "Network-1 waived any objections" to HP's evidence applying an improper claim construction "by failing to object." Opp. 18. For purposes of weighing the evidence, however, that Network-1 did not object is irrelevant. "[T]estimony based on an impermissible claim construction is … irrelevant." *Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*, No. 6:11-CV-492-RWS-KNM, 2017 WL 4020589, at *3 (E.D. Tex. Sept. 12, 2017). Accordingly, HP's irrelevant evidence is given no weight when balanced against the great weight of Network-1's evidence applying the proper construction.

7

with redundant power supplies. Mot. 13-14. HP acknowledges these two categories (Opp. 11), but then ignores them and the compelling admissions. HP instead presents two diversions.

HP diversion 1: HP asserts that, for all HP switches, HP's detection currents are delivered "from" downstream PoE chips, not upstream power sources. Opp. 11-12. As explained above (in Section I), this argument should be given no weight because it fails to apply the Court's construction and instead applies a construction that was rejected by the Court.

HP diversion 2: HP discusses other HP switches. HP cites the testimony of Mr. Dowling addressing "certain HP switches" and "other HP switches" (Opp. 9), but not the two categories identified in Network-1's motion. Evidence specific to these "other HP switches" does not weigh against Network-1's compelling admissions regarding the two identified categories.

At best for HP, on HP's side of the scale for these two categories of switches are generic unsupported conclusions from HP's witnesses that all its switches do not have a power source that performs both required functions. On Network-1's side are specific admissions from these same witnesses that (a) explain the details of why these two categories of switches have a power source that performs both functions, and (b) acknowledge that they did not address these particular switches when they presented their general conclusions.[14] As a result, for these two categories, the non-infringement verdict is against the great weight of the evidence. For the remaining switches, HP failed to address its own witnesses' compelling admissions (e.g. Ex. 7 (Davis) at 110:7-12) and continues to rely on self-serving oral testimony that directly contradicts HP's own documents and the testimony of those same witnesses. Therefore, even for the remaining switches, the verdict is against the great weight of the evidence.

---

[14] See Ex. 6 (Tremblay) 50:22-51:1; 47:6-17; 48:20-49:10; 49:16-22; 45:14-22; 51:2-8 ("Q. Why didn't you tell the jury that in your direct examination? A. We did not talk about this particular power supply in the direct examination.") ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 6 (Tremblay) 51:9-52:3.

8

Date: March 16, 2018  Respectfully submitted,

By: /s/ *Sean A. Luner*
    Sean A. Luner
    CA State Bar No. 165443
    Gregory S. Dovel
    CA State Bar No. 135387
    Christin Cho
    CA State Bar No. 238173
    Jonas Jacobson
    CA State Bar No. 269912
    DOVEL & LUNER, LLP
    201 Santa Monica Blvd., Suite 600
    Santa Monica, CA 90401
    Telephone: 310-656-7066
    Email: sean@dovel.com
    Email: greg@dovel.com
    Email: christin@dovel.com
    Email: jonas@dovel.com

    T. John Ward, Jr.
    State Bar No. 00794818
    Claire Henry
    State Bar No. 24053063
    Andrea Fair
    State Bar No. 24078488
    WARD, SMITH & HILL, PLLC
    1127 Judson Road, Suite 220
    Longview, Texas 75601
    Telephone: (903) 757-6400
    Facsimile: (903) 757-2323
    Email: jw@wsfirm.com
    Email: claire@wsfirm.com
    Email: andrea@wsfirm.com

ATTORNEYS FOR PLAINTIFF,
NETWORK-1 TECHNOLOGIES, INC.

## Certificate of Service

I certify that this document is being served on counsel of record by email on the filing date listed above.

/s/ *Sean A. Luner*
Sean A. Luner

**Certificate of Authorization to Seal**

I certify that the protective order governing this cause authorizes this document to be filed under seal.

/s/ *Sean A. Luner*
Sean A. Luner