1   IN THE UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF TEXAS
2               TYLER DIVISION

3

NETWORK-1 TECHNOLOGIES, INC.  )
4                                  DOCKET NO. 6:13cv72
    -vs-                       )
5                                  Tyler, Texas
                              )  12:59 p.m.
6   HEWLETT-PACKARD COMPANY, ET AL   May 14, 2018

7

8            TRANSCRIPT OF POST-TRIAL MOTIONS HEARING
         BEFORE THE HONORABLE ROBERT W. SCHROEDER III
                 UNITED STATES DISTRICT JUDGE
9

10                 A P P E A R A N C E S

11

FOR THE PLAINTIFF:
12

MR. GREGORY DOVEL
13   MS. CHRISTIN CHO
    MR. JONAS JACOBSON
14   DOVEL & LUNER
    201 Santa Monica Blvd., Ste. 600
15   Santa Monica, CA 90401

16

MS. ANDREA FAIR
17   WARD, SMITH & HILL, PLLC
    1507 Bill Owens Parkway
18   Longview, TX 75604

19

20

21   COURT REPORTER:         MS. SHEA SLOAN
                            FEDERAL OFFICIAL COURT REPORTER
22                           211 W. Ferguson
                            Tyler, TX 75702
23

24   Proceedings taken by Machine Stenotype; transcript was
    produced by computer-aided transcription.
25

```
 1    FOR THE DEFENDANTS:

 2
      MS. JENNIFER DOAN
 3    MR. JOSH R. THANE
      MR. KYLE AKIN
 4    HALTOM & DOAN
      6500 Summerhill Road, Ste. 100
 5    Texarkana, TX 75503

 6
      MS. NATALIE A. BENNETT
 7    MCDERMOTT WILL & EMERY LLP
      500 North Capitol Street, NW
 8    Washington, DC 20001

 9
      MR. HERSH H. MEHTA
10    MCDERMOTT WILL & EMERY LLP
      444 West Lake St.
11    Chicago, IL 60606-0029

12
      MR. MARK S. OUWELEEN
13    BARTLIT BECK HERMAN
         PALENCHAR & SCOTT LLP
14    54 W. Hubbard St., Ste. 300
      Chicago, IL 60654
15

16

17

18

19

20

21

22

23

24

25
```

```
1                       P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              Mrs. Schroeder, please call the case for us.

4              THE CLERK:  Case No. 6:13cv72, Network-1

5    Technologies, Inc. v. Hewlett-Packard Company, et al.

6              THE COURT:  Announcements for the record.

7              MS. FAIR:  Good afternoon, Your Honor.  Andrea Fair

8    on behalf of the Plaintiff.  Here with me Mr. Greg Dovel,

9    Ms. Christin Cho, and Mr. Jonas Jacobson.  We are ready to

10   proceed at the Court's --

11             THE COURT:  Good afternoon, welcome.

12             MS. DOAN:  Your Honor, for HP, Jennifer Doan Josh

13   Thane, Kyle Akin also from our office, Mr. Hersch Mehta from

14   McDermott Will & Emery and his partner Natalie Bennett, and

15   then Mr. Mark Ouweleen from Bartlit Beck, and Tim Foster our

16   able paralegal.

17             THE COURT:  Welcome.

18             MS. DOAN:  Also in the courtroom, Your Honor, is

19   Ms. Vaishali Udupa and Mr. Grant Ritz, also in-house for

20   HP.

21             THE COURT:  Good afternoon, everybody.  Thank you

22   for coming to Texarkana.

23             We are here this afternoon for argument on two

24   motions, the Plaintiff's motion for new trial on

25   infringement, which is Docket No. 98; and the Plaintiff's
```

```
1   motion for judgment as a matter of law and new trial on

2   invalidity, which is Docket No. 99.

3          We are also, tomorrow, hearing the bench trial on

4   inequitable conduct, and I know that the parties had filed a

5   joint motion to adjust the deadlines with respect to

6   tomorrow's bench trial, including changing some of the

7   deadlines related to that.  So that motion will be granted.

8          And then I know that there was a motion filed by

9   the Plaintiff asking us to limit the inequitable conduct

10  trial tomorrow to any theories raised by the Defendant in its

11  complaint and in the pretrial order.

12         I understand that the Defendants have filed a

13  response to that.  We will take a look at that.  And then I

14  have suggested to the Plaintiffs that they will have an

15  opportunity to reply if they so desire.

16         So I think that completes my preliminary comments.

17  Unless the parties have anything that we need to address

18  before we begin argument on the motions, we will do that now.

19         MR. DOVEL:  Good afternoon, Your Honor.

20         THE COURT:  Good afternoon.

21         MR. DOVEL:  Your Honor, we are asking the Court to

22  grant JMOL that the patents -- that the claims asserted in

23  the patents were not obvious, and the patent is valid.

24         Your Honor, as you are aware, the question of

25  obviousness is a question of law, so what do we do with the
```

1    jury's finding on that?

2            As the Federal Circuit held in the Richardson case,

3    it says:  We assess the record evidence in the light most

4    favorable to the verdict winner.  But this does not mean that

5    we are free to abdicate our role as the ultimate decision

6    maker on the question of obviousness.  That decision remains

7    within our province.

8            So the Court has not yet ruled on obviousness.

9    That is one of the things we are asking the Court to do is to

10   issue a ruling that as a matter of law the asserted claims

11   were not obvious.

12           Now, the first point I am going to address, Your

13   Honor, relates to the Fisher System.  As an overview, we

14   argue in our papers that there are five important fundamental

15   flaws in their obviousness case, any one of them means as a

16   matter of law the claims were not obvious.  I am going to

17   spend time on four of those today.

18           The first is the Fisher System.  To assert the

19   Fisher System they have got to establish that it is prior

20   art.  They don't dispute that.  They also don't dispute that

21   their only assertion that it was prior art is under Sections

22   102(a) and (b) where they assert it was prior art because it

23   was in public use.  The Fisher System, they assert, was in

24   public use.

25           And just to be clear, I put on the board the

1   Federal Circuit's controlling authority in the Woodland case

2   often cited by the Federal Circuit about what this means.

3   And they say under Section 102(a):  In order to invalidate a

4   patent based on prior knowledge or use, that knowledge or use

5   must have been available to the public.  The language "known

6   or used by others in this country" means knowledge or use

7   which is accessible to the public.

8           It is not enough to establish that the Fisher

9   System was used.  They have got to establish with evidence,

10  clear and convincing evidence, that that use was public.  It

11  was accessible to the public.

12          So I am going to spend just a minute discussing

13  with Your Honor what the law tells us what it means for use

14  to be public and not public.

15          In the Dey case the Federal Circuit held that:  If

16  members of the public are not informed of and cannot readily

17  discern the claimed features, the public has not been put in

18  possession of those features.  To be a public use it has to

19  be used where members of the general public can readily

20  discern the claimed features.

21          Public use in the Clock Spring is an example of a

22  case where the Federal Circuit found there was public use.

23  In that case there was a demonstration of the product in

24  public.  There were representatives of competitors who

25  watched the demonstration.  That made it accessible to the

1   public.

2          Now, what are examples where the use is not public

3   as a matter of law?  Here are two that are directly on point,

4   Your Honor.  We have got them on our Slide 6.  First is the

5   Invitrogen case.  The Court held that the fact that

6   Invitrogen secretly used the cells internally to develop

7   future products that were never sold, is insufficient to

8   create a public use.

9          Using a system internally to accept future products

10  is not a public use.  That is not a use that is accessible to

11  the public.  That is an internal use.

12         Another case that provides great guidance to this

13  Court, it is another ruling by the Federal Circuit as a

14  matter of law, is the Allied Colloids case.

15         In that case, Your Honor, the -- there was a use

16  made of this -- this claimed set of chemicals that were used

17  in a sewage system.  And the way they tested them was to take

18  them to a public municipal sewage system at the City of

19  Detroit, their plant, and put the chemicals in and do tests

20  on it.

21         And even though that was something that was open

22  and available, the Federal Circuit held as a matter of law

23  that is not a public use.  Why not?  The tests were not

24  observed by anyone other than Colloids' employees, the

25  Federal Circuit said.

1          Representatives of the City of Detroit were there

2    at the municipal plant, but no witness testified that anyone

3    other than Colloids' employees conducted or observed the

4    experiments.  As a matter of law that is non-public use.

5          If there is no witness that testifies that the use

6    was observed or conducted by outsiders by members of the

7    general public, it is a non-public use.

8          Now let's turn to the evidence here.  What is

9    evidence -- what is HP's evidence of public use?  In fact,

10   the only thing they point to is evidence of use, not public

11   use.

12         Here is from their brief, Your Honor.  It is on our

13   Slide 7.  They say that:  Fisher testified that 3Com actually

14   implemented powering an access device using PoE, and then

15   they cite seven lines of testimony.  And here are those seven

16   lines of testimony.  We have it on the board now.

17         In this testimony Fisher says -- was asked:  Did

18   you actually implement powering an access device using Power

19   over Ethernet technology in 1996?  And he says:  Well, we

20   probably had it working in '95.  This was the second

21   generation that was done in '96.  But, yeah, we probably had

22   it done.

23         Your Honor, this is testimony from Fisher to using

24   the system.  But there is not a word of mention that the use

25   was publicly accessible; that it was open to the general

1    public; the members of the general public attended.  There is

2    not a single word, clause, or sentence from which you could

3    infer public use in this testimony.  That is it, Your Honor.

4    That is the sole testimony they rely upon for Fisher.

5         What they don't do is cite any of the testimony

6    where Fisher describes in the details of what they were

7    doing.  What was he using it for?  And the reason they don't

8    cite that, Your Honor, is because Fisher consistently

9    described that the purpose of his using it was non-public.

10   It was for internal development of a system at 3Com.

11        Here are the words he used.  He said it was for

12   research or development.  He said this was a prototype.

13   There was hardware that was in development.  The use was in

14   order to test it.  It did not go to product.  3Com exited the

15   space.  All of this testimony describing what the use was is

16   consistent with this, Your Honor.

17        This is every clause in the transcript, the trial

18   transcript, where he describes why he was using it and how he

19   was using it, for research and development, a non-public use.

20   That is Fisher, Your Honor.

21        Fisher was the only witness they called who was

22   around at the time who could provide any testimony about the

23   use.  They have no testimony, and they provided no documents

24   showing use.  That's it.  The Court should grant our motion

25   as a matter of law that Fisher was not in public use, they

1    haven't proven it; therefore, Fisher is not prior art.

2            Now, in addition, they said our expert testified

3    about this, Dr. Neikirk.  But, Your Honor, Dr. Neikirk was

4    not there in '95 or '96.  He wasn't a witness to anything.

5    He can't testify as a percipient witness.  And if he

6    testifies as an expert, he can't simply give a conclusion.

7    Conclusions from an expert are given no weight.

8            What is it that they rely upon from Dr. Neikirk?

9    Here it is.  I have reproduced that portion of the brief so

10   Your Honor can see it.  Here is the testimony they rely upon

11   from Neikirk.

12           QUESTION:  Dr. Neikirk, was Mr. Fisher's system,

13   was it in public use?

14           ANSWER:  Yes, I believe it was.

15           Your Honor, that is a classic example of a pure

16   conclusion.  There is no articulated reasoning.  It is

17   simply, yeah, I believe it was.  But he had no basis to

18   articulate as to why there was a public use because there was

19   literally no evidence of public use.  All he could say was,

20   yeah, I believe it was in public use.  That conclusion as a

21   matter of law fails.

22           The Federal Circuit's Upjohn case, for the

23   determination of obviousness there must be factual support

24   for an expert's conclusory opinion.  Lack of factual support

25   for expert opinion going to factual little probative value.

1  Such conclusory expert testimony cannot support an

2  obviousness conclusion.  That is the holding of the Federal

3  Circuit in Duke University.  You cannot employ mere

4  conclusory statements.

5         In ActiveVideo the Federal Circuit again held, the

6  obviousness testimony by the Defendant's expert was

7  conclusory and fatally unsupported.  He never provided any

8  factual basis for his assertions.  Therefore, they are

9  disregarded as a matter of law, Your Honor.  That is what

10 they point to from Neikirk.

11        Now, they to point to one other thing.  They say,

12 well, we presented evidence of the hardware.  We had the

13 actual hardware in Court.  And here it is.  I presented it on

14 our Slide 12.  This is a photograph of it.  But it provides

15 no evidence of public use, Your Honor.  The fact that there

16 is hardware sitting on a desk says nothing about whether a

17 use of it in '95 and '96 was open to the public.

18        Now, HP they say, well, one of the circuit boards

19 had a copyright notice, a copyright symbol on it "c" with

20 1996.  It said:  All rights reversed.  And I have reproduced

21 that on Slide 13.

22        And this is what they argued to Your Honor when we

23 brought our JMOL before the verdict.  We requested the Court

24 to give us judgment as a matter of law because they had no

25 evidence of public use.  And HP made exactly one argument.  I

1   reproduced it here on the screen for Your Honor, and the

2   argument is simply a false assertion.  The sole argument was

3   that the system had copyright etched into the machine that

4   said 1996 indicating that the Copyright Office had reviewed

5   it and that it was available.

6           What their assertion is that, well, we had this

7   copyright symbol, that means we registered it.  To register

8   we had to send the system to the Copyright Office, and they

9   used it.

10          There was no evidence of that, and all those

11  inferences, in fact, are wrong as a matter of law, Your

12  Honor.

13          Let me go through that.

14          First of all, as a matter of law, putting the

15  copyright symbol on something does not imply registration.

16  We quote the cases, we quote the relevant statutes that state

17  unequivocally that registration with the Copyright Office is

18  not required before adding the symbol on a work.

19          So putting that symbol doesn't mean that HP

20  registered it.  If it had been registered what you would see

21  is an application and registration certificate.  There was no

22  evidence of an application or registration certificate.  HP

23  certainly would have provided that if there was one.

24          The only inference that can be reasonably arrived

25  at is it was not registered.  There is no evidence of

1  registration.  Moreover, if they had sought to register that

2  circuit board, as a matter of law they would not have sent

3  the circuit board in because the Copyright Office does not

4  accept tangible articles like circuit boards.  That is not

5  how you register them.  You send in a photograph of it.  They

6  have no ability to accept it.

7        And if 3Com for some reason had sent that circuit

8  board in to try and register it, it doesn't mean that there

9  was any public use.  The Copyright Office is not going to

10  take that circuit board and put together a system and fire it

11  up and run it.  The fact that there was a copyright symbol is

12  not evidence of public use as a matter of law.  That is the

13  sole argument they made pre-verdict on this, and it is simply

14  wrong.

15        Now, the next point I want to address, Your Honor,

16  is a misstatement of the law that they make in their brief.

17  I want to address this.  We explain it in our brief, I think,

18  very well, but I want to address it because there shouldn't

19  be any confusion on this.  I want to point out that a

20  district court did get confused on this and did get reversed

21  by the Federal Circuit.  We don't want that to happen here.

22        What they quote in their response is this:  Any use

23  of the claimed invention by a person other than the inventor

24  who is under no limitation, restriction, or obligation of

25  secrecy to the inventor, is a public use.

1     And they say then that Fisher's use of the system

2  with others at 3Com would, therefore, be a public use.  What

3  they are suggesting is this language from this Federal

4  Circuit case means that if Fisher and his colleagues at 3Com

5  are using it, that makes it a public use because they are not

6  under any obligation of secrecy to the inventor of our

7  patent, to the inventor of the '930 patent, Mr. Katzenberg.

8     But the Federal Circuit has held that that is

9  simply the wrong way to understand what this law is about.

10  And they reversed the Federal Circuit for that -- or reversed

11  a district court who did exactly that.  This is in the Dey

12  case.  I reproduced on the screen now the relevant portion

13  from that Dey case.

14     And the Federal Circuit said:  The district court's

15  decision was the result of misconceptions about the reach of

16  Section 102.  It says:  The district court's findings were

17  based on language from our cases stating that public use

18  includes any use of the claimed invention by a person other

19  than the inventor who is under no limitation, restriction, or

20  obligation of secrecy to the inventor.  It is the exact

21  language that HP quoted.

22     And the Federal Circuit then held:  Those

23  statements are not meant to apply to third-party use cases.

24  That is, if Katzenberg were using the invention before the

25  filing of the patent, then there would be a question of were

1    other people under an obligation to him?  But that is the not

2    the case here.  We have a third party that is purportedly

3    using the invention, a third party being 3Com and Fisher.

4         As the Federal Circuit went on to hold in Dey, even

5    in the case of third-party uses, being accessible to the

6    public still requires public availability.  It is not enough

7    that Fisher and 3Com made a use.  Their use must have been

8    made available to the public.

9         As the Federal Circuit held:  When the alleged

10   public use is performed by an unaffiliated third party rather

11   than the inventor, such use must still be publicly

12   accessible.  That is from the 2015 Delano Farms case.

13        So their quoting of that language and misusing it,

14   is wrong as a Federal Circuit law.  The Federal Circuit has

15   directly addressed it and reversed the district court who

16   followed that approach.  They have to show that any use by

17   Fisher at 3Com was accessible to the public.  That's what

18   would make it a public use.

19        Fisher's use at 3Com is not a public use, not

20   unless they have evidence that members of the public attended

21   the demonstrations, attended the use, and that they had made

22   it accessible to the public.

23        Now, HP in surreply they say, well, there was no

24   evidence that the Fisher System was confidential or secret.

25   There is two problems with this one.  The first one is a

1   legal problem.  This reverses the burden of proof.  For them

2   to establish that Fisher's prior art, they have to show by

3   clear and convincing evidence that the use was public.  It is

4   not enough for them to show a use.  They have the burden to

5   show a public use.

6           We don't have to come in and say, well, you showed

7   a use, now it is our burden to show that it was confidential.

8   No.  HP, as the proponent of the argument that the patent was

9   invalid because of Fisher, has the burden of proving that

10  there was a public use.

11          Here is the Federal Circuit cases that we cite on

12  that point directly.  The Defendant had the burden to show by

13  clear and convincing evidence that the inventors placed their

14  invention in public use.

15          Here is another case, Tone Brothers.  The party

16  asserting the public use bar has the initial burden of

17  showing by clear and convincing evidence facts which support

18  the existence of a public use.  They haven't done that, Your

19  Honor.

20          The second problem, Your Honor, is that the only

21  evidence that was in the record is evidence from which you

22  could infer that it was confidential.  As I showed before,

23  Fisher's testimony about the use was that it was for research

24  or development, they were developing a prototype of a

25  product.

1            The only reasonable inference is that HP would keep

2   that confidential.  HP is not in the business of developing

3   products and inviting their competitors in to see them before

4   they release the product.  That is not ordinary business

5   behavior, and there is no testimony suggesting that HP

6   decided while developing this product, conducting research

7   and development, preparing this prototype, that they decided

8   to invite the public in or invite competitors in or invite a

9   journalist in to write an article about it.  None of those

10  things.  No evidence of public use.

11           The other piece of evidence that bears heavily on

12  this, Your Honor, is the patent application that 3Com filed

13  on May 29th, 1997.  To file that patent application, 3Com

14  necessarily did not engage in any prior public use that could

15  act as a bar to their own patent.

16           So prior to May 29, 1997, the only reasonable

17  inference is that 3Com did not engage in a prior public use.

18  They kept it confidential.  And when was it that Mr. Fisher

19  testified his use was at 3Com?  Unequivocally, '95 and '96.

20  So Fisher's use in '95 and '96 was non-public.  There was no

21  evidence, no evidence of a public use of the Fisher System.

22  All evidence pointed to the fact that it was a non-public use

23  by 3Com in developing a product.

24           There is yet another hurdle they have got to

25  overcome, Your Honor, and that is corroboration.  It is not

1    enough to come in when you are talking about facts that are

2    this old and have one witness testify about it.

3            Here is the Federal Circuit in Finnigan talking

4    about the requirement of corroboration that:  Testimony

5    concerning invalidating activities can be unsatisfactory due

6    to the forgetfulness of witnesses, their liability to make

7    mistakes, their proneness to recollect things as the party

8    calling them would have them recollect them.  For that reason

9    corroboration is required.

10           They had one witness on this subject, Fisher.  They

11   didn't have two.  As a matter of law, they lose.  There was

12   no corroboration.

13           The Federal Circuit in Finnigan specifically held

14   that corroboration is required on the issue of public use.  A

15   witness's uncorroborated testimony is equally suspect if he

16   testifies concerning the use of the invention in public or

17   use the invention in public, 102(b).

18           In that particular case they reversed.  They said:

19   What we are left with is Jefferts' testimony concerning his

20   alleged public use.  Such evidence is insufficient as a

21   matter of law.

22           So that was a case where they actually had a

23   witness who did provide testimony about a public use.  The

24   Federal Circuit said as a matter of law that fails.  It

25   wasn't corroborated.

1          They need to put on evidence of public use, and

2     then they need to do it twice.  They need two forms of

3     evidence, any evidence and corroboration.  They don't have

4     any, Your Honor.

5          Let me show you what their purported corroboration

6     is.  This is from the trial transcript.  I put it on the

7     screen.  It is our Slide 27.

8          Dr. Neikirk was asked:  Has it been corroborated

9     here that it was in public use?

10          Here is what he says:  Yes, Dr. Fisher told us this

11     morning that they built a system, they plugged it into the

12     network at their offices and used it.

13          So this is not corroboration.  This is Fisher

14     himself talking about it.  This is not corroboration of

15     Fisher.  And it is not about a public use.  This is Fisher

16     describing a non-public use.

17          They plugged it into the network at their offices

18     and used it, not plugged it into a public space and

19     demonstrated it to the public, not invited miscellaneous

20     third parties to come in and observe them using it, that they

21     plugged it into their network in their offices and used it.

22     That is not corroboration, and it is not testimony about

23     public use.

24          Now, because there was no evidence of public use,

25     the Court is required as a matter of law to conclude that the

1    Fisher System was not proven to be prior art.  That means the

2    Fisher System has to be eliminated and not considered in

3    their obviousness contentions.

4         And what they are left with then is the Fisher

5    patents, Woodmas patent, and Chang patents.  That

6    combination, Your Honor, they are estopped on.  We moved for

7    JMOL of estoppel specifically on this before the verdict.

8    And they should have been estopped from presenting that.

9         The statute 35 USC 315 provides that they are not

10   able to raise before the jury any grounds that they raised or

11   reasonably could have raised during the IPR, anything they

12   reasonably could have raised.

13        Well, they knew about these grounds, these patents,

14   and could have raised them during the IPR.  We know that

15   because here is their invalidity contentions dated December

16   19th, 2012.  And on them they identify Chang and Fisher and

17   Woodmas.  They were fully aware of those references in

18   December of 2012.

19        And this Court's holding on a similar motion

20   earlier is controlling on this.  As this Court ruled and I

21   will quote the Court's own order, HP disclosed each reference

22   in its invalidity contentions on December 19th, 2012.

23   Therefore, HP reasonably could have raised each invalidity

24   ground before the PTAB.  That means they are estopped on

25   those invalidity grounds.

1          If they are estopped on those grounds, that is the

2     end of their obviousness case.  Fisher is not prior art.  The

3     remaining patents they are estopped on.  JMOL should have

4     been granted pre-verdict, and it should be granted now.  As a

5     matter of law, their obviousness case fails.

6          Now, Your Honor I want to turn to the next part of

7     our motion, which is it fails for additional reasons, in that

8     they failed to prove necessary elements in order to establish

9     obviousness.

10          They have argued that we waived these.  I am going

11     to address the waiver after I address the merits of these

12     because understanding the waiver will be easier in light of

13     understanding exactly what the issues are.

14          The first missing element is low level current.

15     They didn't establish in their combination that it had a low

16     level current, applying evidence, using evidence that applied

17     the Court's construction.

18          In order to satisfy this requirement of proving

19     that their prior art had a low level current, they would need

20     to have an expert testify and apply the Court's construction

21     and demonstrate where each part of the construction was

22     satisfied in the prior art reference.

23          They didn't offer any such testimony.  The Federal

24     Circuit has held, this is an example, in the Aspex case, this

25     is not a one of the rare cases where the invention is so

1  simple that expert testimony is not required.  The party

2  asserting invalidity has the burden of introducing such

3  evidence, such expert testimony.  Expert testimony is

4  required for a technical patent like this.

5       In the Koito case the Federal Circuit reversed the

6  district court.  Why?  Because the district court erred in

7  concluding that explanatory testimony from the expert

8  relating to the prior art reference of the patent was

9  unnecessary.  It would be error for this Court to do so as

10  well.  They have to introduce explanatory testimony that

11  relates to the prior art reference to the patent.

12       The Federal Circuit held that general and

13  conclusory testimony does not suffice as substantial evidence

14  of invalidity.

15       Same thing in ActiveVideo, and I urge Your Honor to

16  look at ActiveVideo.  The facts are very similar in this

17  regard.  As they point out, the testimony provided by the

18  expert was conclusory and lacked sufficient technical detail.

19  For that reason it had to be disregarded, justifying JMOL.

20       Now, on this issue of low level current, the Court

21  required that it must be a non-data-signal current that is

22  sufficient to begin start up of the access device but that is

23  not sufficient to sustain the start up.

24       Their expert, Dr. Neikirk, at no time applied that

25  construction except when I asked him about it -- and you will

1   see that testimony later -- when he admitted it wasn't found

2   in their references.

3           But in their testimony that they point to he

4   doesn't say, aha, here in Woodmas this is a current that is

5   sufficient to begin start up of the access device.  He

6   doesn't even make that conclusory assertion, much less show

7   it.

8           There is no testimony from Neikirk showing that the

9   Woodmas current -- that was the one that they alleged was

10  going to satisfy this -- there is no testimony that it was

11  sufficient to begin start up of the access device.  Without

12  that testimony, under Federal Circuit law, their obviousness

13  case fails as a matter of law.  They need explanatory

14  testimony applying that by their expert.  Their expert didn't

15  do it.  They failed as a matter of law.

16          What HP relies upon instead -- and I have

17  reproduced it from the brief on Page 57 -- is the barest

18  conclusory testimony from Neikirk where he says:  The Woodmas

19  is clearly teaching us a great deal about low level currents,

20  and I'll go ahead and check off low level current.  We'll see

21  that it's truly the low level current as construed by the

22  Court when we look at that combination.

23          All he is doing is saying, yeah, I found the low

24  level current, but he at no point applies the Court's

25  construction and says, aha, this is a low level current.  We

1   simply have his bare conclusions.  And those bare conclusions

2   as a matter of law as the Federal Circuit has done in four

3   other cases, those bare conclusions have to be disregarded.

4   They are not sufficient evidence.  They are given no weight.

5          Now, in addition when he gave us conclusions, they

6   were always qualified.  He always threw in, well, there would

7   be a low level current if we used -- if we do this the way

8   that Network-1 did in its infringement theory or the way

9   Dr. Knox did in his infringement theory.

10          And what those qualifications were referring to --

11   and I will go to our Slide 60 now -- is that Dr. Neikirk

12   asserted that the theory that Network-1 was using was that it

13   merely has to be a current that is used in a detection

14   process.  And he described that as an erroneous construction.

15          And it certainly would be.  We can compare it to

16   the Court's construction, and it is not the same thing at

17   all.  If you merely establish that a current is used in a

18   detection process, that would not establish that it was

19   sufficient to begin start up.

20          And for that reason they never asked Dr. Neikirk to

21   go further and try to actually apply the Court's construction

22   before the jury.

23          In closing argument HP gave us a telling admission

24   on this very point.  They said that:  This construction

25   applied by Neikirk was just sufficient -- was just current

1    sufficient to go through the detection circuitry.  That's

2    completely different to what Judge Schroeder says.  Judge

3    Schroeder says it has to begin start up of the access device.

4    Not current sufficient to go through the detection circuitry.

5         So that is an admission that this erroneous

6    construction is not the same thing as the Court's

7    construction.  It is completely different as to what Judge

8    Schroeder says.  Judge Schroeder requires that it be

9    sufficient to begin start up of the access device.  That is

10   not mentioned at all in this erroneous construction.

11        Now, what happens if we actually applied the

12   Court's construction?  The evidence is undisputed on that,

13   Your Honor.  Dr. Neikirk himself admitted what would happen

14   if we applied the Court's construction and looked for a

15   current that would be sufficient to begin start up.

16        And here is his testimony on Slide 68, and this

17   testimony alone should be conclusive on the issue.  He was

18   asked this:  In your opinion, does Woodmas disclose or teach

19   a low level current using the Court's definition of low level

20   current?

21        His answer:  The Court has recommended a

22   construction of low level current, that it's a

23   non-data-signal current that is sufficient to begin start up

24   of the access device but that is not sufficient to sustain

25   start up.  I have applied that exactly as it is stated by the

1   Court, to Woodmas.

2           And as I pointed out quite clearly in the Footnote

3   128, it's my opinion that Woodmas's current of 15 milliamps

4   does not start up.  So hence, no, Woodmas is not disclosing

5   that low level current as required by the Court.  They needed

6   to provide expert testimony applying the Court's definition

7   to Woodmas.  They didn't do it.

8           I asked their own expert to apply that.  And he

9   said unequivocally, Your Honor, this testimony could not be

10  clearer.  I have applied that construction as exactly as it

11  is stated by the Court, and Woodmas is not disclosing that

12  low level current as required by the Court.

13          Moreover, Your Honor, I asked Dr. Neikirk in a

14  series of eight questions to explain exactly why it was that

15  the prior art did not disclose a low level current.  And I

16  put -- to help him explain it, I put in the front of him the

17  Figure 1 from Woodmas, which I have got on the board now, and

18  asked Dr. Neikirk about it.

19          And he explained that Woodmas system is going to

20  deliver a current, this 15 milliamp current, from something

21  called the power delivery unit over to the power reception

22  unit.  And those are illustrated on this diagram.  That is

23  where the current goes between.

24          Now, Dr. Neikirk also explained that over on the

25  far right here in Box 16, that is where we have these remote

1   devices, what would be the access devices; a camera,

2   headphones, a microphone over there.

3         And he was asked this -- going to our Slide 64 --

4   by delivering this 15 milliamp current, does that mean that

5   the current is sufficient to begin the start up of the

6   connected remote device?

7         ANSWER:  No.  In my opinion, it doesn't.  The

8   remote device is not started up by that current.

9         Does the detection current in Woodmas, does it reach

10   any of the items in box 16?

11         His answer:  The lower power current provided by

12   the power delivery unit to the power reception unit, no.  The

13   current does not flow onto the rest of the circuitry.

14         This current doesn't even -- in Woodmas, doesn't

15   get over to the accused devices.  A current can't start up an

16   access device if it doesn't even reach it.  And Dr. Neikirk

17   explained the current doesn't even get to the access device

18   so, of course, it doesn't start it up.

19         He confirmed this question:  You would agree that

20   there is no current that reaches any of the items in Box 16?

21   Yes, I would, yes.

22         And I went on to identify them specifically.

23         The current does not reach this camera, correct?

24         That's exactly how it is designed, yes.

25         Does not reach the microphone?

1          Correct.

2          Does not reach the headphones?

3          Correct.

4          The Woodmas current doesn't reach any of the remote

5   devices.  There is no begin start up.

6          And then he concluded.  He was asked this question,

7   which is directly on point, Your Honor:  Do you have any

8   basis for concluding that the '930 patent claims are obvious?

9          And here is his answer:  Given that the Court said

10  that the low level current must be sufficient to begin start

11  up of the access device, I could not find that element in the

12  art that I used.  My opinions would not have all of the

13  elements required for an obviousness conclusion.  It is his

14  own admission at trial that if we actually apply the Court's

15  construction, it is not there.

16         Do you have any basis to conclude that the '930

17  patent is obvious, I asked him?

18         He says this:  I cannot conclude that it is

19  obvious.

20         QUESTION:  It would be valid.

21         ANSWER:  It would be valid.

22         They don't have any evidence from an expert or from

23  any witness saying that there is a current in any of their

24  prior art that is sufficient to begin start up of an access

25  device.  Their expert didn't testify to that.  He testified

1  just to the opposite.  Our expert agreed with it.  The

2  testimony is uniform on this point.  Therefore, there is no

3  evidence supporting an essential element of their obviousness

4  case.

5          Without prior art that has a low level current, one

6  that is sufficient to begin start up, they are missing a

7  fundamental part of the claim; and, therefore, they cannot

8  satisfy their obviousness case, as their own expert admitted.

9  Without that element, he has no basis to conclude that the

10  patent is obvious.

11          And on that point, again, here is another just -- I

12  will say -- I will use the word "devastating," a devastating

13  admission from HP itself.  This is HP's own comment in

14  closing argument about that, comment about Dr. Neikirk.

15          And, finally, he had to say, look, I don't know the

16  element would be met.  And if it's not met, yes, it would be

17  valid.  But that's using Judge Schroeder's claim

18  construction.  Using his analysis and the way he's applying

19  it, these patents are valid, yes, they are.  And he went

20  through a thorough analysis, and it's his opinion.

21          That is the only way to interpret this testimony.

22  There is no way to interpret this testimony that there was a

23  current that was sufficient to begin start up in the prior

24  art.

25          Now, that's low level current.  I am going to

1    address two more missing elements on this -- for this

2    motion.

3         The next one is secondary power source.  Secondary

4    power source is an element that had the longest construction

5    of any of the elements.  Among other things, it required

6    driving -- the identification of driving points for the

7    secondary power source and for a main power source.

8         So in order to establish that there was a secondary

9    power source, they would need testimony from an expert

10   identifying the secondary power source in the prior art and

11   explaining why -- where its driving points are and why those

12   driving points are physically separate from the driving

13   points of the main power source.  Those are highly technical

14   issues.  That is not something a lay person can figure out on

15   their own.

16        Without that testimony, again, an important part of

17   their obviousness case disappears, and we are entitled to

18   judgment as a matter of law.

19        What evidence did they put on that?  None.  Your

20   Honor, their expert Dr. Neikirk did not even mention driving

21   points.  It doesn't show up anywhere in his testimony.

22   Moreover, he did not even make the conclusory assertion that

23   the secondary power source was found anywhere in the prior

24   art.

25        On direct examination I'm going to show Your Honor

his sole mention of the word "secondary power source."  It's

when he was identifying what elements were found in Claim 6

that he would have to prove.  He says:  I started with

Claim 6.  I tried to pull out the key pieces again so we can

look for those.  There's a main power source, secondary power

source, low level current, sensing, and controlling.

The sole time he even used the words "secondary

power source" was when he said, this is what we have got to

show.  This is what we need to prove.  But then he never went

on to actually prove it.

The only time he discussed secondary power source

was on cross-examination when he admitted it was not present.

I put on the screen his testimony.

QUESTION:  In your testimony you didn't identify

that the Fisher System teaches a secondary power source:  Is

that true?

ANSWER:  Not as construed by the Court, no, it does

not.

His only testimony, even conclusory testimony about

secondary power source was that it was not found in the prior

art he used.

Now, HP in their brief, they say, well, he did

mention it in a demonstrative, and they reproduce a

demonstrative in their brief.  But they don't cite to the

record for that, and the reason is that demonstrative was not

1    in the record.

2           In fact, we cite Fifth Circuit and Eastern District

3    cases holding that demonstratives are never a part of the

4    record.  Charts of this nature are not themselves evidence.

5    They are not evidence.  You have to look at the testimony.

6           And, moreover, even that demonstrative itself, if

7    it had been admitted, would not have done anything because it

8    does not mention anything about driving points.  It does not

9    apply the Court's construction.

10          So there was no evidence of secondary power source.

11   They needed testimony from an expert.  Their expert didn't

12   apply it, did not supply that testimony.  When asked on

13   cross-examination, he admitted it was not present.

14          The third missing element is main power source.

15   Now, for this element, Your Honor, the claim requires a

16   single power source, a single power supply that does two

17   things.  It supplies power to the data node, power to the

18   switch, and also is for delivering a low level current from

19   said main power source.

20          So one power source does both things.  Dr. Neikirk

21   never identified in the prior art a power source that did

22   both of these things.

23          In HP's brief they say the following:  Again, they

24   point out the fact that Neikirk simply identified that there

25   was one piece of prior art that had a power source that would

1   do one thing, power the data node, and then a different piece

2   of prior art would power for the other function, but no power

3   source did nothing.

4        They say:  For example, the Chang patents, the

5   Fisher System, and the Fisher patents disclosed a power

6   source supplying power to a data node.  Well, that is true.

7   But that is not a main power source.  You need a power source

8   that does both things.  Supplying power to the data node is

9   not a main power source.

10        And then they say:  And the Woodmas patent

11   disclosed delivering a low level current to the access

12   device.  Well, the detection current from Woodmas was not a

13   low level current, as we just saw.  Moreover, that current

14   was not provided from a power source that also provided power

15   to a data node, so it couldn't be a main power source.

16        Now, the reason they didn't have their expert

17   testify about it is because he had admitted in his own expert

18   report that it wasn't in the prior art.  Here is -- from his

19   expert report.  And for the combination of Fisher, Chang, and

20   Woodmas what he does is you can see here he refers to -- he

21   says:  See the discussion and citations to Fisher in view of

22   Chang.  So he just incorporates what he has done on Fisher

23   and Chang for main power source.

24        If we turn to that, here is what he says:  Fisher

25   in view of Chang does not disclose this element of Claim 6,

1     main power source.  In Fisher and Chang no power source

2     performs both of the functions; i.e., one, supplying power to

3     the data node.  And, two, delivering a low level current to

4     the access device.

5          The reason they didn't ask Dr. Neikirk to testify

6     that there was a main power source in their combination is

7     because he found just the opposite.  In his report he put a

8     footnote in admitting that it was not there.

9          All right.  So they are missing three elements --

10    we also demonstrate in our brief that they are missing the

11    motivation to combine.  That was simply conclusory.  And the

12    Fisher System is not prior art.  That eliminates on five

13    different bases their obviousness case.

14         Now, they say that the basis relating to missing

15    elements, that that was waived.  That wasn't mentioned in our

16    JMOL.  But they are simply not applying the correct law on

17    that, Your Honor.  The correct law was set forth by the

18    Federal Circuit in the Orion case.

19         In that case the Federal Circuit, as they held in

20    that case, the Fifth Circuit construes Rule 50(a) liberally

21    such that adequacy of a motion depends on the context in

22    which the motion is made.  And a cursory motion can be

23    sufficient if it is clear from the context that neither the

24    Court nor the non-movant's attorneys needed any more

25    enlightenment about the movant's positions on those issues

1    and that is exactly the case here.

2            Network-1 and the Court were well apprised of our

3    positions on these issues, and I am going to walk through the

4    evidence demonstrating that.  And our evidence on this is

5    actually undisputed, Your Honor.

6            First of all, there is no dispute that we timely

7    moved for JMOL for lack of evidence of obviousness.  We moved

8    that HP's entire validity case should be rejected as a matter

9    of law; that there is not sufficient evidence from which any

10   reasonable jury could conclude that the patent is obvious.

11   Moreover, we had unequivocally identified for HP the elements

12   that were missing from its prior art combination.

13           Dr. Knox, our expert, had identified those in his

14   expert report.  He said expressly that the key missing

15   elements from Dr. Neikirk's proposed combination of Fisher,

16   Chang, and Woodmas included main power source, secondary

17   power source, and delivering a low level current.

18           And he explained in detail why they were missing,

19   the very things that happened at trial.  He said, for

20   example, for secondary power source, Dr. Neikirk fails to

21   identify the claim secondary power source as defined by the

22   Court.  Dr. Neikirk does not address the part of the Court's

23   definition that refers to driving points, doesn't identify

24   it.

25           Then, Your Honor, HP's own expert had admitted

1    before trial that these elements were missing.  In his

2    report, for example, a quote from his report admitting that

3    the Woodmas current does not cause the start up.  He admitted

4    in his deposition, and his deposition testimony was played in

5    front of the jury at trial, he admitted that Woodmas does not

6    disclose or teach a low level current.

7              He admitted that his prior art does not teach a

8    main power source that does both of the things required of

9    the main power source.

10             So HP was under -- there is no mystery about what

11   was missing.  We pointed out, and HP's own expert admitted

12   it.

13             Then on cross-examination, Your Honor, we pointed

14   it out again.  We had Dr. Neikirk admit that these elements

15   were missing.  When we concluded with our cross-examination

16   of Dr. Neikirk, there could be no doubt that they understood

17   that a missing element was low level current, as Dr. Neikirk

18   had admitted that he hadn't found it.  The same with

19   secondary power source in cross-examination, Dr. Neikirk had

20   admitted he didn't identify it.

21             In addition in the Orion case, they pointed out one

22   of the factors to consider, part of the context is that the

23   final jury instructions contain specific, detailed

24   instructions as to both anticipation and obviousness so that

25   the Defendant would know that they needed to -- that both

1  parties would know they needed to meet those elements.

2        Well, that was the case here as well, Your Honor.

3  There were detailed instructions on anticipation and

4  obviousness -- and I will go to our Slide 46 -- including

5  instructing the jury specifically that the details of the

6  Court's construction of secondary power source and low level

7  current would need to be met.

8        So HP was fully on notice that they would need to

9  present proof of those elements; that the jury would be told

10  that they needed to look for those elements.

11        Your Honor, just as you held in the Adaptix case,

12  in that case the oral JMOL on obviousness consisted of the

13  following:  There's not specific evidence to determine

14  obviousness.  That was seven words, yet Your Honor held that

15  was sufficient to preserve the issues.  Why?  In light of the

16  context.  Because the other side knew that the invalidity

17  challenges were sufficiently developed, and the other side

18  was fully on notice of the issues concerning validity.  There

19  is even more evidence of that here.

20        We put HP on notice before trial and throughout the

21  trial of the exact issues.  There was no mystery when we

22  stood up and said insufficient evidence of obviousness is

23  what we were talking about.  They knew exactly what we were

24  talking about.

25        The final factor on this waiver is this one, Your

1    Honor.  As Your Honor held in Adaptix, in considering the

2    context we have to consider if greater specificity would have

3    resulted in reopening the case.

4            And in that case, Adaptix, the other side made no

5    claim in the briefing that it would have sought to reopen its

6    case to provide additional evidence for its invalidity

7    arguments had Adaptix been more specific in its oral motion.

8            The same is true here, Your Honor.  There is no

9    claim by HP that if we had been more specific in our motion,

10   they would have then moved to reopen the case.  And that is

11   for a very good reason, Your Honor.  Their expert had

12   admitted, as we just showed, that they couldn't put on more

13   specific evidence on those elements.

14           He concluded in his expert report and in

15   depositions that they couldn't prove those elements; they

16   couldn't prove low level current, they couldn't prove main

17   power source, for example.  As a result they simply couldn't

18   have put on more evidence, and they've made no claim in their

19   briefing that they could have.

20           And, finally, Your Honor, an additional factor here

21   is that Your Honor had given the parties an additional 25

22   minutes.  HP, instead of using that time to try and put on a

23   better validity case, used it for other things, and they ran

24   out of time at the very end of the case even with that

25   additional 25 minutes.

1            So if they moved to reopen the case, not only would

2    they have not had any evidence they could have put on, they

3    didn't have time in which to put that evidence on.

4            Your Honor, there was no waiver here.  We moved

5    before the jury verdict, before the jury went out to

6    deliberate for JMOL on obviousness because they had

7    insufficient evidence.

8            HP and the Court were fully aware of the issues.

9    All of the documents that I pointed to where HP was put on

10   notice about our contentions, were submitted to the Court.

11   They were in the Court record.  There was no question about

12   it when we concluded our cross-examination, what elements

13   they were missing.

14           So for that reason there was no waiver.  And with

15   no waiver, as a matter of law their obviousness case fails.

16           I will finish with one final thing, Your Honor.

17   This is certainly the most important motion I have ever

18   argued.  All motions are important to clients, but this

19   motion is vital to Network-1.  The '930 patent is an

20   important asset of Network-1.  It is a public company.

21   Findings that these claims, especially these independent

22   claims are invalid, is very fundamental to Network-1.  There

23   is nothing that is more important.  I can assure Your Honor

24   that no matter which side loses this case, there is going to

25   be an appeal.

```
 1              What I have wanted to point out here, Your Honor,
 2    is that the reason you should rule our way is the Federal
 3    Circuit law is crystal clear.  You will be affirmed if you
 4    grant JMOL our way.  But if you don't, there is Federal
 5    Circuit cases, four of them we have cited, where the Federal
 6    Circuit reversed the district court that accepted evidence
 7    like this.  They don't have evidence that is sufficient to
 8    withstand JMOL.  Your Honor should grant our motion.
 9              Unless there are any questions, I will stop here.
10              THE COURT:  Thank you.
11              MR. DOVEL:  Thank you.
12              THE COURT:  Let's take a short recess.
13              (Recess was taken at this time.)
14              THE COURT:  Please be seated.
15              Ms. Doan.
16              MS. DOAN:  Your Honor, we obviously oppose the
17    Plaintiff's motion for JMOL on the invalidity issues.  We had
18    prepared our comments, I think, for the entire motion with
19    respect to JMOL and for the motion for new trial.  I am not
20    sure if Mr. Dovel is splitting up his argument for both.  I
21    am happy to proceed with all of it or just a portion of it.
22    I just want to make sure I am responding to the right
23    thing.
24              MR. DOVEL:  We are addressing those motions
25    separately, Your Honor.
```

1          MS. DOAN:  Then we will stop at the end of that.

2          Your Honor, with respect to -- I would like to

3   start with Mr. Dovel's last comment with the plea to the

4   Court to please set aside the jury verdict in the Eastern

5   District of Texas because they will take care of this Court,

6   and they are going to take it up anyway.

7          We find that to be offensive, at least to the

8   Defendants.  This is the first time that Network-1 has ever

9   tried this case.  And what they are asking you to do -- to a

10  jury verdict.  And what they are asking you to do is to set

11  aside the jury verdict in the Eastern District of Texas that

12  ruled for the Defendants based upon all of the evidence in

13  the record, not based upon the expert reports that Mr. Dovel

14  was reading from at the end, which are not in evidence in

15  front of the jury except for, I think, a few paragraphs that

16  he actually showed with respect to Dr. Davis.  Those are the

17  only two.

18         But with respect to the verdict that was given,

19  Your Honor, there is several things that could have happened

20  here.  They just didn't.  And the jury went with the

21  Defendant.

22         For example, this is a general jury verdict.

23         I am so sorry, Your Honor.  I have some technical

24  issues on this.

25              (Pause in proceedings.)

1          MS. DOAN:  I will keep going, Your Honor, until

2     they get it clear.

3          With respect to the renewed motion for judgment as

4     a matter of law, the Fisher System was corroborated.  There

5     is clear evidence of that.  The Fisher System was also in

6     public use, and the standard that is set by the Fifth Circuit

7     is not -- there is lots of different types of public use, and

8     they are citing public use as in public demonstration.  And

9     that is not what we are advocating here is for public

10    demonstration.

11         The second -- the third reason, Your Honor, is the

12    Plaintiff's estoppel arguments fail completely here because

13    they were not preserved in a 50(a) motion.

14         And, finally, Plaintiffs waived the remainder of

15    their arguments under the current Federal Circuit law of Shaw

16    and the HP cases.  The jury -- the jury considered and

17    rejected secondary considerations and every element was

18    established.

19         Let's talk about first the renewed JMOL motion and

20    why it should fail under 50(b).

21         First, like I said a minute ago, this is a general

22    invalidity verdict.  The Plaintiff could have asked for

23    specific interrogatory questions here.  They did not propose

24    those.  They have never asked those.  This is a general

25    verdict, and it is based on obviousness.  And all of the

```
1   evidence that came into this case showed by clear and
2   convincing evidence that each of these elements was made and
3   was met in the prior art, and the combination of the prior
4   art with respect to the Fisher System, Fisher patents, Chang
5   patents, and Woodmas.
6          And, as you know, the verdict must be affirmed
7   unless the evidence points so strongly or overwhelmingly in
8   favor of one party that the Court believes reasonable persons
9   could not reach a contradictory conclusion.  That is just not
10  what is happening here.
11         Instead what is happening is that Network-1
12  believes that the evidence should be reweighed by this Court.
13  The evidence has been weighed by this jury.  They have heard
14  all of the evidence here with respect to what Dr. Neikirk
15  said; with respect to Mr. Dovel's cross-examination of
16  Dr. Neikirk; with respect to Mr. Dovel's cross-examination of
17  Dr. Davis; and with respect to all of the evidence that we
18  put on with respect to Dr. Neikirk, Mr. Godici; and
19  importantly let's start with the very first day, the very
20  first witness, Corey Horowitz, the CEO of Network-1.
21         Corey Horowitz told this jury that he had already
22  said 15 years ago in 2003 that when he was talking to Merlot
23  that there is a risk that the detection scheme is an obvious
24  solution thereby rendering the '930 patent invalid.  And we
25  went on to ask him a separate question making sure he was
```

1    talking about the '930 patent.  And he said:  Probably yes.

2          Not only was that his testimony, we also introduced

3    a document, DX27, where he is specifically talking about all

4    of the problems with the '930 patent.  And one of the large

5    bullets, No. 3, with respect to Mr. Horowitz's memorandum and

6    statements that came before this jury the very first day,

7    prior art and obviousness are still issues that might affect

8    validity.  There are several proprietary solutions

9    pre-802.3af, and their impact is unclear.

10          And as this Court will recall, we discussed

11   different propriety solutions with respect to the proposals

12   that were presented to the IEEE and Dave Dwelley's testimony,

13   et cetera.

14          Then Mr. Horowitz went on to say:  Moreover, there

15   is a risk that the detection scheme is an obvious solution

16   thereby rendering the patent invalid.

17          Mr. Horowitz and Network-1 knew 15 years ago that

18   the '930 patent may be held to be invalid, and there was

19   clearly a risk with respect to that.  They had given lots of

20   licenses to various people.  I think they introduced 24 or 26

21   in front of the jury.  They had written, as the Court will

22   recall, over 350 letters asking for different companies to

23   license.  And, of course, not everybody licensed, as we

24   talked about, with respect to -- Apple comes to mind.  There

25   were several others that did not license as well.

1          But they introduced -- this isn't a case where they

2     were -- somehow withheld these various licenses from coming

3     in front of the jury.  He introduced these licenses the very

4     first day, and Mr. Dovel opened on it telling the jury

5     that -- signaling to the jury that everybody else has

6     licensed this; therefore, this patent is valid.

7          But that is not the law.  And it never has been the

8     law.  And he has known for 15 years that if he ever was

9     pushed actually to trial that there is prior art out there

10    that may render this invalid and obvious.

11         Next slide, please.

12         Let's talk about the corroboration, the points that

13    Mr. Dovel raised.  First of all, with respect to the Fisher

14    System, it is definitely corroborated.

15         Next slide, please.

16         As the Court knows, the Federal Circuit law is that

17    physical, documentary, or circumstantial evidence or reliable

18    testimony from individuals other than the alleged inventor or

19    an interested party, may corroborate.  And this is not what

20    Mr. Dovel was saying, that somehow 3Com is using the

21    invention of Mr. Kasowitz [sic] and Deptula.

22         The Fisher System was definitely corroborated.  We

23    don't just have Mr. Fisher giving testimony up there by

24    himself.  He actually brings the second generation product

25    from 1996.  And goes through it and shows it with the jury.

1    As the Court will recall, we then gave it to the jury to show

2    certain parts.  Then again the Fisher System was corroborated

3    through Dean Neikirk's testimony, and, again, he showed how

4    the Fisher System worked.  And, again, different parts were

5    shown to the jury.  So the Fisher System is corroborated not

6    only through Mr. Fisher's testimony but also this system

7    itself.

8         Here we have Mr. Fisher also showing there is a

9    specific date on the second generation, and it is copyright

10   1996.  Now, what Mr. Dovel wants to say is that, yes, but you

11   didn't show me the additional evidence where it is actually

12   registered with the Copyright Office.  That is not required.

13   What is required is some evidence.  It has got to be clear

14   and convincing evidence, but there is always more evidence.

15        We could have shown that.  We could have presented

16   evidence from someone else that used it.  We could have done

17   this to show additional evidence.  But that is not required,

18   not to set aside the jury verdict.  Some evidence that

19   supports that.  And there is clear and convincing evidence

20   that the jury had in front of it.

21        And we -- and Mr. Fisher also talked about the

22   specific Fisher patents, as the Court will recall there were

23   three Fisher patents and a European patent on the system

24   itself.

25        So this is not the type of case where he is talking

1    about -- and I believe he used the Finnigan case saying

2    that -- yes, the Finnigan where we had to show there was

3    something else going on besides the inventor testimony.

4         And if the Court will recall in Finnigan and in

5    Rosco we clearly distinguished those cases, those are two

6    cases where anticipation is the invalidity theory there, not

7    obviousness.  So it is one prior art reference, not multiple

8    prior art references.  And there is only the inventor that is

9    testimony -- that is testifying.

10        He has no product with him in Finnigan and Rosco.

11   He has no drawings.  He has no other patents.  Here you have

12   all of these things.  This is clearly corroborated.

13        Next slide, please.

14        And Dean Neikirk, Dr. Neikirk also answered the

15   question, and the question was:  And has it -- referring to

16   the Fisher System -- been corroborated here that it was in

17   public use?

18        Exactly the testimony that Mr. Dovel said that we

19   did not have in the record.  It is clearly in the record.

20   Corroboration in public use.  And Dean Neikirk said:  Yes.

21   Dr. Fisher told us this morning they had built a system, they

22   had plugged it into the network in their offices, and used

23   it.

24        Dr. Neikirk also goes on in his trial testimony and

25   talks about this phone call that he had with Dean Neikirk --

1  with Mr. Fisher -- Dr. Neikirk and Mr. Fisher, and talked

2  about specifically that he told him it was in public use,

3  what was going on at the time, and how he developed it, et

4  cetera.  The jury heard all of that testimony.  Not just from

5  Mr. Fisher and his testimony but also from the phone call

6  from Dean Neikirk.  It wasn't like he just sat there and

7  listened to it and was able to opine on it further.

8         So we have of the Fisher System corroborated, and

9  we actually put it into the combination of the Fisher, Chang,

10  Woodmas combination.  And Dean Neikirk specifically talked

11  through how the Fisher System and what it did with respect to

12  the combination, and he went through all four of the parts

13  that were shown when it was corroborated; being the access

14  point, main power source -- sorry, Your Honor.

15         There were four elements that were shown with

16  respect to the Fisher System, and I -- my mind just went

17  blank.  I'm so sorry.  It's the access point, main power

18  source, a data node, and the data signaling pair all were

19  shown with the Fisher System.  And we went over that in

20  painstaking detail in the trial testimony of Dr. Neikirk.

21         Next slide, please.

22         So what we have on the corroboration is not only

23  the actual hardware of the system itself.  We have pictures

24  of the system as well that are labeled by Mr. Fisher.  We

25  have Mr. Fisher's testimony where he is actually holding the

1    system and showing how it matched up with the patents and

2    what it specifically did.  We also have Dean Neikirk taking

3    the system, going through it and showing how each of these

4    elements -- four elements were met with respect to the eight

5    elements that had to be met on the '930 patent, Claim 6.

6           And then we also have the patents themselves.  He

7    showed evidence where each of these four elements is met in

8    the patents themselves.  So the Fisher System is clearly

9    corroborated under the current Federal Circuit law.

10          Now, what else did he say with respect to

11   corroboration?  That's all he said.  Corroboration of public

12   use, he cites Finnigan and Rosco.  But Finnigan and Rosco are

13   clearly inapposite for the reason that we discussed before.

14          And what was the jury instructed on?  You

15   specifically instructed the jury not on just, hey, as long as

16   Mr. Fisher says it, it is good enough.  But, no, documentary

17   or other physical evidence that is made contemporaneously

18   with the inventive process is the most reliable proof that

19   the testimony has been corroborated.  That was in their final

20   jury instructions.

21          Here we not only had the inventor testimony, we

22   also had documentary testimony, drawings, and patents that

23   supported it, and we also had the actual system itself of

24   which 58 pictures now exist for DX500, Your Honor.

25          There is no doubt that the evidence is

1    overwhelming.  It doesn't have to be overwhelming.  But it

2    was corroborated.

3           The Fisher System was also public.  And let's talk

4    about this public testimony, public use testimony and what

5    evidence there is and what the actual case law is in the

6    Federal Circuit because it is not what Mr. Dovel says it is.

7           Public use.  Whether a public use has occurred is a

8    mixed question of law and fact.  And under Barry vs.

9    Medtronic, the inquiry is characterized:  A mixed question of

10   law and fact given to the jury without a special verdict --

11   which the Plaintiff did not request here -- without a special

12   verdict form delineating the questions of fact, the jury's

13   conclusion must be upheld unless the jury was not presented

14   with substantial evidence to support any set of implicit

15   findings sufficient under the law to arrive at its

16   conclusion.

17          Here they did not ask for special

18   interrogatories.  It is a general jury form.  And they found

19   that, indeed, this element is met.

20          Go to the next slide, please.

21          There is testimony of public use.  Dr. Neikirk

22   said, as we have discussed before:  Dr. Neikirk,

23   was Mr. Fisher's system, was it in public use?

24          Yes, I believe it was.

25          What is this belief based upon?

1            His conversations, his testimony, and what he has

2     seen with respect to the product itself with the specific

3     date on the product.

4            The Fisher System was in public use, as we know, on

5     the silk screen and also on the radio, all rights reserved,

6     copyright 1996 with respect to 3Com.

7            Next slide, please.

8            Public use includes any use of a claimed invention

9     by a person other than the inventor who is under no

10    limitation, restriction, or obligation of secrecy to the

11    inventor.

12           And I want to stop here because Mr. Dovel put up

13    some words on the side that is supposedly what Mr. Fisher was

14    saying.  He said it was only used in testing.  It was only in

15    research and development.  It was only experimental.  It was

16    only internal development.

17           And when you read through the record and what

18    Mr. Fisher said, that is not what he said about the second

19    generation 1996 system that he actually brought to the

20    courtroom to put in front of the jury.

21           So I took down what Mr. Dovel said, and I looked

22    back at these references that he was referring the Court to

23    because I noticed they would be in quotes, quote, research

24    and development as those these were words used by Dr.

25    Neikirk -- by Mr. Fisher, but in what context?

1          So we look at -- and I am on the transcript from

2     November 10, 2017 in the morning, and I am on Page 123.  And

3     the question was -- it is on background with respect to

4     Mr. Fisher:  In general what were your roles and

5     responsibilities while you were employed at 3Com?

6          And he says:  I was responsible for developing the

7     wireless networking technology.  I managed the engineering

8     group.  I was the guy that worried about the system problems,

9     you know, was the -- kind of the key architect on a lot of

10    things and managed the engineers' day-to-day activity.

11         And then the question was, by Ms. Cho:  Did you

12    ever do any research or development in the Power over

13    Ethernet field?  That is where the quote research and

14    development comes from that they are saying is the limitation

15    that this 1996, Exhibit No. 500 was limited to at 3Com.

16         Did you ever do any research and development?

17         And he says:  Yes, we did.  I, myself, and Larry

18    were kind of the key inventors of it.

19         That does not mean nor does it say it was only used

20    for research and development.

21         So I looked next at the next reference he had,

22    which was Page 131 of the same day, November 10th, 2017, in

23    the morning.

24         And the question is:  So the system you have just

25    shown us, is it okay if I call this the Fisher System?  And

1  this was Mr. Thane asking questions about this.

2          And he says:  Yeah, sure, you can call it the

3  Fisher System.  It was the first Power over Ethernet.  And I

4  was thinking if I were really bold, I would get out the

5  charger and the Ethernet and fire it up, which we could

6  probably do.

7          And he is talking during the deposition like we

8  could probably do it right here.

9          And then he goes on to say in the next -- second to

10 next paragraph:  So in order to test it, you know, we would

11 just plug that in, stick it in the front of the hub, and then

12 take the 10BaseT wiring that was in the building and plug it

13 in here so --

14         And the question is:  Did you actually

15 implement...

16         And then it went on to the next questions.

17         But he is talking about we could test it right here

18 in this room in this deposition.  He never says we only used

19 it for testing.  The snippets and quotes Mr. Dovel is using

20 are taken completely out of context.

21         And then, finally, there is another one where he is

22 talking about where he actually -- let me get the phrase on

23 this last one.  I'm sorry, Your Honor.  Internal development

24 and what they had done.  And so the question -- and

25 proposals.

1          And then so the question is on Page 137, now

2   Line 8:  Sometimes when we have been talking about the system

3   you have talked about proposals versus the system.  Are there

4   two different things, or was the whole thing a proposal or

5   something else?

6          Mr. Fisher says:  So we -- so we had built.  So it

7   is a good question.  The first hardware that we built that I

8   brought with me we had not yet put it in a switch.  Then he

9   goes on to talk about the first hardware.

10          And then he also says:  When I use the word

11   "proposal" there was hardware that was in development that,

12   you know, we were working on it with respect to the first

13   proposal.  But the second proposal, what he has then, was

14   what was in use at 3Com that was being used with everyone out

15   in their system that they had plugged in in the ceiling at

16   3Com to get wireless access information to be used with

17   everyone including the public.  That was the second system.

18   That's the 1996 one.

19          So Mr. Dovel's comment that he says, oh, yes, it

20   couldn't have been that first one from 1995 because then they

21   would be in violation of the on sale bar because their patent

22   application wasn't until 1997.  Yes.  Well, the one we talked

23   about that was introduced in front of the jury was the 1996.

24   It is copyright 1996.  There no question here, they are not

25   in violation of the on sale bar.

1          But what else does he say?  He says -- what

2   Mr. Fisher says on Page 138 of his deposition testimony when

3   he was questioned by Ms. Cho, she asked him a question:  But

4   was this concealed?

5          And he says:  I don't know anything about it being

6   concealed from the public.

7          So there is -- the only testimony with respect to

8   concealment was Ms. Cho's question Network-1 was trying to

9   get him to admit that somehow it was secret, confidential,

10  concealed from the public, and he specifically denies it.  I

11  don't know anything about that.  He never said it was

12  confidential.  He never said there was an NDA.  He never said

13  anything about that.

14         There is just absolutely no testimony on that,

15  which is the testimony that was found in the Dey case, the

16  case that Mr. Dovel says is so similar to this case, Dey

17  specifically -- the inventor said it was unavailable to the

18  public and it was confidential.  That is not at all what

19  Mr. Fisher said.  That is not what he said in the testimony

20  from this jury.  It is not what he said on the phone call

21  with Mr. Neikirk -- Dr. Neikirk that he testified about, and

22  it is just not anywhere shown in the record.

23         It was used at 3Com with others, a wireless access

24  device with respect to communications.

25         So the JumpSport case has not been overruled by the

1  Dey case.  The Dey case specifically said it had to be

2  confidential and used with the public.  That is not what

3  JumpSport stands for.

4         The Plaintiff wants us to think it is a public

5  demonstration; that somehow we had to go out and demonstrate

6  it to the public.  We are not saying that we had a some kind

7  of -- we presented it at the IEEE.  He didn't know anything

8  about that.  He was asked about that.  He just didn't have

9  any testimony about that.  He is not saying that someone else

10 had to see it.

11        But if there is a public demonstration, as this

12 Court knows, as this Court has tried other invalidity cases,

13 there is no requirement that you have to have someone there

14 that has seen it.

15        Now, the evidence is stronger for the defense if

16 someone has seen it.  So, of course, we are always trying to

17 look for the strongest evidence possible, but there is no

18 evidence of that.

19        And, in fact, the law is more akin to the Voter

20 case that we cite in our surreply brief, Voter Verified vs.

21 Premier Election Solutions.  As this Court knows, to make it

22 publicly available, for example, all you have to do is put it

23 on the Internet.  And in Voter Verified the issue was, well,

24 it may be on the Internet, but a search engine can't find it.

25        And the Federal Circuit said:  Where the Court

1    found a prior art reference was sufficiently accessible to

2    the public when it was posted online, regardless of whether

3    it could be found using a search engine.  The standard for

4    public use is nowhere near as high as what Mr. Dovel is

5    saying.

6            Now, if we were in front -- if we were arguing that

7    we had lost this issue and we had presented -- we might not

8    be able to have all of the evidence we could have but we had

9    sufficient evidence to make it clear and convincing for this

10   jury with respect to the public use, and that is all that is

11   required under the case law lest because they did not have a

12   specific verdict form on this.

13           If they had and had listed, okay, was it

14   corroborated?  Okay.  Was it used in the public?  Okay.  Were

15   these specific questions asked?  That would be different.

16   The Plaintiff wanted a general verdict form, and that was

17   fine with us.  So we went with that.

18           I think I have addressed everything he asked -- he

19   said on public use, but if there are any questions the Court

20   has, I am happy to cover this as well.

21           All right.  Let's go to the next slide, please.

22           Oh, public use also came in from Dr. Davis because

23   Dr. Davis talked about 3Com and HP had functional systems for

24   delivering Power over Ethernet to wireless access points, and

25   he was talking about the state of the art, but he was clearly

1    talking about what was happening back then with respect to

2    3Com.

3              And the next slide.

4              So Dr. Davis says, the question is:  Now, you told

5    us something about the background of the technology of the

6    patent and various systems and you talked about the Fisher

7    System?

8              And he says:  I did.

9              And the question is:  In your report -- in your

10   report you mentioned from Page 43 to 44 -- and this

11   questioning from Mr. Dovel -- you say, I discussed with

12   Mr. Fisher the work that led to the 3Com Power over Ethernet

13   patents on September 19th, 2016.  And during the call

14   Mr. Fisher System explained, and so on; is that correct?

15             Then he says:  What you have up there is correct.

16             And then Mr. Dovel has specifically put in front of

17   the jury Pages 43 and 44 of Dr. Davis's report.  Here are

18   Pages 43 and 44 of Dr. Davis's report.

19             And these actually say:  For example, 3Com -- now

20   HP -- had functional systems for delivering Power over

21   Ethernet to wireless access points and VoIP phones that were

22   effective and safe to operate.

23             He also says in report that was in front of the

24   jury:  It is my opinion that 3Com/HP created the foundation

25   for Power over Ethernet systems including before and after

1    the development of the 802.3af standard.

2              Mr. Dovel put those pages in front of the jury.

3              Next slide, please.

4              And, of course, there were two things.  I think

5    that the argument that Mr. Jacobson actually made with

6    respect to the 50(a) motions, Your Honor, is very limited.

7    It is not broad like Mr. Dovel is saying.

8              But at the end when he specifically argued with

9    respect to public use and corroboration then and Ms. Bennett

10   responded, you responded:  Thank you, Mr. Jacobson.  I think

11   there is a legally sufficient evidentiary basis on all of

12   these issues for a jury to find in the Defendant's favor.

13             That was your ruling on 50(a).  It is still your --

14   should be -- we -- request -- it still be your ruling today.

15   There is still evidence in the record to support both public

16   use and corroboration under the Federal Circuit law.

17             Now, next we talk about HP not being estopped.  So

18   this is actually another issue that was preserved by 50(a).

19   There is a lot of them that were not preserved by 50(a), but

20   this one was preserved by 50(a).

21             But it is interesting because Mr. Dovel, who is up

22   here in front of you telling you this issue was going up

23   anyway, but the Federal Circuit law supported his position,

24   the Shaw and the HP cases, the two current 2016 Federal

25   Circuit cases in the area of estoppel actually support

 1   Hewlett-Packard in this case.

 2            Next slide, please.

 3            The issue here is Section 315(e) where they create

 4   arguments for estoppel.  They are on any ground that the

 5   petitioner raised or reasonably could have raised during the

 6   inter partes review.

 7            So, of course, the Plaintiff's argument is it looks

 8   like they should win on corroboration and public use, and

 9   therefore, we can't proceed on the patents.  That is not the

10   law in the Federal Circuit.

11            Fisher, Chang, and Woodmas patents, actually not

12   all of them that are in this case but a subset of them, were

13   put before -- a request with an inter partes review with the

14   PTO which was not instituted.  Under Shaw and under the HP

15   cases the current case law in the Federal Circuit is

16   non-instituted references from an IPR are not barred.

17            And there is no Federal Circuit case law that says

18   what Mr. Dovel is advocating here that because HP joined an

19   already instituted IPR of Avaya -- if the IPR is already

20   instituted, we cannot introduce new prior art into that IPR.

21   Because we joined Avaya's IPR, there is no Federal Circuit

22   law that says that we are somehow barred by bringing a

23   Fisher, Chang, Woodmas patents only before this jury.

24            We didn't.  We think the Fisher System is

25   overwhelmingly with respect to the four elements that we are

1  talking about with the Fisher System.  We think that there is

2  overwhelming evidence that it was corroborated and it was in

3  public use, so we don't really have to reach this issue.

4      But if the Court does reach this issue, the Federal

5  Circuit law favors HP.  That is what the HP case stands for

6  and also Shaw.  It is also telling that Mr. Dovel did not

7  address this.  It is in both our response brief and our

8  surreply brief, and he did not touch on it at all when he

9  started talking about estoppel.

10          Next slide.

11          With respect to waiving all of the other arguments,

12  as this Court knows if a party fails to move for judgment as

13  a matter of law under 50(a) of the Federal Rules of Civil

14  Procedure on an issue at the conclusion of the evidence, that

15  party waives both its right to file a renewed post-verdict

16  50(b) motion and also its right to challenge the sufficiency

17  of the evidence on that right to appeal.

18          So their arguments with respect to low level

19  current, secondary considerations, secondary power source and

20  main power source, those are all waived.

21          In particular, in the transcript from 11-10-17,

22  Mr. Jacobson makes his argument with respect to JMOL on 50(a)

23  at the very bottom of Page 157.  And it goes two-thirds

24  through the Page 181.  He does preserve public use.  He does

25  preserve corroboration.  He does preserve what he calls his

1   estoppel argument that we have already addressed.

2          And then he goes in to talk about the issue with

3   respect to the claim construction, the combination doesn't

4   render the patent obvious, and then there is also this issue

5   with respect to the breach of contract case that we raised

6   that -- where the matter of law should have been in New York,

7   et cetera, and then that was withdrawn.

8          Those are the only thing he raises.  He doesn't say

9   anything specifically about main power source, secondary

10  power source, secondary considerations, et cetera.

11          And why is this important?  It is important because

12  not only does the Federal Circuit case that we just read

13  support saying that you have to raise it on 50(a) to raise it

14  on 50(b), but also the Decorte case versus Jordan says:  We

15  caution that the 50(a) motion should be far more specific

16  than a bare bones recitation of insufficient evidence as

17  required by 50(a)(2).

18          And as this Court knows the i4i/Microsoft case came

19  out of this jurisdiction.  And they specifically raised this

20  issue when it said, this may be an interesting issue for

21  appeal, but it is not preserved on 50(a).  It was not

22  specifically mentioned, and Microsoft could not raise that

23  point on 50(b).

24          So it is not just the Federal Circuit that has

25  spoken so strongly on this but the United States Supreme

 1  Court has, as well.  They had every opportunity, as this

 2  Court invited, if they wanted to file something that night to

 3  delineate every -- or they wanted to move on, they failed to

 4  do that.  These additional points are waived.  But there is

 5  sufficient evidence on all of these additional points, so we

 6  are happy to address those as well.

 7          With respect to secondary considerations, and we

 8  want to start there because the secondary considerations

 9  point is a fairly a large point here.

10          Oh, before I go to secondary considerations,

11  another point that Mr. Dovel raised in his argument on waiver

12  he talked about the Blackboard case and the Orion case, which

13  are other earlier Federal Circuit cases, but there has been

14  additional Federal Circuit cases that we are talking about

15  here, as well as the Supreme Court case.

16          But then he started reading from the Knox rebuttal

17  report how we should have been on notice of certain things.

18  That is not proper.  Just having it, putting something in a

19  rebuttal report of an expert does not give us notice at the

20  end of trial that they are going to stand up and say, hey,

21  there is no evidence of secondary considerations or somehow

22  that has been left out when clearly that was discussed.

23          But, I mean, that was something that you cannot do

24  is preserve it by putting it in some type of expert report.

25          They also cite to Neikirk's expert report as well.

1    If they think there is missing evidence about something, we

2    failed to address it specifically to their liking with the

3    wording specifically like they like it, that was the time to

4    preserve it, and they failed to do so.

5         And, Your Honor, what they are asking you to do is

6    basically say that if it is -- it is not waived because we

7    could always put it in our expert reports, then that will

8    really be a problem with 50(a) and 50(b) motions in the

9    future.  If all we have to do -- and the Plaintiff and

10   Defendants will do this in the future, if all we have to do

11   in this Court to be able to preserve a 50(a) motion is to

12   include it in some expert report and to have sent it at some

13   point during this trial to the other side and that will

14   suffice for 50(a), that is not the law.  That is what they

15   are advocating for this Court to do, and this Court should

16   not hold that to be the law.

17        All right.  So we talked about secondary

18   considerations.

19        Next slide, please.

20        As this Court recalls, this is not a case where

21   secondary considerations didn't come into evidence.  All of

22   these licenses came into evidence.  They came into

23   evidence -- this is a slide from the Plaintiff's opening

24   slide deck.  They opened on this because they wanted the

25   jury, our theory is, to advocate during their job.

1          But the jury heard about these licenses from the

2     get-go, and they analyzed each of these licenses, and they

3     looked at them.

4               And what did these licenses show?

5               The next slide.

6          For example, when we talked about these licenses,

7     we showed the jury through Corey Horowitz, the first witness

8     on the very first day, we said let's look at the Cisco

9     license.  There is no admission in the Cisco license that

10    there either constituted an admission of Cisco or its

11    affiliates or Cisco's authorized parties of liability,

12    infringement or validity of the asserted patent.  That's what

13    these licenses are.  It was just not to have to try the case.

14          The jury heard of all of -- this is not a case

15    where the jury did not hear this evidence.  They heard all of

16    this evidence.  Then we also showed where the vast majority

17    of the other licenses have -- there is 12 of them that we

18    went through specifically.  We didn't got through all 26 of

19    them.  We could have.  But they are all very similar.

20    Language saying they did not admit to liability.  They just

21    wanted to settle the case.  And they also showed that they

22    settled for fairly low amounts.

23          I mean, there are various amounts that were out

24    there; and depending on -- obviously, money is relative --

25    but for not anything near the 80 to $100 million they were

1 | asking from HP in this case.  So the jury did hear the
2 | evidence of secondary considerations.
3 | They were able to analyze exactly what that
4 | evidence was and what it was trying to be used for, and they
5 | rejected Plaintiff's thoughts with respect to secondary
6 | considerations.
7 | And as the case law in the Federal Circuit says,
8 | under Rothman:  This Court must presume that the jury
9 | adequately weighed this factual evidence and found it
10 | insufficient to support a finding of validity.  Indeed, a
11 | strong prima facie obviousness showing may stand even in the
12 | face of considerable evidence of secondary considerations.
13 | We have that here.  We heard all of it, they
14 | analyzed it, and they still ruled for the Defendant based
15 | upon what those licenses really were.
16 | Next slide, please.
17 | And then HP also proved every element that was in
18 | the prior art, and we are going through these -- these are
19 | the ones we say are waived now.  I am happy to go through and
20 | we think there was plenty of evidence of all of them.
21 | With respect to low level current, Dr. Neikirk --
22 | and you will recall, Your Honor, that this was where
23 | Dr. Neikirk was showing the low level current in Woodmas, and
24 | he specifically went through the Woodmas -- as was -- as the
25 | Court's claim construction, Woodmas would need to be combined

1   with the other references Chang and Fisher.  And I marked

2   specifically where he covered this in his transcript.

3              Okay.  I will have to come -- it is on -- and it is

4   the afternoon of 11-10-17.  And he specifically talks about

5   Woodmas and the low level current, and on Pages 32 all the

6   way through 36 talking about the various combination where

7   the low level current is shown under the Court's claim

8   construction.

9              But more importantly, standing on its own with

10  respect to low level current, he did apply Dr. Knox's

11  interpretation of this Court's claim construction.  He did.

12  Because as this Court will recall, in the Realtime Data case

13  this Court is on, if an infringement expert is going to use

14  one interpretation, it is totally fair game for the

15  invalidity expert to use that exact same interpretation.

16  Otherwise, they are holding us to a standard that they

17  themselves don't even meet.

18             But let's talk about low level current and what he

19  said.  The question was:  Is there any doubt in the your mind

20  that with respect to the Court's claim construction of low

21  level current and the combination we put before this jury,

22  that the combination does indeed show a low level current?

23             And Dr. Neikirk says:  No, there is absolutely no

24  doubt in my mind whatsoever.

25             What else does Dr. Neikirk says?  He says:  By

1   delivering this 50 milliamp current before full operating

2   power is supplied and in looking for return voltage

3   representative of the full low level current, both the

4   presence and functionality of power delivery unit 76 are

5   checked before full power is imposed on the cable 30

6   [Referring to Figure 1 in Woodmas].  Do you see that?

7           He says:  I do.

8           And here we talk about the low level current, low

9   level power that is met here with respect to Woodmas.  We are

10  showing it here in No. 6.  That is the slide he had in front

11  of him when he was talking the testimony that was in the

12  record --

13          Go back to 39, if you don't mind, Josh.

14          -- when he is giving this testimony with respect to

15  this Q and A how and how it would work with respect to the

16  Woodmas low level current.

17          And then 40, please.

18          And he testified specifically that low level

19  current and sensing were both met by Woodmas.

20          So what else does Dr. Neikirk says?  The question

21  was:  And that would be applying Judge Schroeder's claim

22  construction of beginning to start the access device but

23  insufficient to sustain start up, as Dr. Knox, the

24  Plaintiff's expert is applying it, right?

25          He says:  Yes, that's correct.

1          Using his analysis and the way he's applying it,

2    these patents are invalid.

3          And he says:  Yes, they are.

4          Next slide.

5          And Dr. Neikirk goes on to say he applies the

6    Court's construction -- is clearly teaching us a great deal

7    about low level currents.

8          The question was:  Sir, in your opinion, does

9    Woodmas disclose or teach a low level current using the

10   Court's definition?

11         And he says:  Applying the Court's definition as

12   the Plaintiff has, then, yes, it is present.  And the law in

13   this jurisdiction is that -- under Realtime Data, is that

14   that is the way to interpret this.

15         Go to the next slide, please.

16         Oh, I'm sorry.  He also says:  I'll go ahead and

17   check off low level current again, and pointing out that we

18   will see that it's truly the low level current as construed

19   by the Court when we look at the combination.

20         And those are the pages of the record that I just

21   referred Your Honor, when we are talking about the

22   combination that he went through showing, using this Court's

23   claim construction how low level current is met by Woodmas

24   when it is used with respect to the Fisher and Chang patents

25   as well.

1          And this Court in Realtime data had that:  Such an

2     approach allows a defendant to set forth relevant,

3     alternative invalidity arguments for the jury to consider in

4     the event that it ultimately finds for -- the Plaintiff's

5     interpretation of the claims is correct.

6          So not only did he use this Court's claim

7     construction when he was doing the entire combination, but he

8     also used the Plaintiff's interpretation, as well, to show

9     that that indeed was -- you are looking at Woodmas by itself.

10    It did show a low level current.

11         And this Court in addressing the Koito and

12    Fresenius case must present some evidence to show that -- a

13    jury that the prior art reference discloses an element of the

14    asserted claim.  The "some evidence" here is Woodmas.

15         It is important, Your Honor, because even Dr. Knox

16    acknowledges through sworn testimony that Woodmas shows a low

17    level current.  I mean, there is no doubt that Woodmas shows

18    a low level current.  And when I look at what he said

19    specifically, Dr. Knox testified under the questioning of

20    Mark Ferguson that it is:  Current merely used in detection

21    process.

22         That was Dr. Knox's interpretation of your claim

23    construction.  That's what Dr. Neikirk also used in his

24    interpretation in saying, look, if that is what Dr. Knox is

25    going to use to show infringement, then I will go through

1   that analysis as well and show it with respect to invalidity.

2          The jury heard all of this.  The jury heard what

3   Mr. Dovel -- the questioning he gave to Dr. Neikirk on

4   cross-examination because he took him through different

5   hypotheticals and what about this?  Well, what if you use

6   this definition?

7          And remember that Dr. -- Mr. Dovel said something

8   like, well, you don't agree with Dr. Knox so, therefore,

9   Dr. Knox is erroneous, so we are using the erroneous claim

10  construction, and you find low level current.  And then

11  trying to say, but the correct construction you don't find

12  low level current.  And the jury heard all of that.

13         And the jury still saw through all of that and

14  said -- and we were talking in front of the jury and said, it

15  is the goose/gander rule.  If you are going to use --    Dr.

16  Knox is going to have one interpretation of Dr. -- of Judge

17  Schroeder's claim construction, then we are entitled to use

18  that on invalidity as well because that is the law in the

19  circuit and that is the law -- in the Federal Circuit -- in

20  this division, and that is the law in the Federal Circuit as

21  well with respect to Realtime Data.

22         He heard everything with respect to

23  cross-examination and still the jury found for the Defendant

24  because they saw what Mr. Dovel was trying to pigeon-hole him

25  to say, and they disagreed with what he is saying.  The jury

1   heard that he found low level current in combination, and he

2   also found it in Woodmas alone when he was using Dr. Knox's

3   interpretation of this Court's claim construction.

4          And then at the end of Mr. Dovel's argument, he

5   puts up my closing argument as evidence somehow of no low

6   level current.  But that's obviously, as the Court knows --

7   and the arguments of Counsel are not evidence.  It is

8   interesting that Mr. Dovel would put up my argument that it

9   would be evidence of no low level current.

10          But as you know, we did cover this in front of the

11   jury about all aspects of Dr. Neikirk's testimony because I

12   wanted the jury to see everything just like we want this

13   Court to see everything, and just like we want -- there is

14   evidence to support the invalidity verdict here.

15          Now, if we could go to the next slide.

16          With respect to secondary power source, let's look

17   at that.  Dr. Neikirk -- the Chang patents, which is where

18   the secondary power source came in with respect to the

19   combination, teaches the data node and the network interface

20   adaptor, the access device, and how they provide electrical

21   power from the hub, the data node, to the remote adaptor, to

22   the access device using the network's wiring.

23          Mr. Dovel was critical that we did not specifically

24   talk about -- and here is the actual demographic --

25   demonstrative that was in front of the jury while Mr. --

1    Dr. Neikirk was giving his testimony that we just went over

2    specifically talking about secondary power source.

3           But it is interesting because he said, well, you

4    didn't go into the definition of driving points, et cetera.

5    We have, with respect to the secondary power source and the

6    main power source, we have different driving points with this

7    Court's claim construction.  And not that you had to have two

8    different driving points from the secondary power source.

9    And in this combination for obviousness, the power sources

10   come from two different patents, so clearly they have two

11   different driving points.

12          That was an issue that could easily have been

13   cross-examined on.  It is an issue that is very obvious since

14   it is not one power source having two different driving

15   points.  It is one patent, the Chang patent providing a power

16   source with a driving point, and then the Woodmas patent

17   providing a power source with the driving point, so they are

18   clearly two different things.  That is a red herring.

19          But the Chang patent does teach the secondary power

20   source, and this demonstrative was also in front of the jury

21   where he went through and showed Fisher plus Chang teach

22   everything except for low level current, and that needed to

23   be added by Woodmas.

24          I believe I have covered everything on secondary

25   power source.  Now let's go to the next one.  Main power

1    source.

2           The issue here is not whether main power source or

3    not I believe -- because clearly Fisher teaches main power

4    source, and that was definitely covered with respect to the

5    evidence in the case.

6           I believe the issue here is, again, that we did not

7    show that main power source was delivering a low level

8    current and also sending power to the data node, the

9    access -- the data node.  I believe that is the issue that we

10   have here.  And that was taught here with respect to the

11   combination.

12          So we have the Fisher, Chang, and Woodmas

13   combination, and then we have the Chang -- in the lower

14   left-hand corner here and on Slide 51, the lower left-hand

15   corner shows the Chang actual power source, and then we have

16   on the 51, the right-hand corner we have the Woodmas power

17   source, the power receptor unit.

18          And so those in combination --

19          Go to the next slide.

20          Those in combination show one power source actually

21   covering, delivering the low level current and sending power

22   to the -- connected to the supply power to the data node and

23   delivering the low level current.

24          And, as you will recall, we talked for pages about

25   motivation to combine and whether there was evidence of

1   motivation to combine.  That is replete throughout

2   Dr. Neikirk's testimony.  Then we specifically covered, is

3   this what experts in the field do is to look at these

4   different patents and combine them?  And he said, yes, this

5   is exactly what they would do.

6           And there was no cross-examination on that point

7   whatsoever, so to say that he did not combine them now or did

8   not have evidence of a main power source doing A and B, that

9   is just not credible since the testimony is that he did.

10          When the jury was supplied with sufficient, valid

11  factual information to support the verdict it reaches, that

12  is the end of the matter.  In such an instance the jury's

13  factual conclusion may not be set aside by a JMOL

14  order.  Here the facts are not only that they had

15  corroborating public use -- arguments with respect to the

16  Fisher System.  And the Fisher System is prior art.  I don't

17  think they are arguing that it is too late.  I mean, it is

18  1996 we are talking about.  It is more than two or three

19  years before the patents applied for here.  There is no

20  evidence -- there is no issue here.

21          But we are talking about, even after they have

22  waived these other elements and they have waived secondary

23  considerations, we still went through and showed you in the

24  record where everything was.  And it is definitely in our

25  attachments and in the briefing as well.

1          Go to the next slide.

2          And we will just end, again, with this is a general

3   invalidity verdict.  It is difficult to say at this point

4   that something was not specifically met or it was met.  I

5   mean, the evidence shows that everything was met.

6          And the jury answered in a general verdict form for

7   each of these.  And as this Court knows invalidity is

8   extremely and difficult to get and especially in East Texas.

9          This verdict should be affirmed unless the evidence

10  points so strongly and overwhelmingly in favor of Network-1

11  that reasonable persons could not reach a conclusion -- a

12  conclude -- a different conclusion.  That is just not what is

13  happening here.  The evidence is replete in the brief, and we

14  ask this Court to affirm the verdict.

15          THE COURT:  Thank you.

16          MR. DOVEL:  I am going to do a very, very short

17  reply.  Regarding public, use you saw no testimony presented

18  on this screen regarding public use.  You heard two

19  assertions from Ms. Doan of public use.

20          The first was that Dean Neikirk testified that he

21  had a phone call with Fisher where Fisher told him it was in

22  public use.  Those are Ms. Doan's words.  There was no such

23  testimony.  That is why she didn't show it to you.

24          I invite Ms. Doan if she has the testimony any time

25  before the day is out to put it up here on the screen so the

1    Court can do it.  There was no testimony from Dean Neikirk

2    that Fisher told him it was in public use.

3           The second thing she said was, there was this

4    second Fisher System, and that was the one that was used with

5    everyone else and the public.  There was no such testimony.

6    Again, Your Honor, no such testimony.  She presented you no

7    testimony regarding public use because there was none.

8           Regarding low level current, Your Honor, you saw no

9    testimony from anyone that Woodmas or any system in the prior

10   art would begin start up of an access device.  The reason is

11   they presented no such testimony.

12          Moreover, we presented testimony from their expert

13   and our expert that the prior art would not begin start up of

14   an access device, would not meet the Court's instruction.  HP

15   simply ignores that.  They have got no response for them.

16          Regarding secondary power source, again, they

17   presented you no testimony that any prior art reference

18   disclosed a secondary power source, no testimony from an

19   expert applying the Court's constructions.

20          And, finally, regarding main power source, they

21   presented you no evidence at all.  The only thing you were

22   shown were demonstratives, which were not in evidence.  They

23   didn't point to a single scrap of testimony, not a line, not

24   a clause, not a single exhibit.  There is no evidence of a

25   main power source.

1           Thank you, Your Honor.

2           THE COURT:  Thank you.

3           MS. DOAN:  Okay.  So to say that we don't have any

4   testimony with respect to public use is obviously not

5   accurate because we put it up here in front of the Court.  It

6   is on our Slide 19.

7           The question and answer from -- it is always -- I'm

8   so sorry -- it is submitted as Exhibit 6, Page 22, Lines 7

9   through 20.

10          Dr. Neikirk, was Mr. Fisher's system, was that in

11  public use?

12          Yes, I believe it was.

13          The phone call that he had was specifically

14  described on Pages 10 and 11 of his testimony.

15          I mean, I think that was the issue with respect to

16  whether he had a phone call with him or not, and how else

17  could he get this information other than through this phone

18  call and listening to what he said there that day?

19          On Page 10 it is on -- Page 10 the question is --

20  we are talking about the duplicate paragraphs on Line 21.  On

21  Line 23, in that same section on the state of the art was the

22  description of what Dr. Fisher told me when I had a

23  conference call with him.  And that is referring to his

24  expert report where he talks about the phone call with

25  Mr. Fisher.

1           And I asked:  And, indeed -- at the top of Page

2  11 -- and did you do a conference call with Mr. Fisher?  And

3  he says:  Yes, he did.  So we have definitely done that.

4           With respect to -- I can't remember what his

5  challenge was on the second one, but the -- there is an

6  earlier system that Mr. Fisher definitely talked about that

7  was a '95 system.  And the second generation system was 1996.

8           And in 1996 the one that was copywritten at 3Com

9  was used openly at 3Com.  They specifically tried to induce

10  evidence of some type of concealment.  He denied that.  There

11  is nothing he knows about with respect to concealment because

12  it was used openly.

13           And there is -- all of the cases that they rely

14  upon deal with concealment, secretive, not use publicly,

15  these are all admissions.  There is no admission like that

16  here.

17           Thank you, Your Honor.

18           THE COURT:  Thank you.

19           MS. CHO:  Your Honor, in addition to granting

20  Network-1's motion as a matter of law on invalidity, the

21  Court should also conditionally grant a new trial on

22  invalid -- on validity on three grounds.

23           First, it is against the great weight of the

24  evidence.

25           Second, a new trial should be granted because

1  inadmissible evidence was admitted.

2           And, third, based on improper closing statements.

3           I will address the first one.  The verdict on

4  validity was against the great weight of the evidence.

5           Under Fifth Circuit law a district court may grant

6  a new trial if the jury verdict is against the great weight

7  of the evidence.

8           The following findings which were necessary -- each

9  of which were necessary for the jury verdicts -- I think it

10 is on an automatic slide show.

11          Just one second, Your Honor.

12          (Pause in proceedings.)

13          MS. CHO:  Okay.  There we go.

14          Okay.  The following findings, which were necessary

15 for the jury's invalidity verdict, were against the great

16 weight of the evidence.

17          First, that Fisher was prior art.  As we previously

18 explained, for Fisher to be prior art there must be evidence

19 of public use.

20          Second, the low level current.  There was no

21 evidence, as we explained, of the low level current, the

22 secondary power source, and the main power source, each of

23 these were against the great weight of the evidence.

24          In fact, there was no evidence at all that Fisher

25 was publicly used or that the prior art disclosed each of

1    those elements.  That is the low level current, the secondary

2    power source, or the main power source.  And in cases where

3    there is an absence of evidence supporting the jury's

4    verdict, the Court must grant a motion for new trial.

5            Here I have got Fifth Circuit law on the board.

6    Irvan vs. Frozen Food Express.  The trial Court will be

7    deemed to have abused its discretion in denying a new trial

8    when there is an absolute absence of evidence to support the

9    jury's verdict.

10           Then there is a Federal Circuit case applying that,

11   Wordtech Systems.  A new trial is also required because

12   Wordtech fails to identify proof of elements required.  There

13   the elements were contributory infringement.  Here they are

14   the elements of invalidity.

15           We had four independent grounds on which there was

16   no evidence.  And because there was an absolute absence of

17   evidence on those, a new trial must be granted.

18           I also want to mention that HP has a -- had a

19   waiver argument that they raised on the judgment as a matter

20   of law.  That does not apply to motions for new trial.  A

21   motion for new trial as against the great weight of the

22   evidence is available regardless of whether a party moves or

23   does not move for motion as a matter of law.

24           Next the motion for new trial should also be

25   conditionally granted because inadmissible evidence was

1   admitted.

2          Where inadmissible is considered that was

3   prejudicial, a new trial should be granted.  In Carson vs.

4   Polley, the Fifth Circuit held that the district court, of

5   course, has power to grant a new trial when the jury has

6   inadvertently considered inadmissible evidence and the

7   evidence was prejudicial to the losing party.

8          That is what we have here.  As previously

9   explained, corroboration was required to show that the Fisher

10  System was prior art and was publicly use.

11         And Network-1 objected to the admissibility of the

12  Fisher System on the basis that it was not corroborated.

13  However, Mr. Fisher was allowed to testify at length about

14  his system.

15         Mr. Fisher testified that he had a detection

16  system, a detection system that was done just by virtue of

17  the current limit and voltage.  He further went on to testify

18  that his detection system involved a staged powering up, a

19  current limit, and an authentication process that followed.

20         None of these things were corroborated at all.

21  There was no corroboration of the fact that Mr. Fisher had a

22  detection system that used a limited current, staged powering

23  up, or authentication.

24         What does HP say in response?  They don't identify

25  any testimony where any of this is corroborated or point to

1  anything corroborating any of these things for the Fisher

2  System.  Instead, what HP says in its papers is that it

3  relied on other art for these elements.  He said this doesn't

4  matter because we showed this existed in other art.

5       This just shows how confusing and prejudicial this

6  would have been to the jury.  If HP had intended to rely on

7  other art to show these elements, then why did they play this

8  testimony?  The testimony about the Fisher System having all

9  of these elements, that was confusing and prejudicial.  That

10  was the only reason to play that testimony.

11       HP also argues, well, we don't have to the

12  corroborate every single detail of the Fisher System.  They

13  say, you don't have to corroborate every single thing.

14       Network-1 doesn't contend that every detail of the

15  Fisher System needs to be corroborated, but the important

16  things, the important things that they intend to rely on,

17  those things need to be corroborated.  And we know that these

18  were the important details of the Fisher System because that

19  is exactly what HP argued in closing.

20       In closing when they talked about the Fisher

21  System, they described the staged power ups, detection and

22  authentication, and the low current.  These were the

23  important things that they wanted the jury to get out of the

24  Fisher System, and absolutely none of it was corroborated.

25  Because of that it was very prejudicial and very confusing to

1   the jury.  And it should have been excluded.

2          Finally, the motion for a new trial should also be

3   conditionally granted because of improper closing statements

4   made by HP.

5          Now, what does HP say about this argument?  HP says

6   it is waived.  In their briefing they say Plaintiff failed to

7   object during its now complained of portions of HP's closing

8   statement.  Therefore, it is barred from claiming it is

9   entitled to a new trial.

10          This argument fails.  The reason is because under

11   Fifth Circuit law improper argument is a basis for a new

12   trial where substantial justice is at stake.  In Alaniz vs.

13   Zamora-Quezada, the Fifth Circuit held:  Improper argument

14   may be the basis for a new trial where no objection has been

15   raised only where the interest of substantial justice is at

16   stake.

17          And in In re Isbell the Fifth Circuit goes on to

18   describe when substantial justice is at stake.  A closing

19   statement may implicate the interest of substantial justice

20   when counsel's assertions are either false or without basis

21   in the record.

22          And that is exactly what happened here.  We have

23   closing statements that were made that were without any basis

24   in the record.

25          First, HP suggested in its closing argument that

```
 1   the low level current limitation is found in Cummings.  There

 2   was absolutely no basis for that in the record.

 3            This is from the closing.  It says:  So there's so

 4   much evidence of this low current going to detection

 5   circuitry.  Who else do we have?

 6            And then they point to:  With respect to the

 7   Cummings patent, and you'll have the Cummings patent before

 8   you.  It's DX146.  This is another patent that's claiming to

 9   have PoE detection as well.  It's from April 1995, way before

10   the '930 patent.  It's detecting -- it's detecting the

11   connection of such equipment low current power is provided to

12   each of the current loops.  You'll have this.  It's DX146.

13            Now, Cummings was not part of HP's invalidity

14   contentions.  It was not part of their obviousness case.  It

15   wasn't part of the obviousness combination at all.  They

16   didn't rely on it as disclosing a low level current.  Yet

17   these comments were made to show that this low level current

18   was actually in Cummings.

19            And this was particularly prejudicial because the

20   low level current limitation was the limitation that HP's

21   expert Dr. Neikirk had conceded wasn't found in the prior

22   art.

23            So these statements invite the jury to look at

24   Cummings and find the low level current in the prior art

25   themselves even though it is not part of their obviousness
```

1 | contentions.  It is very prejudicial.

2 | In addition to that, there were statements made by

3 | HP that were attributed to Mr. Godici that also had

4 | absolutely no basis in the record.

5 | I'll put up the excerpt from the transcript.  Look

6 | at all of the prior art.  You know, when Nick Godici, when we

7 | were talking about coming and him testifying, he could not

8 | believe how much prior art and how much evidence this case

9 | had with respect to this patent being invalid.

10 | Here is where in the record there is support for

11 | that.  Absolutely nowhere.  There is no support anywhere in

12 | the other trial transcript that suggests that Mr. Godici ever

13 | made these comments about the amount of prior art that there

14 | was with respect to this patent being invalid.

15 | Mr. Godici never testified about this at trial at

16 | all.  And here the statement was particularly prejudicial

17 | because the jury had already been told that Mr. Godici is the

18 | former chairman of the United States Patent and Trademark

19 | Office.  Thus, the jury is being led to believe that the

20 | former chairman of the Patent and Trademark Office believes

21 | there is lots of evidence with respect to this patent being

22 | invalid.

23 | That was highly prejudicial and completely without

24 | basis in the record.  Because of that, that the motion for

25 | new trial should also be conditionally granted.

1          Unless Your Honor has any questions.

2          THE COURT:  I do not.  I do not.  Thank you.

3          MS. CHO:  Thank you.

4          MS. DOAN:  Your Honor, the motion for new trial

5   should also be denied on invalidity.  And let me just touch

6   briefly.  I'm not going to cover all of the parts on

7   corroboration and the other issues that we have already

8   argued earlier this afternoon with respect to the great

9   weight of the evidence.  But I do want to show what the

10  evidence was and the standard is with respect to the Fifth

11  Circuit and this Court.

12          This Court says:  But the burden a movant must meet

13  is high.  A motion for new trial should not be granted unless

14  the verdict is against the great weight of the evidence, not

15  merely against the preponderance of the evidence.  This Court

16  is not to reweigh the evidence.

17          I know that Network-1 disagrees with the weight of

18  the evidence, and they perhaps don't believe that it is clear

19  and convincing.  But the jury thought that it was.  And the

20  jury is the one that decides.  And the burden to set aside

21  that verdict and have a new trial on that issue that we have

22  tried for six days with all of experts and witnesses that

23  came in from everywhere, is a burden they have not yet met.

24          And here is why.  First of all, it is against the

25  great weight of the evidence.  Listen to what the evidence

1    was.  We have Dean Neikirk and all of his testimony.  We have

2    the prior art patents.  We have three with respect to Fisher,

3    and then we have a European patent from Fisher.  We have two

4    with respect to -- we have a Chang patent and a European

5    patent and then we have the Woodmas patent.

6           We have this Court's claim construction.  We have

7    Fisher System itself.  We have pictures of the Fisher System

8    that have been labeled by Mr. Fisher.  And we have

9    Mr. Fisher's testimony.

10          And let's not forget we also have Mr. Horowitz's

11   testimony, the CEO of Network-1 where he also knows that this

12   patent may be obvious, and there were other detection systems

13   out there more than 15 years ago.  So the great weight of the

14   evidence is, indeed, that the patent is invalid.

15          I'm sorry.

16          When Ms. Cho was talking about corroboration,

17   again, she is quoting to Finnigan.  And I think we have

18   addressed Finnigan; but as this Court knows, Finnigan was the

19   case where there was -- it is anticipation, not combination

20   for obviousness.  And it is also just the testimony of the

21   inventor without any type of product, drawings, or patents.

22   Here we have all three, so it is definitely very different.

23          With respect to Mr. Fisher's specific testimony,

24   staged power up, limited current, and authentication, these

25   were not -- and we specifically told the jury these were not

1    the four points that we were making with respect to the

2    Fisher System.

3            The Fisher System was made with respect to data

4    node, access device, data signaling pair, and main power

5    source.  That was shown through the Fisher System, not the

6    other three.  But we went ahead and played -- they did not

7    object to those specific questions coming in.

8            Then later on we did go back and talk about the

9    state of the art when this invention was coming out and not

10   just with the Fisher System and the limited current, because

11   as this Court will recall, Mr. Fisher knew about the specific

12   type of low level current.

13           He didn't call it a low level current.  He called

14   it a current that was sufficient to begin start up but

15   insufficient to sustain start up, and he knew about that type

16   of current, but he decided not to go with that and went with

17   a different type of current.

18           So, if anything, they could argue that it is

19   teaching away, but that is not what we pointed out from low

20   level current was not Fisher's testimony anyway.  So their

21   objections at this late date are of no event and actually

22   should definitely not only be sustained but point to the

23   other way.

24           With respect to the improper closing arguments,

25   let's delve straight into that because I do think it is a

1   personal attack.

2          You specifically instructed the jury what you

3   should base your decision on is the evidence that you will

4   hear from the witness stand and by deposition and the

5   exhibits that I admit into evidence.  You will rely on this

6   evidence in making your decision as to the verdict in this

7   case.

8          Then you went on to say:  After I instruct you on

9   the law, the attorneys will have an opportunity to make their

10  closing arguments.  Statements and arguments of the attorneys

11  are not evidence and are not instructions on the law.  They

12  are intended only to assist you in understanding the evidence

13  and the parties' contentions.

14         The Fifth Circuit law is:  The plaintiff's failure

15  to object to the impropriety of the defendant's closing

16  argument, bars it from urging the improper arguments as

17  grounds for new trial after the jury returns its verdict.

18         This is not a case where Mr. Dovel does not know

19  how to object during closing argument.  In fact, he did

20  object during closing argument, as this Court will recall.

21  And asked a sidebar.  And asked us to redo something.  And

22  that was on the oscillating power source that was already in

23  evidence on the preferred embodiment, and he asked us to

24  rephrase that, and we thought that all worked out.  That was

25  on Page 110 of the record during my -- during HP's closing

1  argument.

2          So he knows how to object, but didn't object to

3  either the Cummings issue or to the Godici issue that they

4  are raising now.  So they are completely waived at this

5  point.

6          And before I go any further, go back one more

7  slide.  No, no, I'm sorry.  Go back one.  Yes.

8          When you are talking about closing arguments to the

9  jury, and you are telling them specifically that it is just

10  attorney argument, it is Mr. Dovel that in the last motion,

11  he puts up our closing argument of evidence of lack of low

12  level current.

13          You cannot have it both ways.  You cannot say that

14  closing argument is evidence and then closing argument is not

15  evidence.  It is not evidence.  It is not evidence to sustain

16  anything they have with respect to low level current, and

17  it's definitely not evidence with respect to anything we say

18  with respect to Cummings and Godici.

19          But let's look specifically at what actually came

20  into evidence with respect to Cummings and Godici because

21  that is where the heart of the matter is.

22          Dr. Davis did -- the Cummings patent, DX146, is in

23  evidence.  It was in evidence before closing.  And anything

24  that is in evidence can be used for any purpose.  Dr. Davis

25  said -- and the question:  Did the '930 patent inventor

1    invent the idea of doing detection of remote equipment over

2    Ethernet lines?

3              He says:  No, they didn't.

4              Is there something you're aware of, some prior work

5    that you're aware of that touched on that?

6              And he said:  Yes, sir.  I show on the next slide a

7    patent issued to Cummings.

8              And the question is:  Can you tell us what you are

9    looking at here and explain what you mean by that?

10             Yes, sir.  The left side is the front page --

11             And if you will switch now, Josh to go over --

12             This is the Cummings patent that actually came in,

13   DX146.  This is what actually came in and was used at

14   closing.  It is the same thing that was used with Dr. Davis

15   during his testimony.

16             And if you'll look on the abstract, the part that

17   is highlighted, detecting the disconnection of such equipment

18   from the network, a low current power signal is provided to

19   each of the current loops.  That is the quote that they are

20   complaining of that we made during closing argument.  And

21   10BaseT communication link.  And it is patent dated April

22   11th, 1995.  All of this came in through Dr. Davis.

23             So go back to Dr. Davis's testimony.

24             He specifically goes on to say:  Yes, sir, the

25   front page on the left, on the right some things have been

1  blown up.  The inventor's name is Mr. Cummings.  The patent

2  was actually issued in April 1995.  And then out of the

3  abstract they describe what it is this patent does.

4  And in three highlighted sections we see that they

5  are wanting to do detection of the disconnection of equipment

6  from the network.  And the second highlighted section the way

7  they are going to do what is with a low level -- the low

8  current power signal that's provided to something they call a

9  current loop.  And they then -- down at the bottom, it says:

10  This the invention is particularly adapted to be used with an

11  existing 10BaseT communication link.  10BaseT is slang for an

12  Ethernet network.

13  So we look at what was said actually during closing

14  argument, and I am on Page 131 of HP's closing argument, and

15  I am on Line 20.

16  With respect to the Cummings patent -- and you will

17  have the Cummings patent before you.  It is DX146.  This is

18  another patent that is claiming to have PoE detection as

19  well.  It is from April 1995, way before the '930 patent.  It

20  is detecting -- it is detecting the connection of such

21  equipment.  Low current power is provided to each of the

22  current loops.  You will have this.  It is Exhibit No. 146.

23  And we went through various other types of

24  detection systems because Mr. Horowitz had already told the

25  jury there are other detection systems that are out there

1   that may render this obvious.  Cummings was just one of them.

2           Dave Dwelley testified about other detection

3   systems.  He talked about the signature resistor method that

4   had been adopted by the IEEE.  There was also testimony about

5   different detection systems that came in that were presented

6   to the IEEE.  There was also other detection systems that

7   were covered as well throughout the testimony.

8           This is just one they complain of because they

9   somehow think that I am saying that it is low level current.

10  I am not saying that.  I am saying it is the low current

11  power because that is exactly directly from the abstract --

12          On the prior page.

13          -- from the abstract, and it is exactly what

14  Mr. Davis had in his testimony.  There is nothing improper

15  about that argument.  But if there had been something

16  improper about that argument, Mr. Dovel should have objected

17  at the time, and he clearly knew how to object because he had

18  already objected before in this closing argument.

19          Next slide.

20          Now, let's look at what they have got -- yes, with

21  respect to what we talked about Mr. Godici and the prior art,

22  and they said that somehow he did not talk about the prior

23  art, and as you know he did not talk about the prior art in

24  mapping the prior art at all to the patent.  That was left to

25  Dr. Neikirk.

1          But he did go through not only the prior art and

2     what was not considered but what was considered by the Patent

3     Office so that that they would know what had been considered

4     already and what had not been considered already.

5          And then we have the pages -- Slide No. 64.

6          But after we put on his direct testimony when he

7     covered what prior art was considered and not considered,

8     then it was Mr. Dovel which approached this Court that said,

9     I just want to the put on this IDS, and I want to take him

10    through that prior art as well.  So PX253 came into evidence,

11    and he listed all of the prior art, went over the prior art

12    of the different patents that had been out as well.  So there

13    was lots of prior art that was discussed by Mr. Godici.

14         He had not done any type of analysis.  And we did

15    not say that he had done any type of analysis.  He did

16    discuss lots of prior art, and there is lots of prior art in

17    this particular case.  There is nothing improper about that

18    argument, certainly nothing improper to cause a motion for

19    new trial now when they waived the argument by not objecting

20    at the time it came in.

21         For all of these reasons, Your Honor, we ask that

22    the motion for new trial be denied.

23         THE COURT:  Thank you.

24         MS. CHO:  I just want to make a couple of really

25    brief points in rebuttal.

1          First on the argument about waiver on the motion

2     for new trial based on arguments that were made on closing.

3     I have Fifth Circuit law on the board.  It is on Slide 16.

4     There is no waiver if substantial justice is at stake.  Then

5     the Court can still grant a motion for new trial based on

6     closing arguments.

7          And substantial justice is at stake where closing

8     arguments are made that are without a basis in the record or

9     are false.  So we would say this applies here.  There is no

10    waiver on these closing arguments.

11         The next point that I want to make is, as Mr. Dovel

12    explained, there was an absence of evidence in HP's case

13    about Fisher on public use and that the prior art disclosed

14    the low level current, secondary power source, and the main

15    power source.

16         And where there is a complete absence of evidence

17    on a required element, the motion for new trial is required

18    under Fifth Circuit law.

19         MS. DOAN:  Very briefly, Your Honor.

20         With respect to substantial prejudice, and I

21    have -- don't have the case that Ms. Cho had up, but I am

22    aware of cases that deal with substantial prejudice; i.e., a

23    plaintiff's lawyer making the argument that the defendant has

24    lots of insurance coming in during closing argument and

25    getting a new trial on that.

1          I am also aware of inappropriate use of the Golden

2    Rule coming in during closing argument.  That would be

3    substantial prejudice.  But actually talking about prior art

4    that Mr. Godici had mentioned because he did mention prior

5    art in his testimony or talking about the exact same thing

6    that Dr. Davis talked about with respect to the Cummings

7    patent and reading from the abstract of the Cummings patent

8    with low current power is not appropriate argument.

9          Thank you, Your Honor.

10         THE COURT:  Thank you.

11         Mr. Dovel, before we proceed to the next motion,

12   let's take a very short break.

13         (Recess was taken at this time.)

14         THE COURT:  Be seated.  Mr. Dovel, you may proceed.

15         MR. DOVEL:  Your Honor, now we turn to the subject

16   of infringement in the jury verdict of infringement.

17         For this, Your Honor, we seek a new trial because

18   the verdict was against the great weight of the evidence.  It

19   is important that Your Honor when ruling on this would keep

20   in mind that, as the Fifth Circuit has held, a verdict can be

21   against the great weight of the evidence even if there is

22   substantial evidence to support it.

23         For this motion the Trial Court, Your Honor, does

24   not need to take the view of the evidence favorable to the

25   winner.  Instead, Your Honor is going to actually weigh the

1  evidence.  That is what you are going to do in ruling on this

2  new trial motion.  This is the Shows case, which is the --

3  recognized as the leading case in the Fifth Circuit on this

4  subject.

5       And when you weigh it, Your Honor, you are going to

6  conclude that the great weight of the evidence favored a

7  finding of infringement, not non-infringement.

8       Now, there are two elements that we are arguing

9  that are the subject of our motion.  One is the low level

10 current element.  The other is the main power source.  I am

11 going to start with low level current.

12      And the place I am going to start with low level

13 current is this "sufficient to begin start up."  HP's

14 arguments all focused on that arguing that their current was

15 not sufficient to begin start up.  That is what they were

16 trying to establish.

17      In understanding that, Your Honor, what we are

18 going to show you is that, in fact, they didn't actually put

19 on any evidence addressing that.  They instead addressed

20 something else, whether their current was sufficient to start

21 up.

22      To understand the importance of that, Your Honor, I

23 am going to go back to the claim construction because this

24 issue was actually ruled on.  This was one of the primary

25 issues that was argued in the papers and in oral argument at

1   claim construction, and the Court issued an express ruling on

2   this.

3           And the ruling was that begin start up and start up

4   are two different things.  Begin start up is when components

5   of an access device start up.  And start up is when the whole

6   thing is starting up.

7           And what we pointed out to the Court during claim

8   construction was that in the patent it talks about an access

9   device, a telephone -- I have a picture of it on the screen.

10  It is very similar to the one that HP showed the jury.

11          And for it to begin start up, it wasn't the case

12  that this phone itself started up.  Instead, it was just a

13  single component down inside the phone.  I have got that on

14  the screen now.  A DC/DC switching supply would begin to

15  start up.

16          And based on that -- and here I have got the

17  Court's order, Markman ruling right on the screen.  The Court

18  ruled:  The current need not be sufficient to result in a

19  completed start up.  The current must be sufficient to begin

20  start up rather than cause start up, thus eliminating any

21  implication that the current must be sufficient to result in

22  a completed start up.

23          The Court ruled that HP's attempt to read that into

24  the claim is wrong.  The low level current doesn't need to

25  start up an access device.  It only has to begin start up, to

1   begin with certain components, not start up the entire access

2   device.

3           The Court expressly ruled:  It need not be

4   sufficient to result in a completed start up.

5           So when Your Honor weighs the evidence, you have

6   got to credit evidence that addresses the Court's actual

7   construction, begin start up.  And you have got to give no

8   weight to HP's evidence that addresses whether their current

9   would cause an access device to start up.

10          Dr. Neikirk, their infringement expert, after the

11  Court issued this claim construction ruling, agreed exactly

12  this point.  And here is his testimony:  To be a low level

13  current, does the current have to be at a level sufficient to

14  begin start up of all of the components?

15          No, it doesn't say that.

16          If you have a detection current that is sufficient

17  to begin start up of a portion of the access device, would

18  you agree that that current is sufficient to begin start up

19  of the access device?

20          ANSWER:  That would meet the requirements for a low

21  level current, so I would agree.

22          Now if we look at -- put on the screen now -- this

23  is the photo of their access device that HP used at the trial

24  and the demonstration that they provided to the jury.

25          To determine whether this access device begins

1   start up, we don't look at whether it starts up.  That is, we

2   don't look at the end of the process, whether the lights go

3   on and the screen starts up.  That is when we have got a

4   completed start up.

5           Instead, we look at the beginning of the process.

6   Begin start up for a device just like with the preferred

7   embodiment in the patent, is going to start down inside the

8   device.  You have to look down inside the circuitry, and HP

9   showed us that diagram as well.

10          We have got to look and see whether the components

11  inside that access device begin to start up.

12          We submitted evidence of overwhelming weight on

13  that point.  And as it turns out -- I am going to show Your

14  Honor -- it was actually undisputed.  You will recall that

15  Dr. Knox, he walked through a diagram, a circuit diagram of

16  the components that were affected by the detection current,

17  and he showed the path of the current and showed and

18  highlighted in yellow all of these components.

19          And then he testified, he was asked:  Do these

20  components begin to consume power?  Did they begin to start

21  up?

22          ANSWER:  Yes.

23          Can you explain why?

24          Well, first off, you can measure the power that

25  they consume.

1          How do you know it is beginning to start up?

2          Well, we have got diodes that have gone above a

3   certain threshold.  They have transitioned to conducted

4   state.  We've got transistors in this integrated circuit that

5   have made decisions.  Capacitors that have charged up.

6          He talked about this yellow rectangle, the

7   integrated circuit, and he said it had more components down

8   inside of it.  And he analyzed those.  He said:  They are

9   active components in there.  They take on certain states when

10  there is a low level current.  Active components.

11         As a result, portions of the device are

12  operating -- when portions of the device are operating, the

13  devices begin to start up.

14         Dr. Knox's testimony on this point was not in any

15  way impeached or rebutted or diminished on cross-examination.

16         And then, Your Honor, we got similar testimony from

17  HP's witnesses.  When HP's witnesses were asked specifically

18  about the components of the access device and whether they

19  would begin to start up, they had to agree that they did.

20         Here, for example, is David Tremblay.  He was their

21  engineer.  He is the one who did this demonstration that

22  showed the outside of the phone not starting up.

23         But he was asked this specific question:  Can you

24  tell us whether the components that Mr. Dovel covered on

25  P122, do they or do they not work during detection during the

1    detection phase?

2            ANSWER:  Yes, ma'am, several of those do work,

3    several of those do work during the detection phase.

4            So Mr. Tremblay, their own engineer, admitted, yes,

5    these components that we went through, they do work during

6    the detection phase.

7            Their expert Dr. Davis, he admitted that the level

8    that would be -- if we actually look at the measured amperage

9    that would be sufficient to start up the access device, the

10   level would be 100 microamps.

11           100 microamps would be sufficient to begin start

12   up.

13           It is starting the device, yes.

14           He further testified that:  When the current level

15   is at .1 milliamp, the start up of the access device will

16   have already taken place.  That is the same as 100 microamps.

17           So we have testimony from Dr. Davis definitively

18   establishing the level that is required, what current level,

19   what is our level that is required.

20           And he then further admitted that HP's detection

21   currents were all above that level.  They were all above the

22   level required for start up.

23           And he then further admitted that HP's detection

24   currents were all above that level.  They were all above the

25   level required for start up, between 165 and 275 microamps.

1          So when we actually look at the actual -- the

2     correct question, which is, what is the level required to

3     begin start up, HP's witnesses agreed with Dr. Knox that they

4     would.

5          Dr. Davis gave additional testimony.

6          Would you agree, sir, that if an access device

7     begins to start up, it has a component that's consuming

8     power?

9          ANSWER:  I think that would be fair, yes.

10         Let's go back to the diagram.  Do each of those

11    components begin to consume power from the detection current?

12         ANSWER:  A little bit, yes.

13         So they are all consuming power.

14         He was asked specifically about some of these

15    components that are part of the integrated circuit that the

16    detection current passes through and whether these components

17    are activated.

18         Do you agree that this yellow triangle thing, this

19    detection comparator is an active component?

20         ANSWER:  Yes.

21         Mr. Dwelley, David Dwelley also agreed.

22         This triangle, what is it called?

23         That's a comparator.

24         Is that an active component as well?

25         It is, yes.

1          He also agreed that the detection current will be

2     sufficient to charge the capacitor.  He said the detection

3     current must charge that capacitor.

4          So when asked about the components, the

5     overwhelming weight of the evidence showed that HP's

6     detection current would be sufficient to begin start up, to

7     start up components of the access device.

8          Mr. Tremblay's testimony that I put on the screen

9     here, Exhibit 20 -- or Slide 22, they don't have an answer

10    for it.  They have no explanation for this.  They have no way

11    around it.  It is conclusive on the issue.  It certainly

12    establishes the great weight of the evidence.  The components

13    do work during the detection phase.

14         Now, HP, what they do -- what they did at trial was

15    rather than engage on that issue, an issue that established

16    that they do infringe, they did two things to submit what I

17    call pernicious testimony, that is, invidious testimony,

18    testimony that doesn't actually prove what they want, that

19    actually is designed to fool the jury.

20         The first was they presented hours of testimony in

21    which they substituted start up for begin start up.  They did

22    exactly what the Court ruled could not be done in claim

23    construction.  The Court ruled that to begin start up doesn't

24    require completed start up.  You don't have to start up an

25    access device.  You don't have to turn it on.  You just have

1    to begin start up.

2          But HP's entire infringement case on low level

3    current was based on this pernicious substitution.

4          For example, Mr. Tremblay they had him do a

5    demonstration, and he testified that it doesn't meet the

6    Court's construction.  It doesn't begin start up.  Why is

7    that?  Is it because it doesn't turn on components?  No.

8          Here is what he said:  The phone is not on.

9    There's no lights turning on.  There's no display.  Can't

10   make a phone call with it.  It's non-operational.  The phone

11   is not usable.

12         He is supplying the test rejected by the Court.  He

13   is applying the test that it must result in start up of the

14   access device.

15         He continued:  The phone has not begun to turn on.

16   The phone is not sustaining the power.  It's not functioning.

17   You can't make a phone call with it.  Those currents would

18   never allow this IP phone to begin to sustain start up.

19         So here he is openly stating that his current will

20   not sustain start up.  But that is not the test.  It just has

21   to begin.  In fact, to be a low level current it must not

22   sustain start up.  It must not reach operational levels.

23         Let me go to our Slide 34.

24         I asked him directly about this.  In this

25   admission, again, they have got no response to this.

1          As you were just using the phrase "begin start up,"

2    were you referring to the point when the device gets

3    operational power and begins to do its operational functions?

4          ANSWER:  Yes, sir.

5          He said that:  When this device gets greater than

6    30 volts, that enables that device to begin and sustain that

7    start up.

8          So as he testified, as he was presenting his

9    testimony, he was doing this substitution that the Court in

10   the claim construction had ruled should not be done.  He was

11   saying, yes, this current, the reason it doesn't meet the

12   Court's construction, is because it doesn't begin start up.

13   And by begin start up, I mean start up.  Operational power.

14   It performs its operational functions.

15         We can't see that the light is on.  We can't see

16   that -- you can't make a phone call with it.

17         Dr. Davis admitted the same thing.  This is

18   Slide 35.  He explained to the jury how he was applying low

19   level current.

20         And he says this:  And the way this low level

21   current is going to work is that it is going to start up the

22   access device.  He is substituting start up for begin start

23   up.  He is requiring that the detection current actually

24   start up of the access device.

25         He testified over and over.  We quoted pages of it

1   in our brief.  Here is a few examples.

2           He says:  The access device has not started up yet.

3   We observed the phone was not doing anything.  We don't turn

4   on the access device until we've got at least 30 volts.

5           The access device has got to receive 30 volts in

6   order to turn on and begin to operate.  When we get above 30,

7   we saw the phone turned on, and it would have been

8   operational.

9           But that is not begin start up, Your Honor.  That

10  is the end of the process when it is already started up.  So

11  they presented literally hours of testimony from the Tremblay

12  and Davis on the very premise that the Court had rejected in

13  claim construction.  Begin start up does not mean start up.

14  That was testimony that should be given no weight.

15          They didn't present testimony, they did not present

16  testimony from their engineer or from Davis or from anyone

17  else that this detection current was insufficient to begin

18  start up, to start up certain components in the access

19  device.  In fact, as we just saw, each of their witnesses

20  admitted that it certainly would start up components in the

21  access device.

22          The next thing they did, Your Honor, the second

23  thing is this:  They said, well, these components that are

24  started up, they are not part of the access device or part of

25  the operational circuitry of the access device.

1          Here is Mr. Tremblay.  He is asked this:  When the

2   access device -- during the detection phase does the

3   operational circuitry get used?

4          No, ma'am, it does not.

5          QUESTION:  Even though it is consuming some current

6   in the access device, that's not going to be the operational

7   circuitry side?

8          ANSWER:  That's absolutely correct.

9          Davis provided snippets of similar testimony.  When

10  they gave that testimony, in fact, it was false and they knew

11  it was false, as we demonstrated at trial.

12         First of all, the first thing they are suggesting

13  is, well, maybe this stuff that starts up is not actually

14  physically part of the access device.  But the evidence

15  showed these components were located in the physical core of

16  the access device.

17         This is our Slide 39, and you can -- it depicts a

18  photograph -- a depiction that was used by Dr. Davis, and on

19  it he identified the PoE chip.  That is that yellow chip from

20  the earlier diagram.  And showed where it was located.  And

21  Dr. Knox then identified where the transistors were located

22  physically.

23         And you can see that these components are located

24  in the physical core of the access device.  They are not

25  separate from it in anyway.

1          Next HP suggests that, well, maybe they are not

2     part of the access device when it is actually operating as an

3     access device, but that is simply not true, as we

4     demonstrated at trial.

5          The Court defined access device.  An access device

6     is a device that can receive and transmit data over a

7     network.  So the components of an access device that make it

8     an access device are those used when it receives and

9     transmits data over a network.

10          And the evidence undisputedly -- was undisputed

11     that each of those components that we identified that start

12     up are components that are part of the access device with

13     that definition.

14          Dr. Knox testified -- was asked this:  When the

15     access device is actually operating, are these essential

16     components.

17          He said:  Yes, if you removed, for example, that

18     steering diode or this chip or the transformers, the whole

19     thing would just stop operating.  He explained that these

20     transformers are used to separate data.  You need

21     transformers even if you're just going to send and receive

22     data.

23          The transformers were the parts of the access

24     device that actually interconnected with the network, the

25     actual physical components that did the receiving and

1    transmitting of data.  They are the most important thing, the

2    single -- the most important single component of an access

3    device.

4             Now, what about HP's witnesses, did they disagree

5    with this when they were asked the specific questions about

6    these components?  No, they admitted that all of these

7    components are part of the operational circuitry, the access

8    device.

9             Here is Mr. Tremblay, their engineer:  Is the

10   center tap itself used when it's fully operational?

11            ANSWER:  Yes.

12            This is part of the operational circuitry of the

13   access device, true?

14            It is part of the -- that particular component is

15   the connection medium, yes.

16            Part of the operational circuitry, true?

17            ANSWER:  Yes, sir.

18            That is an unambiguous admission.  And what that

19   means, Your Honor, is that when he testified earlier in

20   response to HP's questions that they are not part of the

21   operational circuitry, he wasn't telling the truth.  He was

22   trying to fool the jury.

23            When confronted with the actual components, he

24   admitted that, yes, they were part of the operational

25   circuitry.

1          His testimony continued:  Let's go one at a time.

2   The center tap transformers are used during full operation,

3   right?

4          ANSWER:  Yes, sir.

5          The diodes are used during full operation?

6          Yes, sir.

7          The capacitor?

8          Yes, sir.

9          What about Dr. Davis, their expert?  He tried on

10  direct examination with HP to say the same thing, they are

11  not part of the access device, they are not part of the

12  operational circuitry.  But on cross-examination when

13  actually confronted with the actual components, he had to

14  admit that all of them were part of the operational

15  circuitry.

16         An important part of the operation of this access

17  device is the center tap transformer would be in place,

18  right?

19         ANSWER:  Yes.

20         There were certain components that the detection

21  current went through that were used during the operation of

22  the access device when it was fully operational, true?

23         ANSWER:  Yes, sir.

24         Those components that are used during the

25  operation, operational circuitry, it includes the center tap

1   transformers, right?

2               ANSWER:  Yes.

3               Same question for the diode.

4               Yes.

5               Same question for the capacitor.

6               It is used during the operation of the access

7   device?

8               The PoE chip is used during the operation?

9               It does functions, yes.

10              So each of those components when HP's witnesses

11  were actually confronted with them and what they actually do

12  in the access device, admitted that they were operational

13  components of the access device, part of the operational

14  circuitry.

15              HP's effort to say that they are not part of the

16  operational circuitry was simply pernicious and designed to

17  fool the jury.  But it can't fool this Court when weighing

18  the evidence.  Your Honor can't credit their simple

19  conclusion, oh, they are not part of the operational

20  circuitry when they provided on cross-examination detailed

21  admissions, pointedly -- as on point as possible that they

22  were part of the operational circuitry.

23              THE COURT:  Mr. Dovel, you are out of time.

24              MR. DOVEL:  I will wrap up then, Your Honor.

25              We also in our papers explain why the main power

1   source evidence would be against the weight of the evidence,

2   and we will rely on our papers for that.

3           Thank you, Your Honor.

4           THE COURT:  Thank you very much.

5           MR. MEHTA:  Good afternoon, Your Honor.

6           THE COURT:  Good afternoon.

7           MR. MEHTA:  Network-1's motion for a new

8   infringement trial should be denied.  The jury's

9   non-infringement verdict rests on ample evidence properly

10  applying all of the Court's claim constructions.

11          Now, Mr. Dovel started out by talking about the

12  Shows Fifth Circuit case from 1982.  The standard is set

13  forth in the Dawson case that is quoted on Slide 2 of this

14  deck.

15          The verdict must be affirmed unless the evidence

16  points so strongly and overwhelmingly in Network-1's favor

17  that the Court believes that reasonable persons could not

18  arrive at a contrary conclusion.

19          For the reasons we have explained in the papers and

20  for the reasons I will explain now, Network-1 falls far short

21  of the standard laid out in Dawson.

22          Now, as Your Honor knows, Network-1 bears the

23  burden of proving infringement.  And despite the fact that HP

24  bears no burden on infringement, HP conclusively established

25  at trial that three separate patent claim elements are

1   missing from every one of HP's products.

2         Mr. Dovel just spent the entirety of his

3   presentation on the third element, low level current.  It is,

4   as set forth in detail in our brief, two other claim elements

5   are missing.  We conclusively established that.

6         I will start with the first element, which is the

7   phrase "delivering a low level current from said main power

8   source."

9         This is an example of where this phrase appears.

10   It is in Claim 6 of the '930 patent.  This term appears in

11   all of the asserted claims.  There is no dispute about that.

12         Now, I will talk about low level current

13   separately, and I will talk about main power source

14   separately.  But the Court has not construed the phrase "from

15   said main power source."  In fact, this was raised during

16   claim construction, and the Court found that the term "from

17   said main power source" requires no construction.  It is to

18   be given its plain and ordinary meaning to persons of skill

19   in the art.

20         At trial HP's non-infringement expert Dr. Davis

21   presented this demonstrative to the jury.  And as a quick

22   aside, Mr. Dovel earlier mentioned that Dr. Neikirk was our

23   non-infringement expert.  I know that is late in the day.

24   That's simply incorrect.  Dr. Davis is our non-infringement

25   expert.  Dr. Neikirk testified at trial on the issue of

1   invalidity.

2            In Dr. Davis's slide on the left side, Dr. Davis

3   shows an excerpt of Claim 6.  The top portion is highlighted

4   in teal.  The bottom portion is highlighted in yellow.  And

5   these are the two requirements in the claim of the term "main

6   power source."  I will be focusing on the bottom requirement,

7   which requires that delivering a low level current from said

8   main power source to the access device.

9            That's represented by the yellow dashed line in the

10  figure right below the claim language.  And, as Your Honor

11  can see here, the power source box 16 on the left side, there

12  is a yellow line extending from that.  That represents that

13  the low level current must be delivered from the main power

14  source.

15           Now, on the right side of this figure is how HP

16  switches work, and I will show you the testimony that

17  supports this in a moment.

18           But as the jury heard at trial, there are separate

19  boards on HP's Power over Ethernet switches.  On the bottom

20  left is the power supply board.  And on the power supply

21  board are multiple power supplies.

22           On the right side is the PoE board, the Power over

23  Ethernet board.  And on the PoE board are PoE chips.  It is

24  from those chips the detection currents, the alleged low

25  level current, are generated and delivered.  They are never

1  delivered from any of the power supplies.  In fact, they

2  don't even exist at the power supplies.

3          You don't have to take my word for it.  Every one

4  of our three witnesses that we put up on this, supported that

5  the detection current in HP's switches, in every one of HP's

6  switches is never delivered from the main power source.  It

7  is always delivered from a PoE chip.

8          This is Mr. Tremblay.  He is HP's resident expert

9  on Power over Ethernet.  He is a distinguished technologist.

10  Mr. Tremblay testified that the detection and the

11  classification currents are coming out of this Power over

12  Ethernet chip.

13          And just backing up, the PoE chip he is referring

14  to is the PoE chip on the board on the right side as shown

15  here in Slide 7.

16          He said it is coming out of this Power over

17  Ethernet chip, which here's one of them.  There are two of

18  them.  And that's where the detection voltages originate

19  from.

20          The PoE chip creates the detection currents and

21  delivers them to what is on the other side of the cable.

22  They don't exist at the power supply.  They don't exist at

23  any of the power sources, and, therefore, they cannot be

24  delivered from any power supply or power source.  This is

25  true of every one of HP's accused Power over Ethernet

 1   switches.

 2           This is Mr. Tremblay again on cross-examination.

 3   Mr. Dovel asked him a specific question as to whether the

 4   detection currents come from a power supply or not.

 5           QUESTION:  As you understand it, the detection

 6   current comes from a power supply of some kind, right?  We

 7   don't have to debate that.  It's from some kind of power

 8   supply, right?

 9           ANSWER:  The detection currents come from a Power

10   over Ethernet chip or controller.

11           Your Honor, there is no dispute in this case that a

12   Power over Ethernet chip is not a power supply.  It is not a

13   power source.  A controller is not a power supply, and a

14   controller is not a power source.  Again, there is no dispute

15   about that.

16           Mr. Tremblay wasn't alone.  We also put up

17   Mr. Dwelley.  Mr. Dwelley spent 29 years at Lanier

18   Technologies developing and overseeing the design of Power

19   over Ethernet chips, the kind of chips that go into HP's

20   products, the kind of chips that go into HP's competitors'

21   products.

22           QUESTION:  Are you saying that the detection

23   currents themselves are actually generated in the Linear

24   chip?

25           ANSWER:  That's correct.

1          Now, it's not just Linear's chips that generate and

2     deliver the detection currents.  Mr. Dwelley testified that

3     the PoE chips that are made by Linear's competitors work

4     essentially the same way in terms of how they generate

5     currents, in terms of how they deliver detection currents.

6          All of these PoE chips used in HP's switches

7     generate and deliver detection currents.  They don't come

8     from any power source.  They don't come from any power

9     supply, and that is what the claim requires.  Our products

10    work a very different way.

11         The same with Dr. Davis.  Looking at the bottom of

12    question and answer here:  That is what delivers the

13    detection currents?

14         Yes.

15         He is referring to the Power over Ethernet chip as

16    shown in the top Q and A here.

17         Now, Mr. Dovel didn't address this claim limitation

18    at all today.  Network-1 didn't address this claim limitation

19    at all in its opening brief.  The first time it addressed

20    this claim limitation is in its reply brief, post-trial.

21         And what Network-1 said is HP asserts that in its

22    switches, a downstream PoE chip limits the current delivered

23    from an upstream power source.  That is simply not what we

24    said.  And Mr. Dwelley's testimony here exemplifies that.

25         QUESTION:  Are you saying that the detection

 1   currents themselves are actually generated in the Linear

 2   chip?

 3            ANSWER:   That's correct.

 4            Mr. Dwelley is not saying that the PoE chip limits

 5   the current.  He is saying it generates and delivers the

 6   current.

 7            Network-1 also argued:  This narrowing limitation

 8   rejected by the Court is what HP asserts as a basis for

 9   non-infringement; that a main power source must be where the

10   detection current is created.

11            Again, that is simply not correct.  Our witnesses

12   all testified that the PoE chip delivers the detection

13   current.  And they followed the exact language of Claim 6

14   that the low level current be delivered from the main power

15   source.

16            Along the way they surely testified about where it

17   is generated and where it is created.  That wasn't the basis

18   for non-infringement.  The basis for non-infringement is that

19   our products don't deliver detection currents from a power

20   source or power supply of any kind.  And you can see that in

21   Dr. Davis's testimony here.

22            Now, Network-1 on this point seems to reference

23   that somehow HP is barred from talking about where these

24   detection currents are created or generated.  And it

25   references one of the Court's claim constructions for that

1    proposition.

2            A review of that Markman order will show that they

3    are incorrect about that.  But, you know, their own expert

4    Dr. Knox, his own testimony defeats that argument.  Dr. Knox

5    stated, quote:  One of the requirements, one of the steps, if

6    you will, of this claim is that we need to deliver a low

7    level current.  In other words, we have to have a low level

8    current from the main power source.  That's where it has to

9    originate.

10           Their own expert Dr. Knox takes the position that

11   delivering a low level current from a main power source means

12   that the low level current has to originate from the main

13   power source.  So their argument fails for that additional

14   reason.

15           On that first point I want to emphasize something

16   because it is important.  Network-1 bears the burden of

17   proving infringement.  You will see no evidence either in

18   their briefing or today from Mr. Dovel, you will see no

19   competent evidence that in any of HP's products a detection

20   current is delivered from a power source or a power supply of

21   any kind.  They simply don't have that.

22           At best they have a misplaced analogy from their

23   expert Dr. Knox.  But that is not the way that our products

24   work.  And we have just shown that from testimony from three

25   separate witnesses.  For that reason alone Network-1's motion

 1  should be denied.

 2          For a second reason, there is no main power source

 3  in any of our switches.  And for the second reason their

 4  motion should be denied as well, and I will explain.

 5          We looked at this demonstrative.  The power source

 6  box 16 on the left has to do two things according to every

 7  one of the asserted claims.  We talked about one of the

 8  requirements, the yellow one, delivering a low level current

 9  from the main power source.

10          That is not the only requirement.  There is a

11  second one.  The power source also has to be connected to

12  supply power to the data node.

13          And you can see on the right that in every one of

14  HP's switches there are two separate power supplies shown in

15  teal and orange on the left side.  Neither one of those power

16  sources does both of these claim requirements.

17          This is Mr. Dowling.  He is the vice president of

18  engineering at Hewlett-Packard.

19          QUESTION:  Is there one power supply that powers

20  both the switchboard and the PoE board in the HP Power over

21  Ethernet switches?

22          ANSWER:  No.

23          This is Mr. Tremblay, HP's resident expert on PoE.

24          QUESTION:  Is there any one PoE switch that

25  Hewlett-Packard makes where one power supply provides power

1   both to the switch circuitry and also delivers the detection

2   current?

3            ANSWER:  No, ma'am, there is no power supply that

4   can do that.

5            Mr. Tremblay again.  But not one of those would do

6   the functions of powering the data node and delivering

7   detection current?

8            ANSWER:  Absolutely not.  There is no way that one

9   power source can do both of those functions.

10            Now, during trial Dr. Knox, Network-1's expert, at

11   times drew a big red box around multiple power supplies and

12   called them one power supply.  And our expert addressed that.

13   Dr. Davis testified about that specifically.

14            He was asked:

15            QUESTION:  Dr. Knox has at times suggested that the

16   12-volt and 50-volt power sources are really just one power

17   source with two outputs?

18            ANSWER:  He is not correct that this represents one

19   power supply, no.

20            He went on to explain.

21            Why not?

22            The 12-volt power supply and the 50 volt-power

23   supply are isolated from one another.

24            What does that mean?

25            They're isolated so that the voltages and the

```
 1    currents on one supply can't interact with the voltages and
 2    currents on the other one, primarily for safety.
 3            Their own expert agreed with this in his
 4    deposition.  And this came out at trial.  So this is
 5    Mr. Ferguson asking Dr. Knox.
 6            Okay -- this is me asking you -- if we look back at
 7    what's on the power supply board, is it true that there are
 8    two separate power supplies on that board?  You say -- and
 9    you kind of chuckled -- there are actually about eight.  Do
10    you recall that?
11            ANSWER:  I do.
12            QUESTION:  But one of them, though, sends out
13    12-volt output, right?
14            ANSWER:  That's correct.
15            QUESTION:  And another of them sends out this
16    nominal 48- to 52-volt output, right?
17            ANSWER:  That's correct.
18            Dr. Knox, their own expert, admitted that on our
19    power supply boards it is not one power supply, it is
20    multiples power supplies, none of which performs both
21    requirements of the claims of the main power source.
22            Now, Network-1 in its reply brief states, quote:
23    Undisputed evidence demonstrates that two categories of
24    accused HP switches use a single power supply that performs
25    both required functions of the main power source.
```

1          That is simply incorrect.  Here is a quote from

2     Mr. Dowling, question and answer, in which Mr. Dowling talks

3     about all of HP's switches, not just some of them.

4          QUESTION:  Is there one power supply that powers

5     both the switchboard and the PoE board in the HP Power over

6     Ethernet switches?

7               ANSWER:  No.

8          He is not talking about some of the power supplies,

9     as Network-1 suggests.  He is talking about all of them.

10         That is true of Mr. Tremblay as well.

11         QUESTION:  Is there any one PoE switch that

12    Hewlett-Packard makes where one power supply provides power

13    both to the switch circuitry and also delivers the detection

14    current?

15              ANSWER:  No, ma'am, there is no power supply that

16    could do that.

17         He is talking about all of HP's accused products,

18    not just some of them.

19         Network-1 also states -- not today but in its

20    briefing -- if HP's single internal power supply were

21    actually two power supplies, HP would certainly have at least

22    one document supporting that fact.

23         The truth is we do have a document supporting that

24    fact, and we put it in front of the jury at trial.  We

25    testified extensively about it.  HP Power over Ethernet

1    Planning and Implementation Guide.  And here is a quote from

2    it.  Quote:  One supply voltage provides power for the switch

3    functionality while the isolated voltage provides power for

4    the PoE functionality.

5              Mr. Dowling specifically was asked this question

6    about this particular quote.

7              QUESTION:  What does that mean?

8              ANSWER:  That means, basically, that we have two

9    power supplies that are isolated from each other.  Two DC

10   power supplies.

11             So here is the one document.  Here is a document

12   that supports our position that our products have multiple

13   power supplies.

14             So that provides a second independent basis for

15   upholding the jury's non-infringement verdict and denying

16   Network-1's motion.

17             Mr. Dovel spent a lot of time today talking about

18   no low level current.  And according to Mr. Dovel, the Court

19   has to reweigh the evidence.

20             HP put in extensive evidence establishing that none

21   of our switches use a low level current that meets the

22   Court's claim construction.

23             As Your Honor is familiar, the term low level

24   current was construed as a non-data-signal current that is

25   sufficient to begin start up of the access device but that is

1   not sufficient to sustain the start up.

2           This demonstrative was presented at trial by

3   Dr. Davis and others.  The Court's construction imposes a

4   lower bound where start up -- where the current must be

5   sufficient to begin start up, and an upper bound where the

6   current must be not sufficient to sustain the start up.

7           This is Dr. Davis.  He concluded:  HP's switches do

8   not deliver a current sufficient to begin start up of the

9   access device but not sufficient to sustain the start up.

10          Now, HP's theory of non-infringement with respect

11  to low level current is this:  Our products comply with the

12  Power over Ethernet standard.  The Power over Ethernet

13  standard specifically forbids detection currents from

14  beginning to start up an access device.  And our witnesses

15  testified to that.  I will show you some of that testimony.

16          But on this slide what is shown here is detection

17  and classification currents at the bottom, are required by

18  the PoE standard to have a voltage within certain ranges.

19  Detection currents must be between 2.8 and 10 volts.

20  Classification must be between 15.5 and 20.5 volts.  And then

21  the turn on voltage has to be 30 or more.  That is required

22  by the standard.

23          So this is Dr. Davis confirming that all of HP's

24  devices comply with the PoE standard.  And Dr. Davis also

25  testified that the detection voltages, according to the PoE

1  standard, have to be between 2.8 and 10 volts.

2          This is a table from the standards, which was

3  marked as an exhibit and introduced to the jury, confirming

4  that detection voltages have to be between 2.8 and 10 volts.

5          Dr. Davis testified that a device, according to the

6  PoE standard, begins to start up when 30 volts or more are

7  applied.  At that point it not only begins to start up, it

8  also sustains the start up.  That is what the PoE standard

9  requires.

10          Now, I mentioned earlier, the PoE standard

11  specifically forbids what the '930 patent requires.  It

12  forbids a device from beginning to start up without

13  sustaining start up, and that is provided right here, and our

14  witnesses testified about it.

15          Section 33.3.5.7 of the standard says:  The PD

16  shall turn on or off without start up oscillation.

17          We asked Dr. Davis what that means.  Dr. Davis

18  stated that this section is requiring the PD to start up and

19  sustain start up one time when you initially begin.

20          Dr. Davis also testified about a specific mechanism

21  that is used in HP's access devices called the undervoltage

22  lockout mechanism.  Here he is saying that the undervoltage

23  lockout mechanism prevents all power, any power from being

24  delivered to the access device unless and until the voltage

25  associated with that power is at least 30 volts.  The access

1    device receives no power under 30 volts.  You need at least

2    30 volts.  And detection happens from 2.8 to 10 volts.  It is

3    too low.

4            Dr. Davis confirms that here.  Nothing is delivered

5    to the access device until you get about 30 volts.

6            Mr. Dwelley is consistent with that.  During the

7    time that detection is going on, is the operational circuitry

8    of a PD, an access device, is that receiving any power?

9            ANSWER:  No.

10           THE COURT:  Let me ask you this:  How is that

11   consistent with the testimony from Tremblay that under --

12   that some components do work during the detection phase?

13           MR. MEHTA:  Your Honor, it is correct that during

14   detection there is a portion of the device called the

15   detection circuitry.  Mr. Dovel showed you and I mentioned

16   that.  It contains a resistor, it contains a PoE chip, and

17   other components.

18           Those do consume power.  That is correct.  And he

19   showed you testimony from our witnesses where those devices

20   consume power during detection.  That does not mean, however,

21   that the access device as a whole begins to start up.  There

22   is a reason for that.

23           The PoE standard specifically forbids a device from

24   beginning to start up.  It is a safety mechanism.  You need

25   at least 30 volts for the device to begin start up and

1 sustain start up under the PoE standard.  Again, all of our

2 devices comply with the PoE standard.

3   This is Dr. Davis confirming that point.

4   When the voltage of any current is sent and the

5 voltage is below 30, can any power get to the operational

6 circuitry?

7   ANSWER:  None of it.

8   Dr. Davis following up on that.

9   If no power is going to the operational circuitry,

10 can the access device begin start up?

11   ANSWER:  No, it cannot.

12   This is Dr. Davis summarizing.

13   We know that the access device has got to receive

14 the 30 volts and whatever current is associated with it, in

15 order to turn on and begin to operate, to begin start up.  We

16 also know that that is enough to sustain its start up.  But

17 we also know that the detection voltages and the

18 classification voltages are not enough to even begin the

19 start up of the access device.

20   Now, to Your Honor's question, the testimony that

21 Mr. Dovel showed you in his presentation today essentially

22 rewrites what the Court's construction requires.  He focused

23 on the devices on the front end consuming power, beginning to

24 work.  But that is simply not what the Court's construction

25 requires.

1          The construction is a non-data-signal current that

2   is sufficient to being the start up of an access device but

3   that is insufficient to sustain the start up.

4          We are focusing on beginning the start up of an

5   access device, not an individual component within that

6   device.

7          Network-1's testimony that an individual component

8   within the device can consume some power, it is simply not

9   germane to the construction of low level current.

10          And so ending where I started off, HP, despite not

11   having the burden to prove infringement, provided three

12   separate reasons for upholding the jury's verdict and for

13   denying Network-1's motion.  Network-1's motion should be

14   denied.

15          Thank you.

16          THE COURT:  Thank you, Mr. Mehta.

17          Short rebuttal, a minute or two?

18          MR. DOVEL:  All right.  I will do two minutes.  How

19   is that then?

20          THE COURT:  That will be fine.

21          MR. DOVEL:  Appreciate it, Your Honor.

22          I will do just one point on the main power source.

23   HP argues that, well, we presented some testimony from our

24   witnesses saying that all of our switches are the same.  They

25   presented that on direct, but Your Honor should not credit

1    that.  And the reason is on cross-examination they explained

2    that that testimony was false.

3          Here is Mr. Tremblay.  I talked to him about the

4    modular switches where he admitted that all of the power from

5    the switch comes from a single power supply.

6          Here is his testimony.

7          Would you agree that all of the power that is

8    consumed inside that switch, whether it is for the switch or

9    for detection or whatever, comes through that DC output of

10    that single power supply?

11          ANSWER:  Yes, sir.

12          Then I asked him this question, this is decisive,

13    Your Honor:  Why didn't you tell the jury that in your direct

14    examination?

15          ANSWER:  We did not talk about this particular

16    power supply in the direct examination.

17          So what he is saying is, when I said that they all

18    have two power supplies, I wasn't asked specifically about

19    this one.  If I had, I would have told them, yeah, it is just

20    one power supply.

21          So they have testimony, generalized testimony that

22    they have two power supplies; but when you actually look at

23    the cross-examination, each of their witnesses, Dowling and

24    Tremblay and Dr. Davis admitted that, no, there is, in fact,

25    a single power supply for HP's switches that does both of the

```
 1    required functions.

 2            Thank you, Your Honor.

 3            THE COURT:  Thank you, Mr. Dovel.

 4            All right.  I appreciate the parties' presentations

 5    this afternoon.  I appreciate your understanding with respect

 6    to my scheduling concerns in the morning.  So I will look

 7    forward to seeing you all as close to the noon hour as

 8    possible.  And we will start at that time.

 9            All right.  See you in the morning.

10            (Hearing adjourned.)

11

12

13                          CERTIFICATION

14

15            I HEREBY CERTIFY that the foregoing is a true

16    and correct transcript from the stenographic notes of the

17    proceedings in the above-entitled matter to the best of my

18    ability.

19

20    /s/ Shea Sloan_____            May 24, 2018
      SHEA SLOAN, CSR, RPR
21    Official Court Reporter
      State of Texas No.:  3081
22    Expiration Date:  12/31/18

23

24

25
```