**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| NETWORK-1 TECHNOLOGIES, INC., | § | |
| | § | |
| | § | CIVIL ACTION NO. 6:13-CV-00072-RWS |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | **SEALED** |
| HEWLETT-PACKARD COMPANY, | § | |
| HEWLETT PACKARD ENTERPRISE | § | |
| COMPANY, | § | |
| | § | |
| Defendants. | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Plaintiff Network-1 Technologies, LLC's ("Network-1") motions for post-trial relief and the parties' proposed findings of fact and conclusions of law. Having considered the argument, written submissions and bench trial in this matter and for the reasons detailed below, the Court rules as follows:

- Network-1's Motion for a New Trial on Infringement (Docket No. 98) is **DENIED**;

- Network-1's Motion for Judgment as a Matter of Law and Motion for New Trial on Validity (Docket No. 99) is **GRANTED**;

- Network-1's Motion to Preclude HP from Presenting Theories of Inequitable Conduct Beyond the Scope of Defendant HP's[1] Complaint (Docket No. 128) is **GRANTED**; and

- the Court concludes HP failed to meet its burden on its inequitable conduct defense.

---

[1] Currently, the Defendants in this matter are Hewlett-Packard Company and Hewlett Packard Enterprise Company (collectively, "HP").

# BACKGROUND

This case has a long, tortured history. On September 15, 2011, Plaintiff Network-1[2] filed an action for patent infringement of U.S. Patent No. 6,218,930 ("the '930 patent") naming several defendants, including Hewlett-Packard Company and Hewlett-Packard Development Company. *See* Case No. 6:11-cv-492. The Court severed the case into numerous individual actions against each set of defendants, assigning each case its own case number and consolidating the cases for pretrial. *See* Case No. 6:11-cv-492 ("Lead Case"), Docket No. 365. On December 5, 2012, another defendant in this action, Avaya, Inc. ("Avaya"), filed a petition for *inter partes* review on the '930 patent, which the Patent Trial and Appeal Board ("PTAB") instituted on May 24, 2013. Defendant Hewlett-Packard Company filed a petition for IPR with Sony Corporation of America on August 6, 2013 asserting the same two grounds instituted in Avaya's IPR, which was instituted and joined with Avaya's IPR.

On January 25, 2013, several Defendants, including Hewlett-Packard Company, moved to stay this case pending *inter partes* review, and the Court granted the motion. Lead Case, Docket No. 410. After the IPR was completed, and the PTAB found the claims not invalid, Plaintiff sought to lift the stay on September 11, 2014. Lead Case, Docket No. 418. The case was reopened on January 5, 2015, but by May 5, 2015, Defendants Sony Corporation, Sony Corporation of America, and Sony Electronics Inc. moved to stay the case pending covered business method ("CBM") review. Lead Case, Docket No. 502. The Court granted the motion, and the case was again stayed until April 8, 2016, when the Court granted Network-1's motion to lift the stay. Lead Case, Docket No. 578.

---

[2] At the time of filing, Plaintiff was named Network-1 Security Solutions, Inc.

The Court held a jury trial in this matter from November 6, 2017 to November 13, 2017. After the six-day trial, the jury reached a unanimous verdict finding that HP did not infringe the '930 patent and that the '930 patent was invalid. Following the verdict, Network-1 filed a Motion for a New Trial on Infringement (Docket No. 98) and a Motion for Judgment as a Matter of Law and Motion for New Trial on Validity (Docket No. 99). The Court heard argument on these motions on May 14, 2018.

HP also asserted an inequitable conduct defense in this case, and, on May 15, 2018, the Court held a bench trial on this matter. The parties both filed proposed findings of fact and conclusions of law for the Court's consideration. Docket Nos. 148, 149.

The Court now resolves the two post-trial motions and the inequitable conduct defense below.

## LEGAL STANDARD

Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008).

Under Fifth Circuit law, a court is to be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211

F.3d 887, 891 (5th Cir. 2000). The Court will "uphold a jury verdict unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary." *Cousin v. Trans Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001); *see also Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007) (citing *Laxton v. Gap, Inc.*, 333 F.3d 572, 577 (5th Cir. 2003)).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013). Although the court must review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001). However, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)). The Court gives "credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses." *Arismendez*, 493 F.3d at 606.

Under Federal Rule of Civil Procedure 59(a), a new trial may be granted on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Rule 59(a)(1)(A). The Federal Circuit reviews the question of a new trial under the law of the regional circuit. *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007). The court can grant a new trial "based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir.

1985).  "Courts grant a new trial when it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999) (quoting *Del Rio Distributing, Inc. v. Adolph Coors Co.*, 589 F.2d 176, 179 n. 3 (5th Cir. 1979)).  "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith*, 773 F.2d at 612–13. The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).  "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great not merely the greater weight of the evidence." *Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980).

## I. NETWORK-1'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL ON VALIDITY (DOCKET NO. 99)

At trial, the only invalidity theory HP presented to the jury was obviousness based on the combination of "the Fisher patents, the Fisher system, Woodmas, and Chang." 11/13/17 Trial Tr. (jury instructions) 63:15–17.  The jury returned a verdict of invalidity.  Docket No. 70.

In its motion, Network-1 contends that HP failed to meet its burden of showing that the Fisher system was (1) in "public use" or (2) corroborated.[3]  Docket No. 99 at 3.  According to Network-1, since the system was not in public use nor corroborated, it did not constitute prior art, and HP's resulting arguments were either defective or estopped.

---

[3] In this Order, the Court references only the pre-AIA version of 35 U.S.C. § 102 because the application date of the only patent in suit—the '930 patent—was filed before March 16, 2013.

## A. Public Use

To determine whether a prior use constitutes an invalidating "public use," the Court considers "whether the purported use: (1) was accessible to the public; or (2) was commercially exploited." *Dey, L.P. v. Sunovion Pharm., Inc.*, 715 F.3d 1351, 1355 (Fed. Cir. 2013) (citing *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005)).

HP asserts that "[t]here is no evidence that the Fisher system was confidential, secret, private, clandestine, or otherwise not public." Docket No. 125. But this is not the test. On a motion for judgment as a matter of law, the Court considers whether *HP* presented evidence at trial to meet its burden to prove by *clear and convincing* evidence that the Fisher system was "accessible to the public." *See Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) ("Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence.").

HP suggests that the following evidence supports a finding that the Fisher system was in public use: (1) David Fisher's testimony; (2) a copyright date on a motherboard; (3) a statement from its expert, Dr. Dean Neikirk; and (4) four pages of evidence from the report of Plaintiff's Expert, Dr. Nathaniel Davis, in which Dr. Davis discusses the state of the art. The Court addresses each piece of evidence in turn.

First, the Court considers Mr. Fisher's testimony about the use of the Fisher system. At trial, Mr. Fisher testified via video deposition regarding the Fisher system. From a photo he had taken within a year of trial, Mr. Fisher identified several components of the system as existing in 1996 based upon "the date on the silk screen, on the motherboard." 11/10/17 AM Tr. at 129:11–25; *id.* at 139:25–130:8. He further explained that he developed the system while at 3Com and that he tested the system inside the 3Com offices. *Id.* at 123:14–24, 137:8–25 ("to test it, we

would, you know, plug that in, stick this into the front of the hub, and then take the 10BaseT wiring that was in the building and plug it in").

Fisher did not testify, however, that he or anyone else at 3Com had shown the system to anyone outside of the company; in fact, he stated that he did not know whether the system was concealed from the public. *Id.* at 138:1–17. Relatedly, he explained that he retained no documentation regarding the system. *Id.* at 138:9–12. What is clear from Mr. Fisher's testimony is that there is no evidence in the record that the Fisher system was ever used outside of the 3Com offices. Mr. Fisher admitted that he could not provide that evidence, and no other percipient witness testified at trial about the use of the system. And a company's internal testing of a system is insufficient to create public use. *Invitrogen Corp.*, 424 F.3d at 1383.

Second, HP identifies a copyright date on the motherboard, which it has represented means "that the copyright office had reviewed it and that it was available." 11/10/17 PM Tr. at 192:5–16. But a copyright mark is not indicative, in itself, of public availability. Registration with the U.S. Copyright Office is permissive and is not required before adding the symbol on a work that qualifies for copyright protection. *Baby Buddies, Inc. v. Toys R Us, Inc.*, 611 F.3d 1308, 1321 n.20 (11th Cir. 2010); 17 U.S.C. § 408(a) ("Registration Permissive . . . [T]he owner of copyright . . . may obtain registration of the copyright claim. . .[R]egistration is not a condition of copyright protection."). Moreover, registering an item with the Copyright Office creates a public record of the registration, including an application for registration and a certificate of registration. 17 U.S.C. § 408, § 410(a). But HP has neither offered nor identified any evidence of registration, and that absence of proof suggests that no registration took place.

But even if HP was correct that the copyright mark on the motherboard meant that the motherboard was sent to the Copyright Office, this evidence does not meet HP's burden. That the

Copyright Office possessed a motherboard component is not clear and convincing evidence that the *system* had also been sent to the Copyright Office and was used by Copyright Office employees. At best, the copyright date may be evidence that the motherboard was available in 1996, but there is no evidence that the Copyright Office ever possessed the system, let alone used it. Accordingly, the copyright date does not establish public use.

Third, HP identifies the trial testimony of Dr. Neikirk as evidence of public use. The identified question-and-answer reads as follows: "Q. Dr. Neikirk, was Mr. Fisher's system, was it in public use? A. Yes, I believe it was." 11/10/17 PM Tr. at 22:7–9.

Dr. Neikirk's knowledge of the Fisher system, according to HP, is based upon his conversations with Mr. Fisher, his analysis of the Fisher Statement, and Mr. Fisher's trial testimony. *See* 11/10/17 PM Tr. at 15:6–17 (" In addition to the -- the prior art patents, which I'll go through, I also looked at the Fisher system. And to get more information about that Fisher system, I did speak to -- to Dr. Fisher. Q. And we have the Fisher system here today on the defense table in front of the jury? A. Yes. Q. Have you looked at the Fisher system? A. Yes, I have. Q. Do you know it's the first prior -- Power over Ethernet system we've had in the world? A. Yes. That's what Dr. Fisher told us this morning.").

When asked at trial whether the system was in public use, Dr. Neikirk testified that he believed the system was in public use based on Mr. Fisher's testimony and a copyright date on a motherboard. *Id.* at 22:7–20. ("Q. (By Ms. Doan) Mr. -- Dr. Neikirk, was Mr. Fisher's system, was it in public use? A. Yes, I believe it was. Q. And has it been corroborated here that it was in public use? A. Yes. Dr. Fisher told us this morning that they built a system, they plugged it into the network at their offices and used it. Q. But other than that, do -- do we also have additional evidence of corroboration on the system itself? A. Yes, there is. If you look at the printed circuit

board -- I think Dr. Fisher also mentioned this this morning -- you can look at that board and there's a marking on it that says Copyright 1996.").

To the extent that Dr. Neikirk suggests the system was publicly available because of the copyright date on the motherboard, the Court has already addressed that argument above: A copyright date on a singular component, without more, is not evidence of public availability. According to HP, Dr. Neikirk also believes the system was in public use based on his review of Mr. Fisher's own testimony and statements. But Dr. Neikirk is not a percipient witness and has no knowledge of the system's use aside from his discussions with the inventor and inspection of the system. At bottom, his testimony amounts to a restatement of the inventor's own testimony. A purported inventor cannot create "new" evidence of public use by having an expert repeat his testimony at trial.

Finally, HP relies on four pages of Dr. Davis's report that HP alleges were published to the jury, but these pages were never admitted into evidence and are not part of the trial record. Regardless, the quoted portions of the expert report do not support public use. Specifically, HP directs the Court to the following statements in the Davis expert report: "3Com (now HP) had functional systems for delivering Power over Ethernet to wireless access points . . .; based independently upon my review and analysis of Mr. Fisher's patents, it is my opinion that 3Com/HP created the foundation for Power over Ethernet systems, including before and after the development of the 802.3af standard." Docket No. 110 at 5–6 (citing Docket No. 110-33 (Dr. Davis's Rebuttal Report) at 43). Dr. Davis's opinion that the Fisher *patents* "created the foundation" for Power over Ethernet systems does not amount to evidence that the Fisher system was ever in public use.

HP has failed to provide a sufficient basis for the jury to conclude that the Fisher system was ever in public use: Mr. Fisher could not confirm whether the Fisher system was ever used outside of the 3Com offices; the copyright date on the motherboard of the Fisher system likewise does not establish that the system was ever used or even left the 3Com offices; and Dr. Neikirk's testimony amounts to a restatement of the inventor's testimony. None of the evidence identified by HP establishes public use, let alone at a clear and convincing level.

Accordingly, because HP did not establish by clear and convincing evidence that the Fisher system was ever in public use, the Fisher system does not constitute prior art as a matter of law.

## B. Corroboration

Relatedly, HP failed to corroborate both the public use of the system and its key inventive features. Oral testimony by an interested party on its own will generally not suffice as "clear and convincing" evidence of invalidity. *TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1301 (Fed. Cir. 2016); *see also Rosco, Inc. v. Mirror Lite Co.*, 120 F. App'x 832, 836 (Fed. Cir. 2005) ("Testimonial evidence of invalidity must be corroborated."). Instead, corroboration of oral evidence of prior invention is the general rule in patent disputes. *Woodland Tr. v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998). Indeed, "[t]hroughout the history of the determination of patent rights, oral testimony by an alleged inventor asserting priority over a patentee's rights is regarded with skepticism, and as a result, such inventor testimony must be supported by some type of corroborating evidence." *Id.* (citing *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed.Cir.1993)).

A "rule of reason" analysis is used to determine the sufficiency of corroboration, under which "all pertinent evidence is examined in order to determine whether the inventor's story is credible." *TransWeb*, 812 F.3d at 1301. "Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's

testimony has been corroborated." *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350–51 (Fed. Cir. 2001) (citing *Woodland Trust*, 148 F.3d at 1373). "Because documentary or physical evidence is created at the time of conception or reduction to practice, the risk of litigation-inspired fabrication or exaggeration is eliminated." *Id.* Circumstantial evidence about the inventive process, alone, may also corroborate. But the Federal Circuit has "generally been most skeptical of oral testimony that is supported only by testimonial evidence of other interested persons." *TransWeb*, 812 F.3d at 1302.

The Federal Circuit has also provided a list of illustrative factors that may be useful in determining whether a witness's testimony provides sufficient corroboration: "1) the relationship between the corroborating witness and the alleged prior user; 2) the time period between the event and trial; 3) the interest of the corroborating witness in the subject matter in suit; 4) contradiction or impeachment of the witness' testimony; 5) the extent and details of the corroborating testimony; 6) the witness' familiarity with the subject matter of the patented invention and the prior use; 7) probability that a prior use could occur considering the state of the art at the time; and 8) impact of the invention on the industry, and the commercial value of its practice. *Sandt Tech.,* 264 F.3d at 1351 (citing *Woodland Trust*, 148 F.3d at 1371).

As evidence of corroboration for the Fisher system, HP points to (1) the copyright date, (2) the Fisher patents, and (3) Dr. Neikirk's testimony. But this evidence is insufficient as a matter of law to meet the exacting clear and convincing evidence standard.

With respect to corroborating the public use of the system, the record is devoid of any evidence that the system was in public use in 1996 aside from the inventor's own testimony. Mr. Fisher's testimony about the "Fisher system" was provided in 2017, more than 20 years after his alleged invention. 11/10/17 AM Tr. at 129:23–25. He is not a disinterested party, as he is a current

HP employee and he developed the Fisher system for 3Com, a company that was acquired by HP. *Id.* at 12:7–17 ("I then moved to a company called BICC Data Networks in 1989, and that's when I first started getting involved in the 802.3 standards committee. And I actually really enjoyed the work we do there. BICC Data Networks then got purchased by a company called 3Com Corporation in 1992. And then in 2010 HP purchased 3Com. So I've actually not changed employer in 28 years now. Q. And you currently are an employee for HP? A. Correct. Employee for HPE now that the split has happened, but, yes.").

And the copyright date is inadequate as a matter of law to establish public availability and appears to be the *only* basis upon which Mr. Fisher states that he invented the Fisher system in 1996. 11/10/17 AM Tr. at 129:19–25 ("QUESTION: Mr. Fisher, you have in front of you what's been marked as Exhibit 1, which is three pictures. Is there any way that you can tell from these pictures when this access device was built? ANSWER: Well, this would have been assembled sometime in 1996 because of the date on the silk screen, on the motherboard."). Finally, Dr. Neikirk, a retained expert, only testified to the public availability of the system as a function of Mr. Fisher's testimony. As to the Fisher patents, HP has not suggested that the patents are coextensive with the system or cited any authority suggesting that the existence of patents establishes public use.

Additionally, as discussed above, Dr. Neikirk's trial testimony about public use was based on the copyright date and on Dr. Fisher's own testimony. Dr. Neikirk, however, is not a fact witness, and his only knowledge of the Fisher system's public availability stems from his discussions with the inventor and inspection of the system. Contrary to HP's assertions, a purported inventor cannot corroborate his testimony by having an expert repeat it at trial. If HP was correct, the corroboration requirement would be a nullity.

With respect to corroboration of the design of the Fisher system, HP was required to corroborate the invalidating functionality in the alleged prior art system. *Finnigan Corp.*, 180 F.3d at 1366, 1369 (holding that published article failed to corroborate purported prior inventor's testimony because the article failed to disclose one important element); *Rosco*, 120 F. App'x at 836–37 (Fed. Cir. 2005) (non-precedential) ("testimony was insufficient to establish prior public knowledge or use" when corroborating physical example was missing one key element).  For example, Mr. Fisher testified that his system would supply power to an "access point" by using an "authentication process" that would "keep the power limited" during authentication and then increase power.  11/10/17 AM Tr. at 132:2–24.  But there is no corroborating evidence in the record that the Fisher system could perform these functions:  HP has not identified a single document, any testimony, or demonstration of how the collection of components that formed the Fisher system functioned as Mr. Fisher claimed.

Instead, at trial, HP displayed an access point motherboard, access point, and access point mounting bracket from the first generation Fisher system.  Docket No. 102-1; 11/10/17 AM Tr. at 128:24–131:19.  But the authentication server and the hub/switch that purportedly performed the power up, detection, and authentication functions Mr. Fisher testified to were never presented to the jury.  In fact, the components Mr. Fisher brought to his deposition and that HP brought to trial did not even relate to the version of the system that had staged power up, detection, and authentication functions.  Those functions were allegedly present in the second generation of Mr. Fisher's system, but Mr. Fisher only brought first generation components to trial.  11/10/17 AM Tr. at 131:6–15, 135:24–136:14 ("this was a prototype that existed prior to us building it into the hub . . . there's pieces that I don't have here, which was the second generation of this stuff, that would detect whether or not it was an Ethernet or a PoE . . . I don't have that with me").

The Fisher patents also do not corroborate that the Fisher system included an authentication method similar to that in the '930 patent's "low level current" detection. Fisher and 3Com had every incentive to disclose all important elements of their system in their patent applications, both to allow for the broadest patent protection, and because it was required at the time by the "best mode" requirement.[4] *Eli Lilly and Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 963, 58 U.S.P.Q.2d 1869 (Fed. Cir. 2001) ("The best mode requirement creates a statutory bargained-for-exchange by which a patentee obtains the right to exclude others from practicing the claimed invention for a certain time period, and the public receives knowledge of the preferred embodiments for practicing the claimed invention."). Therefore, if the staged power up, detection, and authentication functions to which Mr. Fisher testified were actually in the system he had developed, it is highly likely that those functions would have been mentioned in the Fisher patents. But none of Fisher's patents says anything about those functions. 11/10/17 AM Tr. at 136:20–137:7; Docket Nos. 99-12, 99-14, 99-14, 99-16.

At best, Mr. Fisher provided uncorroborated testimony that his system performed "staged powering up" with a "current limit" to perform "detection and authentication" for "determining whether or not an access point was able to accept Power over Ethernet." The jury had no basis for a finding of invalidity in the absence of corroboration. *Rosco*, 120 F'Appx at 837. Again, that HP could not corroborate the important details of the invention at trial is another reason that the Fisher system does not constitute prior art.

---

[4] The America Invents Act ("AIA") eliminated best mode as a basis for invalidity and unenforceability defenses under 35 U.S.C. § 282.

## C. Estoppel

Before trial, Network-1 moved for partial summary judgment of estoppel on certain of HP's invalidity defenses because HP had participated in an IPR, which resulted in a Final Written Decision that the '930 patent was not invalid.

The plain language of § 315(e)(2) suggests that estoppel applies to certain non-petitioned grounds—grounds that a party failed to raise in an IPR but reasonably could have done so. When a party has knowledge of an invalidity position that *could* be included in an IPR petition but it *chooses* to omit that ground from its filing, estoppel attaches because it "reasonably could have raised" the invalidity ground in its IPR. To find otherwise would frustrate the litigation efficiencies the AIA was designed to produce and would call into question this Court's decision to stay this case pending IPR.[5] See Lead Case, Docket No. 410; *NFC Tech. LLC v. HTC Am., Inc*., No. 2:13-CV-1058-WCB, 2015 WL 1069111, at *4 (E.D. Tex. Mar. 11, 2015) ("Giving the agency the authority to consider the validity of patents in the *inter partes* review process was designed in large measure to simplify proceedings before the courts and to give the courts the benefit of the expert agency's full and focused consideration of the effect of prior art on patents being asserted in litigation."); *Cobalt Boats, LLC v. Sea Ray Boats, Inc*., No. 2:15CV21, 2017 WL 2605977, at *3 (E.D. Va. June 5, 2017) ("It would waste this Court's time to allow a stay for a year during IPR proceedings and then review invalidity arguments that Defendants could (and perhaps should) have raised in their IPR petition."). Indeed, the Court struggles to see how the AIA could "limit counterproductive litigation costs" if the AIA permits a petitioner to file an IPR on a set of selected grounds and obtain a stay of the district-court proceedings—only for the petitioner to ask this Court

---

[5] The Court also stayed this case pending covered business method review at the request of now-dismissed Defendants Sony Corporation, Sony Corporation of America and Sony Electronics, Inc. (Lead Case, Docket No. 558).

and a jury to review invalidity grounds that it could have raised at the PTAB once the stay is lifted. H.R. Rep. 112–98, pt. 1, at 40 (2011), 2011 U.S.C.C.A.N. 67, 69.

Moreover, applying estoppel only to instituted grounds would effectively read out the "reasonably could have raised" language from the statute. *See Oil-Dri Corp. of Am. v. Nestle Purina Petcare Co.*, No. 15-CV-1067, 2017 WL 3278915, at *8 (N.D. Ill. Aug. 2, 2017) ("Under Purina's reading of the statute, the 'reasonably could have raised' language would come into play where a petitioner raises a ground in a petition, the PTAB institutes IPR on that ground, the petitioner abruptly changes course and fails to pursue that ground before the PTAB post-institution, and then later the petitioner changes course once again and seeks to raise that invalidity ground in federal court. The Court has difficulty understanding why a party would pursue such a strategy."). Under HP's reading, grounds that the petitioner "raised" and grounds that "reasonably could have been raised" are coextensive. *See* Docket No. 110 at 11–12. Such an interpretation should be rejected at least because it "violat[es] the rule of statutory construction that Congress does not use unnecessary words." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1345 (Fed. Cir. 2010) (citing *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)); *Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009) ("We therefore reject [an] interpretation, which would violate the canon that we must 'give effect, if possible, to every clause and word of a statute' and should avoid rendering any of the statutory text meaningless or as mere surplusage.").

A number of districts—including this one—have adopted a similar view of the AIA estoppel provision. *See Biscotti Inc. v. Microsoft Corp.*, No. 2:13-cv-01015-JRG-RSP, 2017 WL 2526231, at *3 (E.D. Tex. May 11, 2017) ("Section 315(e) estops Microsoft from asserting at trial . . . grounds not included in a petition that a 'skilled searcher conducting a diligent search reasonably could have been expected to discover. . . .' ") (citing 157 Cong. Rec. S1375 (daily ed.

Mar. 8, 2011) (statement of Senator Jon Kyl)); *Oil-Dri Corp.*, 2017 WL 3278915, at *8; *Cobalt Boats*, 2017 WL 2605977, at *2–3; *Douglas Dynamics, LLC v. Meyer Prods. LLC*, No. 14-cv-886-JDP, 2017 WL 1382556, at *4 (W.D. Wis. Apr. 18, 2017), *reconsideration granted in part on other grounds*, No. 14-cv-886-JDP, 2017 WL 2116714 (W.D. Wis. May 15, 2017); *Parallel Networks Licensing, LLC v. IBM Corp.*, No. 13-2072, 2017 WL 1045912, at *11–12 (D. Del. Feb. 22, 2017) (Jordan, J.), appeal filed, No. 17-2115 (Fed. Cir. May 31, 2017); *Clearlamp, LLC v. LKQ Corp.*, No. 12 C 2533, 2016 WL 4734389, at *7–8 (N.D. Ill. Mar. 18, 2016).

The Court is not persuaded by the reasoning in the cases holding to the contrary. *See, e.g., Verinata Health, Inc. v. Ariosa Diagnostics, Inc*, No. 12-CV-05501-SI, 2017 WL 235048, at *3 (N.D. Cal. Jan. 19, 2017) ("limiting IPR estoppel to grounds actually instituted ensures that estoppel applies only to those arguments, or potential arguments, that received (or reasonably could have received) proper judicial attention."); *Koninklijke Philips N.V. v. Wangs All. Corp.*, No. CV 14-12298-DJC, 2018 WL 283893, at *4 (D. Mass. Jan. 2, 2018). In one such case, for example, the District of Delaware limited estoppel because it could not "divine a reasoned way around the Federal Circuit's interpretation in *Shaw*," noting that its decision "confound[ed] the very purpose of [PTAB] parallel administrative proceedings." *Intellectual Ventures I LLC v. Toshiba Corp.*, 221 F. Supp. 3d 534, 553–54 (D. Del. 2016). In *Shaw*, the Federal Circuit held that "the plain language" of 35 U.S.C. § 315(e) prohibited the application of estoppel to grounds that were *raised* in a petition but were not instituted by the PTAB. *Shaw Indus. Grp., Inc. v. Automated Creel Sys., Inc.*, 817 F.3d 1293, 1300 (Fed. Cir. 2016). *Shaw* does not speak to the fate of grounds that were not raised in an IPR petition, and the Court agrees with the views expressed by numerous other courts that *Shaw* does not limit the application of estoppel to non-petitioned grounds.

Further, the fact that HP sought joinder with Avaya's IPR does not mean that HP could not have reasonably raised different grounds from those raised by Avaya. And whether to join an IPR and assert identical or different prior art—with the associated estoppel ramifications—was a decision for HP to make. Indeed, "[a]llowing [HP] to raise arguments here that it elected not to raise during the IPR would give it a second bite at the apple and allow it to reap the benefits of the IPR without the downside of meaningful estoppel." *Parallel Networks Licensing*, 2017 WL 1045912, at *12.

Only patents and printed publications can be submitted to the PTAB for review in an IPR. 35 U.S.C. § 311(b) ("SCOPE. – A petitioner in an *inter partes* review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications."). Before trial, the Court ruled that each invalidity ground disclosed in HP's invalidity contentions on December 19, 2012 (Lead Case, Docket No. 811-2)—served almost eight months before HP filed its IPR on August 6, 2013 (Lead Case, Docket No. 811-5)—were grounds that reasonably could have been raised in the IPR.

HP was permitted to present an invalidity theory at trial based on the Fisher system because the Fisher system could not have been raised in an IPR. But, as determined above, HP failed to meet its burden to prove that the Fisher system constitutes prior art. Because HP has no remaining invalidity positions that are not estopped, judgment as a matter of law on invalidity is **GRANTED**.[6]

---

[6] Because the Court concludes that estoppel attaches to HP's invalidity positions, it does not reach the Network-1's remaining technical arguments.

## II.    NETWORK-1'S MOTION FOR NEW TRIAL ON INFRINGEMENT (DOCKET NO. 98)

In its second motion, Network-1 seeks a new trial on infringement because the jury's noninfringement verdict was against the great weight of the evidence. Specifically, Network-1 contends that (1) a finding that HP's detection current is not a "low level current" would be against the great weight of the evidence and (2) a finding that no HP accused product used a "main power source" would be against the great weight of the evidence.

### A.    Low level current

The Court construed "low level current" as "a non-data-signal current that is sufficient to begin start up of the access device but that is not sufficient to sustain the start up." Lead Case, Docket No. 693 at 12. Specifically, the Court explained that "[t]he current need not be sufficient to result in a completed start up and thus the prior construction from D-Link and Cisco must be clarified. The current must be sufficient to "begin start up" rather than "cause start up," thus eliminating any implication that the current must be sufficient to result in a completed start-up." *Id.* at 11.

According to Network-1, it presented compelling evidence that the HP detection current begins start up of the access device in the same way as the "low level current" in the '930 patent preferred embodiment: It reaches at least one component in the access device that begins to start up. Docket No. 98 at 4. Network-1 points to the trial testimony of its expert, Dr. Knox, in which he explained that HP's detection current causes multiple components in an access device consume power and begin to start up, including center tap transformers, bridge diodes, capacitors, and integrated circuits. *Id.* at 4–5. Network-1 also identifies trial testimony from HP's witness, Mr. David Tremblay, in which he agreed that several of these components consume power and work during the detection phase. *Id.* at 6 (citing 11/9/17 AM Tr. (Tremblay redirect) 70:20–71:4).

In response, HP takes the position that its detection currents are too low to begin start up. According to HP, the only current that is sent by HP devices which is sufficient to begin start up of the access device is also sufficient to sustain the start up, so these currents do not meet the low level current limitation. Docket No. 109 at 17–18. In support, HP cites to the testimony of its expert Dr. Davis, who testified that the HP products do not infringe because "they do not deliver a current sufficient to begin start up of the access device but not sufficient to sustain start up." *Id.* at 14 (citing 11/9/17 PM Tr. at 12:15–20). HP cites Dr. Davis's testimony that all of HP's devices comply with the 802.3af standard, which he suggests requires a detection current between 2.9 and 10 V. Docket No. 109 at 14. Dr. Davis further testified that these detection voltages are not enough to even begin the start up of the access device because the access device must "receive 30 volts and whatever current is associated with it in order to turn on and begin to operate, to begin startup." *Id.* HP also points to Dr. Davis's testimony about an undervoltage lockout, which "prevents all power, any power from being delivered to the access device unless and until the voltage associate with that power is at least 30 volts." *Id.* Dr. Davis testified that, when the voltage of any current sent is below 30V, no power goes to the operational circuitry, so the access device cannot begin start up. 11/9/17 PM Tr. at 44:19–21.

HP also cites to Dr. David Dwelley's testimony, in which he testified that, during detection, the circuitry in the access device ("PD") "really doesn't do anything." 11/9/17 AM Tr. (Dwelley) at 115:5. Dr. Dwelley likens the operational circuitry to a "picture on the wall" or "passive actor" in the detection process. *Id.* at 115:16–25. HP also points to the testimony of Dr. Tremblay, who testified that the detection currents "are purely going to the isolated side of the circuitry in the IP phone" and that "the detection phase happens before the IP phone or any access device begins to start up." *Id.* at 21:7–9.

Network-1 in its reply suggests that the Davis, Dwelley, and Tremblay testimony are only "general conclusions" from HP witnesses that, when the detection current is applied, "nothing is delivered to the access device itself." Docket No. 115 at 5. But, according to Network-1, HP has not presented any evidence that the components HP identifies as affected by the detection current (the transformers, capacitor, PoE chip, etc.) do not fall within the Court's definition of "access device" or are not used when the device is fully operational. *Id.* Network-1 argues that "HP's complete lack of specific evidence and argument certainly cannot overcome the great weight of the evidence presented by Network-1, which includes admissions by HP's own witnesses (Dr. Davis and Mr. Tremblay) that these components are 'operational circuitry' 'used during the operation of the access device,' and are "an important part of the operation of this access device." *Id.* (citing 11/9/17 PM Tr. (Davis) at 87:20–89:11; 11/9/17 AM Tr. (Tremblay) at 63:18–64:25; 66:3–67:13).

Specifically, in response to Dr. Dwelley's testimony, Network-1 points out that Mr. Dwelley agreed at trial that several access device components "do . . . work during the detection phase." 11/8/17 AM Tr. (Tremblay) at 70:20–71:4; *id.* at 130:25–132:1 ("[t]he detection current must charge that capacitor before detection can proceed").

Even if the Court agreed that Network-1 presented credible evidence that the HP accused devices meet the "low level current" limitation, the jury was likewise presented with HP's evidence that it did not. The jury was entitled to credit Dr. Davis and Mr. Dwelley's testimony to support its finding, even if Mr. Tremblay's testimony was contradictory, and such a finding is not against the great weight of the evidence. The Court does not substitute its judgment for that of the jury on

a new trial motion.[7]  *See Conway*, 610 F.2d at 363.  Accordingly, Network-1's motion for a new trial based on the "low level current" limitation is **DENIED**.

### B.  Main power source

Network-1 contends that two types of accused switches, modular switches and switches with redundant power supplies, both used a single power source that provided power for both the switch itself and for the detection current.  The '930 claim language includes two requirements for a "main power source": (1) "supply power to the data node," i.e., the switching functionality, and (2) "delivering a low level current from said main power source to the access device." '930 patent at 4:56–62.

For modular switches, Network-1 points to testimony from HP witnesses that the power consumed inside the switch comes from a single power supply.  11/9/17 AM Tr. (Tremblay cross) at 50:22–51:1, 47:6–17, 48:20–49:10 ("all of the power" comes from "that output, that DC power"), 49:16–22, 51:2–8 ("Q. Why didn't you tell the jury that in your direct examination? A. We did not talk about this particular power supply in the direct examination."), 45:14–22.

For switches with redundant power supplies, Network-1 contends that the evidence proved that each supply (the primary and the redundant) both individually perform the two "main power

---

[7] Network-1 also suggests that it is entitled to a new trial because HP's counsel argued against the Court's claim construction.  *See* Docket No. 98 (citing 11/13/17 All Day Tr. at 115:15–19; *id*. at 115:24–25 ("at 10 volts forever, it's never going to start up").  Network-1 also points to HP witness testimony that it believes is contrary to the Court's constructions.  *See* Docket No. 98 (citing 11/9/17 AM Tr. (Tremblay cross) at 57:3–9(" 'begin start up' . . . refer[s] to the point when the device gets operational power and begins to do its operational functions"); *id.* (Tremblay direct) at 23:24–25:7 ("we know that it's not beginning to start up the access device" because "the phone is not on. . . .. There's no display. Can't make a phone call with it. It's . . . nonoperational"); *id.* at 24:9–25, 26:25–27:13 (the ancillary circuitry in the access device visible to a user also needed to actually turn on and start operating—i.e., "lights turning on . . . red light is turned on"); *id.* at 25:20–23 ("although there's current being sent, the phone is not usable"); *id.* at 19:4–17 (based on HP's detection current, [the phone] is not functioning. You can't make phone call with it"); 11/9/17 PM Tr. (Davis direct) at 18:3–13 ("the way this low level current is going to work" is that "it's going to start up the access device")).  However, in each of the cited instances, Network-1 did not object when the testimony was elicited.  Network-1 waived any objections by failing to object.  *See SSL Servs., LLC v. Citrix Sys., Inc*., 940 F. Supp. 2d 480, 492 (E.D. Tex. 2013) (Plaintiff "waived any objection it might have had to the testimony presented at trial because it failed to object to such testimony during the direct examination at trial.").

source" functions. 11/8/17 AM Tr. (Tremblay via deposition) at 77:2–17 ("[T]he 12-volt is used for the majority of the switching side . . . The 54 volts will be used for PoE-related circuity, such as applying current and voltage in the detection process."); 11/7/17 AM Tr. at 121:8–19, 124:7–17; 11/7/17 PM Tr. at 170:11–13, 171:3–5.

Network-1 also argues that the remaining, non-modular switches and switches without redundant power supplies can be categorized as either structure A or structure B. Docket No. 98 at 14 (citing 11/9/17 PM Tr. (Davis cross) at 107:6–13). For both of these structures, as evidence of a single power supply, Network-1 points to testimony from Dr. Davis to "confirm" that one power supply provides two isolated voltages, one for the detection current and one for the switch. *Id.* at 14–15 (citing 11/9/17 PM Tr. at 115:10–22; *id.* at 110:7–12). Network-1 also points to HP documentation indicating that the HP products use a single internal power supply. *Id.* at 15 (citing Docket No. 98-12 at 79, 83–84, 88, 98, 165).

Conversely, HP points to testimony from Brian Dowling, a VP of Engineering at HP Enterprise: "Q. Is there one power supply that powers both this – the switchboard and the PoE board in the HP Power over Ethernet switches? A. No." Docket No. 109 at 9 (citing 11/8/17 PM Tr. (Dowling) at 106:12–15). HP points to similar testimony from Mr. Tremblay and its expert, Dr. Davis. *See id.* at 9–11.

The jury weighs and determines the credibility of the evidence, and it was presented sufficient evidence from which to conclude that the HP products used more than one power source. *See, e.g.*, 11/9/17 AM Tr. (Tremblay) at 42:13–16 ("Q. Is there any one PoE switch that Hewlett-Packard makes where one power supply provides power both to the switch circuitry and also delivers the detection current? A. No, ma'am. There is no power supply that could do that."); *id.* at 36:8–11 ("Q. Okay. But not one of those [power sources] would do the functions of powering

the data node and delivering detection current? A. Absolutely not. There's no way that one power source can do both of those functions, no."); 11/9/17 AM Tr. (Davis) at 56:10–25 ("Q. Dr. Knox has at times suggested that the 12-volt and 50-volt power sources are really one just – just one power source with two outputs. He also testified otherwise as you saw, but he maintains now that this is really all just one power source. Do you believe Dr. Knox is correct about that? A. He is not correct that this represents one power supply, no. Q. Why not? A. The 12-volts power supply [and] the 50-volt power supply are isolated from one another."). The verdict was not against the great weight of the evidence, and the Court declines to substitute its judgment for that of the jury. *See Conway*, 610 F.2d at 363. Accordingly, Network-1's motion with respect to the "main power source" limitation is **DENIED**.

## C. HP's Argument

In response to Network-1's motion, HP argues that Network-1 is not entitled to a new trial on infringement because it did not present competent evidence that the claims require "delivering a low level current from said main power source." Docket No. 109 at 7. HP's argument amounts to a JMOL-type inquiry regarding whether Network-1 met its burden to prove infringement at trial. Because the jury returned a noninfringement verdict, HP did not move for judgment as a matter of law of noninfringement, and this matter is not properly before the Court. Because the Court has rejected the basis raised by the movant Network-1 in its new trial motion, the Court declines to opine on whether Network-1 met its burden to prove infringement at trial.

* * *

Having considered Network-1's arguments for a new trial, the Court **DENIES** Network-1's motion for the reasons detailed above.

## III.    BENCH TRIAL ON INEQUITABLE CONDUCT

HP also advanced an inequitable conduct defense in this case. Lead Case, Docket No. 650. In its pleadings, HP identified one omission and four alleged misrepresentations by Network-1's representatives during Reexamination No. 90/012,401 ("the '401 reexam") proceeding that were allegedly intended to deceive the United States Patent and Trademark Office ("PTO" or "Patent Office"):

(1) Network-1's representatives failed to properly disclose the Cisco Markman Order to the examiners during the '401 reexam, knowing that if the Court's constructions for certain terms were applied, the claims would improperly broaden the scope of the original claims of the '930 patent. Lead Case, Docket No. 650 ¶ 52.

(2) Network-1 representatives stated that new claims 15 and 16 were not broader than original claim 6, although the representatives knew that claims 15 and 16 "attempt to erase . . . the claim construction for 'secondary power source' adopted in the Cisco Markman Order." *Id*.

(3) Network-1 representatives misrepresented "the Board's construction of 'low level current,' " to gain allowance of claim 21, which is "impermissibly broader than claim 6." *Id.* at ¶ 53.

(4) Network-1 representatives stated that new claims 22 and 23 were not broader than original claim 6, but Network-1 representatives knew that these claims make the "sensing" requirement "permissive rather than mandatory" and thus "impermissibly broader than claim 6." *Id.* at ¶¶ 54, 55. And

(5) Network-1 representatives stated that claim 23 was not broader than original claim 6, although the representatives knew that this claim eliminated "much of the 'providing' limitation of claim 6" and was therefore broader than claim 6. *Id.* at ¶ 55.

In HP's proposed findings of fact and conclusions of law submitted before the November 2017 jury trial, HP explained that "[t]he central legal issue in the inequitable conduct analysis is whether the Network-1 representatives omitted material information such as the Cisco Markman Order to the PTO and whether the omission and subsequent misrepresentations were made with the specific intent to deceive." Lead Case, Docket No. 1003.

The bench trial, originally set to occur once the jury had begun its deliberations, was instead conducted the day after the post-trial motions hearing. *See* 11/8/17 PM Tr. at 176:1–177:20. Before the trial began, Network-1 filed a motion to limit HP to the theories of inequitable conduct pled in HP's affirmative defense. Docket No. 128.

Inequitable conduct allegations are subject to the higher pleading standard of Fed. R. Civ. P. 9(b). "[T]he pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328 (Fed. Cir. 2009). The pleading must, moreover, "include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO." *Id.* at 1328–1329.

After hearing argument on Network-1's motion, the Court limited HP's inequitable conduct defense to the allegations pled in its Answer and the '401 reexam. Docket No. 147 at 7:3 –9:5. Allowing HP to advance new, unpleaded inequitable conduct theories for the first time at trial would deprive Network-1 of an opportunity to fully investigate or defense against the merits of HP's claims. *See Fiber Sys. Int'l v. Applied Optical Sys.*, 2010 U.S. Dist. LEXIS 67331, at *25– 26 (E.D. Tex. July 7, 2010). Indeed, the heightened pleading requirement would be meaningless

if parties were free to present any new inequitable conduct theory for the first time at trial. At the very least, Rule 9(b)'s goal of providing defendants with fair notice of the precise nature of the claim against them would be undermined. *See, e.g., U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (noting that Rule 9(b) ensures the complaint "provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs.").

Accordingly, the Court advised the parties that it would consider only evidence "related to the actual claims in the case" which arose from the '401 reexam. In light of the Court's ruling at trial and the above, Network-1's Motion to Preclude HP from Presenting Theories of Inequitable Conduct Beyond the Scope of HP's Complaint (Docket No. 128) is **GRANTED**.

With this background, the Court now sets forth its findings of facts and conclusions of law as required by Fed. R. Civ. P. 52(a).

## I. FINDINGS OF FACT

### A. Facts relating to the alleged omission of the Cisco Markman Order

#### (1) <u>Facts relating to materiality</u>

**[FF1]**    Network-1 proposed new claims 10–23 during the '401 reexam. D97 at 856–59.

**[FF2]**    As is the PTO's practice, examiners analyzed the scope of the claims to determine whether the new claims were impermissibly broader than the original claims. 5/15/18 Tr. (Bench Trial Transcript) (Doll) at 261:2–5; P230 (MPEP) at 369.

**[FF3]**    The Court credits the evidence demonstrating that the Cisco Markman Order was not material to the examiners; analysis of claim scope and broadening for three reasons: (1) The Patent Office would not have relied on the district court's claim construction because the

Patent Office relies on a different claim construction standard in reexam; (2) the PTAB entered orders detailing the broadest reasonable interpretation of the claim terms of the '930 patent and ordered that the '401 reexam be conducted consistent with those orders; and (3) the Cisco Markman was affirmatively considered by the examiner.

> *(a) The Patent Office would not have relied on the district court's claim construction because the Patent Office relies on a different claim construction standard in reexamination*

**[FF4]** Examiners in the Patent Office are required to apply a claim construction standard (i.e., the broadest reasonable interpretation, or "BRI") that is different from the standard applied in district court proceedings involving infringement. "Examiners are bound by the guidance in the MPEP, [i.e. the Manual of Patent Examining Procedure]," 5/15/18 Tr. (Doll) at 242:3–7, which explains that the Patent "Office does not interpret claims in the same manner as the Courts." P230 (MPEP) at 56 (citing Federal Circuit authority). This is because "[d]uring patent examination, the pending claims must be given their broadest reasonable interpretation consistent with the specification," but "[p]atented claims are not given their broadest reasonable interpretation during court proceedings involving infringement." *Id.*

**[FF5]** Because the Cisco Markman was a product of a district-court litigation in this Court and because the Court relied on the *Phillips* claim construction standard, the Cisco Markman Order would not have been material to the examiners' analysis.

**[FF6]** John Doll, Network-1's expert on Patent Office procedure, testified that the "Cisco Markman Order was [not] material to patentability in the reexam" because "the Patent Office is [required] to use the broadest reasonable interpretation when making patentability determinations" and, therefore, "an examiner in the '401 reexam" could not "have chosen to apply a different interpretation, a district court construction." 5/15/18 Tr. (Doll) at 241:17–243:9.

**[FF7]**     Nicholas Godici, HP's expert on Patent Office procedure, likewise testified that "examiners understand that there is a different standard that is used in court than at the PTO," and "if the examiners were following the rules in the patent manual," "they would use the BRI" and "cannot use" "a construction . . . different from the BRI." 5/15/18 Tr. (Godici) at 211:13–20,191:8–12, 212:25–213:10.

**[FF8]**     Both parties' technical experts also testified that the Patent Office applies the BRI, not the Cisco Markman constructions. 5/15/18 Tr. (HP's technical expert, Dr. Neikirk) at 189:11–18 (examiners cannot apply "a district court construction that is different from the broadest reasonable interpretation" because "[w]ithin the PTO you use the BRI"); Docket No. 148-2 ("Knox Tr.") at 41:13–17 ("my understanding [is] that [it] would be improper" to apply "constructions from the Cisco district court case")

**[FF9]**     The PTAB stayed the '401 reexam until the PTAB completed IPR2013-00071. D97 at 597–99 (Order Staying Concurrent Ex Parte Reexamination). One purpose of the stay was to prevent the '401 examiners from making any determinations that would be inconsistent with the PTAB's own determinations. *Id.* at 598 ("Conducting the reexamination of the '930 patent concurrently with the instant proceeding . . . could potentially result in inconsistencies between the proceedings.").

**[FF10]**     In the IPR, the PTAB considered the Cisco Markman Order and rejected the Court's constructions because they did not follow the broadest reasonable interpretation standard. Applying the broadest reasonable interpretation standard, the PTAB construed the claims differently from the Cisco Markman Order. For the claim term "secondary power source," the PTAB explained that the "district court in the Cisco litigation interpreted the terms such that the main power source and secondary power source must be 'physically separate.' " P502 (Decision:

Institution of Inter Partes Review) at 13. When "[a]pplying the broadest reasonable interpretation of the claim in light of the Specification, [the PTAB] did not interpret claim 6 as requiring the 'main power source' and 'secondary power source' to be physically separate." *Id.* at 13–14; D97 at 611–12 (Final Written Decision). Similarly, for the claim term "low level current," the PTAB explained that the "district court in the Cisco litigation interpreted the term to mean 'a current sufficient to cause the access device to start up, but not sufficient to sustain the start up." P502 at 8. But, "[a]pplying the broadest reasonable interpretation of the claim in light of the Specification, [the PTAB] interpret[ed] 'low level current' to mean a current (e.g., approximately 2[0] mA) that is sufficiently low that, by itself, it will not operate the access device." P502 at 10; D97 at 611 (Final Written Decision).

> *(b) the PTAB entered orders detailing the broadest reasonable interpretation of the claim terms of the '930 patent and ordered that the '401 reexamination be conducted consistent with those orders*

**[FF11]**     On May 22, 2014, the PTAB lifted the stay in the '401 reexam and ordered that the examiners take "action that is consistent with the Board's orders." D97 at 634 ("FURTHER ORDERED that the stay of Reexamination Control No. 90/012,401 is lifted so that any necessary action that is consistent with the Board's orders in Case IPR2013-00071 can be taken.").

**[FF12]**     Because the PTAB's orders included its BRI claim constructions for the key claim terms, and the Cisco constructions were inconsistent with the PTAB's BRI constructions for these claim terms (P502 at 8, 10, 12–13), the examiners were prohibited from applying the Cisco constructions. The examiners were required to apply the PTAB's BRI constructions. 5/15/18 Tr. (Godici) at 200:22–25 ("Q. To be consistent with the Board's orders, the examiners would have used the Board's broadest reasonable interpretation, right? A. For those terms, yes."); 5/15/18 Tr. (Doll) at 245:3–9 ("Q. Now, an examiner in the reexam, after seeing this order, could they choose to apply different claim constructions from [those] in the PTAB's order? A. No. Q. Could they

choose to disregard the broadest reasonable interpretation and apply district court constructions? A. No.").

**[FF13]**    Moreover, the PTAB's Order to the '401 examiners was not a mere suggestion. "The Patent Trial and Appeal Board is the reviewing authoritative body that reviews examiner's decisions with respect to patentability and renders decisions on them. It is very similar to the relationship between the Court of Appeals for the Federal Circuit and a district court." 5/15/18 Tr. (Doll) at 244:1–5; 5/15/18 Tr. (Godici) 193:22–23 ("Q. And when the Appeal Board gives an order, the examiners have to follow it, right? A. Generally, yes."); 5/15/18 Tr. (Doll) at 243:25–244:7 ("Q. Are examiners free to disregard orders from the PTAB? A. No.").

**[FF14]**    Accordingly, because the examiners were explicitly ordered by the  PTAB to conduct the reexam in a manner "consistent with the Board's orders" that set forth the PTAB's claim constructions for the '930 patent, and because the PTAB's constructions of the relevant claim terms were inconsistent with the corresponding constructions in the Cisco Markman Order, the examiners could have relied on the Cisco Markman Order's constructions, and the Order was not material to patentability in the reexam proceedings.

**[FF15]**    The examiners in the '401 reexam were required to apply the BRI constructions for the key claim terms and the Cisco Markman Order could not have caused the examiners to change their minds and disallow the claims.  If the examiners "followed the rules," the Markman Order "wouldn't have changed the outcome."  5/15/18 Tr. (Godici) at 191:13–192:2.

*(c)  the Cisco Markman was affirmatively considered by the examiner*

**[FF16]**    The evidence demonstrates that the examiners were aware of, and did consider, the Cisco Markman Order before allowing the newly proposed claims.  Network-1 presented the newly proposed claims to the examiners in its July 25, 2014, Amendment and Reply.  D97 at 856–59.  Three days later, on July 28, 2014, Network-1 submitted an Information Disclosure Statement

requesting that the examiners "expressly consider" the cited documents including the Cisco Markman Order. D97 at 867, 861. Three days later, on July 31, 2014—before the examiners expressed their intent to allow the new claims on August 13, 2014 (D97 at 1399–1404)—the examiners confirmed that they did consider the Cisco Markman Order. The IDS form included instructions to the examiner: "EXAMINER: initial if reference considered." *Id.* at 1407. The examiner Peng Ke signed the form and initialed ("/PK/") next to the Cisco Markman Order. *Id.* He also added the confirmatory language "All references considered except where lined through." *Id.* The Cisco Markman Order was not lined through. *Id.*

**[FF17]** "[T]he Cisco Markman Order was not just disclosed on this IDS[;] it was affirmatively considered by the examiners," who "checked the block or initialed at the bottom that all of the documents in this IDS were considered." 5/15/18 Tr. at 205:14–25.

**[FF18]** The examiners in the '401 reexam would have readily recognized that the Cisco Markman Order was a district court claim construction order that is not material to the reexam. 5/15/18 Tr. (Godici) at 210:23–211:4. This is especially true because the document states in the caption that it is from the United States District Court from the Eastern District of Texas and because the first line in the text of the Order explains that it is an "Opinion constru[ing] the disputed terms" in the '930 patent. *See* D97 at 1357.

**[FF19]** Because the examiners were aware of the Cisco Markman Order and nonetheless concluded that the new claims were patentable, the Cisco Markman Order was not material to patentability. As Mr. Doll explained, "the examiners had the Cisco Markman order, they considered it, and they allowed the claims and confirmed the claims in the reexamination in light of, in view of, after considering the Markman order. Therefore, the Markman order by the definition set forth, could not be 'but-for' material." 5/15/18 Tr. at 246:9–14.

**[FF20]**    Accordingly, for the reasons above, the Court credits the evidence favoring Network-1 on this issue and finds that the Cisco Markman was not material to the patentability of the claims.

### (2) **Facts relating to omission**

**[FF21]**    HP alleges that (1) Network-1 failed to properly disclose the "Cisco Markman Order as Network-1 was required to do under the MPEP" and, as a result, (2) it was "unlikely that the Examiners ever saw the Cisco Markman Order."  Lead Case, Docket No. 1003 at ¶¶ 65, 63.

**[FF22]**    The Court credits the testimony of HP's expert, Mr. Godici, who confirmed that "the Cisco Markman order was submitted to the Patent Office" and "affirmatively considered by the examiners.  5/15/18 Tr. (Godici) at 202:25–203:11; 205:14–25.

**[FF23]**    The Cisco Markman Order was both (1) cited by the Patent Office and (2) submitted in an information disclosure statement.

### *(a) Cited by the Patent Office*

**[FF24]**    The Cisco Markman Order was "cited by the Office" at the outset of the '401 reexam in the July 24, 2012 Litigation Search Report.  D97 at 387–388; 5/15/18 Tr. (Doll) at 238:8–240:8.

**[FF25]**    The Litigation Search Report is a "search report that is performed to look for any litigation pending or passed, with respect to the patent that has been requested to be reexamined."  5/15/18 Tr. (Doll) at 238:1721.

**[FF26]**    The '401 reexam file history includes a July 24, 2012 Litigation Search Report (D97 at 385–98) indicating that on July 24, 2012, "a paralegal in the CRU, which is the central reexamination unit [of the Patent Office], performed [a] search and sent it to the examiner who was the lead examiner responsible for the '401 reexamination."  5/15/18 Tr. (Doll) at 238:22–239:13.

**[FF27]**    The "litigation search report shows that the Network-1 vs. Cisco Systems Markman order was cited to the examiner." *Id.* at 239:14–21; D97 at 388 (Litigation Search Report listing Cisco Markman Order as third cited document).   Network-1's expert explained—in unrebutted and unchallenged testimony—that, after the Cisco Markman Order was cited by the Office in the Litigation Search Report, any duty to disclose the Cisco Markman Order was deemed to be satisfied under 37 C.F.R. § 1.555.   5/15/18 Tr. at 240:3–8 ("Q. -- did Network-1 have any further obligation to disclose the Cisco Markman order?   A. No.   Q. Did it have any further obligation to discuss the Cisco Markman order with the reexaminers?   A. No.").

*(b) Submitted in an IDS*

**[FF28]**    "An information disclosure statement is the most popular vehicle by which applicants can submit information to the Patent Office to be considered by a patent examiner." 5/15/18 Tr. (Doll) at 240:9–14.

**[FF29]**    Network-1 submitted the Cisco Markman Order to the Office in the July 28, 2014 Information Disclosure Statement.   D97 at 867, 861; 5/15/18 Tr. (Doll) at 240:15–241:11. Network-1's expert explained— in unrebutted and unchallenged testimony—that disclosure of this "IDS [is] a second independent way to also satisfy . . . any duty to disclose . . . the Cisco Markman order."   5/15/18 Tr. (Doll) at 241:12–16.

**[FF30]**    HP's own expert testified that "[t]here is nothing improper about sticking a document like the Cisco Markman on an IDS."   5/15/18 Tr. (Godici) at 213:17–19.

**[FF31]**    There was no reason for Network-1 to discuss the Cisco Markman Order with the examiners because, as described above, the Cisco Markman Order was not material to the patentability issue before the examiners.   Instead, the PTAB's own BRI claim constructions controlled.   *See* Knox Tr. at 41:13–24 (explaining that Network-1's representatives did not "discuss with the examiners . . . any constructions from the Cisco district court case" and instead

"discuss[ed] . . . the board's constructions" because the board's constructions were the constructions that applied); *id.* at 22:7–11 ("the district court's constructions from the Cisco case" did not "com[e] up" "during the interview" with the Patent Office "[s]ince it wouldn't be relevant"); *id.* at 37:12–17; 5/15/18 Tr. (Godici) 224:24–225:5.

    **[FF32]**    HP alleges that it is "unlikely that the Examiners ever saw the Cisco Markman Order." Lead Case, Docket No. 1003 at ¶ 63. This allegation is essential to HP's claim because the Cisco Markman Order cannot be but-for material (as the inequitable conduct standard requires) if the examiners were aware of the Cisco Markman order during the '401 reexam. But the undisputed evidence is clear that the examiners saw and considered the Cisco Markman Order.

    **[FF33]**    Examiners cannot simply choose not to look at information included in a properly submitted IDS. Instead, if an IDS is properly submitted (as was the July 28, 2014 IDS that included the Cisco Markman Order), then "the examiner has an obligation to consider the information." P508 (MPEP) at 4.

    **[FF34]**    Moreover, the '401 reexam file history includes a copy of the IDS signed and initialed by Peng Ke, lead examiner in the '401 reexam, expressly indicating that he considered the Cisco Markman Order. D97 at 1407. This was confirmed by both parties' experts. 5/15/18 Tr. (Godici) at 205:14–25 ("Q. Now, the Cisco Markman order was not just disclosed on this IDS, it was affirmatively considered by the examiners, true? A. Yes. It is my recollection that the examiner initialed -- checked the block or initialed at the bottom that all of the documents in this IDS were considered."); *id.* (Doll) at 247:8–12 ("[T]he significance of the signature is that the IDS was considered. The initials in the middle expanded portion where it shows /PK/, which are electronic initials, indicate the examiner specifically considered the Markman ruling set forth on this line.").

(3) **Facts relating to deceptive intent**

**[FF35]**     The Court finds that Network-1 did not intend to deceive the Patent Office regarding the Cisco Markman Order based on both direct and circumstantial evidence.

*(a) Direct evidence*

**[FF36]**     The only direct evidence on intent indicates that Network-1's representatives did not have any intent to deceive.  The Court finds the testimony of Mr. Wieland, Dr. Knox, and Mr. Horowitz stating that they had "no deceptive intent" credible.  *See* Docket No. 148-3 ("Wieland Tr.") at 82:12–20 ("I know I had no deceptive intent.  I know that I didn't do anything that I would think anyone at the patent office or my community would be viewed as wrong."); Knox Tr. at 40:7–17 ("Q. Did you in any way intend to deceive the patent office? A. No, of course not.  Q. Are you aware of anyone at Network-1 ever intending to deceive the patent office?  A. Not that I'm aware of.");  5/15/18 Tr. (Horowitz) at 67:1–9 ("Q. Did you ever have the intent to deceive the Patent Office?  A. No.  Q. Are you aware of any act by anyone at Network-1 or on behalf of Network-1 that deceived the Patent Office?   A. No.").

**[FF37]**     HP did not present any direct evidence of deceptive intent.  For example, HP did not point to any testimony from Network-1's representatives in the '401 reexam or any documents that suggest that the Cisco Markman was material to the examination or that Network-1 wanted to hide the Cisco Markman Order from the examiners.

*(b) Circumstantial evidence*

**[FF38]**     The circumstantial evidence also demonstrates that Network-1's representatives had no intent to deceive.

**[FF39]**     HP asserts that the Court should infer that Network-1's representatives intended to deceive the Patent Office because they (1) "knew that [the Cisco Markman Order] was material to the reexamination proceedings," and (2) "withheld it from discussions with the Examiners . . .

with the understanding that it would likely never be looked at." Lead Case, Docket No. 1003 at ¶ 65.

**[FF40]**     The Court rejects both of HP's assertions which are refuted by credible evidence. As the Court found above, the Cisco Markman Order was not material to the reexam. And Network-1's attorneys in the '401 reexam, Sean Luner and Charles Wieland, would have known it was not material. Because Mr. Luner and Mr. Wieland are both licensed to practice before the Patent Office, 5/15/18 Tr. at 38:16–18; Wieland Tr. at 23:19–24:2, they would be aware of its rules and procedures, including the requirement that the Patent Office "does not interpret claims in the same manner as the courts." P230 (MPEP) at 56. And because they were both involved in the IPR proceedings, they would be aware of the PTAB's Order instructing the reexam examiners to act "consistent with" its Order that included the PTAB's BRI claim constructions, not the Cisco Markman constructions. D97 at 634.

**[FF41]**     As the Court found above, Network-1's representatives did not withhold the Cisco Markman Order with the understanding it would never be looked at. To the contrary, they knew that the examiners would look at the Cisco Markman Order because they included it in an IDS (D97 at 867, 861, 5/15/18 Tr. (Doll) at 249:7–250:22), and they would have been aware of the requirement that "the examiner has an obligation to consider the information" included in an IDS. P508 (MPEP) at 4.

**[FF42]**     There was no reason for Network-1 to discuss the Cisco Markman Order with the examiners because it was not material to the patentability issue before the examiners. Knox Tr. at 41:13–24; 5/15/18 Tr. (Godici) at 224:24–225:5

**[FF43]**     The evidence reasonably supports an inference that points to a lack of deceptive intent. "If more than one reasonable inference is possible, intent to deceive cannot be found."

*TransWeb*, 812 F.3d at 1304. Here, the evidence reasonably supports an alternative inference that points to a lack of deceptive intent—that Network-1's attorneys believed the PTAB's constructions were the operable constructions in the reexam and that the Cisco constructions were not material.

**[FF44]**    Network-1's attorneys explicitly confirmed this belief in their submission to the examiners: "Based on the Board's direction . . . the constructions to be used in this reexamination proceeding are the constructions adopted by the Board." D97 at 664 (Network-1's Amendment and Reply).

**[FF45]**    Network-1's disclosure of the Cisco Markman  Order is inconsistent with deceptive intent.  If Network-1's representatives intended to deceive the Patent Office by concealing the Cisco Markman Order, they would have avoided bringing the Cisco Markman Order to the examiners' attention.  But they did bring it to the examiners' attention by disclosing it in the July 28, 2014 IDS.  D97 at 867, 861.

**[FF46]**    Network-1's disclosure is inconsistent with an intent to conceal for two additional reasons: (1) There was no requirement for Network-1 to bring the Cisco Markman Order to the examiners' attention at all because it was already cited in the Litigation Search Report, D97 at 387–88, 5/15/18 Tr. at 238:9–240:8; and (2) Network-1 brought the Cisco Markman Order to the attention of the examiners during the exact time period when the newly proposed claims were pending before the examiners.  5/15/18 Tr. (Doll) at 249:6–250:22.

## B.  Facts relating to alleged misrepresentation about Claims 15 and 16

**[FF47]**    HP alleges that Network-1's statement to the Patent Office that "new dependent claim 15 . . . and new dependent claim 16" "do not broaden the scope of original claim 6" was an intentional misrepresentation because the statement is not "consistent with the Cisco Markman Order['s]" construction of the "term 'secondary power source.' "  Lead Case, Docket No. 650 at

¶ 52; Lead Case, Docket No. 1003 at ¶ 54; 5/15/18 Tr. (HP Opening) at 14:12–16, 15:4–12; *id.* (Neikirk) at 87:3–93:12.

### (1) **Not a misrepresentation**

**[FF48]**    The Court finds that Network-1's statement that new claims 15 and 16 do not broaden original claim 6 was not a misrepresentation.  In the same document that Network-1 made this statement, Network-1 explicitly stated that it was applying the BRI construction adopted by the PTAB.  D97 at 664 ("Based on the Board's direction in IPR2013-00071, the constructions to be used in this reexamination proceeding are the constructions adopted by the Board in IPR2013-00071.").  It is undisputed that claims 15 and 16 are not broader than claim 6 when "secondary power source" is given the BRI construction adopted by the PTAB.

**[FF49]**    The PTAB's construction was that "the main power source and secondary power source" in claim 6 do not need to be, but can be, "physically separate."  P502 at 13–14.

**[FF50]**    Applying this construction, claim 6 encompassed within its scope (a) methods where the main and secondary power sources were physically separate and (b) methods where the main and secondary power sources were not physically separate.  Claims 15 and 16 narrowed the claim scope by excluding (a) methods where the main and secondary power sources were physically separate.  Claim 15 required the two power sources to be the "same source of power." *See* claim 15 ("Method according to claim 6, wherein said secondary power source is the same source of power as said main power source.").  And claim 16 required the two power sources to be the "same physical device."  *See* claim 16 ("Method according to claim 6, wherein said secondary power source is the same physical device as the main power source.").

**[FF51]**    Accordingly, under the PTAB's construction that Network-1 said it was applying, new claims 15 and 16 narrowed the scope of claim 6 and were thus not broader than

claim 6.  *See* Knox Tr. 42:2–19 (explaining that claims 15 and 16 are not broader than claim 6 under the PTAB's construction); 5/15/18 Tr. (Neikirk) at 111:9–13 (admitting he "never compared [claims 15 and 16] to the PTAB's broadest reasonable interpretation" and instead "only compared [them] to the Cisco Markman").

### (2) **Not material to patentability**

**[FF52]**     HP contends that Network-1's statement is material to patentability if the Cisco Markman Order's construction for "secondary power source" is applied to the claims.  However, as the Court found above, the Cisco Markman Order's construction for "secondary power source" did not apply in the reexam proceedings.  Moreover, it would have been improper to apply the Cisco Markman Order's construction for "secondary power source" in the reexam because the PTAB ordered the examiners and Network-1 to proceed consistent with the PTAB's BRI constructions, and the Cisco Markman Order's construction was inconsistent with the PTAB's BRI construction.

**[FF53]**     HP's expert agreed that, "[t]o be consistent with the Board's orders, the examiners would have used the Board's broadest reasonable interpretation" for "secondary power source."  5/15/18 Tr. (Godici) at 199:19–200:25.  He further agreed that the examiners "would have had to use the BRI standard rather than the Cisco standard for those particular claim terms, and then they would have made their decision with respect to broadening based on their analysis."  *Id.* at 201:8–16.  As set forth above, it is undisputed that, under the BRI construction from the PTAB, new claims 15 and 16 were not broader than original claim 6.

**[FF54]**     A statement is but-for material to patentability only if, in the absence of the statement, the Patent Office would have found a claim unpatentable.  *See Ohio Willow Wood Co. v. Alps S., LLC*, 813 F.3d 1350, 1357 (Fed. Cir. 2016).  HP has not demonstrated that, in the

absence of Network-1's statement, the Patent Office would have found claims 15 or 16 (or any other claim) unpatentable. "[T]he patent owner makes [the] statement" that "the newly proposed claims are not broader than the original claims" "virtually in every reexamination" because they are advocating for their position. 5/15/18 Tr. (Doll) at 252:8–12. This is a legal argument or conclusion from the Patent Owner (not a misrepresentation of fact, like a falsified date or made-up conversation between inventors).

**[FF55]**    Examiners do not merely accept and adopt a Patent Owner's arguments or conclusions. Wieland Tr. at 266:10–14. Instead, examiners always perform their own independent analysis of the issues—in this case, performing their own "broadening analysis" comparing "the original claim . . . language" to the "new claim language." 5/15/18 Tr. (Doll) at 261:2–11.

**[FF56]**    Because examiners perform an independent analysis and do not rely on a Patent Owner's own conclusion for legal issues like broadening, the Patent Office would have performed the same analysis and reached the same conclusion in the absence of Network-1's statement. Network-1's statement was therefore not material to patentability.

### (3) **No intent to deceive**

**[FF57]**    The Court finds that Network-1's representatives had no intent to deceive the Patent Office. Network-1's representatives credibly testified that they had no intent to deceive. Wieland Tr. at 82:12–20; Knox Tr. at 40:7–17; 5/15/18 Tr. (Horowitz) at 67:1–9. HP provided no contrary evidence that causes the Court to question the truth of this testimony.

**[FF58]**    Network-1's representatives reasonably believed they were supposed to apply the PTAB's construction, not the Cisco construction. They were also explicit that they were applying the PTAB's construction, not the Cisco construction. And when the PTAB's construction is applied, it is undisputed that Network-1's statements were true.

## C. Facts relating to alleged misrepresentations about Claim 21

**[FF59]**    The district court in the Cisco case construed "low level current" in claim 6 as "a current sufficient to cause the access device to start up, but not sufficient to sustain the start up." P502 at 8.   The PTAB rejected the Cisco district court construction and determined that the broadest reasonable interpretation of "low level current" is "a current (e.g., approximately 2[0] mA) that is sufficiently low that, by itself, it will not operate the access device."   P502 at 10; D97 at 611.   When Network-1 proposed new claim 21, it incorporated the requirements of the PTAB's "low level current" construction into the claim language of claim 21: "current" that is "insufficient, by itself, to operate said access device."

**[FF60]**    HP makes two inequitable conduct allegations regarding claim 21 that the Court addresses in turn.

### (1) Incorporating the PTAB's construction instead of the Cisco construction

**[FF61]**    First, the Court addresses HP's argument that, by incorporating into claim 21 the PTAB's broader construction for "low-level current" instead of the narrower Cisco construction, Network-1 "sought to broaden the scope of the '930 patent" "in direct contrast to the scope of the claims assigned in the Cisco Markman Order."   Lead Case, Docket No. 1003 at ¶¶ 55–56; 5/15/18 Tr. (Neikirk) 75:4–77:7. Like HP's allegations concerning "secondary power source," this allegation rests on the incorrect premise that the Cisco Markman Order controlled the analysis in the reexamination proceeding.

#### (a) Not a misrepresentation

**[FF62]**     There was no misrepresentation because Network-1 and its expert Dr. Knox (in an accompanying declaration) were clear they were adopting the PTAB's broadest reasonable interpretation of "low level current," not the construction in the Cisco Markman Order.   D97 at 664 (Amendment and Reply); *id.* at 738 (Knox Declaration) ("It is my understanding that, based

on the Board's direction in IPR2013-00071, the constructions to be used in this reexamination proceeding are the constructions adopted by the Board in I PR2013-00071.").

### (b) Not material to patentability

**[FF63]**    Network-1's reliance on the PTAB's construction for "low level current," instead of the Cisco Markman Order's construction, was not material to patentability in the reexam because Network-1 and the examiners were required to apply the PTAB's construction and were prohibited from applying the Cisco construction.    5/15/18 Tr. (Godici) at 188:22–189:2, 189:19190:1, 191:8–12, 199:19–200:25, 200:22–25; 5/15/18 Tr. (Neikirk) at 77:24–78:6.

**[FF64]**    Because the Cisco construction for "low level current" did not apply in the reexam, it "wouldn't have changed the outcome" and "is not material."  5/15/18 Tr. (Godici) at 191:13–192:2, 199:19–200:25, 201:8–16; 5/15/18 Tr. (Neikirk) at 110:13–20.

**[FF65]**    In support of its materiality argument, HP relies on this Court's ruling granting HP's motion that the "current" claimed in claim 21 is broader than the "low level current" in claim 6.  5/15/18 Tr. 85:9–86:1 (referring to Lead Case, Docket No. 1035).  But that ruling has no applicability here because, as the Court already held, "the basis for Defendants' Motion is the Court's construction, not the Board's construction."  Lead Case, Docket No. 1035 at 11.  And the examiners "would have made their decision with respect to broadening based on [the Board's construction]," not the Court's construction.  5/15/18 Tr. (Godici) at 201:8–16.

### (c) No intent to deceive

**[FF66]**    The Court finds that Network-1's representatives had no intent to deceive the Patent Office.  Wieland Tr. at 82:12–20; Knox Tr. at 40:7–17; 5/15/18 Tr. (Horowitz) at 67:1–9.

**[FF67]**    Network-1 reasonably believed it was supposed to apply the PTAB's construction, not the Cisco construction.  Knox Tr. at 43:4–17 ("the construction for 'low-level current' that was used here is consistent with the construction of the patent office and the

construction, therefore, that, in my understanding, I'm supposed to use."). Moreover, Network-1 was explicit that it was applying the PTAB's construction, not the Cisco construction. D97 at 664, 738; Knox Tr. at 43:25–44:19.

(2) **Falsely incorporating the PTAB's construction**

**[FF68]** HP also alleges that, when Network-1 incorporated the PTAB's construction for "low-level current" into claim 21, it failed to do so word-for-word and its representatives, therefore, made "false and material misrepresentations" when they told the examiners that "Claim 21 replaces the phrase 'low level current' with the Board's construction of 'low level current.' " Lead Case, Docket No. 650 at ¶ 53; Lead Case, Docket No. 1003 at ¶¶ 55–56; 5/15/18 Tr. (HP Opening) at 14:20–25, 15:14–22.

**[FF69]** HP identifies the following two statements as the purported misrepresentations: "Claim 21 . . . replaces the phrase 'low level current' with the Board's construction of 'low level current' ('a current that is insufficient, in itself, to operate the access device'). Replacing a phrase with the construction of the phrase does not change the scope of the claim in which the phrase is found and therefore does not broaden the scope of the claim." D97 at 722 (Network-1's Amendment and Reply).

**[FF70]** "Proposed claim 21 . . . replaces the phrase 'low level current' with the Board's construction of that phrase, which, by using the definition of the phrase, does [not] broaden the scope of the original claim 6." D97 at 831 (Declaration of James Knox) at 104; Knox Tr. at 27:1–16.

**[FF71]** HP alleges that a "current that is insufficient in itself to operate the access device," i.e., the language Network-1 included in claim 21, does not reflect the PTAB's construction because the PTAB's construction includes different wording—"sufficiently low"

instead of "insufficient" and an "e.g." phrase, "(e.g., approximately 20 mA)." See D97 at 611 (the PTAB "interpret[s] 'low-level current' to mean a current (e.g., approximately 20 mA) that is sufficiently low that, by itself, it will not operate the access device."). According to HP, Network-1's paraphrasing of the PTAB's construction was "intended to deceive the USPTO" into allowing an improperly broadened claim. Lead Case, Docket No. 650 at ¶ 53; Lead Case, Docket No. 1003 at ¶¶ 55–56.

**[FF72]** For the reasons set forth below, the Court rejects HP's allegation. HP has not proved any of the necessary requirements of inequitable conduct—i.e., that Network-1's statements about claim 21 were a misrepresentation, were material to patentability in the reexam, and made with specific intent to mislead or deceive the Patent Office.

### (a) Not a misrepresentation

**[FF73]** The Court finds that HP has not met its burden of proving that Network-1's representatives made a misrepresentation when they stated that "claim 21 . . . replaces the phrase 'low level current' with the Board's construction of that phrase" and thus "does [not] broaden the scope of the original claim." D97 at 831, 722.

**[FF74]** The Court finds Mr. Wieland and Dr. Knox's testimony on this point to be instructive and credible. Mr. Wieland testified that Network-1's statement that "claim 21 . . . replaces the phrase 'low-level current with the board's construction of 'low-level current' " is a "fair" and "correct" statement. Wieland Tr. at 266:15–267:2. He explained, "We did adopt the construction by the board. The fact that we didn't use their exact word formulation is neither surprising nor problematic." *Id.* at 256:20–257:7. He further explained that Network-1 did not seek to change, or broaden, the scope of the claim, but rather sought to maintain the same scope while tweaking the language into proper claim language. *Id.* at 251:11–22. "We did not duplicate the exact language of the board's construction . . . because . . . that's improper claim language."

*Id.* at 251:11–22.  While "e.g." clauses and relative terms like "sufficiently low" are common in constructions of claim language (like the PTAB's construction of "low-level current"), their inclusion in actual claim language is disfavored by the Patent Office.  *Id.* at 252:1–17.  As Mr. Wieland explained, "the 'e.g.' is improper because you can't have 'e.g.' anything in a claim" and " 'sufficiently low' is a relative term" and "relative terms are discouraged."  *Id.* at 252:1–17.  Mr. Wieland's explanation is confirmed by the Manual of Patent Examining Procedure, which states that "examples" are not "properly set forth in . . . the claims," and the "use of relative terminology in claim language" can potentially "render the claim indefinite."  P230 (MPEP) at 319, 315.  Accordingly, Network-1 re-worded the PTAB's construction into what it considered to be proper claim language by eliminating the "e.g." and "chang[ing] 'sufficiently low' to 'insufficient.' "  Wieland Tr. at 252:1–17.

**[FF75]**     Moreover, the re-wording of the PTAB's construction into proper claim language did not broaden its scope.  Dr. Knox testified that there is not "any difference in scope between the board's construction of 'low-level current' and the 'current' claimed in claim 21.' "  Knox Tr. at 48:17–20; *id.* at 49:8–13 (The "current and the limitations imposed on [the] current in claim 21 have the same breadth . . . [as] the low-level current appearing in claim 6.");  Wieland Tr. at 252:117 ("we were capturing . . . the meaning of . . . the interpretation by the board").  HP's own expert, Dr. Neikirk, admitted on cross-examination that "a person of ordinary skill in the art would perceive the claims['] use [of] low level current and current as synonyms in claims 6 and 21" because "the language of claim 21 describes the recited functions as a construction of the low level current in claim 6."  5/15/18 Tr. (Neikirk) at 120:1–6.

*(b) Not material to patentability*

**[FF76]**     The Court finds that Network-1's representatives' statements that "claim 21 . . . replaces the phrase 'low level current' with the Board's construction of that phrase" and "does

[not] broaden the scope of the original claim," D97 at 722, 831, were not material to patentability in the reexam proceedings for three independent reasons.

**[FF77]**     HP has not demonstrated that, in the absence of Network-1's assertions about the scope of claim 21 (i.e., that it incorporates the PTAB's "low-level current" construction and is not broader than claim 6), the Patent Office would have found claim 21 (or any other claim) unpatentable.  As explained above, examiners do not simply accept and adopt a Patent Owner's assertions.  Wieland Tr. at 265:17–266:14.  Instead, the examiners in a reexamination always perform their own analysis—here an analysis of "the original claim language" (claim 6), the "new claim language" (claim 21), and the construction in "the order that was set forth by the PTAB." 5/15/18 Tr. (Doll) at 261:2–11; Wieland Tr. at 347:7–21.  Because examiners perform an independent analysis and do not rely on a Patent Owner's own assertions on claim scope, the Patent Office would have performed the same analysis and reached the same conclusion in the absence of Network-1's statement.  Network-1's statement was therefore not material to patentability.

**[FF78]**     HP's allegation depends on the inference that Network-1 caused all three of the examiners in the '401 reexam to perform their broadening analysis with the understanding that the PTAB's "low-level current" construction did not include the words "sufficiently low" or "e.g. (approximately 20 mA)."  The Court rejects this inference and finds that the credible evidence supports the opposite inference—that the examiners would be fully aware of the wording of the PTAB's "low-level current" construction.  The PTAB's Institution Decision and Final Written Decision, both of which discuss and recite the PTAB's "low-level current" construction, are part of the reexamination record, and would have been read by the examiners.  P502 at 10; D97 at 611.

**[FF79]**     The examiners would have read Network-1's Amendment and Reply and the accompanying Knox declaration in their entirety.  These documents both include an entire section

discussing the PTAB's "low-level current" construction. D97 at 666–67, 741–743. These documents also reproduce the PTAB's construction word-for-word eight separate times, each time including the "sufficiently low" and "e.g. (approximately 20mA)" language. *Id.* at 658, 665, 666, 667, 738, 741, 742; Knox Tr. at 49:24–50:6.

**[FF80]**    It is highly implausible that all three examiners would have (a) overlooked all eight instances in the Amendment and Reply and accompanying Knox declaration where Network-1 and Dr. Knox reproduced the PTAB's construction of "low-level current" word-for-word, (b) overlooked the entire sections in these documents that Network-1 and Dr. Knox dedicated to the PTAB's construction of "low-level current," (c) and overlooked the PTAB's Institution Decision and Final Written Decision, and instead based their analysis on the instance where Network-1 and its expert paraphrased the construction. See Wieland Tr. at 347:7–21.

**[FF81]**    HP has not met its burden of demonstrating that Network-1's assertions about the scope of claim 21 (i.e., that it incorporates the PTAB's "low-level current" construction and is therefore not broader than claim 6) caused the Patent Office to allow a claim that it otherwise would not have allowed because HP has failed to demonstrate that the Patent Office would have viewed Network-1's position as incorrect.

**[FF82]**    The Patent Office would have reasonably agreed with Network-1 that its construction of "low-level current" and the re-worded version of the construction in claim 21 have the same claim scope.  Nework-1's paraphrased construction (1) removed the example current "(e.g., approximately 20mA)" and (2) changed "sufficiently low that it will not operate" to "insufficient to operate."  HP has not proved that the Patent Office would have considered either change to affect claim scope.

**[FF83]** An example current, which merely identifies one of several currents that fall within the scope of the other claim limitations, cannot be a narrowing limitation. HP and its expert did not contend at trial that the removal of the example current "(e.g., approximately 20 mA)" had any impact on claim scope.

**[FF84]** A current that is "sufficiently low that it will not operate" (i.e., the claim 6 "low level current" construction) means the same thing as a current that is "insufficient to operate" (i.e., the paraphrased version in claim 21). In both cases, it means the current needs to be below the level (i.e., beneath a particular amperage) at which the current will operate the device. This is why Dr. Knox and Dr. Neikirk (in a declaration submitted earlier in the case) opined that these limitations are synonymous. 5/15/18 Tr. (Neikirk) at 118:11–19, 120:1–25 ("a person of ordinary skill in the art would perceive the claims['] use [of] low level current and current as synonyms in claims 6 and 21"); Knox Tr. 49:8–13 ("They're the same").

**[FF85]** At trial, Dr. Neikirk backtracked on his "synonyms" testimony. He opined that a current can "be a function of time" and therefore "a current that is applied for a relatively short period of time" could be "insufficient to operate the device" but not sufficiently low that the device does not operate. 5/15/18 Tr. 121:25–122:22, 79:5–20. Dr. Knox rebutted this testimony and explained, " 'Current' is not a function of time. 'Current' is a function of amperage." Knox Tr. at 148:21–149:22; 5/15/18 Tr. at 126:13–127:4. Dr. Knox explained that, regardless of whether "you use 'insufficient to operate' the device" or the "exact wording of the Board" (i.e., "sufficiently low that it will not operate"), the "construction . . . does not address . . . this issue of time. It's not in the patent." Knox Tr. at 148:21–149:22; 5/15/18 Tr. at 126:13–127:4.

**[FF86]**     The Court finds Dr. Knox's testimony credible and concludes that the Patent Office would have reasonably adopted the same view—that its construction of "low-level current" and the re-worded version of the construction in claim 21 have the same claim scope.

### (c) No intent to deceive

**[FF87]**     Network-1's representatives had no intent to deceive the Patent Office.   The direct evidence proves that Network-1's representatives did not have any intent to deceive. Wieland Tr. at 82:12–20; Knox Tr. at 40:7–17; 5/15/18 Tr. (Horowitz) at 67:1–9.

**[FF88]**     Both parties' technical experts agreed that there was no intent to deceive.   Dr. Knox credibly testified that "[a]t the time [he] stated to the patent office that claim 21 was not broader than the original claim" he "believe[d] that statement to be true" and he "still" believes that statement to be true.   Knox Tr. at 48:1–5.   He would not "ever intentionally misrepresent or make misleading statements about the board's construction of 'low-level current' " because doing so "goes against everything that [he] stand[s] for" as "a scientist."   *Id.* at 48:11–16.   HP's own expert disagreed with Dr. Knox's technical opinion, but he did not doubt that Dr. Knox was giving "an honest opinion."   5/15/18 Tr. (Neikirk) at 126:13–127:4, 127:5–14.   Even HP's own counsel, in her Opening Statement, acknowledged that Dr. Knox was "quot[ing] what he thinks the PTAB's construction of low level current is."   5/15/18 Tr. at 14:21–23.

**[FF89]**     Moreover, the Court rejects HP's assertion that the Court should infer deception from the indirect evidence.   If the statements that HP identifies in Network-1's Amendment and Reply and accompanying Knox declaration as supporting an inference of deception can also reasonably support an alternative inference that points to a lack of deceptive intent, then HP cannot satisfy its burden of proof on an inequitable conduct claim.   Here, the statements reasonably support an alternative inference that points to a lack of deceptive intent—that Network-1's representatives believed they accurately characterized the PTAB's construction and that claim 21

was not broader than claim 6.  See Knox Tr. at 48:1–5, 48:11–16, 49:15–22; Wieland Tr. at 252:1–17, 256:20–257:7, 266:15–267:2.

**[FF90]**    The content of Network-1's Amendment and Reply and accompanying Knox declaration is also inconsistent with an intent to deceive.  If Network-1 and Dr. Knox intended to conceal, or misrepresent, the PTAB's construction of "low level current" in these documents, they would not have included the construction word-for-word eight separate times in the same documents.  Nor would they have included an entire section discussing the PTAB's construction in these same documents.

### D.  Facts relating to alleged misrepresentation about Claim 23

**[FF91]**    HP alleges that Network-1's representatives falsely asserted that claim 23 was not broader than original claim 6, although the representatives knew that claim 23 eliminated "much of the 'providing' limitation of claim 6" and was therefore broader than claim 6.  Lead Case, Docket No. 650 at ¶ 55; Lead Case, Docket No. 1003 at ¶ 58; 5/15/18 Tr. (Neikirk) at 94:19–98:10.

**[FF92]**    The Court finds that HP has not proved any of the necessary requirements of inequitable conduct for this allegation—i.e., that Network-1's assertion was (a) a misrepresentation, (b) material to patentability in the reexam, and (c) made with specific intent to mislead or deceive the Patent Office.

### (1)  <u>Not a misrepresentation</u>

**[FF93]**    The Court finds that HP has not satisfied its burden of proving that Network-1's representatives misrepresented the scope of claim 23.   Under the broadest reasonable interpretation of the claim language (i.e., the standard applied in reexamination proceedings), claim 23 includes all of the limitations as, and is not broader than, claim 6.

**[FF94]**     Claim 6 recites five system components: the "data node adapted for data switching," "access device adapted for data transmission," "data signaling pair," "main power source," and "secondary power source."

**[FF95]**     Claim 23 recites the same five system components.

**[FF96]**     Accordingly, "if you want to practice the invention that's claim 23, you have to have all of the same things that are in claim 6." Knox Tr. 55:14–18; 5/15/18 Tr. (Godici) 129:19–22 ("If somebody performs claim 23, they are going to have present all five components that are in claim 6").

**[FF97]**     HP contends that, although the claims include the same five components, claim 6 is still narrower because it requires "providing" all five while claim 23 only requires "providing" the access device. 5/15/18 Tr. (Godici) 129:19–22 (in claim 23, "they don't have to provide all five"). This contention, however, depends on an overly narrow interpretation of "providing."

**[FF98]**     Under the broadest reasonable interpretation of "providing"—i.e., the interpretation that applies in Patent Office proceedings—one way to provide a system component is to make it available to the system, e.g., to connect the component to the system. *Meyer Intellectual Props. Ltd v. Bodum, Inc.*, 690 F.3d 1354, 1369 (Fed. Cir. 2012) (adopting the dictionary definition of "providing" and construing "the term 'providing' to mean 'furnishing, supplying, making available, or preparing' "). For example, if you want to provide a power source in an electrical system, one way to do so is to connect that system to the power source (e.g., plug the cord into an outlet).

**[FF99]**     Claim 23 requires connecting all five components to the system. HP's own expert agrees. 5/15/18 Tr. (Neikirk) at 129:19–131:14 ("if somebody performs claim 23 . . . the four other components . . . would be connected") ("claim 23 says" "connected to the data signaling

pair," "connected between the access device and data node," "a main power source connected," and "a secondary power source has to be connected").

[FF100]    Because (a) the broadest reasonable interpretation of "providing" includes "connecting," and (b) claim 23 requires "connecting" the system to the same components that must be provided in claim 6, "claim 23 [cannot] be performed without providing the same five items from claim 6" and is therefore "not broader than the original claim [6]."  Knox Tr. at 55:14–23. Moreover, this testimony from Dr. Knox is unrebutted.  Dr. Neikirk has "not conducted an analysis to determine what the broadest reasonable interpretation of providing would be." 5/15/18 Tr. (Neikirk) at 128:18–129:8.  And when asked to assume "the broadest reasonable interpretation of providing [that] encompasses connecting," Dr. Neikirk did not deny that "someone who does [claim 23] would be not just providing an access device, they would be providing the other components." *Id.* at 134:15–135:11.  Instead, he sidestepped the question and said, it is "nothing I have ever considered before.  It will take a moment." *Id.*  That moment passed, his counsel questioned him again, and he never addressed the broadest reasonable interpretation of "providing."

[FF101]    Accordingly, the Court finds that HP has not proved that, under the broadest reasonable interpretation of the claim language, claim 23 is broader than claim 6.  HP has therefore not met its burden of demonstrating that Network-1's contrary assertion was a misrepresentation.

[FF102]    Moreover, that the Court previously found claim 23 invalid as broader than claim 6 in the district court proceeding (Lead Case, Docket No. 860) is not relevant to the broadening analysis before the Patent Office because claims are interpreted differently before the Patent Office.  The Court's analysis of broadening did not determine the broadest reasonable interpretation of the claims and then apply that interpretation.  Unlike the Court's analysis, the

Patent Office's analysis would necessarily have been based on the broadest reasonable interpretation of "providing."

### (2) **Not material to patentability**

**[FF103]**     HP has not demonstrated that, in the absence of Network-1's statement—that claim 23 was not broader than claim 6 because it included all of the limitations of claim 6—the Patent Office would have found claim 23 (or any other claim) unpatentable. As explained above, patent owners make the same type of assertion in nearly every reexam where new claims are proposed, and examiners do not merely accept and adopt the patent owners' assertion. 5/15/18 Tr. (Doll) at 252:8–12; Wieland Tr. at 266:10–14. Instead, examiners always perform their own independent analysis of claim scope and the broadening issue. 5/15/18 Tr. (Doll) at 261:2–11. Accordingly, the examiners would have performed the same analysis and reached the same conclusion in the absence of Network-1's statement. Network-1's statement was therefore not material to patentability.

### (3) **No intent to deceive**

**[FF104]**     HP has not presented any credible evidence that, at the time Network-1's representatives stated that claim 23 was not broader than claim 6, they believed the statement to be false. The credible evidence demonstrates the opposite. Wieland Tr. at 350:9–16 ("we thought we were capturing the same limitations in detail"); Knox Tr. at 55:19–23 ("At the time [he] represented to the patent office that claim 23 was not broader than the original claim" he "believe[d] that statement to be true" and he "still" believes that statement to be true.); *id.* at 54:12–55:10; Wieland Tr. at 82:12–20; Knox Tr. at 40:7–17,; 5/15/18 Tr. (Horowitz) at 67:1–9.

**[FF105]**     Accordingly, the Court finds that Network-1's representatives had no intent to deceive the Patent Office.

### E. Facts relating to alleged misrepresentation about Claim 22

**[FF106]**     In its pretrial submissions, HP alleged that Network-1 committed inequitable conduct by asserting to the Patent Office that new claim 22 is not broader than claim 6.  Lead Case, Docket No. 650 at ¶ 55; Lead Case, Docket No. 1003 at ¶ 57.  HP did not pursue this theory of inequitable conduct at trial.  HP did not elicit any testimony on claim 22 from any witness, and its counsel never even mentioned claim 22.

## II.    CONCLUSIONS OF LAW

**[CL1]**     Based on the Findings of Fact set forth above and the Federal Circuit law on inequitable conduct identified below, the Court concludes that Network-1 has not committed inequitable conduct.

### A.  Legal Standard

**[CL2]**     "Inequitable conduct has been overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system.  The habit of charging inequitable conduct in almost every major patent case has become an absolute plague."  *Therasense*, 649 F.3d at 1289 (internal quotations and citations omitted).

**[CL3]**     "A patent shall be presumed valid."  35 U.S.C. § 282(a).  A party contesting a patent's validity based upon inequitable conduct bears the burden of proving that claim by clear and convincing evidence. *See In re Rosuvastatin Calcium Patent Litig*., 703 F.3d 511, 519 (Fed. Cir. 2012).

**[CL4]**     "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO."  *Therasense*, 649 F.3d at 1287.

**[CL5]**     "The accused infringer must prove both elements—intent and materiality—by clear and convincing evidence."  *Id.*  "If the accused infringer meets its burden, then the district

court must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable."

**[CL6]**    Materiality and intent are separate and distinct requirements. "Materiality and intent must be separately established." *Rosuvastatin*, 703 F.3d at 519. "A district court should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, or vice versa." *Am. Calcar, Inc. v. Am. Honda Motor Co., Inc*., 651 F.3d 1318, 1334 (Fed. Cir. 2011).

**[CL7]**    The controlling standard for determining whether an alleged omission or misrepresentation is material is "but-for" materiality. A party alleging inequitable conduct must prove that the Patent Office would not have allowed the claim but for the omission or misrepresentation. If the Patent Office would have allowed the claim even if the omitted information had been disclosed or if the alleged misrepresentation had not occurred, then the alleged omission or misrepresentation is not material. *See Ohio Willow Wood Co*., 813 F.3d at 1357 ("To prove the element of materiality, a party claiming inequitable conduct ordinarily must show that the patentee withheld or misrepresented information that, in the absence of the withholding or misrepresentation, would have prevented a patent claim from issuing.") (internal quotations and citations omitted); *Therasense*, 649 F.3d at 1291–1292 ("[A]s a general matter, the materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference. In making this patentability determination, the court

should apply the preponderance of the evidence standard and give claims their broadest reasonable construction.").

**[CL8]**     Information that is cumulative of information already considered by the Patent Office is not material.  *See Eisai Co. v. Dr. Reddy's Labs*., Ltd, 533 F.3d 1353, 1361 (Fed. Cir. 2008) ("cumulative evidence is definitionally not material evidence"); 37 C.F.R. § 1.555 ("information is material to patentability in a reexamination proceeding when it is not cumulative to information of record or being made of record in the reexamination proceeding").

**[CL9]**     To prove inequitable conduct, it is not enough for an accused infringer to show by clear and convincing evidence that the patentee misrepresented or omitted material information. The accused infringer must also show by clear and convincing evidence that the patentee did so with specific intent to mislead the Patent Office, and that deceptive intent was the single most reasonable inference to be drawn from the evidence.  *See Ohio Willow Wood Co*., 813 F.3d at 1357 ("A party seeking to prove inequitable conduct must show by clear and convincing evidence that the patent applicant made misrepresentations or omissions material to patentability, that he did so with the specific intent to mislead or deceive the PTO, and that deceptive intent was the single most reasonable inference to be drawn from the evidence.").

**[CL10]**     If more than one reasonable inference is possible, intent to deceive cannot be found.  *TransWeb*, 812 F.3d 1295 at 1304 ("Intent to deceive may be found only if specific intent to deceive is the single most reasonable inference able to be drawn from the evidence. . . . If more than one reasonable inference is possible, intent to deceive cannot be found.") (internal quotations and citations omitted).

**[CL11]**     "Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Therasense*, 649 F.3d at 1290.

**[CL12]**     "Knowledge of the reference and knowledge of materiality alone are insufficient after *Therasense* to show an intent to deceive. Moreover, it is not enough to argue carelessness, lack of attention, poor docketing or cross-referencing, or anything else that might be considered negligent or even grossly negligent." *1st Media, LLC v. Elec. Arts, Inc*., 694 F.3d 1367, 1374–75 (Fed. Cir. 2012); *Therasense*, 649 F.3d at 1290 ("A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement.").

**[CL13]**     "[T]he patentee need not offer any good faith explanation unless the accused infringer first . . . prove[s] a threshold level of intent to deceive by clear and convincing evidence. The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive." *Therasense*, 649 F.3d at 1291 (internal citations and quotations omitted).

## B. Alleged omission of the Cisco Markman Order:

**[CL14]**     For HP to prevail on its inequitable conduct claim with respect to the omission of the Cisco Markman Order, it must prove that (1) Network-1 omitted information, (2) that the information was material to patentability, and (3) that Network-1 did so with the specific intent to mislead or deceive the PTO. *Rosuvastatin*, 703 F.3d at 519.

### (1) <u>**Network-1 did not omit the Cisco Markman**</u>

**[CL15]**     As detailed above, Network-1 disclosed the Cisco Markman to the Patent Office. *See* FF29.

**[CL16]**     HP asserts that it was "unlikely that the Examiners ever saw the Cisco Markman Order." Lead Case, Docket No. 1003 at ¶¶ 65, 63. But the Court concludes otherwise. The Cisco

Markman was disclosed to the office in both an IDS and was cited by the Office in a 2012 Litigation Search Report.  FF28–34; FF21–27.

**[CL17]**     Relatedly, the examiner indicated that he affirmatively considered the Cisco Markman.  FF34.

(2) <u>**The Cisco Markman was not material**</u>

**[CL18]**     The examiners could not have relied on the Cisco Markman because it applied the *Phillips* standard, whereas the PTAB applies the BRI standard.  FF4–10.  The examiners were bound to apply the PTAB's claim construction for the '930 patent, which also relies on the BRI standard.  FF11–15.

(3) <u>**Network-1 did not intend to deceive the Patent Office**</u>

**[CL19]**     The direct evidence and circumstantial evidence in this case support the conclusion that Network-1 did not exhibit any intent to deceive the Patent Office.  FF35–46.

**[CL20]**     Because none of the requirements for this claim are met, HP's inequitable conduct defense as to the omission of the Cisco Markman Order fails as a matter of law.

### C.  Alleged misrepresentation about Claims 15 and 16

**[CL21]**     HP alleges that Network-1's statement to the Patent Office that "new dependent claim 15 . . . and new dependent claim 16" "do not broaden the scope of original claim 6" was an intentional misrepresentation because the statement is not "consistent with the Cisco Markman Order['s]" construction of the "term 'secondary power source.'"  Lead Case, Docket No. 650 at ¶ 52; Lead Case, Docket No. 1003 at ¶ 54; 5/15/18 Tr. (HP Opening) at 14:12–16, 15:4–12; *id.* (Neikirk) at 87:3–93:12.

**[CL22]**     HP failed to carry its burden for each requirement of inequitable conduct.  HP has not proved that any of the identified statements by Network-1 or its representatives was a misrepresentation to the Patent Office.  HP has not proved that any identified statement was

material to patentability—i.e., that the Patent Office would have found a Network-1 claim unpatentable if Network-1 had not made the identified statement.  HP has not proved that Network-1 intended to mislead or deceive the Patent Office.

**[CL23]**     Network-1's statement that new claims 15 and 15 do not broaden original claim 6 was not a misrepresentation.  Claims 15 and 16 were not broadened with respect to claim 6 under the BRI construction standard.  FF48–51.

**[CL24]**     A statement is but-for material to patentability only if, in the absence of the statement, the Patent Office would have found a claim unpatentable.  *See Ohio Willow Wood Co.*, 813 F.3d at 1357.  The Cisco Markman was not material to the examiner's analysis because it did not apply the BRI standard.  FF52–56.  HP has not made a showing that, in the absence of Network-1's statement, the PTO would have found any claims unpatentable.  FF54–56.

**[CL25]**     As indicated above, Network-1's representatives had no intent to deceive the Patent Office.  Network-1's representatives credibly testified that they had no intent to deceive. Wieland Tr. at 82:12–20; Knox Tr. at 40:7–17; 5/15/18 Tr. (Horowitz) at 67:1–9.  HP provided no contrary evidence that causes the Court to question the truth of this testimony.  FF57–58.

**[CL26]**     Because none of the requirements for this claim are met, HP's inequitable conduct claim as to the misrepresentation of claims 15 and 16 in light of the Cisco Markman Order fails as a matter of law.

### D.  Alleged misrepresentations about Claim 21

#### (1)  <u>Incorporating the PTAB's construction instead of the Cisco construction</u>

**[CL27]**     HP first alleges that, by incorporating into claim 21 the PTAB's broader construction for "low-level current" instead of the narrower Cisco construction, Network-1 "sought to broaden the scope of the '930 patent" "in direct contrast to the scope of the claims

assigned in the Cisco Markman Order."  Lead Case, Docket No. 1003 at ¶¶ 55–56; 5/15/18 Tr. (Neikirk) 75:4–77:7.

[CL28]    Like HP's allegations concerning "secondary power source," this allegation rests on the incorrect premise that the Cisco Markman Order controlled the analysis in the reexamination proceeding.

[CL29]    There was no misrepresentation because Network-1 and its expert Dr. Knox (in an accompanying declaration) were clear they were adopting the PTAB's broadest reasonable interpretation of "low level current," not the construction in the Cisco Markman Order.  D97 at 664 (Amendment and Reply); *id.* at 738 (Knox Declaration) ("It is my understanding that, based on the Board's direction in IPR2013-00071, the constructions to be used in this reexamination proceeding are the constructions adopted by the Board in IPR2013-00071.").  FF62.

[CL30]    Because the Cisco construction for "low level current" did not apply in the reexam, it "wouldn't have changed the outcome" and "is not material."  FF63–65.

[CL31]    Although the Court ruled that the "current" claimed in claim 21 is broader than the "low level current" in claim 6, the Court's ruling was under the *Phillips* standard.  5/15/18 Tr. 85:9–86:1 (referring to Order, Lead Case, Docket No. 1035).  That ruling has no applicability here because, as the Court already held, "the basis for Defendants' Motion is the Court's construction, not the Board's construction."  Lead Case, Docket No. 1035 at 11.

[CL32]    The Court finds that Network-1's representatives had no intent to deceive the Patent Office.  Wieland Tr. at 82:12–20; Knox Tr. at 40:7–17; 5/15/18 Tr. (Horowitz) at 67:1–9. *See* FF66–67.

**[CL33]** HP also alleges that, when Network-1 incorporated the PTAB's construction for "low-level current" into claim 21, it failed to do so word-for-word and its representatives therefore made "false and material misrepresentations" when they told the examiners that "Claim 21 replaces the phrase 'low level current' with the Board's construction of 'low level current.'" Lead Case, Docket No. 650 at ¶ 53; Lead Case, Docket No. 1003 at ¶¶ 55–56; 5/15/18 Tr. (HP Opening) at 14:20–25, 15:14–22.

**[CL34]** For the reasons set forth below, the Court rejects HP's allegation. HP has not proved any of the necessary requirements of inequitable conduct—i.e., that Network-1's statements about claim 21 were (i) a misrepresentation, (ii) material to patentability in the reexam, and (iii) made with specific intent to mislead or deceive the Patent Office.

**[CL35]** The Court finds that HP has not met its burden of proving that Network-1's representatives made a misrepresentation when they stated that "claim 21 . . . replaces the phrase 'low level current' with the Board's construction of that phrase" and thus "does [not] broaden the scope of the original claim." D97 at 831, 722; FF73.

**[CL36]** Network-1's rewording of the PTAB's construction into proper claim language (removing the e.g.,) did not did not seek to change, or broaden, the scope of the claim, but rather sought to maintain the same scope while tweaking the language into proper claim language. FF74.

**[CL37]** Moreover, the re-wording of the PTAB's construction into proper claim language did not broaden its scope. FF75.

**[CL38]** HP has not demonstrated that, in the absence of Network-1's assertions about the scope of claim 21 (i.e., that it incorporates the PTAB's "low-level current" construction and is

not broader than claim 6), the Patent Office would have found claim 21 (or any other claim) unpatentable. FF76–77.

**[CL39]**     Because examiners perform an independent analysis and do not rely on Patent Owner's own assertions on claim scope, the Patent Office would have performed the same analysis and reached the same conclusion in the absence of Network-1's statement. Network-1's statement was therefore not material to patentability. FF78.

**[CL40]**     The examiners would have read Network-1's Amendment and Reply and the accompanying Knox declaration in their entirety. These documents both include an entire section discussing the PTAB's "low-level current" construction. D97 at 666–67, 741–743. These documents also reproduce the PTAB's construction word-for-word eight separate times, each time including the "sufficiently low" and "e.g. (approximately 20mA)" language. *Id.* at 658, 665, 666, 667, 738, 741, 742; Knox Tr. at 49:24–50:6. FF79–80.

**[CL41]**     HP has not met its burden of demonstrating that Network-1's assertions about the scope of claim 21 (i.e., that it incorporates the PTAB's "low-level current" construction and is therefore not broader than claim 6) caused the Patent Office to allow a claim that it otherwise would not have allowed because HP has failed to demonstrate that the Patent Office would have viewed Network-1's position as incorrect. FF81.

**[CL42]**     The Patent Office would have reasonably agreed with Network-1 that its construction of "low-level current" and the re-worded version of the construction in claim 21 have the same claim scope. Nework-1's paraphrased construction (1) removed the example current "(e.g., approximately 20mA)" and (2) changed "sufficiently low that it will not operate" to "insufficient to operate." HP has not proved that the Patent Office would have considered either change to affect claim scope. FF82–86.

**[CL43]**     Network-1's representatives had no intent to deceive the Patent Office.  The direct evidence and expert testimony proves that Network-1's representatives did not have any intent to deceive. Wieland Tr. at 82:12–20; Knox Tr. at 40:7–17; 5/15/18 Tr. (Horowitz) at 67:1–9.  FF87–90.

**[CL44]**     Because none of the requirements for this claim are met, HP's inequitable conduct claim as to the this alleged misrepresentation fails as a matter of law.

### E.  Alleged misrepresentation about Claim 23

**[CL45]**     HP alleges that Network-1's representatives falsely asserted that claim 23 was not broader than original claim 6, although the representatives knew that claim 23 eliminated "much of the 'providing' limitation of claim 6" and was therefore broader than claim 6.  Lead Case, Docket No. 650 at ¶ 55; Lead Case, Docket No. 1003 at ¶ 58; 5/15/18 Tr. (Neikirk) at 94:19–98:10.

**[CL46]**     The Court finds that HP has not proved any of the necessary requirements of inequitable conduct for this allegation—i.e., that Network-1's assertion was (a) a misrepresentation, (b) material to patentability in the reexam, and (c) made with specific intent to mislead or deceive the Patent Office.

**[CL47]**     The Court finds that HP has not proved that, under the broadest reasonable interpretation of the claim language, claim 23 is broader than claim 6.  HP has therefore not met its burden of demonstrating that Network-1's contrary assertion was a misrepresentation.  FF93–101.

**[CL48]**     Moreover, that the Court previously found claim 23 invalid as broader than claim 6 in the district court proceeding (Lead Case, Docket No. 860) is not relevant to the broadening analysis before the Patent Office because claims are interpreted differently before the Patent Office.  The Court's analysis of broadening did not determine the broadest reasonable

interpretation of the claims and then apply that interpretation. Unlike the Court's analysis, the Patent Office's analysis would necessarily have been based on the broadest reasonable interpretation of "providing." FF102.

[CL49]     HP has not demonstrated that, in the absence of Network-1's statement—that claim 23 was not broader than claim 6 because it included all of the limitations of claim 6—the Patent Office would have found claim 23 (or any other claim) unpatentable. Accordingly, the examiners would have performed the same analysis and reached the same conclusion in the absence of Network-1's statement. Network-1's statement was therefore not material to patentability. FF103.

[CL50]     HP has not presented any credible evidence that, at the time Network-1's representatives stated that claim 23 was not broader than claim 6, they believed the statement to be false. Accordingly, the Court finds that Network-1's representatives had no intent to deceive the Patent Office. FF104–105.

### F.  Alleged misrepresentation about Claim 22

[CL51]     In its pretrial submissions, HP alleged that Network-1 committed inequitable conduct by asserting to the Patent Office that new claim 22 is not broader than claim 6. Lead Case, Docket No. 650 at ¶ 55; Lead Case, Docket No. 1003 at ¶ 57. HP did not pursue this theory of inequitable conduct at trial. HP did not elicit any testimony on claim 22 from any witness, and its counsel never even mentioned claim 22. Moreover, the evidence demonstrates that Network-1's assertions were correct, not material to patentability, and made with no intent to deceive. Knox Tr. 54:4–11 ("If someone uses the apparatus of claim 22 . . . they [are] using the method of claim 6" and therefore "claim 22 was not broader than the original claims."). FF106.

### III.   CONCLUSION

Accordingly, for the reasons set forth above. The Court concludes that HP has failed to meet its burden to establish inequitable conduct by Network-1.

**So ORDERED and SIGNED this 29th day of August, 2018.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE